## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *Ex.* )
*Rel.* KENNETH JAMES JONES )
                     )
      Plaintiff )
                     )    Case No. 1:07-CV-11481-WGY
vs. )
                     )
BRIGHAM AND WOMEN'S )
HOSPITAL, MASSACHUSETTS )    **[JURY DEMAND]**
GENERAL HOSPITAL, MARILYN )
ALBERT, RONALD J. KILLIANY, )
and MARIE F. KIJEWSKI, )
                     )
      Defendants
_____

## FIRST AMENDED *QUI TAM* COMPLAINT

*Qui tam* plaintiff and relator Kenneth James Jones alleged:

### INTRODUCTION

1.  This is a *qui tam* action brought in the name of and on behalf of the United States government, to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §3729, for false and fraudulent statements made in applications for NIH Program Project Grants for research into Alzheimer's Disease.

### PARTIES

2.  The plaintiff in this action is the United States of America, on whose behalf and in whose name this action is brought.

3.  *Qui tam* plaintiff Kenneth James Jones ("relator") is a resident of Massachusetts and is *emeritus* professor of Human Rehabilitation on the John Stein Chair, Brandeis University.   Relator is an original source of the information upon which the allegations in the original complaint and this amended complaint is based.

4.  Defendant Brigham and Women's Hospital is, and was at all times mentioned herein, a body corporate under the laws of the Commonwealth of Massachusetts, and in that capacity, it may sue and be sued.  This defendant joined with other defendants and was the organization which signed off on and was otherwise responsible for the National

Institutes of Health grant applications that are the subject of this litigation.

5.   Defendant Massachusetts General Hospital is, and was at all times mentioned herein, a body corporate under the laws of the Commonwealth of Massachusetts, and in that capacity, it may sue and be sued.  Defendant Massachusetts General Hospital sometimes operates under the name "The General Hospital Corporation."   This defendant joined with other defendants and was the organization which signed off on and was otherwise responsible for the National Institutes of Health grant applications that are the subject of this litigation.

6.  Defendant Marilyn Albert is an individual who, at all relevant times herein, was Principal Investigator and Program Director on behalf of the institutional defendants for a project program grant application with the National Institutes of Health entitled "Age Related Changes in Cognition in Health and Disease" (hereinafter the "PPG").

7.   Defendant Ronald Killiany is an individual who, at all relevant times herein, worked on behalf of the institutional defendants for a project grant application with the National Institutes of Health entitled "Age Related Changes in Cognition in Health and Disease."   At the time defendants applied for funding of PPG's 2002-2007 cycle (in October 2001), defendant Killiany was a proposed project leader responsible for Magnetic Resonance Imaging, or "MRI."

8.  Defendant Marie Foley Kijewski, is an individual who, at all relevant times herein, was Principal Investigator and Program Director on behalf of the institutional defendants for a project grant application with the National Institutes of Health entitled "Physical Limits of Quantitative SPECT."

9.  At all times mentioned, all defendants and each of them, were agents, principals, employers and employees of all other defendants, and in doing the things hereinafter mentioned were acting within the course and scope of their authority as such agents, principals, employers and employees and with the consent and ratification of all other defendants.

## JURISDICTION AND VENUE

10.  Subject matter jurisdiction in the district court pursuant to 28 U.S.C. §1331 is based upon the federal questions arising under the False Claims Act, 32 U.S.C. §3729 *et. seq*.  Subject matter jurisdiction is not barred under §3730(e), as the allegations upon which this action is based were not publicly disclosed, as defined in the False Claims Act, and relator is an original source of the information.   This action was originally filed in the District of Columbia, and was transferred to this District voluntarily.  Venue is proper pursuant to 31 U.S.C. § 3732.

## BACKGROUND ALLEGATIONS

11.  Individual and institutional defendants engage in research in the medical sciences and, since the 1970's, have pursued research projects on age-related changes in cognition and the development of Alzheimer's Disease.   Alzheimer's Disease is a condition of the brain which leads to severe cognitive decline and early dementia. Scientists agree that the physiological causes of the disease – the development of neuritic plaques and neurofibrillary tangles – develop many years before the dementia can be diagnosed.  In the 1990's, defendants began to focus their research on the psychological and neuro-physiological changes that take place in individuals who convert from normal, aging brains to early Alzheimer's Disease.  In particular, defendants developed and maintained a research plan to study sufficient numbers of individuals over the course of many years, some of whom would age normally (a control group), and some of whom would ultimately be stricken with Alzheimer's Disease.   As a primary goal of the research, defendants proposed to apply statistical analysis to their accumulated data, and determine whether there were observable and measurable physiological changes in the brain that could "predict" individuals who would, years down the road, convert to Alzheimer's Disease.

