UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                             )
UNITED STATES EX REL. KENNETH )
JAMES JONES                   )
                             )
              Plaintiff,     )
                             )
         v.                   )    CIVIL ACTION
                             )    NO. 07-11481-WGY
BRIGHAM AND WOMEN'S HOSPITAL, )
MASSACHUSETTS GENERAL HOSPITAL,)
MARILYN ALBERT, & RONALD      )
KILLIANY                      )
                             )
              Defendants.    )
_____)
```

MEMORANDUM

YOUNG, D.J.                                    November 10, 2010


I.   **INTRODUCTION**

     This case presents a plethora of interesting legal theories
in search of an evidentiary anchor.

     Dr. Kenneth James Jones ("Relator") filed a qui tam action
against the defendants Brigham and Women's Hospital,
Massachusetts General Hospital ("Mass. General"), Dr. Marilyn
Albert ("Dr. Albert"), and Dr. Ronald Killiany ("Dr. Killiany")
(collectively, the "Defendants") under the False Claims Act, 31
U.S.C. § 3729 (the "Act").  The case arises out of alleged false
statements contained in a Program Project Grant Application (the
"Application") to the National Institute on Aging (the "NIA"), an

organization under the National Institutes of Health ("NIH").

The Relator alleges that certain statements contained in the

Application are false because they are predicated on "falsified"

data.   The Relator claims that the Defendants falsely certified

that the Application was in compliance with all relevant statutes

and regulations.   Thus, the Relator contends that the Defendants

caused the government to fund the Grant in violation of the False

Claims Act by asserting false statements in the Application and

falsely certifying compliance with relevant statutes.   The

parties filed cross motions for summary judgment, which this

Court now addresses.

## II.  BACKGROUND

A.   Facts[1]

Alzheimer's Disease ("Alzheimer's") is a neurodegenerative

illness associated with aging.   Expert Report Andrew J. Saykin,

Psy. D., 5 ¶ 1, ECF No. 83-4 ("Saykin Rep.").   At the time of the

alleged violations, research was being done into early detection

of Alzheimer's through longitudinal studies of certain regions of

the brain.   The research aimed to characterize the early phase of

Alzheimer's disease and to differentiate it from changes related

to normal aging, thus enabling prediction of who will develop

Alzheimer's years before the individual displays diagnosable

---

[1] This recitation is drawn from evidentiary material that is
essentially undisputed.  Matters in dispute are clearly stated.
All inferences are drawn in favor of the Relator.

dementia.  Grant Application Excerpts 2, ECF Nos. 91-1; 83-9
("Application Excerpts").

The research at issue was conducted under a grant entitled
"Age-related changes of cognition in health disease" (the
"Grant"), which the NIA and the NIH first funded in 1980 and
continued to fund through 2007.  Dep. Marilyn Albert, Ph.D.
67:21-69:20; 82:2-5, ECF No. 83-8 ("Albert Dep.").  The
defendants, Drs. Albert and Killiany, along with the Relator,
were part of a team of scientists working for several decades on
the Grant, which consisted of four "Projects" and four "Cores."
The Projects were interrelated and comprised: Neuropsychological
assessment (Project 1), Single Photon Emission Computed
Tomography (SPECT) (Project 2), structural magnetic resonance
imaging (MRI) (Project 3), and functional magnetic resonance
imaging (fMRI) (Project 4).  Application Excerpts 2.  The Cores
provided support to the Projects and included: the Administrative
and Clinical Core (Core A), the Data Management and Statistical
Core (Core B), the Genetics Core (Core C), and the Neuropathology
Core (Core D).  Id.

The NIA systematically reviews submitted applications.  The
grant process requires institutions seeking funding to submit
applications to the Center for Scientific Review and the NIH; the
applications are then submitted to the NIA for funding
consideration.  Nat'l Inst. on Aging, Grant Process, available at

http://www.nia.nig.gob/GrantsAndTraining/GrantProcess/, ECF No. 83-6 ("Grant Process"). The NIH Grants Policy Statement shows the initial level of review is a peer-review conducted by a committee of experts in order to assess several factors. Some of the factors include the significance of the proposed study, the approach taken, innovation, whether the investigator is appropriately trained, and whether the environment where research will be conducted will likely contribute to the probability of success. NIH Grants Policy Statement 36-37 (March, 2001), ECF No. 83-7 ("Policy Statement").

Subsequently, the Scientific Review Administrator prepares a summary statement ("Pink Sheets") with peer reviewers' comments, including a summary of the strengths and weaknesses of the proposed project and a priority score. Policy Statement 37. If recommended for further consideration, the Pink Sheets are presented to the National Advisory Council on Aging for a second level of review. Id. The Director of the NIA has the authority to approve payment of applications reviewed favorably where primary weight is given to the perceived scientific quality of the application. Grant Process.

Dr. Albert served as the Principal Investigator and Program Director of the Grant. Application Excerpts 2. The Relator was the Core Leader of Core B, the Data Management and Statistical Core. Id. As the Core B Leader, the Relator's responsibilities

4

included supervising data management, reviewing project progress, carrying out complex analyses pertaining to individual projects, and developing new analytic approaches for the data set. Application Excerpts 149.  Dr. Mary Hyde ("Dr. Hyde") worked with the Relator as the Data Manager and Programmer for Core B.  Id. Dr. Hyde's responsibilities included communicating with Project Leaders, assisting Project Leaders with data entry, and reviewing the contents of data sets for accuracy and completeness.  Id.

