**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                        )
UNITED STATES OF AMERICA, *ex rel.*     )
KENNETH JAMES JONES, Ed.D.,             )
                                        )
           Plaintiff,                   )
                                        )
v.                                      )   Civil No. 1:07-CV-11481-WGY
                                        )
BRIGHAM AND WOMEN'S HOSPITAL, *et al.*, )
                                        )
           Defendants.                  )
_____)

## JOINT PRETRIAL MEMORANDUM

Pursuant to Local Rules 16.5(d), the parties hereby submit the following Joint Pretrial

Memorandum in this case.

### I.    Concise Summary of the Evidence

#### A.    Relator's Statement

This is a *qui tam* action pursuant to the False Claims Act, 31 U.S.C. §3729, against

two related Harvard research institutions – Massachusetts General Hospital and Brigham

and Women's Hospital – and two individual scientists – neuroanatomist Ronald Killiany

and principal investigator Marilyn Albert. It is brought in the name of, and on behalf of,

the United States, by relator Kenneth Jones, who was the Core Leader responsible for

statistical analysis for the Program Project Grant (PPG) at issue in the litigation. Jones

filed his *qui tam* action after Killiany falsely and fraudulently created a second-set of MRI data

which altered the reportable results of research the defendants knowingly used to obtain scarce

Alzheimer's Disease research funding from NIH that would not have been awarded had the

falsity of the data been known to NIH.

Following the First Circuit opinion on relator's appeal in this case, the few remaining factual issues for the jury are narrowly focused, as the appellate court resolved several disputes over principles of law and admission of key evidence.  First, defendant Killiany and the institutional defendants are liable for any knowing falsities or fraudulent conduct in the NIH Grant Application, whether or not defendant Albert is also liable.  Second, the First Circuit opinion makes clear that if Killiany knowingly altered a portion of the MRI data, in departure from stated methodology, and falsely report that the scientists had achieved certain results, the NIH grant application contains false and fraudulent statements.

Thus, the three remaining ultimate fact questions for the jury are:

1.  Whether defendant Killiany knowingly altered a portion of the MRI data, in departure from stated methodology, resulting in the false reporting of scientific results and false reporting of the existence of reliable methodologies,

2.  Whether the reporting of scientific results and the existence of reliable methodologies while concealing the existence of altered data and changed methodologies were material to NIH's decision to fund the Program Project Grant; and

3.  Whether defendant Albert knew of the false statements in the NIH grant application, or acted with reckless disregard for the truth.

**1.      Did Killiany Knowingly Alter Data in Departure from Stated Methodologies in Order to Falsely Report Research Results?**

There is no dispute that Killiany knowingly altered the MRI research data, creating a second set of drawings with re-measuring of the entorhinal cortex (EC) for some, but not all, of the study subjects.  While negligible changes were made to a few "questionable" and "converter"

group subjects, all of the significant changes – all in the same direction – were made only to the normal subjects with the smallest EC volumes.  The alterations Killiany made to these normal subjects were responsible for the results reported in the grant application.  Before the alterations were made, the MRI data did not support Killiany's hypothesis, and the MRI project was being written out of the 5-year funding cycles. After the alterations, the MRI project claimed a major breakthrough – that measurement of EC volumes provided the scientists with the ability to predict who would develop Alzheimer's Disease (AD) – "convert" to AD –within 3 years. Killiany's work then became front-and-center in the PPG.

Relator's evidence on this key factual issue includes overwhelming percipient and expert testimony which establishes Killiany knowingly departing from the stated protocol and manipulated the data to falsely report scientific results that would be used to obtain a government grant. After the First Circuit mandate, defendants will be unable to assert any defenses on this key point, leaving only Killiany's unsupported denial for the jury to ponder in determining defendants' liability for false claims.

### a. Statistics.

Relator Jones is an expert statistician, disclosed as a testifying expert. In addition, Richard Goldstein (substituting for previously disclosed expert Daniel Teitelbaum) will testify as a retained statistician. Both witnesses will establish, without contradiction by any defense witness, that Killiany's initial MRI measurements did not produce meaningful scientific results; that the alterations Killiany made to his tracing are solely responsible for scientific findings reported in the PPG.  Additionally, the testimony of the retained statistician and Dr. Jones will establish that before Killiany's tracings of the EC could be cited to in the PPG grant application they had to undergo a reliability study; that the reliability study used Killiany's

original tracings and that when Killiany's altered tracings are substituted into the reliability study the reliability study results prove to a scientific certainty that Killian's altered measurements are unreliable. Using the altered data, consistency shown in the reliability studies is lost, with the Pearson Correlation dropping from a "very high" mark of 0.96 to a low, unreportable value of 0.54. The 0.54 Pearson Correlation rendered the data generated by Killiany's second set of tracings unreliable to the point of having lost all scientific significance.  Defendants offer no evidence or testimony from any statistical expert to contradict relator's proof of falsity in defendants' claims of reliability.