12.  Since at least 1980, defendants have received federal funding for their Program Project from the National Institutes of Health (NIH), applying for grant funding every five years.  Although the federal government is a primary source of basic medical

research funds, NIH has limited financial resources available.  Strict dollar limits are therefore placed on the amount of money the government can award through grants, and all NIH grant applications are subjected to vigorous peer-review and ranking, based upon the evaluation of information provided to NIH in the grant application.

13.  Given the limited financial resources and the fact that even meritorious projects cannot be given high enough priority to receive funding, individuals and institutions which apply for NIH funds are required to supply the government with complete and honest information about the proposed research project.  Grant applicants are required to follow instructions issued by the Public Health Service of the Department of Health and Human Services.  Included in the information required to be disclosed are "broad, long-term objectives and what the specific research proposed in this application is intended to accomplish," "an account of the principal investigator/program director's preliminary studies pertinent to the application," and "potential difficulties and limitations of the proposed procedures and alternative approaches to achieve the aims."

14.  As part of the application process for NIH funding of the PPG, both the principal investigator and the research institution are, and at all relevant times were, required to certify the accuracy and completeness of the information provided.

15.  Under the heading "principal investigatory/program director assurance," the principal investigator – in the case of the 2002-2007 funding cycle, defendant Marilyn Albert – was required to state and did state:

> I certify that the statements herein are true, complete and accurate to the best of my knowledge.  I am aware that any false, fictitious, or fraudulent statement or claims may subject me to criminal, civil, or administrative penalties.  I agree to accept responsibility for the scientific conduct of the project and to provide the required progress reports if a grant is awarded.

16.  Under the heading "applicant organization certification and acceptance," the research institution – in the case of the 2002-2007 funding cycle, defendants Brigham and Women's Hospital and Massachusetts General Hospital – was required and did state:

I certify that the statements herein are true, complete and accurate to the best of my knowledge and accept the obligation to comply with Public Health Service terms and conditions if a grant is awarded as a result of this application.  I am aware that any false, fictitious or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties.

## GENERAL ALLEGATIONS

17.  During the 1997-2002 funding cycle, in approximately 2000, defendants reported internally and in scientific publications a significant scientific breakthrough in its PPG entitled "Age Related Changes in Cognition and Disease."  In particular, defendants claimed that they had identified a method of measuring physiological changes in one particular area of the brain – the entorhinal cortex – which was "excellent at discriminating controls from mild AD patients."  In other words, defendants claimed they had discovered a way to measure an area of the brain for objective indicia that were highly predictive of who would later develop Alzheimer's Disease.

18.  Reports of this scientific breakthrough were based on data that derived from manually drawn measurements of MRI scans by defendant Killiany.  As of 2000, defendant Killiany had been involved in the Program Project for many years, and had been disclosed to NIH during the 1997-2002 funding cycle as a co-investigator on the Image Analysis Core, with responsibility of providing manual drawings of regions of interest ("ROI") for study on a subset of MRI scans.  In the application for the 1997-2002 funding cycle, defendants had not sought federal funding for a separate MRI project, as the MRI data evaluated by the time of submission did not appear to be promising with respect to understanding the development of Alzheimer's Disease.  In 2000, however, new MRI measurements drawn by defendant Killiany formed the basis of reports by defendants that MRI scans, and in particular the area of the entorhinal cortex, were very useful in the study of early Alzheimer's Disease.  Defendants reported internally and in scientific publications that their measurements allowed one to discriminate controls (those who later did not develop Alzheimer's Disease) from individuals with early Alzheimer's

Disease (those who were not diagnosed with dementia at the time of the scan but who were shown to have later developed full blown Alzheimer's Disease).