Project 3, the structural MRI study, involved analysis of MRI images of certain regions of the brain.  In the mid-1990s, with the advent of advanced MRI techniques, a potential method of early detection of Alzheimer's evolved.  Saykin Rep. 7 ¶ 4. Measurements of the volumes of certain regions of interest ("ROIs") have been shown to be especially useful indicators.  Id. 7 ¶ 5.  Two regions of the brain, the entorhinal cortex ("EC") and the hippocampus have been shown to be indicators of the atrophy associated with Alzheimer's.  Id. 6 ¶ 3.  While MRI is a useful marker for degenerative changes in the brain, alone it is not a diagnostic for clinical Alzheimer's.  Id. 7 ¶ 6.

In Project 3, participants were observed for a period of years to track the progression of cognitive development in the prodromal phases of Alzheimer's.  Participants in the longitudinal study using MRI data were divided into three groups on the basis of their group status after several years of follow-

up: Controls (subjects who remained constant for three follow-up evaluations); Questionables (non-demented subjects with memory problems who did not progress to Alzheimer's); and Converters (non-demented subjects with memory problems who progressed and eventually were diagnosed with probable Alzheimer's). Application Excerpts 339.

Dr. Killiany was the Project Leader of Project 3, the structural MRI project. Id. 319, ECF No. 83-9. As such, he was responsible for using MRI scans to trace the boundaries of certain regions of the brain that interested the scientists, Id. 104, ECF No. 91-1; that is, he was the primary neuroanatomist tasked with tracing the boundaries of the entorhinal cortex and subsequently sending volumetric data to Dr. Hyde in the Statistical Core. Dep. Ronald J. Killiany, Ph.D. 98:10-25, ECF No. 83-12 ("Killiany Dep."). The ultimate objective of Project 3 was to determine whether structural MRI data could be used to predict which non-demented subjects with memory problems would decline into Alzheimer's. Application Excerpts 319, ECF No. 83-9.

The manual outlining of the boundaries of various regions of interest was done using a computer, a track-ball driven mouse, and a software program called "Neuroview." Killiany Answer Relator's First Set Interrogs., Answer 2, ECF No. 83-13. To trace the boundaries of the EC using the protocol developed by

Dr. Killiany and other members of the Grant, the operator would begin the outline of the region at the angle formed by the junction of the rhinal sulcus and the surface of the brain. The operator would then transect this angle, cutting across the gray matter to the level of the white matter. Next, the operator would follow the edge of the white matter to the inferior surface of the hippocampus. Finally, to complete the outline, the operator would trace the surface of the brain back to the starting point. R.J. Killiany, et al., Use of Structural Magnetic Resonance Imaging to Predict Who Will Get Alzheimer's Disease, 47 Annals of Neurology 430, 433 (2000), ECF No. 83-18 [hereinafter Killiany, Structural MRI].

The Relator alleges that Dr. Killiany falsified data pertaining to manually drawn boundaries of the EC, producing a second set of data in which the volumes of twelve subjects in the "normal" grouping were enlarged in order to make data statistically significant. Sec. Amend. Compl. ¶¶ 19-19.3, ECF No. 54. The Relator claims to have learned of this supposed second set of data through discussions with Dr. Keith Johnson, leader of Project 2, SPECT. Decl. of Kenneth Jones ¶ 9, ECF No. 86 ("Jones Decl."). This data, the Relator contends, enabled the Grant to claim that the EC was a region that could be used to predict conversion to Alzheimer's. Id. ¶ 10. In addition, the Relator claims that he compared Dr. Killiany's first and second

7

sets of data and performed an analysis which showed that the changes Dr. Killiany made were responsible for the statistical significance of the reported results.  Id.

The Relator reported his concern over a discrepancy in Dr. Killiany's two sets of data to Dr. Albert.  See id. ¶ 11; Albert Dep. 352:12-353:7.  In response to the Relator's concern, Dr. Albert initiated an inquiry, having Dr. Mark Moss ("Dr. Moss"), an eminent neuroanatomist, evaluate both sets of data from twenty-three of Dr. Killiany's measurements to determine their accuracy.  Albert Dep. 219:9-22, 221:20-223:5.  The Relator chose the twenty-three cases evaluated by Dr. Moss.  Jones Decl. ¶ 11.

B.   Relator's Allegations

In total, the Relator alleges four ways in which the Defendants violated the Act.  First, the Relator claims that the results generated by Dr. Killiany's altered MRI data served as the centerpiece of the Application, resulting in false representations to the NIA.[2]  Jones Mot. Summ. J. 8, ECF No. 85.

_____

[2] Throughout the Relator's complaint, the alleged false statements are never clearly established.  Despite claims sounding in fraud, he never articulated the false statements in the complaint.  In order to locate the alleged false statements, the Court has had to comb through the Relator's pleadings and motions.

Theoretically, the requirements of Federal Rule of Civil Procedure 9(b) ought earlier have forestalled this exhaustive excursion.  To understand why it was ultimately necessary, it is helpful briefly to rehearse the prior proceedings in this case.

The United States District Court for the District of Columbia transferred this case here on August 10, 2007.  On March 27, 2009, the Defendants moved to dismiss the Relator's original

To support this allegation, the Relator cites several statements made in the Application.  He claims that the Defendants stated they "achieved a 'major finding' that measures of the [EC] were 'highly predictive' for the course of prodromal AD."  Id.  The Application actually states:

> Our major finding is that measures of memory and executive function, or SPECT and MRI measures of brain regions related to these domains (such as the entorhinal cortex, the hippocampus, and the caudal portion of the anterior cingulate) are highly predictive of subsequent

---

Complaint because the Complaint: (1) failed to state a claim upon which relief might be granted (Fed. R. Civ. P. 12(b)(6)); (2) failed to plead fraud with particularity (Fed. R. Civ. P. 9(b)); and (3) failed to set forth concise, direct, short statements of the claim (Fed. R. Civ. P. 8(a)(2) & 8(d)(1)).  Defs. Mot. Dismiss Relator's Compl. 1, ECF No. 36.