### b.  Cherry-picking.

Relator's table shows Killiany cherry-picked the normals with the smallest EC volumes, and altered them so each moved to the end of the spectrum with the largest EC volumes. Both sets of columns represent a ranking of study subjects according to the volumetric size of the EC. On the left are the initial data and on the right are the altered data. In initial measurements, the normals (marked in red) were scattered throughout the order of study subjects, including some distributed among the smallest EC volumes.  Initially, normal EC measurements ranked in terms of smallest as Nos. 3, 9, 15, 16, 25, 28, 36, 38, 43, 55 and 73 (out of 103). After Killiany's alterations, normals with the smallest EC measurements were changed to rank among the largest, at Nos. 70, 75, 77, 83, 95, 96, 98, 99, 101, 102 and 103. As can be readily seen from Relator's Table, all of the red-coded Normals are grouped below the mean after the alterations, filling out the bottom part of the chart. The magnitude of the increased volumes range between 22% and 238%, with the smallest six original measures being increased between 109% to 238%.  The statistical probability of all of the measurements that were increased by more than 50% occurring naturally

is only 0.00000003 strongly implying that these changes were the result of deliberate intervention by Killiany.

Again, defendants have not raised or disclosed any evidence to refute Relator's Table or the source data from which it is derived.

### c. Departure from protocol.

Killiany altered the protocol of how the boundaries of the EC were to be measured without reporting this alteration to anyone.  Killiany testified at his deposition that he decided to alter some – but not all – of the EC drawings after he came upon an anatomical "anomaly." Defendants never explained this anomaly, and they disclosed no expert who will testify that Killiany kept to his protocol. In contrast, relator retained and disclosed a preeminent expert on MRI measurements of EC boundaries – Norbert Schuff, Ph.D. Schuff reviewed the initial, altered and unchanged drawings of EC boundaries on the study subjects, and testified there were no major errors in the initial drawings and no scientific reason for the highly selective revisions by Killiany "[o]ther than to exaggerate group differences with false data, no explanation exists for the selective re-measurements."

Schuff also testified – without contradiction – that Killiany's alteration of the data after the conduct of the reliability studies was a departure from stated protocols.

> Killiany's second set of measurements were made after the investigators' protocol had been shown to be reliable. The altered measurements were inconsistent with natural variations between raters, as established by the investigators' reported reliability study. Those inconsistencies represent a departure from the stated protocols that had been shown to be reliable.

Defendants admit that Killiany did "modify the operational definition" for the EC drawings subsequent to the reliability study, purportedly to make them more "consistent." In science, however, one re-evaluates prior tracings when reliability studies show them to

be inconsistent. One does not modify operational definitions after a reliability study has

been concluded without conducting additional subsequent measures to ensure reliability:

> After refinements, standard scientific practice would require that the
> investigator determine whether they are still consistent with the established
> protocol, or whether – as is the case here – they are systematically different.
> Without re-assessment of consistency, results from the revised data cannot
> be assumed to be interpretable. Investigators first must ensure consistency
> between the re-measurements and the original protocol for tracing.
> Standard practice would have another experienced rater inspect all the
> measurements, including those that were altered, and those that were not,
> and come to a consensus about the consistency of the markings. If it
> appears that the re-measurements lead to systematic deviations from the
> original protocol, standard scientific practice is to re-evaluate rater reliability.

Again, none of this testimony was refuted by defendants or their experts.

### d.  Obvious Failure to Follow Scientific Procedure

It was obvious to Jones, as it would be to any other person knowledgeable of the

scientific process, that it was wrong for Killiany to create a second set of data without

disclosing the alterations to anyone. Jones stumbled upon the second set of data along

with co-investigator Keith Johnson, and both understood the significance of Killiany's

conduct when they approached Albert as the Principle Investigator (PI) over the PPG. At her

deposition, Albert acknowledged that she understood Jones to have alleged that Killiany

knowingly altered the data to exaggerate group differences, making the basis for the PPG and the

grant application a "lie."

Killiany not only failed to tell anyone about what he was doing when he altered the data,

he failed to produce any record of his alterations or the reasons for making them. Indeed, if he

had in fact modified his protocol to overcome some "anomaly" in the method and manner in

which the EC drawings should be captured, and that modification alone accounted for his

reported scientific breakthrough, it would have incumbent upon Killiany to make those facts

known to the PI and this information would have to be reported to the NIH as part of the PPG

grant application.  Killiany knew what he was doing and kept it secret because he knew what he

was doing was wrong.

> **2.     Were Defendants' Statements about Past Research Results and Use of Reliable Methodologies Material to NIH Decision to Fund the PPG?**

Relator must establish that the statements in the grant application were "material"

to the government's funding decision, *i.e.*, whether they have "a natural tendency to

influence or were capable of influencing" the decision to award grant funds. In light of

the First Circuit decision, as well as uncontradicted testimony, relator will establish this

fact before the jury. At 43-44, the First Circuit held that the notion Killiany had been

unblinded and had selectively manipulated the data "would certainly have a natural

tendency to influence the reviewers' evaluations." The court (at 45, 46) also held it was

error to exclude the testimony of Schuff and Martha Davila Garcia, both of whom have opined

without contradiction that the statements made by defendants were essential, let alone material,

to the NIH funding decision. And the First Circuit rejected defendants' arguments on materiality

as a matter of law (at 48).  Davila-Garcia will explain that the NIH review process required the

defendants to state in the PPG grant application that its "major finding" had been generated

based on a scientific protocol, which verified the reliability of Killiany's EC measurements.

Davila-Garcia will also explain that the PPG grant application reviewers had to be told that a

concern had been raised about the reliability of Killiany's measurements.  She will establish that

Jones' allegations implied scientific misconduct that struck at a central pillar of the grant

proposal, i.e., whether Killiany had manipulated the second set of EC measurements to prove the

study hypothesis.  She will establish that the defendants were required to comply with NIH

requirements to determine whether scientific misconduct had occurred and that Dr. Albert failed

to do so.   She will opine that it was particularly inappropriate for Albert to have avoided

independent review of Killiany's second set of measurements and that Albert understood that the

grant would not have been awarded had the truth behind Killiany's second set of measurements

been revealed.