19.   Relator and *qui tam* plaintiff Jones was a Core Leader (Core B) on the Program Project responsible for data management and statistical analysis.  Dr. Jones had performed such data management and statistical analysis for the past 35 years. Pursuant to his role with the PPG, relator Jones reviewed the data provided by defendant Killiany first hand, and applied the statistical modeling required for the Program Project.  In approximately January 2001, after reviewing and analyzing the MRI data, relator was suspicious of the validity of the data submitted by defendant Killiany, in that the level of accuracy (88%) in predicting the conversion to Alzheimer's Disease was too good to be true.  This prompted  relator to conduct his own investigation into the MRI data, by speaking with defendants Killiany and Albert about the data, reviewing paper and electronic records, and modeling the statistical values.  Through his own independent investigation, relator Jones discovered that defendant Killiany had knowingly and fraudulently altered the data so that they would fit with the conclusions he sought to establish.  In particular, defendant Killiany had redrawn certain MRI regions at issue (the entorhinal cortex) in some of the study individuals, with full knowledge of their later status in relation to Alzheimer's Disease.  He had manipulated the preliminary data about the neuro-physiological changes that were occurring in the individuals' brains, to produce a false and fraudulent report that the scientists could evaluate the physiological changes *a priori*, and predict who would develop Alzheimer's Disease in the years to come.

20.   Defendants, and each of them, were made aware of the facts gained through relator's investigation.  In meetings over the report of prior data and the preparation of future NIH grant application submissions, Jones specifically accused defendant Killiany of reporting false and fraudulent data, and made his accusations known to all defendants. Relator also demanded that defendant Albert, as the principal investigator and director of the Program Project grant on behalf of the institutional defendants, investigate the accuracy of defendant Killiany's reports and disavow any and all of the tainted data.

## NIH GRANT APPLICATIONS

21.  Subsequent to the discovery that defendant Killiany had reported false and fraudulent MRI data, defendants, and each of them, applied for and received federal funds in the form of Public Health Service grants.  In October 2001, defendants Albert and Massachusetts General Hospital signed a Grant Application entitled "Age-related changes of cognition in health and disease," seeking an award for total costs of $14,965,700 and covering the period of August 2002 through July 2007 (the 2002-2007 funding cycle).

22.  On the October 2001 grant application, defendants Albert and Massachusetts General Hospital certified their assurances that the information supplied was "true, complete and accurate," that they accepted the obligation to comply with Public Health Service terms and conditions, and that they acknowledged liability under federal law for false or fraudulent statements or claims.

23.  During the course of applying for and receiving NIH grants for the 2002-2007 funding cycle, defendants, and each of them, made or caused to be made statements and certifications in grant application forms, progress reports, vouchers, requests for progress payments and other writings necessary for the payment of federal funds.

24.  During the course of applying for and receiving the grant funds for the 2002-2007 funding cycle, and in the statements referenced in the preceding paragraph, defendants, and each of them, stated, reported, adopted, ratified, and relied upon (both expressly and implicitly) defendant Killiany's reported MRI data, with full knowledge of the false and fraudulent nature of those data and the significance of the information to the NIH grant process.

25.  In the NIH grant application for the 2002-2007 funding cycle, defendants made the false and fraudulent report of MRI data a centerpiece of their research plan. Disclosing their preliminary data as required by NIH instructions, defendants reported to NIH that the data represented a "major finding." Defendants relied upon that data to claim prior success, *i.e.*, in the study of individuals, they had been able to identify MRI measurements of regions of the brain that were "highly predictive" of which non-

demented individuals with memory problems will meet criteria for Alzheimer's Disease within a few years. These statements of false and fraudulent preliminary data infected the entire grant application, providing the basis for the proposed research involving psychological testing and statistical analysis, as well as future MRI and SPECT studies.

26.   On information and belief, defendants, and each of them, obtained additional grant funds from applications submitted to NIH based on the false and fraudulent data that had been manipulated by defendant Killiany. Defendants, and each of them, knew that NIH would rely on this data when ranking the proposals and when awarding federal grant funds. One example is the grant application signed by defendants Kijewski and Brigham and Women's Hospital in June 2001, entitled "Physical Limits of Quantitative SPECT," seeking an award for total costs of $2,878,060. Defendants have first hand knowledge of each and every grant application, progress report, request for progress payment or other form of claims against NIH funds, that defendants submitted to the government after January 2001 that refer to and rely on the fraudulent MRI data.

27.   On the basis of the false and fraudulent statements, defendants were awarded NIH grant funds. These funds were paid out and disbursed to defendants over time pursuant to the Public Health Service terms and conditions.