On April 17, 2009, the Relator filed a First Amended Complaint, as was his right.  ECF No. 41.  This rendered the Motion to Dismiss moot as it had attacked the original complaint. On May 7, 2009, the Defendants filed a Motion to Dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 9(b) and 12(b)(6).  ECF No. 43.  On July 10, 2009, this Court dismissed the First Amended Complaint with leave to amend.  Subsequently, on October 5, 2009, the Relator filed a Second Amended Complaint.  ECF. No. 54.  The Defendants did not challenge the present case complaint as pled; instead they moved for Summary Judgment on September 7, 2010.  ECF. No. 80.

Is this the "modest" success of judicial supervision over case management of which Justice Souter complained in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 559 (2007)?  Compare the hammering out of a viable complaint through successive motions to dismiss in United States ex rel. Westmoreland v. Amgen, Inc., 707 F. Supp. 2d 123 (D. Mass. 2010) and No. 06-10972-WGY, 2010 WL 3622033 (D. Mass. Sept. 20, 2010).  Perhaps this is the more satisfying and cost efficient procedural approach.  Either way, this Court is satisfied that in both cases the proper legal framework has been applied to the merits.  The larger issues are masterfully explained in Arthur R. Miller, From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1 (2010).

development of dementia among non-demented individuals
with memory problems.

Application Excerpts 92.

The Relator also claims that the Defendants "stated
prediction of conversion to [Alzheimer's] as one of the primary
findings of the MRI data, with EC studies proving to be the most
'discriminating measurements.'"  Jones Mot. Summ. J. 8.  The
actual Application, however, says: "The most discriminating MRI
measures pertain to atrophy of the medial temporal lobe
(particularly the entorhinal cortex), and the volume of anterior
and posterior cingulate."  Application Excerpts 100.  Further,
the Relator claims that the Defendants wrote that they had
"identified a selected group of brain regions, primarily the EC,
which paralleled the neuropsychological changes during
preclinical [Alzheimer's]."  Jones Mot. Summ. J. 8.  But the
Application states:

> [A] selected group of brain regions develop
> neuropathology during preclinical [Alzheimer's] which, in
> turn, influence the cognitive deficits of the
> individuals.  Based on combined analyses of the data it
> appears that problems within a memory circuit (involving
> the entorhinal cortex and the hippocampus) are essential
> but not sufficient for a diagnosis of [Alzheimer's] . .
> . .

Application Excerpts 101.  These statements together account for
the allegedly false statements, predicated on "falsified" data,
which comprise the Relator's first claim.

Second, the Relator alleges the Defendants violated the Act

by falsely stating that Dr. Killiany followed blinded
methodologies when manually tracing the EC.   The Application
states in relevant part: "In order to prevent possible bias in
the drawing of the manually drawn regions, all operators are
blinded to the groupings of the subjects."  Application Excerpts
350.  The Relator admits, however, that he has no evidence that
Dr. Killiany had not followed proper, blinded methodologies when
retracing EC boundaries.  Dep. Kenneth J. Jones 164:14-19, ECF
No. 83-2 ("Jones Dep.").

The third basis for the Relator's claim is that the
Defendants violated the Act by making false representations that
they had conducted a reliability study on the underlying data.
Sec. Amend. Compl. ¶ 29.1.  Section D4.3 of the Application
states, "The procedures in place for generating the manually
drawn image maps have been demonstrated to have high reliability.
Inter-rater reliability for these ROIs ranges between r=0.94-
0.99."  Application Excerpts 350.  The Relator contends that the
reliability study represented in the Application was based on the
first set of data, not the second, "falsified" set of data.
Jones Decl. ¶ 10.

Contemporaneous emails show that Dr. Killiany submitted the
second set of data to Dr. Hyde for reliability testing.  Aff.
Lisa A. Tenerowicz, Exs. 9, 10, ECF Nos. 97-9, 97-10.   In
addition, Dr. Killiany testified that he had no knowledge of the

statistical significance of the MRI data nor what happened to the
EC tracings once the measurements were emailed to Dr. Hyde.
Killiany Dep. 60:7-61:1, 162:14-19.

The Relator also raises a fourth novel claim in his motion
for summary judgment that was not originally pled in his Second
Amended Complaint.  In the motion, the Relator claims that the
Defendants violated the Act by both expressly and impliedly
certifying compliance with the "Responsibilities of Awardee and
Applicant Institutions for Dealing with and Reporting Possible
Misconduct in Science" ("Responsibilities of Applicants"), 42
C.F.R. Part 50, Subpart A (2001) (replaced by 42 C.F.R. Part 93).

Additionally, the Relator filed a motion for sanctions for
spoliation of evidence on September 28, 2010, asserting yet
another theory of liability for violating 45 C.F.R. § 74.53, a
separate regulation regarding post-award requirements.

## III.  ANALYSIS

A.   Legal Standard

Summary judgment is proper where there exists no genuine
issue of material fact and where the moving party is entitled to
judgment as a matter of law based on the pleadings, depositions,
answers to interrogatories, admissions on file, and any
affidavits.  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855
(1st Cir. 2008).  The moving party bears the initial burden of
showing the district court the basis for its motion and

12

identifying where there exists a lack of any genuine issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  The burden of going forward then shifts to the nonmoving
party to show sufficient evidence to back up each element of each
claim.  See id. at 324.

Where the nonmoving party cannot show sufficient evidence to
establish an essential element of a claim, there can be no
genuine issue of material fact "since a complete failure of proof
concerning an essential element of the nonmoving party's case
necessarily renders all other facts immaterial."  Id. at 323.