**3.     Did Albert Know Killiany Departed from the Stated, Reliable Protocols or Act with Reckless Disregard for the Truth of Falsity of That Fact?**

For Albert to be found individually liable, relator must establish she knew Killiany

departed from stated protocols, or otherwise acted with reckless disregard for the truth of

statements made in the grant application. On this issue, relator has overwhelming

evidence, and Albert has very little to say in her defense.

Albert signed a certification stating that all information in the grant application

was true and correct, and that she would be liable for any false statements made therein.

At deposition, she testified that she understood her obligation to verify and stand behind

the veracity of the statements she made, even when based upon information from her co-

investigator Killiany. Albert admitted to the facts surrounding Jones' discovery and

disclosure of Killiany's secret second set of data. She stated she understood the

significance of Jones' concern, testifying that, if true, it would mean her PPG and grant

application was based on a "lie." She also admitted that Jones – leader of the Statistical

Core – demanded Killiany's measurements be re-done, saying he would no longer work

with Killiany's MRI data, and would nullify those data if they came before him.

At trial, Albert is expected to testify only that she referred the matter to her

colleague – Mark Moss – for a review. Moss was a long-time investigator on the PPG

and was Killiany's boss. Relator will establish that Moss was therefore not a "neutral"
party to conduct any inquiry or investigation into the fraudulent manipulation of data by
Killiany or the claim for federal funds by defendants on the basis of the fraudulent data.
Relator will also show that Moss created no formal record of any inquiry, and he did not
prepare a report or otherwise document his findings. At deposition, he was unable to
testify whether the second set of EC volume measurements was generated pursuant to the
protocols. In tasking Moss to look into the allegations, Albert did not want Moss to re-measure
the boundaries of any subjects, or compare the altered boundaries with the
tracings of EC boundaries in MRI scans of other subjects. In fact, Albert did not want
Moss to even talk to Killiany about his decision to make a second set of measurements.
She did not even request that Killiany compare the second set of measurements to initial
tracings, or to the tracings that were used in the blinded, reliability study.

In its opinion, the First Circuit expressly indicated defendants' failure to adhere to
the policies and regulations mandating inquiry, investigation and report of scientific
misconduct are consistent with defendants' knowledge or deliberate indifference to the truth.
Albert's abject failure to disclose the allegations to NIH or arrange for the required independent
inquiry is convincing proof of actual and constructive knowledge that the grant application
contained material falsities.

### B.    Defendants' Statement

This case involves the defendants' research on Alzheimer's disease ("AD").  Under the
False Claims Act, Kenneth Jones is seeking to recover about $12.3 million that the National
Institutes of Health ("NIH") paid to fund this research.

The defendants' program project grant ("PPG") lasted from 1980 to 2007.  This grant, titled "Age-related changes of cognition in health and disease," aimed to characterize the pre-symptomatic phase of AD and to differentiate it from changes related to normal aging.  The defendants' goal was to predict who will develop AD many years before the onset of diagnosable dementia.

During the early stages of AD, there is a significant loss of neurons in a region of the brain called the entorhinal cortex ("EC").  This change is not associated with normal aging.  As a result of Dr. Albert's conversations with other members of the PPG team, Dr. Albert concluded that it would make sense to attempt to measure the boundaries of the EC on the MRI scans of living people.  The purpose of this research was to determine whether the atrophy observable in post-mortem tissue could be detected before a person would experience symptoms of AD.

Dr. Killiany's work on the PPG involved tracing the boundaries of the EC on MRI scans. This process was subjective; it was more art than science. It was also limited by the technology that was available in the late 1990s.  After Dr. Killiany finished each tracing, a computer program would measure the area that he had captured.  Dr. Killiany then sent this data to Dr. Mary Hyde, who managed the database for the PPG.

Dr. Albert divided the participants into three groups—"normals," "converters," and "questionables"—depending on their level of cognitive function.  However, Dr. Killiany never knew which participant belonged to which group.  He was only provided with access to names and participant numbers.  In other words, he was blinded.

As Dr. Killiany became more experienced in tracing the ECs, he noticed anatomical variability, meaning that the brain structures of different participants appeared differently on MRI scans.  This prompted him to review the EC tracings that he previously had completed, and

to re-trace the boundaries of some of the ECs to make them more accurate.  There was nothing unusual or improper about Dr. Killiany's decision to re-measure certain of the ECs.  As he did with his first set of EC measurements, Dr. Killiany sent the revised measurements to Dr. Hyde.

In March 2001, Dr. Jones told Dr. Albert that he had concerns about the data derived from Dr. Killiany's re-measurements.  Specifically, he identified 23 participants whose measurements he believed should be analyzed.  He did not express any concerns about the inter-rater reliability study, which had compared Dr. Killiany's measurements of the EC with measurements that had been made by another rater, Teresa Gomez-Isla.