28.   At the time defendants made statements to NIH in support of their claim for federal grant funds as referred to herein, each of them knew that the data supplied and information stated was false and fraudulent. Further, defendants, and each of them, knew that the false and fraudulent reported data would influence and cause NIH to approve funding. In citing and relying upon the false and fraudulent data, defendants, and each of them, made the statements, failed to take corrective action and engaged in a fraudulent course of conduct with the intent to and in fact did mislead the government and NIH reviewers to fund the grant applications. Defendants, and each of them, acted with deliberate indifference and reckless disregard for the truth of the statements and information they  provided to NIH when seeking and accepting funding under the grants.

29.  Each false and fraudulent statement made to NIH in connection with the major findings of the MRI study data was material to the decision to award federal funds.  Each statement related to the provision of preliminary data and the basis for supporting the proposed research, and therefore was likely to impact upon NIH's funding decisions. Defendants knew that the false and fraudulent report of preliminary data would cause the applications to receive an artificially high priority raking, and intended to cause NIH to be more likely to award the grant.

30.  Had NIH known the truth – *i.e.,* that defendants had reported false and fraudulent MRI data as a major finding of the research – it would not and could not have approved of defendants' grant applications and would not have made progress payments throughout the course of the grants.

31.  As a proximate result of the false and fraudulent statements alleged herein, the United States government sustained direct and substantial monetary damages, in the amount of the federal funds paid out to defendants on the NIH grants referred to herein. Damages would include, at a minimum, the total costs of the two identified grants, in an amount exceeding $17.25 million.  Defendants' false statements and fraudulent conduct proximately resulted in additional damage, including depriving other proposed scientific research of scarce NIH funds, and misleading other scientists to obtain federal funds for MRI studies that otherwise would not have been pursued.

## CAUSE OF ACTION

32.  Relator and *qui tam* plaintiff re-alleges and incorporates herein by reference each and every allegations contained in paragraphs 1-31 of this complaint.

33.  By virtue of the statements and conduct described herein, defendants Brigham and Women's Hospital, Massachusetts General Hospital, Albert, Killiany and Kijewski knowingly made false and fraudulent claims for federal funds.  Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements in order to get a false and fraudulent claim paid.  Defendants, and each of them, knowingly failed to take corrective action or disavow the false and fraudulent data after learning that their

representations to NIH were false.  The actions and conduct described herein were in violation of the False Claims Act, 32 U.S.C. §3729.

34.   Unaware of the false and fraudulent nature of the reported data, the United States – in reliance on the accuracy thereof – awarded grants to defendants and was damaged thereby.  The amount of damages would include the total costs paid out and disbursed on NIH grants whose applications or requests for progress payments were supported by false or fraudulent preliminary data.   At a minimum, that would include actual damages on the two grants specifically identified herein in excess of $17.5 million.

## PRAYER FOR RELIEF

Wherefore, relator and *qui tam* plaintiff prays for judgment as follows:

1. Civil penalties of $11,000 for each violation of the False Claims Act;

2. Treble the amount of money damages to the government;

3. The maximum amount awardable to relator under 31 U.S.C. § 3730 (d);

4. Relator's reasonable expenses;

5. Relator's reasonable attorney's fees and costs; and

6. Such other further relief as the Court deems just and proper.

Dated: April 17, 2009                    Kohn, Kohn & Colapinto, LLP
                                         Hughes & Nunn, LLP
                                         Law Office of Jeremy L. Friedman


                              By:/s/Jeremy L. Friedman_____
                                  Jeremy L. Friedman


                              By:/s/David K. Colapinto_____
                                  David K. Colapinto

                                  Attorneys for *qui tam* plaintiff
                                  Kenneth James Jones

Michael D. Kohn (*Pro Hac Vice* Application pending)
David K. Colapinto (BBO No. 551835)
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984
Michael Kohn [mk@kkc.com]
David Colapinto [dc@kkc.com]

William D. Hughes (BBO No. 243860)
HUGHES & NUNN LLP
401 "B" Street, Suite 1250
San Diego, CA 92101
Phone: (619) 231-1661
Fax:    (619) 236-9271
William D. Hughes [whughes@HughesNunn.com]

Jeremy L. Friedman (*Pro Hac Vice* Application pending)
LAW OFFICE OF JEREMY L. FRIEDMAN
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
Jeremy L. Friedman [jlfried@comcast.net]

Attorneys for *qui tam* plaintiff and relator
Kenneth James Jones