Additionally, "[w]here the record taken as a whole could not lead
a rational trier of fact to find for the non-moving party, there
is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l
Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288 (1968)).
Finally, in determining whether summary judgment is appropriate,
all reasonable inferences must be drawn in favor of the non-
moving party.  Id. at 587.

B.   False Claims Act Theories

The False Claims Act creates civil liability for individuals
or entities that make false or fraudulent claims for payment to
the federal government.  See 31 U.S.C. § 3729(a).  An individual
violates the Act when he "knowingly presents, or causes to be
presented, a false or fraudulent claim for payment or approval"

13

to an officer or employee of the United States Government. 31
U.S.C. § 3729(a)(1)(A). An action may be filed by the Attorney
General or by a private individual, called a relator, as an
assignee of the government. 31 U.S.C. § 3730(a)-(b).

In order to state a claim under the Act, an individual must
allege that the defendant: "(1) knowingly presented or caused to
be presented, (2) a false claim, (3) to the United States
government, (4) knowing its falsity, (5) which was material, (6)
seeking payment from the federal treasury." United States ex
rel. Hutcheson v. Blackstone Med., Inc., 694 F. Supp. 2d 48, 61
(D. Mass. 2010). Here, the "false claim or statement,"
"materiality," and "knowingly" elements are at issue with respect
to the Relator's claims.

There are three theories under which a claim may be "false
or fraudulent" under the Act. These are: (1) factual falsity;[3]
(2) legal falsity under an express certification theory;[4] and (3)

---

[3] A claim is deemed "factually false" when "the goods or services
provided are either incorrectly described, or make claim for a
good or service never provided." Hutcheson, 694 F. Supp. 2d at
62 (citing United States ex rel. Mikes v. Straus, 274 F.3d 687,
697 (2d Cir. 2001)).

[4] A claim is legally false under an express certification theory
when the party making the claim expressly but falsely states that
it has complied with any precondition of payment. Hutcheson, 694
F. Supp. 2d at 62 (citing United States ex rel. Conner v. Salina
Reg'l Health Ctr, Inc., 543 F.3d 1211, 1217 (10th Cir. 2008)).

legal falsity under an implied certification theory.[5]  It was not
clear from the Second Amended Complaint or the Relator's summary
judgment memoranda upon which theory he relied.  At oral
argument, Relator's counsel clarified that the claims rest on all
three theories.  Thus, misrepresentations regarding the allegedly
falsified data, blinded methodologies, and reliability tests
arise under the factual falsity theory.  Alleged failure to
comply with the Responsibilities of Applicants grounds liability
under both the express and implied certification theories.
Finally, the alleged failure to comply with the Post-award
Requirements regulation appears to be grounded upon an implied
certification theory.

    C.   Application

        1.   Falsified Data

At oral argument, Relator's counsel devoted the majority of
his time to arguing that the evidence irrefutably showed that the
EC data was falsified.  The Relator, however, failed to
articulate how the supposedly false data relates to a false

---

[5] In Hutcheson, the Court recognized that a claim is legally
false under an implied certification theory when "a claimant
makes no express statement about compliance with a statute or
regulation, but by submitting a claim for payment implies that it
has complied with any preconditions to payment." Id. (citing
Conner, 543 F.3d at 1218).  In adopting this definition, the
Court restricted liability under an implied certification theory
to "compliance with expressly stated preconditions of payment
found in the relevant statute or regulations." Id. at 63 (citing
Mikes, 274 F.3d at 700).

statement in the Application.  There is no evidence suggesting that the EC data itself was submitted as part of the Application. At most, the Relator identified three statements in the Application which depended on the allegedly false data.[6]  Each of the statements identified by the Relator expresses a conclusion drawn from the data that the Relator alleges was falsified.  The difficulty with this claim is that the creation of the underlying data — the measurements of the entorhinal cortex — requires considerable scientific judgment.

At a minimum, "falsity" under the Act requires proof of an objective falsehood.  United States ex rel. Roby v. Boeing Co., 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) (citing Hagood v. Sonoma Cnty. Water Agency, 81 F.3d 1465, 1477-78 (9th Cir. 1996)).  "Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."  Id.; see also United States ex rel. Milam v. Regents of the Univ. of Cal., 912 F. Supp. 868, 886 (D. Md. 1995) (noting that "the legal process is not suited to

---

[6] The Relator contends that the Defendants made false representations regarding "major findings."  The allegedly false representations claimed a major finding that some regions of the brain, including the entorhinal cortex, are highly predictive of conversion to Alzheimer's.  Application Excerpts 92. Furthermore, the EC was identified, among others, as a particularly discriminating region.  Id. 100.  Finally, the Application also stated that the EC was among several brain regions that developed neuropathology during preclinical Alzheimer's.  Id. 101.

resolving scientific disputes or identifying scientific misconduct").

The Defendants assert that the central issue of the claim is the manual tracing of the EC.  Dr. Killiany, the Relator, and the experts for both parties have submitted affidavits averring that the manual tracing of the EC is a subjective process during which the exercise of scientific judgment is used at almost every step. Jones Dep. 157:5-12; Killiany Dep. 49:1-6; Saykin Rep. 16 ¶ 15. Moreover, there is agreement in the scientific community that the EC is a particularly difficult region to trace.  Saykin Rep. 13-16 ¶¶ 11-13; Expert Report Dr. Schuff 2, ECF Nos. 83-17; 91-6 ("Schuff Rep.").  The Application explicitly notes differing boundary definitions regarding certain regions of interest ("ROIs"), including the entorhinal cortex.  Application Excerpts 348-49.  After the boundary of the EC is manually drawn, a semi-automated computer program calculates the total intracranial volume of the EC.  Killiany, Structural MRI, at 432.  The manual tracing is used to calculate volumetric data, which is obtained objectively by a computer program.  The Relator himself admitted that drawing the boundaries of the EC is "subjective because it relies on the operator's knowledge of anatomy, knowledge of the boundaries, and eyesight, so it would require a good deal of practice and training [to trace ROIs]."  Jones Dep. 157:5-12.