Dr. Albert took Dr. Jones' concerns seriously and investigated them appropriately.  She asked Mark Moss, a highly respected neuroanatomist, to review the first and second set of EC tracings for all 23 participants about whom Dr. Jones had expressed concern. Dr. Albert sought to determine whether Dr. Killiany's second set of EC tracings was more accurate than the first set of EC tracings. Dr. Moss conducted his review, and in late July 2001, he concluded that in almost all cases, Dr. Killiany's second set of tracings was more accurate than his first set of tracings. After July 30, 2001, Dr. Jones no longer raised any concerns with Dr. Albert about Dr. Killiany's measurements.  He agreed to be named as a coauthor on articles reporting the results of the study.  He continued to work on the PPG and the renewal of the PPG application. Indeed, he praised the "excellent" work of the study and sought to increase his participation in the PPG going forward.

Dr. Jones' claim arises from a grant application that he, Dr. Albert, Dr. Killiany, and others submitted in October 2001.  The application sought to renew funding for the PPG from 2002 to 2007.  In support of their application, Dr. Albert, Dr. Killiany, and Dr. Jones traveled to Bethesda, Maryland, in March 2002.  There they participated in a "reverse site visit," in which a

team of NIH reviewers questioned them. As a result of the reverse site visit, in April 2002, the

NIH reviewers sent Dr. Albert a summary of the reviewers' comments, also known as the "pink

sheets." The pink sheets were highly critical of the statistical analyses that Dr. Jones had

proposed in the Grant Application, and in particular, the absence of a method of statistical

analysis called "survival analysis." In response to these criticisms, Dr. Albert did two things: she

recruited a specialist in survival analysis from the Harvard School of Public Health; and she

wrote a letter to the NIH explaining that she and her team were addressing the reviewers'

concerns. The NIH approved the grant and funded the PPG for the period from 2002 to 2007.

Dr. Killiany and Dr. Albert acted appropriately at all times. Furthermore, the Grant

Application contained no statements that were false and misleading. To the extent any

statements in the Grant Application may have turned out to be inaccurate, they were not

knowingly false or made with reckless disregard of their falsity. There will be substantial

testimony that the omissions of which Dr. Jones complains were not material to the NIH's

funding decisions. The evidence will also establish that the PPG team provided substantial value

in return for the funds received from the Government.

## II.      Undisputed Facts

Dr. Killiany and Dr. Albert acted pursuant to the course and scope of their employment

on behalf of the research institutions.

## III.     Facts which Relator contends are undisputed based on the Pleadings, Rulings, Admissions and Stipulations

A.  On October 1, 2001, defendants submitted a renewal application of the Program

Project Grant, seeking $14,965,700 for a five year funding period, and between 2002

and 2007, the federal government paid defendants $12,308,967 in grant funds. (RFAs

No. 1)

B.   Relator's statistical expert testimony concerning statistical significance and cherry-picking is admissible on the issue of whether Killiany knowingly altered the MRI data to achieve desired results. It would be an abuse of discretion to ignore testimony on expected distribution of random revisions and the cherry-picking nature of those revisions.  (First Circuit Opinion, at pp. 21-23)

C.   Relator's expert testimony concerning the meaning and significance of the reliability study is admissible on the issue of whether Killiany knowingly altered the MRI data to achieve desired results. It would be an abuse of discretion to disregard relator's evidence on the reliability study – testimony that the Pearson correlation was reduced from 0.96 to 0.54 when the altered data is included in the reliability study; and evidence showing defendants failed to conduct a reliability study on the altered data. (*See* First Circuit Opinion, at 36-37.)

D.   Killiany did "modify the operational definition" for the EC drawings subsequent to the reliability study. (Defs.' Statement of Undisputed Facts, No. 92).

E.   Defendants deny that the "final procedure and protocol used to map the entorhinal cortex for the purpose of determining the volume measures reported in the PPG Renewal Application and Killiany, et al., 2000 were in place at the time Dr. Gomez-Isla prepared her maps of the EC that were used in the reliability study."  (RFA No. 33)

F.   Most of Killiany's revisions were "quite extensive," "biased toward normal subjects," frequently "inconsistent with the initially adapted protocol agreed to by the raters, and "not founded on scientific reason." (*See* First Circuit Opinion, at 31)

G.  "If Killiany had made the second set of measurements as part of his "'learning curve,'" sound scientific practice required him "to generate documentation and work papers in connection with his corrections . . . and share[] what he learned with his colleagues." (*See* First Circuit Opinion, at 31).

H.  Jones disclosed his concerns over the discovery of Killiany's second set of MRI data to defendants. Albert understood Jones to suspect Killiany of manipulating the data to exaggerate group differences, in departure from stated protocol and accepted scientific methods. Albert knew that, if true, it would mean her PPG and grant application were based on a "lie."

I.  Albert knew that Jones – leader of the Statistical Core – demanded Killiany's measurements be re-done, and that Jones had said he would no longer work with the data, and would nullify them if they came before him.

J.  The notion Killiany had been unblinded and had selectively manipulated the data "would certainly have a natural tendency to influence the reviewers' evaluations." (First Circuit Opinion, at 43-44.)

K.  Testimony by relator's experts, including Schuff and Davila-Garcia, is admissible to establish materiality of the alleged falsities and fraudulent course of conduct. It would be error to exclude such testimony. (First Circuit Opinion, at 45-46.)

L.  As noted by the First Circuit (at 18, n.18), corporate defendants are liable for the misrepresentations of the individual defendants made while acting within the scope of their employment.

M.  The PPG Renewal Application resulted in funds being awarded by the federal government to MGH in the amount of $12,308,961.01.

**IV.**     **Defendants' Statement of Disputed Facts**

The ultimate factual issues in this case include the following:

1.   Whether the defendants made false statements in the Grant Application;

2.   Whether the defendants acted knowingly; and

3.   Whether the defendants' statements were material to the NIH's decision to fund the

Grant Application.