17

Relator's counsel insisted at oral argument that this is not an issue of scientific dispute because the scientific dispute involves the decision as to which protocol to use; since the same protocol was used and the results were inconsistent, the second set must have been falsified or manipulated.  Moreover, he argued, because the volumetric data is derived objectively from boundaries traced using the same protocol, there is no scientific judgment at issue in this case.  Relator's counsel, however, glossed over the undisputed fact that tracing the EC is highly subjective and thus two scientists who use the same protocol manually to trace the EC may nevertheless obtain different results.  The parties both submitted expert reports to substantiate their positions as to whether Dr. Killiany's tracing of the EC was more accurate in the first or second set of data. Not surprisingly, the experts reached contrary conclusions.  See Saykin Rep. 14 ¶ 11; Schuff Rep. 4.

In this case, the disagreement over which set of data was more accurate cannot give rise to a "false" or "fraudulent" statement.  The record demonstrates that the act of tracing the boundaries of the EC is subjective and requires the exercise of scientific judgment.  Disagreements over these judgments are not the proper basis for a claim under the Act.  Luckey v. Baxter Healthcare Corp., 2 F. Supp. 2d 1034, 1047-48 (N.D. Ill. 1998) (holding that a dispute over the exercise of "scientific

18

judgment" is "insufficient to support an FCA action"); see also United States ex rel. Prevenslik v. Univ. of Wash., Civ.A. MJG-02-80, 2003 WL 23573424, at *4 (D. Md. June 20, 2003) ("[A] difference in the interpretation of research results and data with regard to a scientific phenomenon subject to a great debate within the scientific community is not an appropriate basis for an FCA claim.").

Furthermore, where experts disagree over the accuracy of Dr. Killiany's second set of data, such disagreement does not yield a resolution where one can state with reasonable certainty that one conclusion is true and the other false. Boisjoly v. Morton Thickol, Inc., 706 F. Supp. 795, 810 (D. Utah 1988) ("[T]he [certification] reflects an engineering judgment . . . . It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim."). Accordingly, this Court holds that the basis for the Relator's claim regarding falsified data is a scientific dispute over the accuracy of subjective measurements, and is thus insufficient to support a claim under the Act.

2.   Blinded Methodologies

The Relator contends that the Defendants made false statements representing that Dr. Killiany followed blinded methodologies when manually tracing the EC.  The Application states, in relevant part: "In order to prevent possible bias in

the drawing of the manually drawn regions, all operators are blinded to the groupings of the subjects . . . ." Application Excerpts 350.

Ample record evidence shows that Dr. Killiany was, in fact, blinded to the group status of the participants for which he re-traced the boundaries of the EC. Dr. Killiany was also blinded to the statistical significance of any data he produced. Furthermore, Dr. Killiany did not receive information concerning the data going to the statistical core, nor was he involved in the analysis of that data. Albert Dep. 275:20-276:3; Killiany Dep. 60:7-61:1, 162:14-19; Dep. Keith A. Johnson 114:1-116:11, 211:13-212:14, ECF No. 83-19 ("Johnson Dep."). Finally, the Relator himself admitted at his deposition that he has no evidence that Dr. Killiany was not following proper, blinded methodologies when retracing EC boundaries. Jones Dep. 164:14-19. There is no genuine issue of material fact as to this matter. The Relator has presented no evidence from which a reasonable finder of fact could conclude that Dr. Killiany was not blinded, so summary judgment for the Defendants on this issue is appropriate.

### 3.   Reliability Study

The Relator alleges that a statement in the Application regarding a reliability study was false because the reliability study analyzed the first set of data from the EC, while the

substance of the Application relied upon the second set of EC data.  He cites language in the Application, which says that "[t]he procedures in place for generating the manually drawn image maps have been demonstrated to have high reliability. Inter-rater reliability for these ROIs ranges between r=0.94-0.99 (Sandor et al., 1992; Killiany et al., 1993; Killiany et al., 2000)."  Application Excerpts 350.

The record largely is silent on the reliability study.  The only evidence of record comes from the Relator's declaration.  He states: "The initial MRI data was the data that had been subject to our reliability study, using blinded, experienced raters and producing a high coefficient of reproducibility."  Jones Decl. ¶ 10.  The Relator claims that when a reliability study is done using the second set of data, the Pearson Correlation coefficient drops from the reported 0.96 to 0.54.  Id. ¶ 21.  As the lead statistician for Core B, the Relator likely is qualified to provide expert testimony regarding a reliability study.  See Fed. R. Evid. 702.  It is not clear, however, that the Relator has put himself forth as an expert consistent with Rule 26(a)(2) of the Federal Rules of Civil Procedure.  His testimony is also bereft of sufficient information to evaluate the veracity of his opinion.  He did not cite evidence in the record that substantiates his claim that the reliability study was conducted on the initial set of data.  Nor does he explain how he knows

21

which study subjects were chosen for the reliability study.
Thus, the Relator provides no foundation upon which the Court may
accept his conclusion.

To the extent the Relator offers himself as a lay witness,
he does not provide sufficient competent evidence of his personal
knowledge.  See Fed. R. Evid. 601.  The Relator admitted in his
deposition that "almost a hundred percent" of the data he
received concerning Dr. Killiany's project came from Dr. Hyde.