**V.**     **Jurisdictional Questions**

The parties agree that this Court has jurisdiction over the subject matter and the parties

pursuant to 28 U.S.C. §§1331 and 32 U.S.C. §§3729 et. seq.

**VI.**     **Issues Raised by Pending Motions**

A.     The defendants withdraw the motion in limine that they previously filed on

September 29, 2010.  (Docket No. 102.)

B.     The defendants filed objections to Dr. Jones' proffered evidence regarding the

defendants' invoices for the grant, the defendants' policies for addressing research

misconduct, and rules that the National Institutes of Health provided to the

defendants.  (Docket No. 141.)  Dr. Jones moved to strike the defendants'

objections (Docket No. 143.)  The defendants opposed this motion.  (Docket No.

145.)

C..     The defendants will be filing a motion to quash Dr. Jones' trial subpoenas to

Brigham and Women's Hospital and Massachusetts General Hospital.

**VII.**     **Issues of Law (including Evidentiary Questions)**

A.     **Relator Jones' Issues of Law and Anticipated *Limine* Motions**

1.   Preclusion of defense claim, and all supporting evidence and argument, of

"No data in the grant application." In its opinion (at 26-27), the First Circuit

rejected defendants' claim that the allegedly falsified data is not stated in the subject PPG application, finding without dispute that the application states the alleged false results and false claim of reliable methodologies. The jury will determine only whether Killiany knowingly manipulated the MRI data or departed from the stated protocol. Relator will be entitled to a jury instruction which requires the conclusion of falsity or fraudulent course of conduct if either of these facts is found in relator's favor.

2. Preclusion of defense claim, and all supporting evidence and argument, regarding "scientific judgment" and "subjective drawings" in connection with the MRI data. Defendants will not be permitted to introduce evidence or argue over whether Killiany's alterations were based on "scientific judgment" or were "subjective" determinations or were more "art" than science. In its opinion, the First Circuit (at 29) rejected these claims as a matter of law, finding them to "miss the point" and not be the "real issue." Thus any defense claim about "scientific judgment" and the subjective nature of the drawings must be excluded under FRE 402 and 403 as irrelevant, confusing and prejudicial.

3. Preclusion of defense claim, and all supporting evidence and argument, regarding "Accuracy of the revisions." Defendants argued that relator must show Killiany's revisions to be inaccurate for them to be found "false."  The First Circuit (at 32) found this accuracy argument to be irrelevant. Any such claim must be excluded under FRE 402 and 403 as irrelevant, confusing and prejudicial.

16

4.  Preclusion of testimony, evidence and argument regarding efforts by

defendants to confirm the accuracy of Killiany's revisions through SPECT

analysis conducted by Marie Kijewski. Defendants have not identified any

data or testimony concerning Kijewski' s purported efforts in any of its pre-

trial pleadings, and in light of the First Circuit ruling that "accuracy" is not at

issue, any such evidence and argument must be excluded under FRE 402 and

403 as irrelevant, confusing and prejudicial.

5.  Preclusion of speculation of others on Killiany's blindness. Defendants may

attempt to rely upon the testimony of Albert, Johnson and Siskin that they

believed Killiany was "blinded" to the group affiliation of the study subjects,

because that is what was required of Killiany in the performance of the stated

protocol (and accepted scientific methodology). Defendants may also attempt

to elicit testimony from Jones that he lacks actual knowledge that Killiany was

unblinded. At 34, n.23, and at 35,the First Circuit made clear that these third

parties' statements do not impact the jury's determination of Killiany's

subjective state of mind. Such testimony must be excluded as lacking in

foundation, based on speculation and improper lay opinions. *See* FRE 602

&701(b). Expert testimony based on disclosed, reliable facts is admissible on

the issue, but not speculation by fact witnesses without a foundation.

Although witnesses may have assumed Killiany was blinded, or lacked

knowledge he was unblinded, testimony by witnesses as to the state of

Killiany's mind lacks foundation and is mere speculation.

6. Preclusion of testimony or argument on knowledge or opinions in the
   scientific community with respect to the relationship between EC volume and
   prodromal AD. Defendants may attempt to prove or argument that it is widely
   known among scientists that significant, observable neuronal loss in the EC is
   associated with early stage AD and not in normal aging. Similarly, defendants
   are expected to argue that other scientists conducting research on AD have
   found similar or significant relationships between volumetric measurements of
   the EC and prodromal AD. At issue in the case is whether defendants falsified
   data and made false statements about the reliability of the data in the grant
   proposal they submitted, to the government and not  whether the a general
   proposition the defendants hoped to advanced is consistent with the data,
   knowledge or opinions of other scientists. Such testimony must be excluded
   under FRE 402 and 403 as irrelevant, confusing and prejudicial.

7. Preclusion of references to NIH reviewers' alleged criticisms of the proposed
   statistical analysis of the study data contained in the "pink sheets. "Defendants
   are expected to argue that the NIH reviewers' comments in the "pink sheets"
   demonstrate that defendants' proposed method of future reliability testing
   affected the materiality of the reported reliability of Killiany's measurements
   contained in the PPG grant.   However, as noted by the First Circuit (at 48),
   "[t]he alleged falsity of in this case does not rest upon the adequacy of
   reliability method to be employed in the future, but rather on results allegedly
   already obtained in a past reliability study and relied upon by the applicants in
   their proposal." Defendants' evidence, arguments and testimony concerning

alleged criticism of the future reliability study must be excluded as irrelevant, confusing and prejudicial under FRE 402 and 403.