Jones Dep. 96:19-97:5.  Furthermore, the Relator's affidavit
fails to establish personal knowledge because it contains no
evidence pertaining to critical issues surrounding the
reliability study; these issues include when and how the
reliability study was conducted, who randomly selected the
twenty-five subjects for the study, and who actually conducted
the study.  The chart provided by the Relator points to no
evidence concerning the actual selection of subjects for the
reliability study.  Whether testifying as an expert or as a lay
witness, the Court surmises that the Relator simply expects the
Court to accept his conclusions sola fide.  Without sufficient
foundation for his conclusions, the evidence provided by the
Relator in his declaration amounts only to hearsay.  See Fed. R.
Evid. 801(c).  Thus the Court need not give any weight to the
representations provided in the Relator's declaration pertaining
to the reliability study.

The Relator also fails to satisfy the materiality element
with respect to the statements concerning the reliability study.
He relies on the testimonies of Dr. Schuff and Dr. Dávila-García
in attempt to establish that the reliability study was material
to NIH's decision to fund the Grant.  In his report, Dr. Schuff
notes that "the statements indicate in my opinion that the issue
of reliability and objectivity of the measurements, specifically
with respect to the [EC], were material to the reviewer's
judgment on the feasibility and scientific merit of study."
Schuff Rep. 6.  Dr. Schuff, however, is not qualified to testify
regarding the materiality of statements to the NIH's decision to
fund the Grant because he is not an expert in that area.  See
Fed. R. Evid. 702.

Rule 26 of the Federal Rules of Civil Procedure requires
that any witness intended to provide expert testimony must submit
a written report which includes his or her qualifications as an
expert.  Fed R. Civ. P. 26(a)(2)(B)(iv).  In his report, Dr.
Schuff lists his qualifications as a professor of radiology in
the Department of Radiology and Biomedical Imaging at the
University of California in San Francisco, an investigator at the
VA Medical Center, a lead physicist at the Center for Imaging of
Neurodegenerative Diseases at the VA Medical Center, and a
researcher focusing on the development of new MRI methods and
concepts to identify markers of neurodegenerative diseases,

including Alzheimer's.  Schuff Rep. 1.  Dr. Schuff does not,
however, list any qualifications regarding the NIH application
review process or the peer editing process, and he cannot testify
as to the materiality of a statement regarding the NIH review
process. [7]

Dr. Dávila-García appears qualified to opine on the matter.
See Decl. Martha Isabel Dávila-García, Ph.D., ¶ 4, ECF No. 84
("Dávila-García Decl.").  Her declaration does support the claim
that the reliability study was material to NIH's decision to fund
the Grant.  Dr. Dávila-García states that "[r]eviewers would not
provide priority scores for an application that relied upon
falsified preliminary data, that had made false statements about
methodologies followed or that failed to disclose allegations of
scientific misconduct on any one grant proposal."  Id. ¶ 10.
Furthermore, Dr. Dávila-García refers to the statement in the
application about the Pearson Coefficient and states that its
inclusion was "required" in the Application and "fundamental to
the peer review ranking of the application."  Id. ¶ 12.

Federal Rule of Evidence 702, however, requires that the
opinions provided in expert testimony be supported by sufficient
facts or data.  Fed. R. Evid. 702.  Although Dr. Dávila-García

---

[7] At oral argument, Relator's counsel adamantly argued that Dr.
Schuff was more than qualified to testify about matters
concerning the NIH review process, but did not provide any
examples of past experience that would so qualify him.

claims that the reliability study was material, she does not
support her opinion with any evidence from the record.  See Advo,
Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir.
1995) (indicating expert testimony without factual foundation
cannot defeat a motion for summary judgment); see also Virgin
Atl. Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571, 579
(S.D.N.Y. 1999) ("[A]n expert's opinion is not a substitute for a
plaintiff's obligation to provide evidence of facts that support
the applicability of the expert's opinion to the case.").

    Dr. Dávila-García opines that the reliability analysis was
material because it was a required element of the application.
She does not, however, provide any support for this statement
from a statute, regulation, instruction manual, or even personal
experience.  Moreover, Dr. Dávila-García fails to cite any of the
reviewers' comments from the Pink Sheets regarding the strengths
and weaknesses of the Application.  Her opinion is thus
completely without corroborating evidentiary support.  In fact,
the Defendants aptly note that the record actually contradicts
her contention that the reliability study was material to the
NIH's decision to fund the Grant.  There is only one mention of
the reliability study in the Pink Sheets: "[T]he use of Pearson
correlation coefficients and Student t-tests to assess
reliability, as proposed, is inadequate."  Pink Sheets 32, ECF

No. 83-22.  Thus, the expert testimony of Dr. Dávila-García is not properly supported by relevant facts from the record.

In addition, the Relator has not established the knowledge element of the claim.  As discussed above, the record is silent as to whether the reliability study was conducted on the second set of data and whether the reference to the Pearson Coefficient related to the first or second set of data.  Beyond this, there is no evidence whatsoever on the record that any of the Defendants knew that the statement regarding the Pearson Coefficient was inaccurate.

The Court holds that the Relator has failed to establish the falsity or materiality of the statement regarding the reliability study in the Application or that any of the Defendants had any knowledge of any inaccuracy.  Therefore, the Court awards summary judgment to the Defendants regarding this claim.

4. Responsibilities of the Applicant: 42 C.F.R. Part 50, Subpart A

a. Express Certification

In his motion for summary judgment, the Relator alleges that the Defendants violated the Act by expressly certifying in the Application that they "accepted the obligation to comply with Public Health Service terms and conditions if a grant is awarded as a result of this application."  Application Excerpts, Face Page.  The Application contains two acceptances, one signed by

26

the Principal Investigator, Dr. Albert, and one signed by the

organization, Mass. General; these constitute the express

certifications.  The Principal Investigator's Acceptance states:

> I certify that the statements herein are true, complete
> and accurate to the best of my knowledge.  I am aware
> that any false, fictitious, or fraudulent statements or
> claims may subject me to criminal, civil, or
> administrative penalties.  I agree to accept
> responsibility for the scientific conduct of the
> project and to provide the required progress reports if
> a grant is awarded as a result of this application.