8. Pursuant to FRE 402 and 403, preclusion of irrelevant, confusing and prejudicial generalized testimony about the overall goals, structure and findings of the PPG, the work of defendants and other employees on the PPG, prior research into the EC and its role in prodromal AD and the renewal process. Except to the extent that such testimony, evidence or argument relates directly to the jury questions presented – did Killiany knowingly alter the data to achieve desired results or depart from stated methodologies, were the statements material to the NIH funding decision and did Albert know or act with reckless disregard to the truth of data generated by Killiany – it is not relevant and is therefore to be excluded. Similarly, to the extent that the evidence, testimony or argument relates to these jury questions, their introduction before the jury is likely to confuse the jury on the questions presented, and prejudice the jury in favor of defendants on whether or not they are responsible for false or fraudulent claims.

9. Preclusion of testimony by Jerrold Rosenbaum, M.D. – a previously undisclosed witness – or by any other witness with respect to the reasons for relator's termination of employment. Relator does not present termination claims in this litigation. Pursuant to Rules 26 and 37, as well as FRE 402, 403 and 404, such testimony is irrelevant, prejudicial and confusing, and must be excluded.

10.   Preclude the defense from stating in the jury's presence that the False Claims Act requires the court to award civil penalties, to multiply damages and to have the defendant pay reasonable attorney fees and costs.  All of these are to be accomplished by the Court without input from the jury.

11.   Preclude the defense from stating or arguing that the government's non-intervention decision is a comment on the merits of the case. When a relator brings a *qui tam* action, the government must investigate the claims and respond to the complaint by taking one of five actions:

> (1) intervene and take over primary responsibility for the prosecution of the case;[1]
>
> (2) dismiss the action if it believes that the case lacks merit;[2]
>
> (3) not intervene and authorize the relator to prosecute the action as a private attorney general on behalf of and in the name of the United States;[3]
>
> (4) settle the *qui tam* action over the relator's objections;[4] or,
>
> (5) elect to pursue its claim through any alternative remedy available to the Government.[5]

Here, the Government elected the third option, to not intervene and instead permit the relator to prosecute the action as a private attorney general.  Having authorized Jones to stand in the shoes of the government does not connote

---

[1] 31 U.S.C. § 3730(c)(1).
[2] 31 U.S.C. § 3730(c)(2)(A).
[3] 31 U.S.C. § 3730(b)(1) and (c)(3); *see also, United States ex rel. Feldman v. van Gorp, No. 03 Civ. 8135 (WHP), 2010 WL 2911606.*
[4] 31 U.S.C. § 373 (c)(2)(B).
[5] 31 U.S.C. § 3730(5).

lack of merit.  The Government did not move to dismiss the action, as it was authorized to do if it had concluded that the action lacked merit.

12.  Preclude the defense from stating in the jury's presence the potential relator's share in this case since that is to be decided by the Court without input from the jury.  Should any party mention or infer that the relator has a financial interest in the outcome of the case, which is not in dispute, the Court is requested to instruct the jury that the amount of the relator's financial interest, if any, will be decided by the Court after the jury phase of the trial has been completed.

13.  Preclude defendants from offering any opinion testimony pursuant to FRE 702, 703 or 705, by any non-retained expert who did not issue a report and for whom defendants failed to timely issue a statement of opinions and supporting facts during discovery, as required by Rule 26(a)(2)(C).

14.  Preclude defendants' retained experts from testifying to matters not previously disclosed in their expert reports.  Rules 26 and 37.

15.  Preclude defendants' expert Andrew Saykin from offering various opinions disclosed in his report and testified to at his deposition, including – among other topics included herein – preclusion of his opinion testimony on (1) defendants' obligation to investigate and report research misconduct,  (2) whether Killiany tried to "carefully" redraw the boundaries of the EC to make the data more accurate, (3) whether the MRI project could have been funded as a separate individual grant, as opposed to part of the program project grant

which defendants submitted,  and (4) Albert or Killiany's credibility, an issue

for the jury to determine that is not subject to expert testimony.

16.  Preclude defendants from raising any new defense or factual claim that was

not pleaded in their answers and/or timely raised in the pleadings in this case.

Preclude defendants from arguing that Jones' concerns were appropriately

investigation absent provision of defendants' written scientific misconduct

policies.

**B.**    **Defendants' Issues of Law**

1.    Whether Dr. Jones should be precluded from arguing that the defendants:

(a)  spoliated evidence;

(b)  failed to maintain scientific notebooks;

(c)  failed to retain scientific notebooks, MRI images, data files, e-mails,

and any record of the internal inquiry into Dr. Jones' allegations; and

(d)  violated the rules of Partners Healthcare, Harvard University, the NIH,

or any other organization, with regard to (b) and (c);

United States ex rel. Jones v. Brigham and Women's Hosp., 678 F.3d 72,

83 n.19 (1st Cir. 2012);

2.    Whether Dr. Dávila-García, Dr. Schuff, and Dr. Jones should be precluded

from testifying, and Dr. Jones should be precluded from arguing, that the

defendants failed to:

(a)  comply with the Public Health Services terms and conditions;

(b)  comply with the NIH Research Misconduct Policy;

(c)  comply with any rules of Partners Healthcare, Harvard University, or

any other organization regarding research misconduct;