Id.  This statement was signed by Dr. Albert on October 1, 2001.

On the same day, Marcia L. Smith signed the "Applicant

Organization Certification and Acceptance" on behalf of Mass.

General.  The Organization's Acceptance states:

> I certify that the statements herein are true, complete
> and accurate to the best of my knowledge, and accept
> the obligation to comply with Public Health Service
> terms and conditions if a grant is awarded as a result
> of this application.  I am aware that any false,
> fictitious, or fraudulent statements or claims may
> subject me to criminal, civil, or administrative
> penalties.

Id.

The Relator contends that these statements were false

because the Defendants were not in compliance with 42 C.F.R. Part

50, a regulation concerning the responsibilities of applicant

institutions in connection with allegations of misconduct

involving the funding.[8]  Subpart A of the regulation stipulated that the responsibilities of the applicant institution are such that it shall "submit, along with its annual assurance, such aggregate information on allegations, inquiries, and investigations as the Secretary may prescribe."  42 C.F.R. § 50.103(b)(2)(2001).

 Additionally, Section 50.103(d)(1) required that "[a] written report shall be prepared that states what evidence was reviewed, summarizes relevant interviews, and includes the conclusions of the inquiry."  42 C.F.R. § 50.103(d)(1)(2001). The Relator asserts that because Dr. Albert did not report any investigation in connection with the allegations of scientific misconduct reported by the Relator, the Defendants accepted funding in violation of the Responsibilities of Applicants; therefore, noncompliance with this regulation at the time of submission of the Application violated the Act.

 The Relator's theory of express certification relies on the "Applicant Organization Certification and Acceptance."  See Application Excerpts, Face Page.  The acceptance states that the obligation to comply with Public Health Services terms and conditions is contingent upon receipt of funding.  Compliance,

---

[8] In May of 2005, a final rule removed 42 C.F.R. Part 50 and replaced it with a more comprehensive regulation entitled, "Public Health Service Policies on Research Misconduct."  70 Fed. Reg. 28370 (May 17, 2005)(codified at 42 C.F.R. Part 93).

therefore, is forward-looking.  Specifically, compliance would
begin in July 2002 (when the funding began) and not in October of
2001 (when the Application was submitted).  Because the conduct
at issue occurred in 2001, prior to the Application's submission,
the Relator theoretically could argue that the Defendants are in
violation of past grant applications, assuming such applications
contained similar language.  The Relator does not introduce any
evidence of application certifications from the 1997-2002 funding
cycle, and therefore, provides no evidence that the regulation
was applicable.

Furthermore, the certification at issue is too vague to
support a claim under an express certification theory.  Where an
express certification claim relies on failure to comply with a
statute, regulation, or some other process, the certification
language must explicitly require compliance with that specific
statute, regulation, or process.  See Hutcheson, 694 F. Supp. 2d
48 at 66 n.13 (holding that providers expressly certified
compliance with the Anti-Kickback Statute by signing a
certification that specifically referred to that statute).  This
Court has previously ruled that vague certifications, such as the
one at issue here, are inadequate for express certification
claims.  United States ex rel. Westmoreland v. Amgen, Inc., 707
F. Supp. 2d 123, 136-37 (D. Mass. 2010) (holding that "broad
language requiring compliance with 'all applicable state and

federal laws' is insufficient to constitute an express
certification of compliance with [a specific statute]."); see
also Hutcheson, 694 F. Supp. 2d at 66 n.13 ("The actual
certification in the Hospital Cost Report is not specific enough
to create False Claims Act liability for failure to comply with
the Anti-Kickback Statute, as it refers broadly to 'such laws and
regulations.'").  Because the certification is forward-looking
and overly broad, there is no liability under an express
certification theory.

b.  Implied Certification

The Relator insists that if the Court does not hold the
Defendants in violation of the Act under an express certification
theory, then the Defendants must be found liable under a theory
of implied certification for falsely certifying compliance with
the Responsibilities of Applicants.

As explained above, allegations regarding the
Responsibilities of Applicants regulation were raised for the
first time in the Relator's summary judgment motion.  While the
Second Amended Complaint referenced an express certification
theory for false statements, no mention of an implied
certification theory of liability was made until the Relator
filed his motion for summary judgment on September 15, 2010.  The
claim under an implied certification theory is based on
allegations that the Defendants did not follow an investigating

30

procedure under the Responsibilities of Applicants, whereas the original claims in the Second Amended Complaint were based on allegations of falsified data and submissions of false statements predicated on that data.  While related, the factual record for these new claims would be substantially different.

Furthermore, the Relator makes new allegations in 2010 regarding conduct that may have occurred in 2001.  The Relator's original Complaint was filed on June 14, 2006, just within the six year statute of limitations period for a claim under the False Claims Act.  31 U.S.C. § 3731(b)(1).  To allow the Relator effectively to amend his complaint almost four years later to include an allegation dependant on different evidence would be unduly prejudicidal to the Defendants.