(d) conduct an adequate inquiry into Dr. Jones' allegations;

(e) create a written record of the inquiry; and

(f) report the results of the inquiry to Partners Healthcare, the NIH Office of Research Integrity, or any other organization; and

id. at 91-93;

3.      Whether Dr. Schuff should be precluded from testifying to certain opinions that he stated at his deposition and in his reports, including (among others) that Dr. Killiany engaged in fraud; Fed. R. Evid. 403, 702, 703, 704;

4.      Whether Dr. Dávila-García should be precluded from testifying to certain opinions that she stated in her report, including (among other things) that "maybe up to 50% of the well-deserving applications are denied federal funding by NIH each year"; Fed. R. Evid. 702, 703;

5.      Whether Dr. Jones should be precluded from testifying that:

(a) there was a correlation between the size of a participant's lateral ventricles and whether the participant had Alzheimer's disease; and

(b) this correlation could have alerted Dr. Killiany to whether a participant belonged to a particular group (or in other words, caused Dr. Killiany to become unblinded);

Fed. R.Evid. 702, 802;

6.      Whether Dr. Jones should be precluded from testifying that Marilyn Albert threatened Dr. Keith Johnson that he would not be allowed to

practice academic medicine again (which Dr. Johnson and Dr. Albert both

deny she ever said); Fed. R. Evid. 802;

7.      Whether Dr. Jones should be precluded from testifying about his alleged

telephone call with Marilyn Albert on July 27, 2003, in light of Dr. Jones'

refusal to produce a written record of that conversation; Jones Dep. 498:2-

508:8); and

8.      Whether Dr. Jones should be precluded from testifying: that Boston

University had experienced problems with data on the regions of interest

in the brain; that Dr. Moss and Dr. Killiany were involved; that there had

been problems with recordkeeping; and that Dr. Albert "had gone over

there and made them do the stuff over again"; Fed. R. Evid. 402, 403;

9.      Whether Dr. Jones should be precluded from introducing evidence that in

the 1980s, there were allegations of scientific misconduct involving heart

disease research at Brigham and Women's Hospital, Fed. R. Evid. 402,

403;

10.    Whether, if the jury finds the defendants liable, the jury may award

damages less than the full amount of the Government's payments, which

Dr. Jones is seeking; see U.S. v. Science Applications Int'l Corp., 626

F.3d 1257, 1279 (D.C. Cir. 2010).

## VII.    Requested Amendments to the Pleadings

None.

## VIII.   Additional Matters

### A.    Relator's Statement

Opposing counsel observed during the discovery phase that Mary Hyde, Ph.D., appeared incompetent for the purpose of being deposed and agreed that neither party would pursue testimony from Hyde.  Should the defendants seek to alter this arrangement a competency hearing would be required and the relator should be permitted to conduct her deposition should she be deemed competent.

**B.     Defendants' Statement**

1.     Dr. Jones has disclosed that he intends to call the following defense witnesses during his case-in-chief: Ron Killiany, Marilyn Albert, Mark Moss, Brad Hyman, Deborah Blacker, Teresa Gomez-Isla, and Keith Johnson.  The defendants will be filing a motion requesting that the Court order the parties to present testimony in an orderly manner, meaning that each party would present the testimony of its own witnesses.  Under Fed. R. Evid. 611(a), this issue is addressed to the Court's discretion.

2.     Keith Johnson will be traveling from February 5, 2013 to February 22, 2013.  The parties have agreed that if the trial is to occur during Dr. Johnson's trip, and subject to the agreement of the parties as to costs, they will conduct a videotaped deposition on January 30, 2013 or January 31, 2013.  The parties would play the videotape for the jury.

3.     At the final pretrial conference, the Court denied Defendants' Motion to Strike Expert Witness Report of Richard Goldstein and to Preclude His Testimony, but ruled that Dr. Goldstein would be limited to the scope of Dr. Teitelbaum's report.

**IX.     Probable Length of Trial**

All parties have requested a jury trial.  Dr. Jones believes he will require approximately 20 hours of testimony – or approximately 5.5 trial days (3 hours and 45 minutes of testimony for each day), including examination and cross-examination, but excluding opening statements, closing arguments and jury selection.  The defendants request an equal amount of time.

**X.     Witness List**

**A.     Relator's Witnesses**

The relator intends to call the following expert witnesses:

1.     Martha Isabel Davila-Garcia, Ph.D.
       Howard University College of Medicine
       Department of Pharmacology
       Suite 3408, Adams Bldg.
       520 W.  Street N.W.
       Washington, DC  20059

2.     Richard Goldstein, Ph.D.
       37 Kirkwood Road
       Brighton, MA 02135

3.     Kenneth J. Jones, Ph.D.
       25 Miller Hill Road
       Dover, MA

4.     Norbert Schuff, Ph.D.
       Professor of Radiology
       Department of Radiology and Biomedical Imaging
       University of California Veterans Affairs Medical Center
       4150 Clement Street, 114M
       San Francisco, CA 94121

The relator intends to call the following fact witnesses:

1.     Marilyn S. Albert, Ph.D.
       The Johns Hopkins Hospital
       Department of Neurology
       Reed Hall East, Room 2227
       Baltimore, MD  21287

2.	Deborah L. Blacker, M.D., Sc.D.
	Massachusetts General Hospital
	Gerontology Research/149-2691
	149 13th Street
	Charlestown, MA  02129