Moreover, even if the Court allowed this claim to go forward, it would not survive summary judgment.  In Hutcheson, the Court observed that a claim may be legally false when "a claimant makes no express statement about compliance with a statute or regulation, but by submitting a claim for payment implies that it has complied with any preconditions to payment." Hutcheson 694 F. Supp. 2d at 62.  Arguably, as recipients of NIH funding in the past, see Albert Dep. 67:21-69:20, the Defendants should have been aware of any regulations with which they were required to comply as a prerequisite for payment of funds.  Per

<u>Hutcheson</u>'s requirement that the regulation explicitly state compliance as a precondition for payment, this regulation states: "An institution's failure to comply with its assurances and requirements of this subpart may result in enforcement action against the institution, including loss of funding . . . ."  42 C.F.R. § 50.105 (2001).

According to the regulation, once scientific misconduct is suspected or alleged, an applicant institution must take "immediate and appropriate action."  42 C.F.R. § 50.103(c)(3)(2001).  An inquiry into any allegation of scientific misconduct must be completed within sixty calendar days; "[a] written report shall be prepared that states what evidence was reviewed, summarizes relevant interviews, and includes the conclusions of the inquiry."  <u>Id.</u> § 50.103(d)(1).  The regulation further stipulates that the Director of the Office of Scientific Integrity shall be notified only when "on the basis of the initial inquiry, the institution determines that an investigation is warranted."  <u>Id.</u> § 50.103(d)(4); <u>see also</u> <u>id.</u> § 50.104(a)(1).  Finally, the regulation demands secure maintenance of sufficiently detailed documentation of inquiries for at least three years after the inquiry's termination.  <u>Id.</u> § 50.103(d)(6).

According to the Relator, he first made Dr. Albert aware of his concerns about the data on March 15, 2001.  Jones Decl. ¶ 11.

32

Notably, the Relator did not accuse Dr. Killiany of scientific
misconduct; rather, he voiced concern that there was a
discrepancy between the two sets of data that he could not
resolve and that it was a serious matter requiring action.  Jones
Dep. 238:14-239:10.

At that point, the Relator suggested Dr. Albert secure an
independent evaluation of the circumstances leading up to the
second set of data.  He then provided Dr. Albert with a list of
twenty-three cases that he believed to be suspect.  Jones Decl. ¶
11.  Dr. Albert engaged Dr. Moss to re-evaluate the data.  Id. ¶
12.  Thus, it is undisputed that an inquiry was performed
regarding the discrepancy between the two sets of data.[9]  The
only evidence available regarding the next steps taken is
testimonial; documentary evidence no longer exists.  Dr. Johnson
was satisfied with the results of the inquiry.  Johnson Dep.
198:4-22, 205:24-206:6.  Dr. Albert, also satisfied with Dr.
Moss's evaluation, considered the issue resolved because it was
no longer discussed.  Albert Dep. 233:6-234:1, 363:7-16.  The
Relator did not produce any objective evidence which would

---

[9] The Relator introduced his declaration and an expert
declaration suggesting that the inquiry was inadequate because it
was not done by an independent evaluator.  Neither declaration
identifies any part of the regulation that requires the inquiry
be done by an outside, independent evaluator.  That the Relator
was not satisfied with the person chosen by the Principal
Investigator to conduct the inquiry is of no consequence to this
Court because it is not supported by a requirement in the
regulation.

suggest that a formal investigation was warranted beyond the
initial inquiry.  The record does not contain sufficient evidence
to show that the Defendants failed to comply with the
Responsibilities of Applicants; therefore this claim does not
survive summary judgment.

     5.   Motion for Sanctions for Spoliation of Evidence

On September 28, 2010, the Relator filed a motion for
sanctions for spoliation of evidence against Mass. General for
"destroying essential documents and critical evidence" pertaining
to the inquiry into the revision of the EC data.  Memo L. Supp.
Relator's Mot. Sanctions Spoliation Evid. 2, ECF No. 100.  The
Responsibilities of Applicants requires the retention of
documents related to inquiries for only three years, thus Mass.
General legally could have disposed of any such documents in
2004.

The Relator argues that Mass. General violated yet another
regulation by failing to maintain its records through 2010.  The
regulation, "Post-award Requirements," pertaining to the
retention and access requirements for records, states in relevant
part: "Financial records, supporting documents, statistical
records, and all other records pertinent to an award shall be
retained for a period of three years from the date of the final .
. . submission of the . . . annual financial report."  45 C.F.R.

34

§ 74.53(b).  The regulation further stipulates that if litigation begins prior to the expiration of the three-year period, "records shall be retained until all litigation, claims or audit findings involving the records have been resolved and final action taken." 45 C.F.R. § 74.53(b)(1).

Again, compliance with the Post-award Requirements regulation is forward-looking.  Because the alleged violations of the Responsibilities of Applicants regulation took place in 2001 and the Grant was not funded until 2002, the Post-award Requirements do not apply to the inquiry.[10]  The conduct at issue occurred within the 1997-2002 funding cycle.  Accordingly, Mass. General was required to retain records from that funding cycle until 2005.  Since the three-year retention period had expired by 2007, when the original suit was brought, there is no basis for sanctions for spoliation of evidence.

---

[10] In the Relator's motion for sanctions for spoliation of evidence, he contends the Defendants violated two regulations, both the Responsibilities of Applicants and the Post-award Requirements, under an express certification theory based on the Acceptance signed by Mass. General in the 2001 Grant application which broadly covered the entire application.  Again, under Amgen, this express certification is too vague to create liability on behalf of the signatory.  See Amgen, 707 F. Supp. 2d at 136-37.

**IV.   CONCLUSION**

Accordingly, on October 6, 2010, the Defendants' motion for summary judgment [ECF No. 80] was GRANTED, the Relator's motion for summary judgment [ECF No. 85] was DENIED, and judgment entered for the Defendants on the same day.  Relator's motion for sanctions [ECF No. 100] was also denied.


/s/ William G. Young
_____
WILLIAM G. YOUNG
DISTRICT JUDGE