3.	Teresa Gomez-Isla, M.D., Ph.D.
	Neurology Associates
	15 Parkman Street, WAC 835
	Boston, MA  02114

4.	Bradley Hyman, M.D., Ph.D.
	Neurology Associates
	15 Parkman Street, WAC 835
	Boston, MA  02114

5.	Keith Johnson, M.D.
	Massachusetts General Hospital
	55 Fruit St
	Boston, MA 02114

6.	Kenneth J. Jones
	25 Miller Hill Road
	Dover,MA  02030

7.	Priscilla Jones
	25 Miller Hill Road
	Dover, MA  02030

8.	Ronald J. Killiany, Ph.D.
	Department of Anatomy and Neurobiology
	Boston University School of Medicine, W-701
	Boston, MA  02118

9.	Mark B. Moss, Ph.D.
	Department of Anatomy and Neurobiology
	Boston University School of Medicine, R-1004
	Boston, MA  02118

10.	Mary Hyde, Ph.D.
	11 Daniel Drive
	Burlington, MA 01803
	(See Relator's statement in Additional Matters.)

**B.	Defendants' Witnesses**

The defendants intend to call the following expert witnesses:

    1.    Andrew J. Saykin, Psy.D.
        950 Walnut Street, R2E124
        Indianapolis, IN  46202

    2.    Bernard R. Siskin, Ph.D.
        1600 JFK Boulevard
        Four Penn Center, Suite 1030
        Philadelphia, PA  19103

The defendants intend to call the following individuals as non-retained expert witnesses

and fact witnesses:

    1.    Marilyn S. Albert, Ph.D.
        The Johns Hopkins Hospital
        Department of Neurology
        Reed Hall East, Room 2227
        Baltimore, MD  21287

    2.    Deborah L. Blacker, M.D., Sc.D.
        Massachusetts General Hospital
        Gerontology Research/149-2691
        149 13th Street
        Charlestown, MA  02129

    3.    Teresa Gomez-Isla, M.D., Ph.D.
        Neurology Associates
        15 Parkman Street, WAC 835
        Boston, MA  02114

    4.    Mary Hyde, Ph.D.
        11 Daniel Drive
        Burlington, MA  01803

    5.    Bradley Hyman, M.D., Ph.D.
        Neurology Associates
        15 Parkman Street, WAC 835
        Boston, MA  02114

    6,    Marie F. Kijewski, Sc.D.
        Brigham and Women's Hospital
        75 Francis Street
        Boston, MA  02115

   7.  Ron Kikinis, M.D.
      Brigham and Women's Hospital
      1249 Boylston Street, Room 352
      Boston, MA  02215

   8.  Ronald J. Killiany, Ph.D.
      Department of Anatomy and Neurobiology
      Boston University School of Medicine, W-701
      Boston, MA  02118

   9.  Mark B. Moss, Ph.D.
      Department of Anatomy and Neurobiology
      Boston University School of Medicine, R-1004
      Boston, MA  02118

   10.  Jerrold Rosenbaum, M.D.
      Psychiatry Associates—Inpatient Consult
      Massachusetts General Hospital
      55 Fruit Street, Bullfinch 351
      Boston, MA  02114

The parties reserve the right to call any witnesses identified as a witness by any other party in this case.

## XI. Proposed Exhibits

The parties have been working together on a joint exhibit list, which will be filed by February 1, 2013.

## XII. Objections to Evidence

The defendants have objected to Dr. Jones' proffered evidence and trial subpoenas regarding the defendants' invoices for the grant, the defendants' policies for addressing research misconduct, and rules that the NIH provided to the defendants.  Dr. Jones failed to disclose this evidence in a timely manner.  The trial subpoenas are nothing more than deposition-type discovery.  Also, the evidence regarding the defendants' policies and the NIH rules is irrelevant. (See Docket No. 141.)

## XIII.   Conclusion

The parties reserve the right to supplement this report following the pretrial conference,

including the identification of expected testimony from each witness. Further, the parties reserve

the right to supplement their motions in limine prior to the commencement of trial

| Kenneth James Jones, | Brigham and Women's Hospital, |
|---|---|
|  | Massachusetts General Hospital, |
|  | Marilyn S. Albert, and |
|  | Ronald J. Killiany, |

By his attorneys,                                          By their attorneys,


/s/ William D. Hughes                                  /s/ Alan D. Rose
William D. Hughes                                      Alan D. Rose (BBO #427280)
Hughes & Nunn, LLP                                  Brian D. Lipkin (BBO #673850)
350 Tenth Avenue, #960                              Rose, Chinitz & Rose
San Diego, CA  92101                                One Beacon Street
(619) 231-1661                                          Boston, MA  02108
Fax: (619) 236-9271                                  (617) 536-0040
whughes@hughesnunn.com                         Fax: (617) 536-4400
                                                              adr@rose-law.net
Michael D. Kohn                                        bdl@rose-law.net
David K. Colapinto (BBO No. 551835)
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007 2756
Phone: (202) 342 6980
Fax:     (202) 342 6984
Michael Kohn [mk@kkc.com]
David Colapinto [dc@kkc.com]

Jeremy L. Friedman
LAW OFFICE OF JEREMY L. FRIEDMAN
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
Jeremy L. Friedman [jlfried@comcast.net]

Dated:  January 23, 2013

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 23, 2013, I served this document by filing it through the ECF system and e-mailing it to:

Tracy L. Hilmer
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 261
Washington, DC  20044
tracy.hilmer@usdoj.gov

<u>/s/ Brian D. Lipkin</u>