```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 07-11481-WGY

 4    * * * * * * * * * * * * * * * * * *
                                         *
 5    UNITED STATES OF AMERICA, ex rel.,  *
      KENNETH JAMES JONES, Ed.D.,         *
 6                                        *
               Plaintiff,                 *   TRANSCRIPT OF
 7                                        *   THE EVIDENCE
      v.                                  *   (Volume 4)
 8                                        *
      BRIGHAM AND WOMEN'S HOSPITAL, et al., *
 9                                        *
               Defendants.                *
10                                        *
      * * * * * * * * * * * * * * * * * *
11
                  BEFORE:  The Honorable William G. Young,
12                               District Judge, and a Jury

13    APPEARANCES:

14            HUGHES & NUNN LLP (By William D. Hughes,
        Esq.), 350 10th Avenue, Suite 960, San Diego,
15      California 92101
              - and -
16            LAW OFFICE OF JEREMY L. FRIEDMAN (By Jeremy
        L. Friedman, Esq.), 2801 Sylhowe Road, Oakland,
17      California 94602
              - and -
18            KOHN, KOHN & COLAPINTO, LLP (By Michael D.
        Kohn, Esq.), 3233 P Street, N.W., Washington, D.C.
19      20007-2756, on behalf of the Plaintiff

20
              ROSE, CHINITZ & ROSE (By Alan D. Rose, Sr.,
21      Esq. and Brian D. Lipkin, Esq.), One Beacon
        Street, 4th Floor, Boston, Massachusetts 02108,
22      on behalf of the Defendants

23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      March 26, 2013
```

1

**I N D E X**

2

3

**WITNESS:**          **DIRECT**   **CROSS**    **REDIRECT**   **RECROSS**

4

NORBERT W. SCHUFF

5

   By Mr. Friedman  3                      128

6

   By Mr. Rose                73

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1             THE CLERK:  All rise for the jury.

 2             (Whereupon the jury entered the courtroom.)

 3             THE CLERK:  The United States District Court is now

 4    in session, you may be seated.

 5             THE COURT:  Good morning, ladies and gentlemen.

 6             THE JURY:  Good morning.

 7             THE COURT:  Thank you so very much for being right

 8    here on time.  We're all ready to go.  A juror has some time

 9    problems at 1:00.  I'm going to look that over.  We'll

10    accommodate that.  And we very, very much appreciate your

11    courtesy and attention to all these proceedings.

12             Now, like I said, we're starting with a new witness

13    and we'll start by swearing that witness.

14             THE CLERK:  Can you please stand and raise your

15    right hand.

16             Do you solemnly swear the testimony you are about

17    to make in the matter now pending before this Court and Jury

18    will be the truth, the whole truth, and nothing but the

19    truth, so help you God?

20             THE WITNESS:  I do.

21             THE CLERK:  You can be seated.

22                     NORBERT W. SCHUFF

23                   **DIRECT EXAMINATION**

24    BY MR. FRIEDMAN

25    Q   Good morning, Norbert.  Could you please introduce

1    yourself to the jury?

2    A    Yes.  My name is Norbert Schuff.  I am a Ph.D in

3    physics.  I'm a professor of radiology at the University of

4    California-San Francisco, and I've been working in the field

5    of brain MRI for the last, about 30 years.

6    **Q**    Dr. Schuff, have you formed any opinions in this case?

7    A    Yes, I did.

8    **Q**    How is it that you came to form opinions about this

9    case?

10   A    Well, you asked me to form an opinion about specific

11   issues that relates to an application by Dr. Albert and Dr.

12   Killiany, and also about the specific images, MRI scans and

13   tracings of the entorhinal cortex that were done for part of

14   the purpose of this application.

15   **Q**    Did I also ask you to form opinions on issues that were

16   raised by the defendant?

17   A    Yes, you did.

18   **Q**    Okay.  Now, did I ask that you comment generally upon

19   things that were raised by the defendant?

20            **MR. ROSE:**  Objection, your Honor.

21            **THE COURT:**  Sustained.  Don't lead the witness.

22            **MR. FRIEDMAN:**  Okay.

23            **THE COURT:**  What did you review to get yourself

24   ready to testify here today?

25            **THE WITNESS:**  I reviewed the grant application that

1    Dr. Albert and Killiany put in NIH.  I reviewed also the

2    critique that the reviewers had opinions about these

3    applications.  In addition, I reviewed all material that

4    were subsequent to the specific issues related to the

5    reliability and predictability of measurements related to

6    the MRI.  So that were, for example, the depositions of

7    Dr. Killiany and Albert, as well as particular MRI scans

8    that were brought to me by, by Mr. Friedman.

9          THE COURT:  Forget this case for a minute, and I'll

10   let him ask the questions, but I have this one general

11   question.

12         In your practice, sir, do you review MRIs?  Tell

13   the jury.

14         THE WITNESS:  I'm not, I'm not an M.D.  I'm not

15   reviewing MRI's.  I look at MRI's and measure MRI's for the

16   purpose of scientific research.

17         THE COURT:  But you do that, you measure MRI's?

18         THE WITNESS:  I measure MRI's, yes.

19         THE COURT:  Tell us a little bit about the research

20   where you've measured MRI's.

21         THE WITNESS:  So that research started almost 30

22   years ago when I was involved in development of MRI to

23   better visualize the brain for a number of diseases.  I then

24   was specifically involved in measuring parts of the brain

25   that are specifically involved in certain what we call

1   neurogenerated diseases, like Alzheimer's disease and

2   Parkinson's disease.  So, my intention was actually to find

3   better ways to make quantitative measurements on those

4   MRI's.  So rather than a doctor giving an impression what

5   the MRI scan looks like, my research was focusing on making

6   the measurement that related to the number.  So that they

7   can use a number and the number, one person compare it to a

8   another one and can say, well, this person is within this

9   limit of Alzheimer measurement.  So that is my major

10  purpose.  And there are several tools to do that.  And

11  that's what I do.

12  Q   Dr. Schuff, in measuring the MRI scans, do you have any

13  experience specifically with the entorhinal cortex?

14  A   Yes, I do.

15  Q   Could you tell the jury what your experience is with the

16  entorhinal cortex?

17  A   I have been involved as principal investigator and core

18  investigator in several clinical studies that involved the

19  entorhinal cortex.  I have supervised entorhinal cortex

20  measurements, reviewed entorhinal cortex measurements,

21  helped implement protocols to do these measurements, and

22  that involved over the years thousands of those measurements

23  in all.

24  Q   Have you contributed to scientific publications in this

25  area?

1    A    In this area, yes.  I, if I counted correctly, I

2    published eight or nine scientific papers that relate to the

3    issue of entorhinal cortex, volume, size and change over

4    time to certain conditions of the brain.

5    Q    Have you served in any capacity with respect to the

6    National Institutes of Health and NIH grants?

7    A    Yes, I do, I did, and continue to do so.  I have been

8    what's called peer reviewer on grant applications to judge

9    the scientific merits of those applications.

10   Q    And I think you mentioned you've served as a principal

11   investigator.  In what capacity have you served as a

12   principal investigator?

13   A    Well, principal investigator, the capacity of a

14   principal investigator is to take overall responsibility of

15   conducting the scientific research.  That involves

16   administrative issues, legal issues, as well as ethical and

17   scientific issues.  And that's the role of the principal

18   investigator, and I have done that.

19   Q    In doing these things that you've described in your

20   background as it relates to this case, have you had any

21   interactions at all with Dr. Albert and Dr. Killiany?

22   A    Yes.

23   Q    Could you please explain to our jury some of those

24   contacts?

25   A    First of all, I have contact with, mainly with Dr.

1     Killiany at meetings, scientific meetings where we exchanged

2     conversations.  Also Dr. Albert on a more casual side.  I

3     have been on one occasion actually a peer reviewer of one of

4     Dr. Killiany's applications where he was a core

5     investigator, at NIH.  And I have been involved, together

6     with Dr. Killiany at the moment, in a very large

7     multi-national study of Alzheimer's initiative where we are

8     participating in this research.

9     **Q**   Okay.  Dr. Schuff, first I want to ask you questions

10    about the questions that we asked you, and I want to put off

11    to the side questions about responding to issues that were

12    raised by the defendant.  Is that okay?

13    A    Yes.

14    **Q**   Okay.  I first want to ask you about the four questions

15    that I had for you.  I have a chalk here.

16          Let's see.  The four questions that we had for you,

17    do you recall what the four questions were?  Oh, that

18    doesn't look so good.

19    A    I can probably paraphrase them.

20    **Q**   Sure.

21    A    So, I think the first question was, you asked me to give

22    an opinion to what extent Dr. Albert and Dr. Killiany made

23    important statement about the reliability and predictability

24    of their study in terms of their NIH, application to the

25    NIH.

1    **Q**    Okay.

2    A    The second question you asked me was whether I had an

3    impression that both Dr. Killiany and Dr. Gomez-Isla were

4    able to reach an agreement how they would outline the

5    entorhinal cortex which is a difficult region of the brain.

6          And the third question I believe was -- can you

7    help me with this, the third question.  I don't know the

8    order.  But the third question was most likely about the

9    extent of my opinion whether Dr. Killiany made major errors

10   in his drawing from the original study to the second set of

11   data.

12         And the final question was to make up my opinion to

13   the extent that I believe that the changes that were made

14   were selective and biased in any way toward one of the

15   groups that were, the normal group and other brain group.

16   **Q**    Okay.  Thank you, Doctor.

17         I would like to first focus on the first question

18   that we asked you to form an opinion on, did Dr. Albert and

19   Killiany make any statements of importance regarding

20   reliability and predictability in the NIH grant application.

21         Could you first tell us what, when you say

22   reliability, what is reliability?

23   A    Reliability describes the consistency of measurements

24   you make from different data sets.  So, for example, if you

25   go to one hospital here in the City of Boston and have an

1    MRI scan, they make a measurement.  You would expect that if

2    you go to another hospital and make measurement again they

3    get similar values.  That's the concept of reliability.

4           In this context of why we are here that was done by

5    human interaction with drawing lines on the computer screen.

6    So the reliability in this case is to what extent can

7    raters, human raters, come to an agreement on how to outline

8    a structure that reliably they get consistent measurements.

9    **Q**   Is reliability important in the submission of an NIH

10   grant application?

11   A   Very much important to judge the reliability of the

12   measurements.

13   **Q**   Now, when you talk about predictability, in the context

14   of this case what does predictability mean?

15   A   Well, predictability, the concept of predictability

16   means that you can make statements about outcomes of future

17   events based on the data you have observed with reasonable

18   level of certainty.  So, for example, if you make a

19   measurement of the temperature of your body and it's 100

20   Fahrenheit then you make the predictability that this person

21   is sick.  That's a predictable study.

22          In this case, we are talking about future events.

23   So you make a measurement at some time in the person's life,

24   predict potential future development of a disease like

25   Alzheimer's disease.

1    **Q**   And in this case what was the claim of predictability

2    that defendants put in?

3    A   The claim of predictability was that if you measure

4    particular region of the brain, the entorhinal cortex, that

5    the size of this structure would predict who would convert

6    to Alzheimer's disease after a certain period of time.

7    **Q**   Now, when you talk about the size of the entorhinal

8    cortex, are we talking about, in the context of this study,

9    the ones that were done by the defendants, are we talking

10   about the size changes over time, or is it just a snapshot

11   picture at the beginning?

12   A   You can do both.  But of particular medical value is, of

13   course, the snapshot picture at the beginning.  Because if,

14   if a patient would come to a doctor and you can make an MRI,

15   that at the time you make the MRI you can predict, tell the

16   patient what the potential of that person develops

17   Alzheimer's disease, that is very important and very

18   practically high importance, as compared to measurements

19   over time where you would say come back in a year, we will

20   find out then.  So that would raise a little anxiety over

21   that period of one year for that subject.

22   **Q**   So if I understand your testimony, you're saying that in

23   the context of this particular grant application the claim

24   of predictability was important?

25   A   It was very important.

1            **MR. ROSE:**  Your Honor, objection to the leading.

2            **THE COURT:**  Yes.  Don't lead this witness.

3            **MR. FRIEDMAN:**  Yes, your Honor.  Thank you.

4    **Q**    Now, in the grant application, if you had very high

5    reliability but very low predictability, would that be,

6    would that be a meaningful grant application?

7            **MR. ROSE:**  Objection, your Honor.

8            **THE COURT:**  Sustained.

9    **Q**    Is it important to have very high, is it important to

10   have, would it be important to have very high reliability

11   and low predictability?

12           **MR. ROSE:**  Objection, your Honor.

13           **THE COURT:**  Sustained.  Don't lead the witness.

14   Look, you can ask him what it means to him.

15           **MR. FRIEDMAN:**  Okay.

16           **THE COURT:**  But the jury's going to make the

17   conclusions here.  He's not going to testify to conclusions.

18   You can ask him what it means to him.

19           **MR. FRIEDMAN:**  Okay.

20           **THE COURT:**  He does measurements.

21   **Q**    Does it mean something to you if their study has high

22   reliability but low predictive power?

23   **A**    Yes, of course.

24           **THE COURT:**  And what does it mean to you?

25   **A**    What it means to me, low predictability is that the

 1    measurement is more or less useless.  You cannot predict

 2    what, the target I want to demonstrate.

 3    **Q**   And to you would it be meaningful to have very low

 4    reliability but very high predictive power?

 5              **MR. ROSE:**  Objection.

 6              **THE COURT:**  Sustained.  Don't lead the witness.

 7    You may ask the question what does it mean to you if, fill

 8    in.

 9    **Q**   If you have very high reliability and, very, very low

10    reliability and very high predictability?

11    A    It would mean to me that, having low reliability means

12    that only very, very few experts probably can do the

13    measurement which is in practical terms a problem because it

14    would mean there are not many people in the world that can

15    do that measurement and all those patients who potentially

16    want to know whether they have the disease have to go to

17    this particular hospital, for example, which is, of course,

18    not the intent of the research, you want to have it

19    generalizable so many different sides, many practices of

20    doctors can do the same procedure.

21    **Q**   Okay.  So is it important to you to have both?

22    A    It's very important to have both.

23    **Q**   Okay.  Now, I want to go back to your first question

24    about whether or not there were statements of importance

25    with respect to these two concepts in the grant application.

1          What did you do in order to form your opinion on

2     whether that was the case?

3     A    Well, I read the grant application.  I forget how many

4     pages there were.  But particularly I read, of course,

5     those, those paragraph that related to this particular case,

6     that related to MRI which was the particular project in this

7     grant, and I also read the critique by the reviewers of this

8     grant, what they thought was their impression of the

9     potential, the scientific potential of this application.

10    Q    I would like to turn our attention to Exhibit 171 which

11    is the grant application.

12         **THE COURT:**  Since we're, since we're turning to a

13    document let me interrupt here with a juror question.

14         The question does not pertain to this witness, but

15    a juror has asked:  Can I get a copy of the paper written in

16    2000 by Dr. Killiany, et al. to read.

17         It's Exhibit 4.  You'll have it in the jury room.

18    But we'll pass it now while the examination is going on so

19    you can at least look it over.

20         (Circulated among the jury.)

21         **THE COURT:**  Forgive the interruption, because it

22    does not directly have to do with what the witness is

23    testifying to, so now back to the interrogation of the

24    witness.

25         Go ahead.

1          **MR. FRIEDMAN:**  Thank you, your Honor.

2     **Q**   Now, the grant application is many pages.  We're going

3     to look at -- this is Exhibit 171.  And we're going to look

4     at what's marked as MBAK 337.

5          Do you see this section right here, this paragraph?

6     Maybe you can, if you touch your screen it might -- Dr.

7     Schuff.

8     **A**   I touched and I see some arrows.

9     **Q**   See that paragraph that starts, "The biggest

10    difference"?  Is this one of the paragraphs that you looked

11    at with respect to the question of reliability in the grant

12    application?

13    **A**   Yes, I think so.  You see in this grant section the

14    applicants, they refer to different other protocols.  So

15    they're not the only ones who developed a protocol for that

16    region of the brain.  But they made a statement here, for

17    example, here we believe -- is that -- here we believe that

18    this measure is reliable.  So, they refer to their own

19    measurement in this case.

20    **Q**   Now, I would like to turn to page 338.  And it's the

21    same document and it will be marked page MBAK 338 at the

22    bottom of it.

23         And here on this section here, reliability and

24    training of operators.  Do you see that paragraph?

25    **A**   Yes.  So, this paragraph describes the procedure they

```
1    had in place at their laboratory how to perform the

2    measurements and also tested that they achieve a rater

3    reliability between, in this case, between Dr. Killiany and

4    Dr. Gomez, which is written here, for example, they give

5    exact numbers, R stands for the correlation coefficient

6    between those raters where number 1 means perfect

7    correlation, number 0 means no correlation at all, and

8    number 0.94 to .99 is very high, very high correlation.

9    Consistency between the measurements.

10   Q    And, Dr. Schuff, in the article that is being passed

11   around to the jury right now that the judge distributed,

12   there's a statement as to the entorhinal cortex and what the

13   reliability calculation was for the entorhinal cortex.

14        Do you recall what that was?

15   A    I don't recall the exact number, but the statement was

16   that it achieved a protocol that was reliable between

17   raters.

18   Q    Now, since I have it in front of me, it's passing around

19   the jurors.  Do you see what they said here was the, the

20   number for the reliability for, the inter-rater reliability

21   for the entorhinal cortex.  On your screen do you see what

22   number they put in?

23   A    Yeah, they put in number, the number 0.92.  That's --

24        MR. ROSE:  Your Honor, I have an objection.

25   Because there's handwriting in the margin of the document
```

1    that's being shown on the screen.

2            **THE COURT:**  Yes, that's not in the original

3    exhibit.  So, let's show him one that doesn't have that.

4            **MR. FRIEDMAN:**  I'm sorry.  It's no longer on the

5    screen.

6            **THE COURT:**  Very well.

7            **MR. FRIEDMAN:**  Thank you, your Honor.  I'm sorry

8    about that.

9    **Q**   So, do you see, do you see the right where the arrow is

10   now?

11   A   Yes.

12   **Q**   And what was the entorhinal cortex measure R?

13   A   Well, it says inter-rater reliability would also be high

14   for entorhinal cortex of 0.96 which is a very, very high

15   measure correlation.

16   **Q**   Could you look now at predictability.  Did you look at

17   what is now here MBAK79.  That's page 92 of the grant

18   application, but in Exhibit 171 it will be MBAK79.

19            This is the part of the, the top part of the

20   section that talks about the overall aims of the program.

21            Do you see the line that's under that?

22   A   Yes.

23   **Q**   Was that something that you looked at in terms of

24   whether or not there was a claim of predictability in the

25   grant application?

1    A    Certainly I would have looked at statements like the

2    predictability from, in this case, that SPECT and MRI was

3    very, it says here highly predictive.  So that's an

4    expression that is actually very, very high confidence in

5    their outcome.  That is certainly measurement which relates

6    to the predictability of their observations.

7    **Q**    All right.  Dr. Schuff, you didn't do the underlining,

8    right?  That's not your underlining?

9    A    That's not my document.

10   **Q**    And I'm also going to point everybody's attention here

11   to what is MBAK 327.  So that would be the page number on

12   this one.  And if you look at this paragraph here.

13          Did you look at this paragraph?

14   A    Yes, I looked at this paragraph.

15   **Q**    It says when the control subjects.  Do you see that

16   line?

17   A    Ah --

18   **Q**    Can you explain what that is to the jury?

19   A    I'm not sure where you're referring to.  I'm looking at

20   the moment at the statement that three measures obtained a

21   base number and very highly significant predictors of who

22   would develop Alzheimer's disease.  So that again is a

23   statement that I used in my opinion to determine the

24   importance they made about predicability of the

25   measurements.

1   **Q**   And do you see their next sentence when the control

2   subjects?

3   A   Yes.  So, yeah, they, so, they, this is a statement

4   about two of the groups in their study.  They had three that

5   the control subject compared to the non-demented individuals

6   with memory impairment who would develop ultimately AD had

7   specific values that's also very high in terms of

8   sensitivity and specificity.

9   **Q**   And when they say accuracy of discrimination was

10   93 percent, can you explain to the jury what that means?

11   A   Accuracy in this context means that they were able based

12   on the measurement of the entorhinal cortex to separate

13   those two groups to an accuracy of 93 percent.  So they made

14   only seven percent error in assigning the subjects to each

15   group.

16   **Q**   And the last page I would like to point out here is MBAK

17   328 of this same Exhibit 171.  And you see here where it

18   says:  However, discriminate function and then 84 percent.

19            Do you see that?

20   A   I have two arrows on my screen.

21   **Q**   In between those two arrows.

22   A   What it says, this suggests, I'm looking here, that,

23   well, this says the volume of hippocampus is significantly

24   different.  That's another brain region they measured.  Let

25   me read this to orient myself on this document.

1   **Q**   The accuracy of the entorhinal cortex measure was

2   considerably higher than that of the hippocampus.  Do you

3   see that?

4   A   Right.  So, yeah, the accuracy of the hippocampus was

5   particularly higher than that of the hippocampus which is

6   another brain region, very often involved in Parkinson's, in

7   Alzheimer's disease, sorry, which is a statement that they,

8   this statement occurs in 98 percent versus 73 percent again

9   means that if you take the entorhinal cortex you were able

10   to make the predictability with 98 percent accuracy, only

11   2 percent error, versus with the hippocampus 73 percent, you

12   make 27 percent error.

13   **Q**   Okay.  So, returning to the first question, did you form

14   an opinion on the first question?  And what is it?

15   A   Yes, I did.  And the opinion is that the grant

16   application included the statement about the reliability as

17   well as the predictability that outlined the entorhinal

18   cortex is a very important brain region to be able to

19   predict Alzheimer's disease, to a reviewer that would have

20   been very important information to know.

21   **Q**   Now let's turn to our second question, did Dr.

22   Gomez-Isla and Killiany reach an agreement on a reliable

23   protocol for measuring the EC.

24        Did you form an opinion on that?

25   A   I did.

1   **Q**   What did you do in this case to form your opinion on

2   that?

3   A    Well, first of all, I read again their applications

4   from, 2000 is one of the papers you just passed around, and

5   they had a follow-up publication in 2002, where they

6   described to some extent their protocol how they outlined

7   the entorhinal cortex.  So I read those papers again.  I

8   also had documentation about MRI scans and tracings that

9   were done by Dr. Killiany and Dr. Gomez and I compared them

10  side by side.

11  **Q**   Okay.

12          **MR. FRIEDMAN:**  Your Honor, we have a chalk that we

13  would like to show.

14          **THE COURT:**  No objection to using it as a chalk?

15          **MR. FRIEDMAN:**  The one we passed to you earlier.

16          **MR. ROSE:**  No objection.

17          **THE COURT:**  It may be used.  And again we know what

18  chalks are, they're not evidence, they're demonstrative

19  aids.  If they help you understand the testimony of the

20  witness, it's like teaching, all well and good.  So to the

21  extent they help you, it's all well and good.  But it's the

22  testimony of the witness that's the evidence.

23          You may put -- do you want me to hold it?

24          **MR. FRIEDMAN:**  Would you?

25          **THE COURT:**  All right.

1          **MR. FRIEDMAN:**  That would be wonderful.

2          **THE COURT:**  Now, if I didn't tell you at the

3     beginning, I'll tell you now.  I'm not helping either party.

4     I'm helping you.  This is a good -- and there's a pointer

5     down there, sir, on the floor, if you need it.  See it right

6     there?

7          **THE WITNESS:**  Oh.

8          **THE COURT:**  Right.  And this way he can use the mic

9     and they won't leave me standing here too long.

10         **MR. FRIEDMAN:**  Thank you, your Honor.

11    **Q**   Now, this is a chalk of Exhibit 97.  So this, this is in

12    as 97.  And it's subject 56.

13         Can you point to the chart and explain what it is

14    that you looked at with respect to Dr. Killiany and Dr.

15    Gomez's measurements.

16         **THE WITNESS:**  May I stand up?

17         **THE COURT:**  Of course.

18    A   So, the important area in the brain that we see is the

19    entorhinal cortex which is identified by two different

20    colors, red and blue.  Red means on the right side, blue on

21    the left side.  And so, those marks are made with respect to

22    certain anatomical landmarks in the brain.  So I'm looking

23    not, not only at the colors, of course, but I look at how

24    those landmarks are outlined, how the boundaries are drawn,

25    and how the overall impression is that those measurements

1    divide the position of the brain according to the protocol

2    that was published in these papers.

3    **Q**   Okay.  And looking at subject 56, if you see all the

4    ones on the left are Dr. Killiany's and the ones in the

5    middle are Dr. Gomez-Isla.

6            Can you talk about, explain to the jury whether or

7    not you, what you see when you look at these markings?

8    **A**   So, Mr. Friedman is referring to these two figures.

9    This is done by Dr. Killiany.  This one is done by Dr.

10   Gomez.  You see there's roughly good similarity between

11   those measurements.  They are not identical.  No one would

12   expect that.  But they're very similar.  So the numbers are

13   very close.  They identify region of the brain that limit

14   those drawings with respect to their extent and they were

15   very consistent in my opinion.

16   **Q**   Okay.

17           **MR. FRIEDMAN:**  Thank you, Judge, I can take that.

18           **THE COURT:**  All right.  That's all right.

19           **MR. FRIEDMAN:**  Okay.  If we could go to the laptop.

20   **Q**   Now, we have here Exhibits -- this is Exhibit 94 and

21   it's subject 55.  This is Dr. Killiany's initial

22   measurements.  And this is Dr. Gomez's.  You see as I go

23   back in between them?

24           Can you tell us what your impression is with

25   respect to these two drawings?

1          **MR. ROSE:**  Objection, your Honor.

2          **THE COURT:**  Can you be -- you may ask a more

3    precise question.  With respect to similarity?

4          **MR. FRIEDMAN:**  Yes.  I --

5          **THE COURT:**  Overruled.  He may tell us.

6    A    In my impression, these markings are very similar,

7    although they're not identical as I said.  There is, what

8    I'm looking here at, as you see, towards the lateral side of

9    the side of the brain, toward the side of the ears there is

10   white matter, for example, that does not belong to the

11   entorhinal cortex.  That is a boundary which both raters

12   identified in this drawing very well, for example.  So, they

13   had an agreement where the boundary towards the middle of

14   the brain ends for the entorhinal cortex.

15   Q    We were just looking at slice 68.  Let's look at slice

16   69.  And the same question.  In terms of similarity, what

17   was your impression as between these two measurements?

18   A    Again, I think they are similar.  They had an agreement

19   measuring, the tracings are not identical and no one would

20   expect that.  But I understand from the protocol where they

21   start and end their drawings.

22   Q    And we'll go to slice 70 as well.

23          Do you see the similarities?

24   A    Again, there are differences in the regions where we

25   expect they're really difficult.  Like you see at the, at

1    the upper part of the, of the brain there are variations.  I

2    suspect in other regions there's a better boundary between

3    what you see as white and grey, they're very consistent.

4    So, in my opinion they had agreement how they would draw the

5    boundaries.  And the variability you see, particularly at

6    the top, which is very difficult to identify the demarcation

7    between two brain structures, appear to me very random.

8    Random means I could not see any particular systematic

9    change to one rater or the other, that one rater would

10   consistently draw it larger than the other rater was more

11   this way.

12   Q   So, after reviewing the tracings by Dr. Gomez-Isla and

13   Dr. Killiany and doing the things that you've just said, you

14   formed an opinion?

15   A   I formed an opinion, yes.

16   Q   Would you please tell our jury what opinion you formed?

17   A   Well, my opinion was that Dr. Killiany and Dr. Gomez had

18   agreed, had reached an agreement how they would draw the

19   entorhinal cortex and according to this data, what I've seen

20   from these images and others, I was convinced that they

21   perform the measurements and achieved very good rater

22   reliability which was probably close to what they stated in

23   the paper.

24   Q   Now, I wanted to turn to the third question that we had

25   asked you about major errors in Dr. Killiany's original

1    measurements and in his revised measurements.

2           What did you do to form an opinion on that topic?

3    A   Well, I looked at later drawings that Dr. Killiany made

4    on the first measurement and on the second measurement and

5    later I got that from you.

6    Q   Okay.

7           THE COURT:  Got what from him?

8           THE WITNESS:  The MRI measurements with the

9    tracings superimposed.

10          MR. FRIEDMAN:  Your Honor, may we use that chalk

11   again that --

12          THE COURT:  Yes.

13   Q   So, Dr. Schuff, going back to, this is patient, I mean,

14   this is subject number 56.  And it's Exhibit 178 in

15   evidence.  Oh, I'm sorry, it's not 178.  It's, it's the same

16   chalk that we put up previously.  It's Exhibit 97.

17          Now, looking at, at those, looking at Dr.

18   Killiany's first measurements on the left and then his

19   second measurements all the way to the right, can you talk

20   about your impressions with respect to those two

21   measurements?

22          MR. ROSE:  Objection, your Honor.

23   Q   In terms of similarity.

24          THE COURT:  In terms of similarity.  Limited to

25   that, he may tell us.  Go ahead.

1   A   Yes.  So, I'm looking in my, forming my opinion, I

2   looked at this row compared to this row.  These are both

3   measurements from Dr. Killiany.  And you see those markings

4   are larger than these ones.  This is not only one case, this

5   is for all three as you see here, it's for other cases, too.

6   So these measurements are consistently larger.  If I go in

7   more detail, there are also measurements that are not as

8   consistent as before with respect to anatomical structure in

9   the brain which I thought they had agreed upon.

10  Q   Okay.

11          MR. FRIEDMAN:  Thank you, your Honor.

12          We have another exhibit that was blown up for

13  demonstrative purposes.

14          THE COURT:  And this is a blowup of exhibit?

15          MR. FRIEDMAN:  Exhibit 178.

16          THE COURT:  178.

17  Q   Now, Dr. Schuff, this is not a document of your

18  creation, correct?

19  A   That's right.

20  Q   And you understand that Dr. Jones put this together not

21  at the time but subsequently for purposes of the litigation,

22  correct?

23  A   I understand.

24  Q   And you understand that the, the data on the left hand

25  side is, is the data that was originally produced and on the

1    right hand side is the data after Dr. Killiany's revisions,

2    correct?

3    A    Yes.

4    **Q**    Okay.  And the red lines show the movement of the normal

5    subjects from the original measurements to the subsequent

6    measurements?

7              **MR. ROSE:**  Objection to the leading --

8              **THE COURT:**  Sustained.  You're leading the witness.

9              **MR. ROSE:**  -- of this witness, your Honor.

10             **THE COURT:**  The document is in evidence, and you've

11   reviewed it.

12             Can you tell us -- you've reviewed this?  This

13   isn't the first time you've seen this?

14             **THE WITNESS:**  This is the second time I've seen it.

15   Because before I came here I saw this document.  But I did

16   not have this document in front of me when I formed my

17   opinion.

18             **THE COURT:**  When you formed your opinion.  Well,

19   now you're being shown it.  So, based upon what you've been

20   told about it, what do you think it shows?

21             **THE WITNESS:**  It confirms my opinion that --

22             **THE COURT:**  What do you think it shows?

23             **THE WITNESS:**  What it shows is it shows that there

24   is a selective change --

25             **MR. ROSE:**  Objection, your Honor, the word

1    selective.

2           THE COURT:  No, he's -- overruled.  He's giving us

3    his opinion.

4    A    So my --

5           THE COURT:  Go ahead, you may continue.

6    A    So my opinion is that -- may I stand up?

7           THE COURT:  Yes.

8    A    So this is a chart where the subjects are ranked or

9    ordered by the size of the entorhinal cortex.  As far as I

10   understand it, this group down here has, they all have small

11   entorhinal cortices.  This group up here have larger

12   entorhinal cortices.  You can make median, what I call

13   median split.  So 50 percent, half of those at the number

14   50, 50 percent have a smaller entorhinal cortex and

15   50 percent have a larger entorhinal cortex.

16          So if you look at that red line, it's my impression

17   that almost all of them except two all ending up at the

18   group which have larger hippocampus.  So, almost all the

19   small entorhinal cortices -- I'm sorry, I misspoke --

20   entorhinal cortices end up with larger entorhinal cortices.

21          THE COURT:  Let me see if I just understand your

22   understanding.

23          Are you suggesting here that this fellow, for

24   example -- is this subject 59 here?  What's the second?  Is

25   that the --

```
 1              THE WITNESS:  It's the subject identification

 2      number.

 3              THE COURT:  That's the subject.  So this is one

 4      subject.  So, over in this first column subject 59 is here.

 5      But over in this second group of numbers there's the number

 6      59, he's there.

 7              THE WITNESS:  Right.

 8              THE COURT:  Well, all right, for just simplistic --

 9              THE WITNESS:  Yes.

10              THE COURT:  -- sake.  So, here on the first column

11      you've told us what you think this sets out is, this ranks

12      all these people based upon the size of their entorhinal

13      cortex.

14              THE WITNESS:  Right, from the first measurement,

15      that's my understanding.

16              THE COURT:  From the first measurement.

17              THE WITNESS:  From the first measurement.  This

18      column --

19              THE COURT:  Ranks them.

20              THE WITNESS:  -- ranks them according to their

21      second measurement.

22              THE COURT:  Thank you.

23              THE WITNESS:  And the red lines draw the

24      connections of those individuals that are identical.  So, as

25      you said, the judge said, this number 9 moved over here,
```

```
 1    this fellow, which had a very small hippocampus, moved

 2    actually all the way down to a big entorhinal cortex.

 3              THE COURT:  Go ahead, Mr. Friedman.

 4              MR. FRIEDMAN:  Thank you.  If we could -- I don't

 5    want you to hold the chalk for too long.  Can I set it down?

 6              THE COURT:  It's your case.

 7              MR. FRIEDMAN:  Okay.

 8              And, Madam Clerk, could we turn to the Pad.

 9              THE COURT:  Now, while he's setting up, you both

10    looked at the measurements of these other folks, Dr.

11    Killiany, Ms. Gomez, you looked at those, and did you do

12    measurements yourself?

13              THE WITNESS:  On those data set, no.  It was not

14    possible.

15              THE COURT:  All right.  Thank you.

16    Q    Okay.  So, in the chalk that we've already looked at,

17    you talked about already number 56.  I want to turn, go to

18    the next, the next normal that we have a red line for.  And

19    that's patient, subject number 103.  And for that we have

20    Exhibit 118, that will be in evidence.

21              THE COURT:  Mr. Friedman, you've suggested that

22    that particular subject is a normal.  I'm trying to follow

23    this.  How do you know that?  I mean, and you can't testify.

24              MR. FRIEDMAN:  Your Honor, the parties have

25    stipulated as to which patients, which subjects had which
```

1   status, which group.  So, there's no dispute on that.

2           **THE COURT:**  And that's --

3           **MR. ROSE:**  We stipulated as to some, your Honor, as

4   to subject 56, yes.

5           **THE COURT:**  That is stipulated.

6           **MR. ROSE:**  It was in the normal category.

7           **THE COURT:**  Thank you.  All right.  Just so we're

8   following, to save your time, the lawyers dispute various

9   things, the parties dispute various things.  But to save you

10  time they don't dispute everything, and when they don't

11  dispute, they stipulate.  So even though it's Mr. Friedman

12  who told us this about this particular subject, Mr. Rose

13  agrees, no dispute that this particular subject is in the

14  normal category.  It's evidence even though the data comes

15  from the lawyers.  And I've been careful to say they're not

16  the source of data, witnesses are the source of data.  But

17  when they agree that's evidence, in fact, it's not disputed.

18          Go ahead, Mr. Friedman.

19          **MR. FRIEDMAN:**  All right.  So, do we have -- if we

20  can go to the next page.

21  **Q**  So, what we have here is subject 103.  And here on this

22  showing we have the, the drawing initially by Dr. Killiany.

23          Can you do a highlight on that.  Okay.  And then we

24  can turn to the next page.  Here you go.  And can you

25  highlight that.

```
 1              Okay.  Dr. Schuff, can you see those images?

 2      A   Yes.

 3      Q   And this is for subject 103.  It started out as the

 4      ninth smallest and was moved down to the 77th smallest.

 5              Can you tell us your impression in terms of the

 6      differences between these two tracings, in terms of

 7      similarity?

 8      A   Yes, we see the difference.  What you see here is mainly

 9      on the left side, so that is in blue, where the body of the

10      entorhinal cortex was enlarged.  My impression was that

11      the -- can I touch this here or -- oh, yeah, right.  So, for

12      example, at the initial -- sorry, I'm looking at the initial

13      markings, which are on the top, there was an agreement

14      between Dr. Gomez and Dr. Killiany where to end the, the

15      boundary towards the temporal lobe, the inner part of the

16      brain.  And that is, as you see here, extended for the

17      boundary that I thought they had agreed upon.  So that made

18      this structure look larger.

19      Q   And if we can go to the next exhibit, 143.

20              No, you can take care of this.  Now, we're going to

21      look at Exhibit 143 which is subject 136.  Now, we're

22      looking at subject 136 which started out as the 15th

23      smallest and ended up down here as 98th smallest.

24              Can you tell us your impression about the two

25      tracings by Dr. Killiany?
```

1   A   Yes.   I tried my best.   The contrast is not that great.

2   I'd like to just explain to the jurors that when we look at

3   these images, we have also real high resolution monitors and

4   we go through certain training cycle how to display the

5   contrast of the images so we see that very carefully.   And

6   that's not the quality I'm used to look at.   But I can -- I

7   have my impression here.

8           And so, again the top you'll see the initial

9   markings which I thought, I understand according to the

10  protocol.   Again, with respect to the inner, let's say the

11  lateral border and the medial border, which is this one

12  here, I'll try to make this one, and this one.   So you see

13  in the revised version, for example, this border, the medial

14  border has it from the red from, the red is the left side, I

15  believe, has extended towards the medial part of the brain

16  which again I couldn't really follow their protocol whether

17  that was ever established.   So that is a change.   And also

18  on the right side in this case, as you see the drawing

19  extends more to the medial part of the brain which I also

20  could not really replicate in terms of when I read the

21  protocol what they had established.

22          **MR. FRIEDMAN:**   Madam Clerk, could we turn to the --

23  back.   And can you clear that screen.

24  **Q**   So we're going to look at subject 103 again using this

25  device.

1          **MR. ROSE:**  Exhibit?

2          **MR. FRIEDMAN:**  It's Exhibit 118.

3     **Q**   Okay.  So, here is this first drawing.  Do you see that?

4     **A**   Yes.

5     **Q**   And then the second one.

6          Can you tell us what your impression is with

7     respect to the change after the revision?

8     **A**   Yeah, this is a little more subtle case.  But it's

9     still, as you see at the, at the left side, again, I would

10    say this drawing goes into the boundary set on the lateral

11    part of the brain that I thought they had established as you

12    should not penetrate this boundary of the white matter.

13    **Q**   Okay.  Could you clear the screen for us.

14    **A**   Clear the screen.  Yes.

15    **Q**   And that was slice 65.  Let's go to 66.  This is

16    initial, this is second.

17         What's your impression about that?

18    **A**   Yeah, here, here this is a case where an error was made.

19    And you see at the bottom here.  I have a hard time with the

20    arrows.  So, you see at the bottom, the second drawing, the

21    entorhinal cortex extends outside the boundary, the outer

22    surface of the brain.  I thought they had in their initial

23    drawings very carefully identified the surface of the brain.

24    **Q**   And on slice 67.  If we could clear the screen again.

25    Thank you.

1           The differences between the first and the second

2    drawings?

3    A   Yeah, here, my impression is -- can you go back and

4    forth, please.

5           Again, on both sides, the boundaries on the right

6    and on the left were extended into regions which I thought

7    they had formed initially an opinion about where they draw

8    boundaries, but this extends over these boundaries both on

9    the medial side of the brain.

10   Q   Okay.  And to look at -- the next one is 136.

11          Dr. Schuff, do you have your report in front of

12   you?

13   A   I have it, yes.

14   Q   Do you recall making notes as you looked through the

15   slides?

16   A   I put my impression on each of the subjects in writing,

17   yes.

18   Q   Could you look at your notes and tell us what you noted

19   for subject 56, which was the big chalk that we had up.

20   A   So, in case 56 -- do you want to bring this up?

21   Q   Well, just from your notes.

22   A   So, I first looked at the drawing of Dr. Killiany as

23   well as his handwriting or typewriting, I forgot exactly

24   what it was, the comment about reasoning why the boundaries

25   would change.  In terms of 56 it was claimed error inferior

1    surface of the entorhinal cortex.  That would be the surface

2    you see towards the middle of the brain.  And in my opinion,

3    I wrote then when I saw this the first time:  Initial

4    measurements were slightly too short with respect to the

5    collateral sulcus.  This is a distinct landmark which they

6    also identified in the upper, not inferior surface.

7    Revisions penetrate into the white matter and into subiculum

8    on the right inconsistent with established protocol.

9    Q    Okay.  And how about, right now on the screen we have

10   subject 136.  What did, what did you say for subject 136?

11   A    One second, please.  They are not in order here.

12        136.  So, my notes said was normal drawing.

13   Revisions penetrate into hippocampus.  This is the region

14   above the entorhinal cortex, here.  And, and I see CSF

15   spaces.  I wrote ventricular spaces but I meant CSF spaces.

16   Inconsistent with established protocol.

17   Q    Okay.  And now I'm going to look at the scans for 142.

18   So, if you could look for your notes on scan 142.  And this

19   would be Exhibit 147.

20   A    Yes.  I wrote normal.  Revisions are exaggerated, badly

21   representing the entorhinal cortex.  Markings deeply

22   penetrate into hippocampus, that was reaching, and

23   ventricular spaces, I meant again outside the brain surface.

24   Inconsistent with the established protocol.

25   Q    What is, what is ventricular space?

```
 1    A   The ventricular space relates to the ventricles
 2    actually.  But in this case, it refers to the area outside
 3    the surface of the brain which is filled with cerebrospinal
 4    fluid which in this case shows a dark, if you have other
 5    contrast in MRI would show up white.  It's just a measure to
 6    see the boundary between the brain surface and contact the
 7    surface.
 8    Q   Okay.  If you could look to subject 112 which is
 9    Exhibit 123.  And if you wouldn't mind clearing the screen
10    on that, Dr. Schuff.
11    A   Yeah, I'm still searching for that in my notes.  112,
12    yes.
13    Q   Okay.
14    A   I remark normal from original drawing.  In my opinion,
15    initial markings had no major errors.  But revisions
16    penetrate in white matter.  So you see this is here the
17    bright areas, this is white matter in the brain, not belong
18    to the entorhinal cortex.  On both sides, although this
19    side.  Inconsistent with established protocol leading,
20    leading to volume increase.
21    Q   Okay.  And now I'm going to turn to subject 1.  If you
22    could find your notes on that.  And this is Exhibit 66.
23    A   So, I wrote for this subject, taken from Dr. Killiany's
24    notes, claim invalid measure on inferior, inferior surface,
25    which I interpreted as the surface towards the middle of the
```

1    brain.  And I wrote:  In my opinion initial measurements are

2    consistent with the protocol.  Perhaps, perhaps entorhinal

3    cortex a bit skinny.  I used that expression.  Revised

4    markings of the entorhinal cortex penetrating to white

5    matter on both hemispheres and extend partially into the,

6    into the rhinal sulcus, the bottom of the entorhinal cortex.

7    Inconsistent with the protocol that Dr. Killiany and Dr.

8    Gomez had established.

9    Q    Now, we're going to look at subject 122 which is

10   Exhibit 132.  Oh, I'm sorry, 122.

11            Can you find that one in your notes as well?

12   A    Sorry, I don't have those notes in front of me.

13   Q    We will go to the next subject which is 140.

14   Exhibit 145.  Do you have 140?

15   A    Yes.  Claim invalid measure on sulcul border and

16   inferior surface.  Sulcul border means the, the little part

17   here, entorhinal cortex.  And this is not really numbered.

18   And I think I continue here:  In my opinion, no major

19   errors.  Revisions deeply penetrate after the revisions into

20   hippocampus, again, the top is extended to the top and into

21   white matter.  Inconsistent with established protocol.

22   Q    Okay.  I'm going to look at one more here, Exhibit 146.

23   Subject 141.  Do you have -- find 141.

24   A    Can you go back?  Yeah.  So the claim is invalid

25   measurement on sulcul border and inferior surface.  Sulcul

1    border would be here.  The bottom inferior surface to the

2    middle of the brain.  In my opinion, there were no major

3    errors.  Revisions aren't exactly representing the

4    boundaries of the entorhinal cortex, penetrating, deeply

5    penetrating the hippocampus and ventricular spaces.

6    Inconsistent with the established protocol.

7    **Q**   Do you have -- can you find your notes on subject 59

8    which would be Exhibit 96 in terms of your evidence.

9    Subject 59.

10   A    I have 59, yes.

11   **Q**   Okay.  Would you please tell our jury what, what your

12   notes say for that subject?

13   A    So, the claim in Dr. Killiany's notes, notes were claim

14   error on the inferior surface and sulcul border.  In my

15   opinion, these measurements were slightly too short with

16   respect to the collateral sulcus which is the lower, one of

17   the lower landmarks to place a border, but not inferior

18   surface.  Revisions penetrate into the subiculum.  That is

19   that upper part of the entorhinal cortex.  Penetrating the

20   subiculum and liberal interpretation of sulcul border,

21   leading overall to a marked volume increase of the

22   entorhinal cortex.  Revised markings are inconsistent with

23   the established protocol.

24   **Q**   And finally, if you could look at subject 114, if you

25   have notes for when you reviewed 114.  This one down here.

1    A    Yes, I have my notes on 114.

2    Q    Would you let our jury know.

3    A    The claim here is error sulcul border and inferior

4    surface.  In my opinion, there were no major errors.

5    Revisions are overdone penetrating into white matter and

6    deeply into hippocampus.  Inconsistent with the established

7    protocol leading to substantial volume increase.

8    Q    Okay.  So, we've gone through the normals that were,

9    that are on Exhibit 178.  I want to return to question three

10   that I had for you, and breaking it down into two parts.

11        With respect to the initial measurements, what is

12   your opinion with respect to Dr. Killiany's original

13   measurements with respect to question three?

14   A    My opinion was original measurements were without major

15   error according to the protocol Dr. Killiany and Dr. Gomez

16   had established.

17   Q    And with respect to the revised measurements that Dr.

18   Killiany made, what is your opinion on that?

19   A    My opinion is that after seeing the revisions that there

20   were changes made that deviated substantially from that

21   initial protocol which I would consider were measurement

22   errors.

23   Q    Now I want to turn to the fourth question that we had

24   for you regarding scientific basis for these revisions.

25        First of all, you mentioned when the judge was

1   asking you questions that, about being biased towards the

2   normals.  Can you explain what you mean by selective

3   revision biased towards the normals?

4          **MR. ROSE:**  Objection, your Honor.

5          **THE COURT:**  Sustained on that foundation.

6   **Q**   Well, can you explain what your opinion is with respect

7   to the fourth question?  Not what your question is, but what

8   the terms mean selective enlargement?

9          **MR. ROSE:**  Objection, your Honor.

10         **THE COURT:**  Yes, sustained.  I don't understand

11  your question.

12         **MR. FRIEDMAN:**  Okay.

13  **Q**   What did you do to answer your question number four?

14  What did you do?

15  **A**   The question, I don't see the question from here.

16  **Q**   Okay.

17  **A**   Can you --

18  **Q**   Sure.

19         **THE COURT:**  Maybe -- this is not -- let me see the

20  question, too.  And here's my problem, sir.

21         Well, you understand these questions lawyers came

22  up with.  Right?  I mean, Dr. Jones' lawyers came up with

23  those questions?

24         **THE WITNESS:**  They posed those questions to me.

25         **THE COURT:**  Let's see if I understand your

1    testimony.

2            This is what -- well, let's see if I've got this

3    right.  You've looked at the measurements of Dr. Killiany

4    and you've compared them to the measurements, and I'm sorry,

5    I don't have -- her last name is Gomez.

6            THE WITNESS:  Gomez.

7            THE COURT:  Gomez.  And don't let me put words in

8    your mouth because now I'm like leading, which I tell them

9    not to do.  By and large those measurements are consistent.

10   And you thought you could figure out the protocol that the

11   two of them were following.  Is that accurate?

12           THE WITNESS:  That's, that's accurate, yes.

13           THE COURT:  Okay.  Then you look over in the third

14   column and in the third column there you're again looking at

15   measurements of Dr. Killiany.

16           THE WITNESS:  Correct.

17           THE COURT:  And with respect to, at least as I have

18   been listening to your testimony, with respect to various of

19   those measurements your view looking at it is that those

20   measurements are for one reason or another erroneous,

21   inaccurate?

22           THE WITNESS:  Inaccurate, correct.  Yeah.

23           THE COURT:  All right.  Now put your question,

24   Mr. Friedman.

25

1   **BY  MR. FRIEDMAN**

2   **Q**   In addition to being inaccurate, do you have any other

3   opinions with respect to the revisions?

4           **THE COURT:**  I didn't mean anything by putting this

5   down.  Do you want me to hold this for you?

6           **MR. FRIEDMAN:**  If you could just, for the fourth

7   question, if you could hold it for one second.

8           **THE COURT:**  All right.

9   **Q**   On the fourth question --

10          **THE COURT:**  But, but before we beat this to death,

11  it's that word selective, that's your word.  Now, we'll see

12  what he says about that, if you want.  But you can't lead

13  him.

14          **MR. FRIEDMAN:**  Okay.

15  **Q**   Can you tell us what, what our question to you meant,

16  question number four, what it meant?

17          **MR. ROSE:**  Objection.

18          **THE COURT:**  Sustained.  We're interested in this

19  case.

20  **Q**   In this case, what is it that you formed an opinion with

21  respect to the revisions that Dr. Killiany made?

22          **MR. ROSE:**  Objection.

23          **THE COURT:**  No, come to the side bar.

24  SIDEBAR CONFERENCE, AS FOLLOWS:

25          **THE COURT:**  Now, you've had things pretty much your

1   way so far this morning, but you're coming aproper on

2   selective, even though they didn't object to you putting

3   this up.  That's argument.  He can't testify as to

4   Killiany's state of mind, a crucial matter here, which your

5   exhibit, which I've let in, assists you.  But I'm not

6   letting him testify that in his judgment these choices were

7   selective.  He may testify as to the facts.  It wound up

8   with the smaller hippocampuses together or the larger

9   cortexes together.  Anything that's factual, and he may, as

10  he already has, testify that when he looked at this, of

11  course, he's not looking at it with the fine detail, I

12  guess, that he says they usually do, he thinks the

13  measurements, that Killiany's measurements aren't all that

14  hot.  That's fine.  He does measurements.  Let him testify

15  as to those measurements.  Okay.

16          **MR. FRIEDMAN:**  Your Honor, the word selective is

17  his testimony, it wasn't mine.

18          **THE COURT:**  I haven't heard it.

19          **MR. FRIEDMAN:**  It was --

20          **THE COURT:**  You've led him and led him.  I haven't

21  heard it.  I'm not going to let him testify even if it was

22  his testimony.

23          **MR. FRIEDMAN:**  Okay.

24          **THE COURT:**  But I haven't heard it.  Witnesses

25  cannot testify as to the veracity of other witnesses.  I'm

1    not allowing it.  You can argue it.  Of course it's central

2    to the case.

3              MR. FRIEDMAN:  Right.

4              THE COURT:  You're laying a foundation.  That's

5    fine.  But he's not going to that conclusion.

6              MR. FRIEDMAN:  Okay.  Thank you, your Honor.

7              (Whereupon the sidebar conference concluded.)

8    BY  MR. FRIEDMAN

9    Q   With respect to your testimony today, is there any --

10   well, did you, what did you do to determine the question on

11   number four?  What did you do to determine whether or not

12   there was --

13             MR. ROSE:  Objection.

14             THE COURT:  No, sustained.  You have my guidance.

15   Proceed.

16   Q   What is your opinion with respect to the scientific

17   basis for Dr. Killiany's revisions?

18             MR. ROSE:  Objection.

19             THE COURT:  Well, on that foundation, sustained.

20   But you may explore it.

21   Q   Did you do anything to determine whether there was a

22   scientific basis for Dr. Killiany's revisions?

23   A   Yes.  I looked at those markings and tried to identify

24   whether or not they were consistent with the protocol they

25   had established.

1    **Q**    Okay.  And what is your opinion on that point?

2    **A**    My, my opinion is that there was not, there was not a

3    scientific reason to make those changes that we saw based on

4    the numbers as well as based on the tracings.

5    **Q**    Now, when you formed your opinion on that, did you look

6    at only the tracings that were revised?

7    **A**    No.  I looked at those sets that I had.  So those were

8    tracings revised as well as those set of tracings that were

9    not revised.  Because I wanted to give my opinion to whether

10   those traces were systematically done for a particular group

11   or particular form of the brain or not.  So I looked at both

12   sides.

13   **Q**    And if you could look at your notes.  One of the ones

14   that Dr. Killiany, that we have already testified to was

15   subject 56.  But we haven't talked about subject 53.  This

16   would be in your second appendix.

17   **A**    You want --

18   **Q**    I would like you to explain to the jury if you saw

19   anything with respect to subject 53 which is --

20   **A**    No, I made my notes.  There were no major errors.

21   Entorhinal cortex, very skinny is the word, narrowly drawn.

22   But no major errors.

23   **Q**    And what did your notes indicate to you as to whether or

24   not that one was revised?

25   **A**    It was not revised.

1    Q    In looking at the ones that were not revised, can you

2    tell the jury what your impression was with respect to the

3    items that were not revised?

4         MR. ROSE:  Objection.

5    Q    In terms of their similarity to the ones that were

6    revised.

7         MR. ROSE:  Objection.

8         THE COURT:  I'm not -- I didn't understand it.  Try

9    it again.

10        MR. FRIEDMAN:  Okay.

11   Q    You testified, Dr. Schuff, that you looked at the ones

12   that were not revised as well as the ones that were revised.

13   Can you tell the jury what your impression was with respect

14   to the ones that were not revised?

15        MR. ROSE:  Objection, your Honor.

16        THE COURT:  No.  Well, I'm not sure I understand

17   that.  The way I'm following you, looking over all this data

18   you couldn't see a scientific basis for the, what you've

19   called revisions; isn't that right?

20        THE WITNESS:  That's, that's right.  But to form

21   this opinion, I also had to look at those who were not

22   revised.  So if you just look at those that were revised,

23   it's unclear whether the revisions were done.  When I

24   identified that revisions were done, I wanted to see whether

25   those criteria which I thought were used to make revisions

1    were also done to those where no revisions were done.

2            **THE COURT:**  And were they?

3            **THE WITNESS:**  Well, yes, there were, there were

4    similarities between the middle drawings between those that

5    were revised and those that were not revised.  So, there was

6    no point for me to identify the reason why those were

7    revised, were actually revised, when I looked at those that

8    were not revised.

9    **Q**   And so, what is your opinion with respect to the

10   scientific justification for the revisions after looking at

11   all of the scans?

12   **A**   There was no, in my opinion, no scientific justification

13   to make those specific revisions that were done to

14   particular subjects and not to other subjects.

15   **Q**   Thank you, Dr. Schuff.

16           That handles, that deals with the questions that we

17   had posed to you.  But I want to ask you some questions

18   about other issues that were raised by the defendants in

19   this case.

20           **MR. ROSE:**  Objection, your Honor.

21           **THE COURT:**  Well, the statement is all stricken,

22   disregard it; ask him questions.

23           **MR. FRIEDMAN:**  Okay.

24   **Q**   Now, in this case the defendants have given you a --

25           **MR. ROSE:**  Objection, your Honor.

1      **THE COURT:**  Ask him questions.  You may show him a

2   document if you want.

3   **Q**   Did you do anything in connection with this case with

4   respect to a report by Dr. Andrew Saykin?

5          **MR. ROSE:**  Objection, your Honor.

6          **THE COURT:**  Come to the side bar.

7   SIDEBAR CONFERENCE, AS FOLLOWS:

8          **THE COURT:**  Are we going beyond the report that's

9   been passed up to me?

10         **MR. FRIEDMAN:**  No, your Honor, it's all been there.

11  The only issue is Dr. Schuff can't come back.  So we were

12  having him do whatever rebuttal is necessary at this time.

13         **THE COURT:**  Well --

14         **MR. ROSE:**  It's in response to a report that might

15  never come in, your Honor.

16         **THE COURT:**  Wait a minute.  First of all, telling

17  me a witness can't come back doesn't cut it.

18         **MR. FRIEDMAN:**  Oh, I'm sorry, your Honor.

19         **THE COURT:**  You hired him.

20         **MR. FRIEDMAN:**  Yes.

21         **THE COURT:**  You hired him at, one imagines, a

22  rather hefty fee.  So that means nothing.  Sustained.  If

23  you need to rebut you may.

24         **MR. FRIEDMAN:**  Your Honor, may I just say, your

25  Honor, that his wife is in the hospital.  And he won't be

1    able to come back.  She's dying of cancer.  And I have no

2    way of being able to get him to come back.

3              THE COURT:  Well, that slows me down.  Now, what is

4    it that you want to rebut?

5              MR. FRIEDMAN:  I wanted to have him speak to the

6    matters that were raised in Dr. Saykin's testimony, but each

7    one of them is --

8              THE COURT:  Are you going to put Saykin on?

9              MR. ROSE:  I don't know, your Honor.  I might not

10   put Saykin on.

11             THE COURT:  Well, this is -- but now you get that

12   choice.  You don't put Saykin on, he's gone.  That's it for

13   him.  You put Saykin on, he's got to be a lot more specific

14   about what he wants to rebut.  But I'm to allow it in view

15   of the personal circumstances.

16             So, are we going to hear from Saykin or no?

17             MR. ROSE:  Your Honor, I haven't made a decision

18   yet about bringing Saykin in from Indiana to testify.

19             THE COURT:  Well, this is what trials are all

20   about.  We can take the morning recess and let you think

21   about it.  Or -- but I need to know.

22             MR. ROSE:  I guess I would need to know, your

23   Honor, whether or not if he's going to be allowed to rebut

24   Saykin, whether Saykin's report would come into evidence

25   now.

```
 1              THE COURT:  Well, the report won't come into

 2    evidence.  Come into evidence now, no.  I'm having a lot of

 3    trouble with his leading, but I'm sustaining you when you

 4    object to that.  So that seems to proceed fairly.  And if

 5    he's going to rebut he's got to be very specific.

 6              So, let's try that.  What do you want to rebut out

 7    of Saykin's report?

 8              MR. FRIEDMAN:  Some of these things are also

 9    raised --

10              THE COURT:  Not some of these things.

11              MR. FRIEDMAN:  I'm sorry.

12              THE COURT:  Precision is important.

13              MR. FRIEDMAN:  Yes.  Let's see.  Excuse me.

14              THE COURT:  Oh, these are your questions.

15              MR. FRIEDMAN:  These are my notes.

16              THE COURT:  I'm awfully sorry.  I thought I had the

17    report.

18              MR. FRIEDMAN:  I'm sorry.  Okay, the questions --

19              THE COURT:  Why don't you show me the report.

20              MR. FRIEDMAN:  The learning, the learning curve.

21              THE COURT:  Wait a second.  Let me get the report.

22    And forgive me, I didn't mean to look at your notes.

23              MR. FRIEDMAN:  I'm sorry, your Honor.

24              THE COURT:  Okay, here's the report.  Where, what

25    part of this report --
```

1              MR. FRIEDMAN:  Supplemental.

2              THE COURT:  Yes.

3              MR. FRIEDMAN:  Here.

4              THE COURT:  Fine.

5              MR. FRIEDMAN:  Every, every one of the paragraphs.

6    So I have paragraph 6 and 14, talking about the learning

7    curve.

8              THE COURT:  Thank you, just a moment.  Six.  And

9    what else?

10             MR. FRIEDMAN:  Whether he was blinded, paragraph 8

11   and 12.  And 9.

12             THE COURT:  Eight.

13             MR. FRIEDMAN:  Eight and 9 and 12.  And 12.

14             THE COURT:  And 12.  All right.

15             MR. FRIEDMAN:  Accuracy, paragraphs 11 and 15.

16             THE COURT:  Eleven and 15.  Okay.

17             MR. FRIEDMAN:  Leaders in the field.  That's

18   paragraph 16.

19             THE COURT:  You're going all out, Mr. Friedman, you

20   want it all.

21             MR. FRIEDMAN:  I was hoping to get all of them if

22   given the opportunity to do it.

23             MR. ROSE:  Your Honor, I don't think he should be

24   questioning about what the response --

25             THE COURT:  Please, please, please.  We'll go

1    question by question.  He's going to have a hard time with

2    this.  And that says nothing about the merits.

3              **MR. FRIEDMAN:**  No.

4              **THE COURT:**  The, the conclusory and argumentative

5    nature of the witness's supplemental report would give any

6    attorney pause.  That's all I'm saying.  But on the unique

7    circumstances of this case, he may go through this as best

8    he can.  If you're going to put Saykin on.  If you're not

9    going to put Saykin on, we're done with him, at least we're

10   done with this direct.

11             Now, do you want it tell me now or do you want to

12   take the recess?

13             **MR. ROSE:**  Take the recess.

14             **THE COURT:**  That's what we'll do.

15             (Whereupon the sidebar conference concluded.)

16             **THE COURT:**  To make things run more smoothly we're

17   going to take the morning recess at this time.  We'll start

18   again at five minutes after 11:00.  And you can see I've run

19   into a snag.  So, we'll take the recess, I'll work through

20   that, we'll start with you folks again at five minutes after

21   11:00.

22             Keep your minds suspended.  Do no discuss the case

23   either among yourselves nor with anyone else.

24             The jury may recess.  I'll remain on the bench.

25             **THE CLERK:**  All rise for the jury.

1          (Whereupon the jury left the courtroom.)

2          **THE COURT:**  Please be seated.

3          You may step down, sir.

4          (Whereupon the witness stepped down.)

5          **THE COURT:**  Two things before I recess.  First is

6    that juror question that a juror wants to read the Killiany

7    paper.  So I had it passed.  But you can hardly read it.

8    Consistent with my instructions, I think we might well make

9    copies of it for the jury and give them to each of the

10   jurors.

11         Is there any objection to that?  We could have that

12   ready for tomorrow.

13         **MR. ROSE:**  No, your Honor.

14         **MR. FRIEDMAN:**  No.

15         **MR. HUGHES:**  No objection.

16         **THE COURT:**  Fine.  Then why don't you take care of

17   it and I'll tell them when we come back, they'll each have

18   their copy, they're not to talk about it with anyone, but

19   they can have their copy.

20         Here's another juror question, but we'll, we'll

21   reflect on that.

22         Now, one last thing with respect to the colloquy at

23   the side bar.  I see no reason to put this defense witness's

24   report in evidence as everyone makes their calculus.  But

25   rather than assuming the defense case, Mr. Friedman, if he

1    puts him on, and therefore I will allow you to continue your

2    examination, the way we'll do it is you show him the report

3    that you want him to impeach, you will mark it for

4    identification so we know what we're talking about, and then

5    you may direct him to portions of it, they don't have to be

6    read in evidence, and the witness may testify as to his

7    factual data.

8         The supplemental report is rather strikingly

9    argumentative.  And I mean to avoid argumentation.  But with

10   those limitations, if he's going to put that witness on you

11   may continue.

12        Why don't you discuss it among yourselves so we

13   know where we're going at five minutes after 11:00.

14        All right, we'll recess until five minutes after

15   11:00.  We'll recess.

16        **THE CLERK:**  All rise.

17        (Recess.)

18        **THE CLERK:**  All rise.  Court is back in session,

19   you may be seated.

20        **THE COURT:**  I came out at counsel's request but we

21   have a more serious problem.  The foreman, and he timely

22   informed Ms. Gaudet of this when the trial started, he

23   suffers from migraine headaches.  And during one day of the

24   trial he had expressed that he was concerned that one was

25   coming on, and I told Ms. Gaudet and she told him that we

1   would suspend if he was having a migraine.  And it didn't

2   become full blown, and as you can see you have a very

3   engaged jury.  Now he's experienced a migraine.  He's in

4   tough shape.

5           My instinct is to cut him loose with thanks.

6   They've all been very faithful.  But before I do that, I

7   inquire of you.

8           Mr. Friedman, counsel?

9           **MR. FRIEDMAN:**  One moment, your Honor?

10          **THE COURT:**  Sure.

11          **MR. HUGHES:**  Your Honor, may we inquire which

12  juror?

13          **THE COURT:**  It's the foreman.

14          **MR. ROSE:**  The foreman.

15          **MR. FRIEDMAN:**  No. 4.

16          **THE COURT:**  It's in the right most seat in the

17  front row.

18          **MR. HUGHES:**  Okay.

19          (Pause in proceedings.)

20          **THE COURT:**  Let him go?

21          **MR. HUGHES:**  Yes.

22          **THE COURT:**  You agree?

23          **MR. ROSE:**  Yes.

24          **THE COURT:**  All right.  Ms. Gaudet will go back,

25  tell him he's excused and with our thanks.  My thanks and

```
1    the thanks of all counsel.  We understand he's excused.  And

2    then she's going to bring the jury in.

3            So let's pause.

4            MR. ROSE:  Your Honor?

5            THE COURT:  I'm sticking to the time.  What's the

6    issue?

7            MR. ROSE:  I have informed Mr. Friedman that he

8    should continue with, you know, with the examination.

9    However, I see no reason why the name of Dr. Saykin needs to

10   be mentioned on every occasion.

11           THE COURT:  It need not.

12           MR. ROSE:  All right.

13           THE COURT:  It need not.  He wants to get in the

14   data.  It's the data.  But he'll show him that report.

15           MR. ROSE:  I understand that.  But if he wants to

16   ask, you know, this contention, that contention from the

17   defense, I understand that.  I just don't want the name of

18   Saykin being thrown about.

19           THE COURT:  He's perfectly content to proceed that

20   way.

21           MR. FRIEDMAN:  Yes, your Honor.

22           THE COURT:  And in light of that you may, but

23   anchored to the report.

24           MR. FRIEDMAN:  And may I also anchor it to

25   testimony that has already been put in the trial?
```

1       **THE COURT:**  Of course, you may do anything

2   appropriate under the rules.

3       **MR. FRIEDMAN:**  Okay.  Thank you, your Honor.

4       **MR. ROSE:**  When you say testimony that's already

5   been offered what do you mean?

6       **MR. FRIEDMAN:**  Any testimony that came in through

7   the witnesses.

8       **THE COURT:**  Well, we're going to have to see

9   question by question.  That's how trials usually proceed.

10      (Pause in proceedings.)

11      **THE CLERK:**  All rise for the jury.

12      (Whereupon the jury entered the courtroom.)

13      **THE CLERK:**  Court is back in session, you may be

14  seated.

15      **THE COURT:**  Well, a couple of things.  First, as

16  you know we've lost the foreman of the jury.  Like you all,

17  he's been very faithful and you probably know better than I

18  he suffers from migraines.  He has a bad one.  I

19  intentionally picked enough people that we could go on.  I

20  truly am sorry to lose him.  And counsel all agree that it's

21  better to keep to our schedule and keep going right on.

22      Let me reflect on it tomorrow, I'll appoint another

23  foreperson.  But obviously it has nothing to do with the

24  case.  Unfortunately, he is suffering from a migraine and

25  necessarily must be excused.

1      We have a juror question, not written out, but can

2  I, can we get a copy of that article to read.  And the

3  answer is yes.

4      What we're going to do is, we'll make enough copies

5  for all of you, because we have to treat all the jurors the

6  same.  You may take those copies home.  You may read them if

7  you want.  You don't have to.  You can tuck them in your

8  notebooks.  They are for you, as any of these exhibits would

9  be.  Don't seize on that one because a question has been

10  asked about it.  All the exhibits are equal, at least equal

11  going in, but you're the jury, if you want copies, we'll

12  give you a copies.  You will have all the exhibits when the

13  trial is over.

14      Now, the fact you can take it home with you, the

15  words don't talk to anyone about the case or allow anyone to

16  talk to you about the case, that remains.  But with those

17  instructions, we'll have copies for you tomorrow.

18      Mr. Friedman, you may continue.

19      **MR. FRIEDMAN:**  Thank you, your Honor.

20      Madam Clerk, I'm sorry, could I have the Elmo.

21          **DIRECT EXAMINATION** (Cont'd)

22  BY MR. FRIEDMAN

23  Q    Dr. Schuff, do you see a document on your screen?

24  A    Yes.

25  Q    This is an Exhibit 41.  Have you seen the information on

1    this screen?

2    A    Yes, I remember seeing that.

3    **Q**    When you were testifying previously about, about the

4    subject scans and you had mentioned the word claim, is this

5    the document that you were referring to?

6    A    Yes.  So, just for clarification, when I saw that

7    document my understanding taught me that number

8    identification like 00 were the original drawings and 01

9    were I believe measurement from Dr. Gomez and 02 were the

10   revised measurements.  So, that was my understanding.

11   **Q**    Okay.  Well, if you go back to the exhibits you see that

12   the 00 is the initial one and 01 was Dr. Killiany's revised

13   one.  Okay.  There's no dispute on that.

14   A    Okay.

15   **Q**    That's the case.

16        So, looking at subject 1, which on this says

17   003001, there's no dispute that this refers to subject

18   number 1, it's one of the ones you gave testimony on earlier

19   today.

20        In this report it states that the initial

21   measurement 00 was invalid, an invalid measure, error on

22   inferior surface, and 01 says valid measure.

23        Is that your opinion?

24   A    No.  When I look at this case, I refer to you before

25   about my opinion where I first read out the claim, that

1  would be the invalid measure, and then my opinion that

2  relates to that second measure.  So it is a valid measure.

3  In this case, as I said the measurement was not valid,

4  dispute that second statement that it was a valid measure.

5  Q   So, just to clarify, can you state in comparison to

6  number 1, what is your opinion with respect to the validity

7  or invalidity of the first measurement and the validity or

8  the invalidity of the second measurement?

9        MR. ROSE:  Objection, your Honor.  This has been

10  asked, this has been asked and answered.

11        THE COURT:  Yes, I thought it had, with respect to

12  this particular individual.  So I'm going to sustain it.

13        MR. FRIEDMAN:  Okay.

14        THE COURT:  You've been over it.

15  Q   And with respect to subject 56?

16        MR. ROSE:  Objection, your Honor.

17        THE COURT:  And the same grounds, right?

18        MR. ROSE:  Yes.

19        THE COURT:  Yes.  We've been over 56.

20        MR. FRIEDMAN:  Okay.

21  Q   And, Dr. Schuff, is it your testimony today that when

22  the Court asked whether or not you could, whether you did

23  the remeasurement, you testified that you were not able to

24  do a remeasurement yourself.  Can you explain why?

25  A   That's correct, yes.  I mean, I had the data in a form

1    which did not allow me to do remeasurements.  I had,

2    initially I had printouts, I received printouts on paper of

3    those, which are not suitable to make any judgment.  Then I

4    asked to get electronic versions which were in a particular

5    format.  You may know that particular format.  But these

6    individual images, they don't allow you to scroll through

7    the grain or highlight, contrast, modify the brightness and

8    things like that.  So, for these reasons, reasons, I was not

9    able to do any drawings myself.

10   Q   And did any of your inability to do the drawings

11   yourself impact your ability to evaluate and look at the

12   ones that were drawn by Dr. Killiany?

13   A   I don't think so.  My, my impression was really

14   important because I could identify the differences between

15   the drawings before and the revised.  And as part of my

16   position as a principal investigator, I have looked with my

17   group at many, many drawings and reviewed drawings, so I'm

18   very familiar with this aspect of reviewing drawings.

19   Q   Now, I wanted to ask you some questions about issues

20   that might come up later on in trial, or might already

21   relate to testimony that's before the Court.

22         There was testimony that these are difficult to

23   draw and that scientists go through a learning curve in

24   order to do, to be able to draw.  What is your opinion with

25   respect to Dr. Killiany's revisions vis-a-vis learning

```
1    curve?

2              MR. ROSE:  Objection, your Honor.

3              THE COURT:  Sustained on that foundation.

4    Q    Do you have any opinion with respect to what, whether or

5    not Dr. Killiany made the revisions pursuant to a learning

6    curve?

7              MR. ROSE:  Objection.

8              THE COURT:  Well, on that foundation, sustained.

9              Have you got any basis to draw any such conclusion?

10   Sir?

11             THE WITNESS:  Oh, sorry.

12             THE COURT:  That's all right.

13             THE WITNESS:  I thought you were talking to them.

14             THE COURT:  Yes, sometimes I do talk to them.  This

15   time I'm talking to you.

16             Have you got any basis for drawing such a

17   conclusion, any conclusion, about whether a learning curve

18   played a role in this?

19             THE WITNESS:  Well, the issue of learning curve

20   came up, the issue of learning curve came up in a rebuttal I

21   made in response to the defendants' expert report.

22             THE COURT:  Well, that's where you raised it, but

23   I'm trying to get at the facts.

24             This is a human thing, isn't it?

25             THE WITNESS:  Right.
```

1          **THE COURT:**  This mapping areas of the brain, at

2     least the way it was done by Dr. Killiany and Dr. Gomez, and

3     it's a human thing when you do it, isn't it?

4          **THE WITNESS:**  Correct.

5          **THE COURT:**  Right.

6          **THE WITNESS:**  Yeah, it's, it's a difficult

7     structure in the brain and there's a learning curve.  You

8     know, in our lab we had over the years over 20 raters.

9     They're not experts.  We had to train them.  That's a long

10    curve.

11         **MR. ROSE:**  Objection, your Honor.

12         **THE COURT:**  Yes.  Well, you object to that.  We'll

13    stop it there.  But he says there's a learning curve and

14    it's a long curve.

15         Now, in your looking over these exhibits, what he's

16    interested in, what he keeps calling the revisions, are you

17    able to draw any conclusion about whether a learning curve

18    played any role in any of that?  Are you able, just from

19    looking at them?

20         **THE WITNESS:**  Yeah, I think I am able to say that

21    when there was a learning curve it was before they

22    established this protocol because a learning curve is that

23    you do the drawings, you come to a conclusion with your

24    colleague, and then you get together and make drawings and

25    you find consistent protocol and you demonstrate, you have

1    reliability.  So, at the end of the learning curve there's a

2    reliability test, and the test in the paper that was

3    documented was very high.  So, in my opinion, the learning

4    curve had actually finished for that protocol.

5          THE COURT:  All right.  Go ahead.

6    Q    Do you have any basis to form any opinion with respect

7    to Dr. Killiany being blinded to the status of the subject?

8          MR. ROSE:  Objection, your Honor.

9          THE COURT:  Well, no, he can ask does he have any

10   basis for this.  Do you have any basis for knowing?

11         THE WITNESS:  I have no basis for knowing that he's

12   blinded.  The regions of the --

13         MR. ROSE:  Objection.

14         THE COURT:  Well, that's an answer to the question.

15   You don't have a basis for knowing whether or not he was

16   blinded, right?

17         THE WITNESS:  No, I don't.

18         THE COURT:  All right.

19   Q    Do you have a basis to have any opinions on, on the

20   measurements, reliability measurements if somebody is

21   blinded?

22         MR. ROSE:  Objection, your Honor.

23         THE COURT:  I'm going to sustain it on that

24   foundation, but let's ask this.

25         In, in doing the studies that you do, it's routine,

1    isn't it, that the measurer be blinded as to the other

2    aspects of the subject?  Is that right?

3           **THE WITNESS:**  Yes.  I mean, it's very important

4    that when you do the measurements that you are blinded to

5    the clinical identification of the subject.  That's very

6    essential.

7           **THE COURT:**  Yes.

8    **Q**   And what do you do in connection with the studies that

9    you do to determine whether or not even if blinded that the

10   measures remain reliable?

11          **THE COURT:**  I don't understand the question, I'm

12   sorry.

13   **Q**   My question is, do you have a basis for any opinion on

14   the need for reliability studies even when you know that the

15   tracers are blinded?

16          **MR. ROSE:**  Objection, your Honor.  This was covered

17   in the direct.

18          **THE COURT:**  I thought it had.  This is still the

19   direct.

20          **MR. ROSE:**  Excuse me, your Honor.

21          **THE COURT:**  But I'll sustain it because it's been

22   asked and answered.

23   **Q**   There was testimony previously by Dr. Albert.  Did you

24   review the testimony that the jurors have heard so far?

25   **A**   Yes, I did.

1    **Q**   And she made a reference to a statement that Dr.

2    Killiany's revisions may have been to make them more

3    accurate.  Do you recall reading that testimony?

4    A   Yes, I do.

5    **Q**   Do you have any opinion with respect to whether or

6    not -- do you have a basis to have an opinion as to whether

7    or not Dr. Killiany's measurements were revised to make them

8    more accurate?

9            **MR. ROSE:**  Objection, your Honor.

10            **THE COURT:**  Sustained in that form.  But -- let's

11   not strain at a gnat.  You don't think they're more

12   accurate, do you?

13            **THE WITNESS:**  No.  The concept of --

14            **THE COURT:**  Yes.

15            **THE WITNESS:**  Could I --

16            **THE COURT:**  No, you've answered.  You don't think

17   they are.  We'll leave it there.

18            Go ahead, Mr. Friedman.

19   **Q**   Now, there may be a contention that, that Dr. Killiany

20   and Dr. Albert were leaders in the field.  Do you have an

21   opinion on that?

22   A   Yes, they were leaders in the field.

23   **Q**   And how does the fact that they were leaders in the

24   field impact your opinions that you've given us?

25            **MR. ROSE:**  Objection, your Honor.

```
 1              THE COURT:  No, overruled.  To the extent it's in
 2    the report he may tell us.
 3    A    Well, we have leaders in the field.  The outcome of
 4    papers and studies that come out of laboratories like this
 5    are very important for the scientific community to follow in
 6    the directions they lead us.  It's very important to judge
 7    also the history of this laboratory in terms of scientific
 8    impact in the field, that's very important to make judgment
 9    about results.
10    Q    And there was also testimony that Dr. Albert offered
11    that other scientists had tried to repeat these results.
12              Do you recall reading that testimony?
13    A    Yes, I did.
14    Q    Do you have any opinion on that?
15    A    Yeah.  I mean, there's no doubt that the entorhinal
16    cortex is a very important region to look into the brain to
17    determine the development, progression of Alzheimer's
18    disease or the prediction.  There's no doubt about that.
19    And our lab, including ourselves, our own lab, tried to
20    pursue those endeavors in the field.
21              THE COURT:  There's a juror question, and you may
22    be able to help us with part of it.
23              When you do these measurements, sir, in your lab,
24    you do it using a computer program and moving a mouse; is
25    that right?
```

1          THE WITNESS:  Yeah, we are using a mouse or an

2     electric pen.

3          THE COURT:  Very well.  And you have some sense of

4     the period over which Dr. Killiany did the measurements that

5     are at issue in this case, right?

6          THE WITNESS:  Approximately.  I think this is still

7     readily a number of subjects, I would guess was able to

8     do --

9          THE COURT:  Well, when you use the word guess, I

10     have to stop you because I'm going to tell them they can't

11     guess.

12          THE WITNESS:  Yes.

13          THE COURT:  So your saying I guess this or I guess

14     that isn't going to be any help.

15          But my question is a simple one.  And over what

16     period do you understand he did these measurements?

17          THE WITNESS:  My understanding is over a period of

18     a month or a couple of months.

19          THE COURT:  In what year?

20          THE WITNESS:  Before they published the first

21     paper, so it was before 2000.

22          THE COURT:  All right.  Now, were you active in the

23     field yourself at that time?  Were you doing measurements

24     back in '98, '99, 2000?

25          THE WITNESS:  No, we did not -- at that time we did

1   not actually look particularly in the entorhinal cortex.

2   We, our lab was focusing specifically on a variant of MRI

3   which looked into spectroscopy of the brain.  And after

4   that, actually we, we and others started to look more and

5   more into the entorhinal cortex.

6           THE COURT:  And do you know, yourself, though, you

7   can tell us if you don't, back then whether there were any

8   improvements in the computer programs used to measure the

9   brain, even though you weren't doing it?  Weren't doing it

10  in that regard.

11          THE WITNESS:  Yeah, there were -- so, the situation

12  back then was there were several labs, very few expert in

13  the world who tried to outline the entorhinal cortex.  And

14  the protocol that Dr. Killiany and Gomez came up with was a

15  very simple one, very fast actually, and only measured a few

16  aspects of the entorhinal cortex.  Those studies we did not

17  pursue that way, but we went to another protocol which is

18  more complicated, takes much more effort, much more time,

19  people have to be much more trained, we have to set up a

20  very broad array of tests and validations, training to

21  pursue that.  And there was other protocols as well.  But

22  that was the progress of this.

23          THE COURT:  But the way you understood it and the

24  data you've reviewed to get yourself ready to testify here

25  today, they were using a certain computer program and a

1    certain computer setup, both at the beginning and at the

2    end.  Is that right?

3              THE WITNESS:  That's right.

4              THE COURT:  They didn't change over the time these

5    measurements were taken?

6              THE WITNESS:  I didn't see any evidence that they

7    changed the computer program.

8              THE COURT:  Mr. Friedman, anything else?

9              MR. FRIEDMAN:  Yes.

10   Q   Dr. Schuff, can you tell our jury whether or not other

11   scientists have repeated the conclusions that were reached

12   in Dr. Albert and Dr. Killiany's study?

13   A    There were several attempts.  There is -- very few came,

14   very few report came out after 2004 those particular

15   approaches to measure the entorhinal cortex manually.  Over

16   the years of course progress has been made.  Not measuring

17   the volume of the entorhinal cortex but measuring the

18   thickness.  Also programs have been devised now which

19   measure automatically all the regions of the brain.  So a

20   lot of progress is being made, but not particular, this

21   protocol has not been fully followed up.

22             MR. FRIEDMAN:  Thank you, your Honor.  Those are

23   our questions.

24             THE COURT:  Mr. Rose.

25

1  **CROSS-EXAMINATION**

2  **BY MR. ROSE**

3  **Q**   Good morning, Dr. Schuff.

4  A   Good morning.

5  **Q**   Now, sir, you are not a neuroanatomist, are you?

6  A   No.

7  **Q**   And isn't it the case that there are at least four or

8  five different protocols for attempting to measure the

9  entorhinal cortex on an MRI scan?

10  A   Yes, there are several protocols.

11  **Q**   Yes.  And you used, or the people in your lab used a

12  version by, a version developed by a man named Insausti,

13  correct?

14  A   Correct.

15  **Q**   And you sent a graduate student, I believe to Helsinki,

16  and he was there for three months in order to learn how to

17  use that protocol; isn't that right?

18  A   It was not a graduate student.  It was not a graduate

19  student.

20  **Q**   Postdoc?

21  A   It was a neuroradiologist postdoc.

22  **Q**   Correct.  In any event, he went to, he went to Helsinki

23  for three or four months to learn --

24  A   Right.

25  **Q**   -- the Insausti method, and he came back, correct?

1    A    Correct.

2    Q    And then the group of you in your, in your lab were then

3    trained on using the Insausti method; isn't that right?

4    A    That's right.

5    Q    And it's it fair to say, sir, that the Insausti method

6    is very different from Dr. Killiany and Dr. Gomez-Isla's

7    method?

8    A    That's right.

9    Q    In fact, the method that was used in your lab produces a

10   volume of the entorhinal cortex that's much larger than the

11   volume produced by the Killiany method; isn't that right?

12   A    That's right.

13   Q    All right.  And how many times -- strike that.

14        The entorhinal cortex, isn't it the case, is the

15   smallest region of the brain which to your knowledge is

16   involved with respect to the development of Alzheimer's

17   disease; isn't that right?

18   A    At the time we thought this is the smallest region.

19   There has been development in the field.  Can I, can I

20   explain?  Would you allow me to explain?

21   Q    Well, sir, didn't I ask you this exact same question at

22   your deposition?

23   A    I think you did.

24        **MR. ROSE:**  May I have his deposition transcript.

25   Q    Isn't it the case, sir, that --

1        **MR. FRIEDMAN:**  Can I have a page number?

2        **MR. ROSE:**  Twenty-nine.

3   **Q**   Directing your attention, sir, to page 29 of your

4   deposition.  Did I ask you, line 16:  Question:  Is it the

5   smallest -- is it the smallest region of the brain which to

6   your knowledge is involved with respect to or associated

7   with the development of Alzheimer's disease?

8        And your answer?

9   A   It was:  Yes.

10  **Q**   Correct.

11       And isn't it the case, sir, that when you are

12  looking at the entorhinal cortex on an MRI scan that you

13  can't see any boundaries, can you?

14  A   No, that is not fully correct.

15  **Q**   Would you please look at page 24, I'm sorry, page 29 of

16  your deposition, line 24.  Did I ask you, sir:

17       Question:  And could you please tell me which parts

18  of its anatomical boundaries provide no contrast on MRI?

19       Answer:  On both ends of entorhinal cortex there

20  are no boundaries.

21       **MR. FRIEDMAN:**  Your Honor --

22  **Q**   Was that your -- is that the question and answer, sir?

23       **MR. FRIEDMAN:**  Your Honor, I object.  It needs to

24  be expanded in order to capture it.

25       **THE COURT:**  Well, you'll have a chance.  He may

1    press it in that form.

2    Q    So, my question was:  And could you please tell me which

3    parts of its anatomical boundaries provide no contrast on

4    MRI?

5          And your answer was:  On both ends of entorhinal

6    cortex there are no boundaries.  So, what I mean by that is

7    the transition between the entorhinal cortex and the

8    perirhinal cortex and one end and the other end transitioned

9    between the entorhinal cortex and the subiculum which is

10   part of the hippocampus.

11

12         And in your report, sir, you, you make the

13   following statement:  MRI based measurements of the EC have

14   emerged around 15 years ago in several research

15   laboratories, including our center, following histopathology

16   data that suggested neurofibrillary tangles.  One of the

17   hallmarks of Alzheimer's disease accumulate in the EC at an

18   early stage of the disease before the tangles spread to

19   other brain regions as the disease progresses.

20         That's your opinion, sir; is that right?

21   A    That's right.

22   Q    No doubt about that, correct?

23   A    No doubt.  Correct.

24   Q    And wasn't it the case that -- and by histopathology

25   what are we referring to?

1    A    Reports by anatomists and pathologists in the field who

2    studied cadaver brains and found neurofibrillary tangles in

3    those brain regions in patients who died.

4    Q    And one of those, one of those histopathologists in fact

5    was Dr. Teresa Gomez-Isla, wasn't it?

6    A    That's right.

7    Q    All right.  And she produced a paper along with Brad

8    Hyman from Mass. General Hospital in roughly 1996; isn't

9    that right?

10   A    That's right.

11   Q    And that, that paper and other papers produced by

12   histopathologists looking at brain tissue under a microscope

13   of people who had died with Alzheimer's disease led to many

14   groups seeing if they could determine whether they could on

15   an MRI scan see the volumes and see changes over time.

16   Isn't that correct?

17   A    Correct.

18   Q    All right.  And your lab was one of those?

19   A    That's right.

20   Q    There's no doubt about the fact, is there, sir, that the

21   entorhinal cortex in the brains of normal people, people who

22   are normal and healthy, is larger than the entorhinal cortex

23   in the brains of people who have Alzheimer's disease; isn't

24   that right?

25   A    This is a question I cannot answer with yes or no.

1    Would you like me to explain it?

2  **Q**    Well, sir, I'd ask you to look at page 93 of your, of

3    the transcript, and I ask you a sentence and -- well, it's

4    actually a long, it's actually a long question.  The

5    question was:  What do you mean by the clause, quote,

6    systematic differences in the brain anatomy between normal

7    subjects and patients could have induced a bias toward more

8    frequent revisions in data from normals?

9              Answer:  Right.  So, I, when I started this opinion

10   I put myself in the, well, neutral objective position to

11   understand why the rater would, could potentially end up

12   with a biased way of revising data without intent and

13   according to my own experience there are several reasons for

14   that.  The first reason is that the normals have larger

15   volumes than Alzheimer's patients as it's established.

16             Isn't that right?

17  A    Yes.

18  **Q**    All right.  So, is there any doubt about the fact, sir,

19   that the entorhinal cortex is larger in the brains of normal

20   healthy patients than in the brains of people who have

21   Alzheimer's disease?

22             **MR. FRIEDMAN:**  Objection, your Honor.  That's a

23   misstatement.

24             **THE COURT:**  No, he may put that question.  We'll

25   see what the answer is.

1  A    Again, I cannot answer this question yes or no.  Would

2  you like me to explain it?

3  **Q**    As a general matter, sir, would you agree that it's the

4  case that the entorhinal cortex in the brains of normal

5  healthy people is smaller, is larger, is larger than the

6  entorhinal cortex in the brains of people who have

7  Alzheimer's?

8         **MR. FRIEDMAN:**  Objection, your Honor; asked and

9  answered.

10         **THE COURT:**  No, he may put the question.  We'll see

11  what the answer is.

12  A    Again, my answer is I cannot answer this question

13  because I don't understand what you mean exactly by general

14  assessment.

15  **Q**    Well, when you said, sir, in your testimony that the

16  normals have larger volumes than Alzheimer's patients as

17  it's established, what did you mean?

18         **MR. FRIEDMAN:**  Objection, your Honor.  May I have a

19  side bar?

20         **THE COURT:**  You may.

21  SIDEBAR CONFERENCE, AS FOLLOWS:

22         **MR. FRIEDMAN:**  He's misstating the testimony,

23  deposition testimony, and he's making it look like --

24         **THE COURT:**  In what respect?

25         **MR. FRIEDMAN:**  Well, the question was he was

1    looking to determine whether the investigative measurement

2    normals were based upon the fact of that possibility, not

3    that that is the fact.  So he was saying I did an

4    investigation.

5            THE COURT:  I guess I've missed something.  I have

6    thought that as a general matter it was true that the

7    normals had a larger entorhinal cortex.  That's not so as

8    matter of existential fact?

9            MR. ROSE:  I think, I think it's a matter of

10   science, scientifically accepted fact.  I'm surprised he's

11   backing away from it.

12           THE COURT:  Wait a minute.  This seems to me --

13   it's not a question of the deposition, at least the way I'm

14   listening to this.  I had thought that there was testimony

15   or some data in this case that supported that conclusion.

16   I'm a little unclear listening to him as to whether he's

17   qualified to give the answer, but I'm going to allow him to

18   press it to see if that's so.

19           MR. FRIEDMAN:  Okay.

20           THE COURT:  See what he says.

21           MR. FRIEDMAN:  Okay.

22           (Whereupon the sidebar conference concluded.)

23   BY MR. ROSE

24   Q   Sir, let me, let me back up and talk about these groups

25   of people, including Dr. Hyman and Dr. Teresa Gomez-Isla who

1   were looking under the microscopes, looking at brain tissue

2   under the microscope.  And didn't they conclude that in the

3   brains of people who died with Alzheimer's disease there was

4   a loss of neurons in the entorhinal cortex; isn't that

5   right?

6   A   That's, that's right.

7   Q   All right.  Many, in fact, many hundreds of thousands of

8   neurons; isn't that right?

9   A   That's correct.

10  Q   All right.  There was shrinkage in the entorhinal cortex

11  in the brains of people who died with Alzheimer's disease,

12  wasn't that right?

13  A   You're correct.

14  Q   And one of the goals of the laboratories that were

15  looking at the brains of people who are normal and people

16  who are questionable and people who are converters is to see

17  whether on MRI scans you could see the difference between

18  the volumes of the entorhinal cortex of the people who were

19  in the normal group, people who were in the questionable

20  group, people who were in the so-called converter group;

21  isn't that right?

22  A   That was a goal.

23  Q   Now, when the person in your lab came back from Helsinki

24  there was a training session, wasn't there?

25  A   Correct.  Yes.

1    Q    All right.  And you and others learned how to attempt to

2    map the outlines of the entorhinal cortex using the Insausti

3    method; isn't that right?

4    A    That's correct.

5    Q    And you, yourself, attempted to measure the entorhinal

6    cortex on MRI scan in that context, didn't you?

7    A    That's right.

8    Q    All right.  But you have never mapped the outline of the

9    entorhinal cortex on any, you, yourself, have never mapped

10   the outline of the entorhinal cortex on any NIH funded

11   study, have you?

12   A    That's true, I have not.

13   Q    You simply participated in that training, didn't you?

14   A    I supervised the training.

15   Q    You supervised the training.

16        But you did not actually draw, outline the

17   entorhinal cortex on more than 50 occasions, did you?

18   A    That's right.

19   Q    All right.  And wasn't it, wasn't it the case, sir, that

20   when you were participating in that training there were

21   occasions when you were drawing the entorhinal cortex too

22   small, weren't you?

23   A    I don't know.

24   Q    You don't know?

25   A    Because my measurements were not measured.  It was a

1    training.

2    **Q**    Are you saying that all you did was do a drawing but no

3    volumetric measure was determined from your drawing?

4    A    It was, it was measurement; the recording was performed.

5    **Q**    Well, in any event, sir, it was the occasion, there were

6    occasions when you drew the entorhinal cortex too short;

7    isn't that right?

8    A    Possible.

9    **Q**    Well, let me direct your attention to page 58 of your

10   deposition transcript, in front of you, line 10.  Did I not

11   ask you the following question:  Well, do you recall

12   situations where there was discussion about the fact that

13   your drawings were different from the drawings of other

14   people who were being trained?

15          And your answer was:  There was an occasion that I

16   was drawing the entorhinal cortex too short, right.

17          Those are your words, correct?

18   A    That's correct.

19   **Q**    All right.  And then, Question:  And when you say,

20   quote, too short, what do you mean by too short?

21          And your answer was:  Too short means that I did

22   not, for example, extend the entorhinal cortex to the lower

23   tip of the collateral sulcus according to the training.

24          Question:  They were too short because you did not

25   trace the boundary did you say as far as, did you say

1    collateral sulcus?

2              Answer:  Yes.

3

4              So, it's the case, then, sir, that when you started

5    doing these drawings yourself, and I know you only did 50

6    and you didn't do any in connection with any NIH funded

7    study, but you were drawing, you were drawing them too

8    short, too small, correct?

9    A    Correct.

10   Q    You need to say yes or no for the jury, sir.

11   A    Yes.

12            **THE COURT:**  He said correct.

13            **MR. ROSE:**  Well, he was --

14            **THE COURT:**  That's sufficient.

15            **MR. ROSE:**  He was nodding.

16            **THE COURT:**  Go ahead, Mr. Rose.

17   Q    And your, your drawings, however, your drawings were not

18   used to produce any volume; is that right?

19   A    Yes.

20   Q    Is that right?  They were not used to produce any

21   volume?

22   A    Yes.

23   Q    They were simply used for training --

24   A    For training.

25   Q    -- for training purposes.

1          And then after you were trained then you simply

2     supervised other people in your lab; isn't that correct?

3     A    Correct.  Yes, that's right.

4     Q    And when did this training happen, sir, when you were

5     drawing the entorhinal cortex too short?  When did this

6     happen?

7     A    That was around 2001 when we started with the study.

8     Q    So the last time that you draw, you drew the entorhinal

9     cortex was 12 years ago?

10    A    On this occasion, yes.

11    Q    And I also asked you at your deposition how -- strike

12    that.

13         I asked you at your deposition:  And in the

14    instance, sir, is it possible for you to estimate, assuming

15    for the moment that your boundary was going to be the basis

16    for determining the volume of that subject's entorhinal

17    cortex, would your measurement have been 20 percent too

18    small, 50 percent too small, or can't you say?

19         And your answer was:  Those changes were typically

20    in the order of 10 percent to 20 percent too small.

21         Isn't that right?

22    A    Yes.

23    Q    Right.  But that's simply an estimate, isn't it, sir?

24    A    That's an estimate.

25    Q    And, sir, isn't it the case that it's difficult to

1    discern the entorhinal cortex on MRI compared to other

2    prominent brain structures like the hippocampus because the

3    EC is very small and some parts of its anatomical boundaries

4    provide no contrast on MRI and therefore must be estimated

5    using anatomical landmarks?

6    A    That's right.

7    Q    Isn't that the case?

8            And when you say no contrast on MRI what do you

9    mean?

10   A    I mean that you cannot see boundaries between one

11   structure and the other as I showed this morning between

12   grey and white matter, for example.

13   Q    Isn't there -- is there a problem on occasion

14   differentiating between white matter and grey matter?

15   A    Yes, there is.

16   Q    Yes?

17   A    Yes.

18   Q    And Dr. Insausti wrote a paper in which he gave, in

19   which he described for our readers how to go about mapping

20   the outline of the --

21           **MR. FRIEDMAN:**  Objection, your Honor.

22   Q    -- entorhinal cortex; isn't that right?

23           **MR. FRIEDMAN:**  Objection, your Honor.

24           **MR. ROSE:**  That's the method that was used.

25           **THE COURT:**  Ask it again.  Ask your question.

1    Q    Your, your lab followed the protocol developed by Dr.

2    Insausti; isn't that right?

3    A    That's correct.

4    Q    And Dr. Insausti wrote a paper in 1998 --

5    A    Right.

6    Q    -- in which, and that paper described a method or a

7    protocol for mapping the outline, drawing the outline of the

8    entorhinal cortex on MRI?

9    A    Correct.  Yes.  Right.

10   Q    All right.  You read that, you read that paper, didn't

11   you, sir?

12   A    Yes.

13   Q    All right.  And wasn't it, and wasn't it the case, sir,

14   that Dr. Insausti described the difficulties that are

15   involved in --

16          **MR. FRIEDMAN:**  Objection, your Honor.

17   Q    -- mapping the outline of the entorhinal cortex?

18          **MR. FRIEDMAN:**  Objection, your Honor.

19          **THE COURT:**  I'm going to sustain it on that

20   foundation.  I'm going to sustain it.

21   Q    Doesn't the, sir, doesn't the depth or shallowness of

22   the collateral sulcus have a bearing on a scientist's

23   ability to draw the outline of the entorhinal cortex?

24   A    Yes, it does.

25   Q    And isn't it, isn't it the case that the collateral

1  sulcus can either be shallow or regular or deep?

2  A   Yes.

3  Q   And the scientist in mapping the outline of the

4  entorhinal cortex has to make a judgment on, first of all,

5  where the collateral sulcus is; isn't that correct?

6  A   That's right.

7  Q   And then a scientist must make a judgment whether or not

8  the collateral sulcus is shallow, regular or deep?

9  A   Right.

10  Q   Sometimes, and isn't it the case also that the

11  collateral sulcus sometimes is unusually long?

12  A   Right.

13  Q   And sometimes the collateral sulcus appears to be

14  divided into two, I think the word is sulci, S U L C I;

15  isn't that right?

16  A   Yes.

17  Q   That's the plural of sulcus?

18  A   Sulci.

19  Q   Right.

20         And so, someone who's attempting to outline the

21  boundary of the entorhinal cortex would have to, would have

22  to be aware of that problem and would have to make a

23  judgment whether or not the collateral sulcus was regular or

24  shallow or deep?

25  A   Right.

1          **MR. FRIEDMAN:**  Objection, your Honor.

2          **THE COURT:**  No, overruled.  Is that what you think?

3          **THE WITNESS:**  Yes, that's -- in the best judgment

4     made, yes.

5     **Q**   And isn't it, isn't it also, isn't it also the case,

6     sir, that someone who is mapping the outline of the

7     entorhinal cortex has to take into consideration where the

8     subiculum is?

9     A    Right.

10    **Q**   And isn't it the case, sir, that the subiculum is

11    frequently very difficult to see on an MRI scan?

12    A    The boundary between entorhinal cortex and the subiculum

13    is difficult to determine.

14    **Q**   And why is it difficult to determine?

15    A    Because there is no contrast on an MRI between those

16    structures.

17    **Q**   Thank you.

18          Now, sir, your, your lab produced a paper in 2001,

19    Magnetic Resonance Imaging of the Entorhinal Cortex and

20    Hippocampus in Mild Cognitive Impairment and Alzheimer's

21    Disease; isn't that right?

22    A    Yes.

23    **Q**   Correct.  May I have Exhibit CT.

24          Do you have Exhibit CT in front of you?

25    A    No.

1    Q    On the screen?

2    A    No.

3    Q    I'm sorry.

4         THE COURT:  On the screen.

5    A    On the screen.  No, my screen is blank.

6         THE COURT:  No, that's not admitted.  But you want

7    it just on his screen?

8         MR. ROSE:  I would like it just on his screen so he

9    can identify it and then I'm going to offer it.

10        THE COURT:  We'll try to do that.

11        This is CT for identification now.  Do you see

12   something there?

13        THE WITNESS:  I see something.  If you can zoom in,

14   please.

15        Yes, I see it now.

16   Q    Is that a paper that was produced by your lab?

17   A    Yes.

18        MR. ROSE:  Your Honor, I offer this.

19        THE COURT:  Any objection?

20        MR. FRIEDMAN:  Objection, your Honor.

21        THE COURT:  Beg pardon?

22        MR. FRIEDMAN:  Objection.

23        THE COURT:  Yes, sustained.  Excluded.

24        MR. ROSE:  May I have up on the screen Exhibit,

25   Exhibit 171.  Page MBAK 828.

1      **THE COURT:**  That's for us all to see?

2          **MR. ROSE:**  That's in evidence, your Honor.

3  **Q**   Now, sir, on Mr. Friedman's examination your attention

4  was directed to the, let's see, approximately ten or eleven

5  lines down from the top of the page.

6          Do you see the sentence beginning with the word

7  "Moreover"?

8  A   Yes, I do.

9  **Q**   The sentence beginning moreover?

10  A   Moreover, yes.

11  **Q**   I believe Mr. Friedman directed your attention to this

12  sentence, did he not?

13  A   I think so, yeah.  I remember it.

14  **Q**   Moreover, while both the entorhinal cortex and the

15  hippocampus significantly differentiated the controls from

16  the mild AD patients, the accuracy of the entorhinal cortex

17  measure was considerably higher than that of the

18  hippocampus, paren, 98 percent versus 73 percent,

19  respectively.

20          I've read that correctly?

21  A   Yes.

22  **Q**   All right.  Didn't your, didn't your lab find that the

23  entorhinal cortex was better than the hippocampus for

24  distinguishing MCI, which is mild cognitive impairment, from

25  Alzheimer's disease?

```
1    A    I have to remember the paper.  We compared MCI to

2    controls.

3    Q    Didn't your lab conclude that volume reductions in the

4    entorhinal cortex and hippocampus may be early signs of

5    Alzheimer's disease pathology that can be measured using

6    MRI?

7              MR. FRIEDMAN:  Objection, your Honor.

8              THE COURT:  I didn't understand the question, if

9    you would ask it again.

10             MR. ROSE:  Yes.

11   Q    Didn't your lab conclude that volume reductions in the

12   entorhinal cortex and hippocampus may be early signs of

13   Alzheimer's disease pathology that can be measured using

14   MRI?

15   A    That's --

16             MR. FRIEDMAN:  Objection.

17             THE COURT:  Wait.  No, the objection is sustained.

18   He may be asked if he agrees with those conclusions.

19   Q    Were you a coauthor on that paper, sir?

20   A    Yes, I was a coauthor on this paper.

21   Q    And did you agree with that conclusion?

22   A    I agreed with its conclusion.

23   Q    Incidentally, sir, when you are a coauthor on a paper do

24   you read the paper?

25   A    More than that.
```

1   **Q**   You said more than that?

2   A   I read -- yes.

3   **Q**   All right.  You wouldn't want to have your, you wouldn't

4   want to have your name as coauthor on a paper without

5   reading it, would you?

6          **MR. FRIEDMAN:**  Objection, your Honor.

7          **THE COURT:**  Overruled.

8   A   I would not allow to have my name on the paper without

9   reading the paper and making me aware of the science that

10  was done to produce that paper.

11  **Q**   I'm sorry, sir?

12  A   Investigating the science that was done to produce this

13  paper.

14  **Q**   So you carefully read every manuscript that has your

15  name on it as a potential coauthor before it's published?

16  A   Yes.

17  **Q**   You do that because you want to make sure that you agree

18  with everything that's in that paper, don't you?

19         **MR. FRIEDMAN:**  Objection, your Honor; it's beyond

20  the scope.

21         **THE COURT:**  Oh, it may be.  Overruled.

22  A   Yes, I read.

23  **Q**   And if you find something in the paper that you believe

24  is not accurate, what do you do?

25  A   I discuss it with the other coauthors and typically the

1   principal investigator if I'm not the principal

2   investigator.

3   **Q**   And if you did not receive satisfaction from the other

4   coauthors would you let your name be associated with that

5   paper?

6             **MR. FRIEDMAN:**   Objection.

7             **THE COURT:**   Overruled.

8   A   No.

9   **Q**   In fact, isn't it the case, sir, that sometimes

10  publishers will insist that every coauthor sign off on the

11  paper before it's published?

12  A   That's correct.

13  **Q**   And the publishers do that because they want to make

14  sure that every coauthor agrees with what's in the paper;

15  isn't that right?

16  A   That's right.

17  **Q**   Now, sir, when someone is using the computer and a mouse

18  and using their cursor to draw the outline of the entorhinal

19  cortex, isn't it the case, sir, that the computer will edit

20  the drawing?

21  A   Can you clarify your question?  What is it -- could you

22  redo it?

23  **Q**   The computer, the computer -- I'm not a computer person,

24  Dr. Schuff.  But the computer screen is in pixels; isn't

25  that right?

```
1    A    That's right.

2    Q    All right.  And the pixels have a certain millimeter,

3    perhaps 1 millimeter, 1.55 millimeters, something like that?

4    A    Yes.

5    Q    All right.  And so, when you draw, when the operator

6    attempts to map the outline of the entorhinal cortex and he

7    draws a line and he cuts, and he cuts through one of these

8    pixels, how does the computer decide whether or not to

9    include the pixel in the drawing or not include the pixel in

10   the drawing?

11   A    A good, a good computer program would know when to do it

12   or not.  It would be achieved by maximum of one pixel.

13   Q    What about back in 1997?  Do you know what the state of

14   technology was at that point?

15   A    Our computer program, maybe it made a mistake by one

16   pixel.

17   Q    By one pixel.

18   A    Yes.

19   Q    Of course the entorhinal cortex is a very small

20   structure, isn't it?

21   A    Yes.

22   Q    All right.  And the entorhinal cortex may have how many,

23   how many pixels?

24   A    I cannot answer the question.  It depends on the

25   protocol you use to measure that structure.
```

1   **Q**   And the protocol that was developed by Dr. Killiany

2   measured only a portion of the entorhinal cortex; isn't that

3   right?

4   **A**   That's right.

5   **Q**   With the consequence that on an MRI scan the product is

6   relatively few pixels, isn't it?

7   **A**   I've never used his program.  So I don't know how to

8   count his number.

9   **Q**   You've never even attempted to draw the outline of the

10  entorhinal cortex using the Killiany method, have you?

11  **A**   I've not tried that.

12  **Q**   All right.  So, let's talk about, so let's talk about

13  what the computer does.  If you could just follow along and

14  I'll try to make sure that everybody can see.

15         So, if you could imagine just for a moment -- if

16  you could just bear with me for a moment, sir.  These are --

17  these would be, these would be pixels on the computer

18  screen.  All right?  And isn't it, and isn't it the case

19  that -- and now I'm trying to draw the mid point, in each of

20  those boxes.  And isn't the case, sir, that if the line were

21  to go here that would be less than 50 percent of the pixel,

22  and so when you're done with your drawing the computer

23  wouldn't pick that up, would it?

24  **A**   Say again, the computer would not pick up the middle

25  line you're drawing?

1    **Q**   It would not pick up, it would not pick up this box

2    unless the line were over here as opposed to here.

3    A   This depends very much on the design of the computer

4    program.

5    **Q**   All right.  And if the design of the computer program is

6    that if the line is drawn less than, on less than, you know,

7    is drawn more on this side of the dotted line, which I'm

8    representing to you is the 50 percent marker, and if you

9    come up here and you're less than 50 percent, the computer

10   won't pick up any of these pixels, will it?

11   A   It depends, it depends on the computer design.

12   **Q**   You don't know.

13   A   I don't know.

14   **Q**   All right.

15         Are you familiar at all, sir, with the concept of a

16   computer editing the outline of the drawing?

17   A   Yes.

18   **Q**   All right.  And how is it that the computer edits the

19   outline?

20   A   The computer, if you draw, the computer basically

21   generates a mask of the boundaries that you were drawing, of

22   a digital number.

23         **MR. ROSE:**  Could you please bring up Exhibit 94,

24   slice -- this is subject number 55.  Slice number 70.

25   **Q**   Do you see that slice in front of you, sir?

1    A    Yes.  If you can zoom in, please.

2    Q    And if you could, if you could zoom --

3            MR. FRIEDMAN:  Objection, your Honor.  This is --

4    objection, your Honor.  It's a misidentified exhibit here.

5            MR. KOHN:  It's also elongated.

6            THE COURT:  Talk among yourselves, see if we

7    can't --

8            (Whereupon counsel conferred.)

9            MR. ROSE:  All right, let me see if I can use this

10   machine.  If we could zoom in.

11   Q    Now, do you see there's a gap on the entorhinal cortex

12   on the left side?

13   A    Left is blue?

14   Q    Yes.

15   A    Yes.

16   Q    And what caused -- well, first of all, the entorhinal

17   cortex is a continuous structure, there's one on the left

18   and there's one on the right, correct?

19   A    Yes.

20   Q    All right.  And isn't it the case, sir, that the

21   entorhinal cortex does not have a gap in it?

22   A    There shouldn't be a gap in it.

23   Q    Right.  That would be an anatomical biological

24   impossibility; isn't that right, sir?

25   A    That's right.

1    Q    All right.  So what is it, sir, that produces the gap in

2    this picture if not the computer?

3    A    I don't know.

4    Q    You have no idea?

5    A    There are several possibilities.

6    Q    What are the possibilities?

7    A    For example, that the line was not drawn consistently.

8    Second possibility is that computer program required

9    specific contact of the pen or the mouse with a computer and

10   it was interrupted.  Third possibility, you are referring

11   to, the computer program would not count each voxel and be

12   leaving holes randomly potentially.

13   Q    It also could be the case that the operator was drawing

14   the entorhinal cortex very thin, correct?

15        **MR. FRIEDMAN:**  Objection, your Honor; calls for

16   speculation.

17        **THE COURT:**  Yes, sustained.

18        **MR. ROSE:**  Correct.

19   Q    Isn't it the case, sir, that tracing the entorhinal

20   cortex can only produce an estimate of the actual volume of

21   the entorhinal cortex?

22   A    That's right.

23   Q    Now, sir, let's -- do you have your report in front of

24   you?

25   A    Yes.

1   **Q**   Now, you, you looked at according to your report 46

2   scans; is that right?  Brain scans from 46 subjects?

3   A   I think so.

4   **Q**   All right.  And would you look at your report, please,

5   sir, not your deposition which you're holding, but if you

6   could just look at your report.  The section called

7   Inspection of EC markings on, on MRI.

8           Do you have that in front of you?

9   A   I have to find it.

10  **Q**   It's not separately paginated, but it's after page,

11  after page 6.  Oh, it is separately paginated.  It becomes

12  page 1.  The inspection of EC markings on MRI.

13          Do you have that?

14  A   No, I don't.  I have loose pages here, so.

15          **MR. LIPKIN:**  Let me see if I can help you out.

16          **THE COURT:**  You can't have a private conversation

17  with him.

18          All right.  Now, that counsel has reshuffled pages

19  put your question, Mr. Rose.

20          **MR. ROSE:**  All right.

21  **Q**   So, throughout your, throughout your report you use the

22  term skinny, don't you?

23          And looking at --

24          **THE COURT:**  Well, I didn't hear an answer.

25  A   Yes.

1    **Q**    Looking at, looking at case number 1 you say in my

2    opinion initial measurements are consistent with protocol.

3    Perhaps ERC a bit skinny.  Isn't that right?

4    A    That's right.  I, I don't have the right page.  Okay.

5    Go ahead.

6    **Q**    All right.  And now, sir, would you look at page 6.

7    Yes, do you see case number 1 again?

8    A    Yes.

9    **Q**    Now, here -- so you talk about this case twice; isn't

10   that right?  On page 1 and on page 6 you talk about case 1?

11   A    Yes.

12   **Q**    All right.  And here you say in my opinion initial

13   measurements were consistent with protocol.  Perhaps ERC a

14   bit too skinny.

15          So, what's the difference between a bit skinny and

16   a bit too skinny?

17   A    Very little difference.  It's skinny.

18   **Q**    And are you saying that the operator made the entorhinal

19   cortex too thin?

20   A    In my impression, I would have drawn it a little bit

21   larger, but I was saying under the protocol.

22   **Q**    In some cases, sir, you would have added an extra line

23   or row of pixels, wouldn't you?

24   A    In a few cases.

25   **Q**    In a few cases you would have drawn an extra row of

1  pixels, wouldn't you?

2  A   Yes.

3  Q   All right.  And again, sir, what's the difference

4  between a bit skinny and a bit too skinny?

5          MR. FRIEDMAN:  Objection, your Honor.

6          MR. ROSE:  All right.

7          THE COURT:  He answered that.  In essence it's a

8  continuum, it's a matter of judgment is what I get.

9          THE WITNESS:  Yes.

10          THE COURT:  Is that accurate, sir?

11          THE WITNESS:  That's right.  Accurate.  A matter of

12  judgment.

13  Q   Now, let's go on to -- well, this term a bit skinny,

14  sir.  So if the operator looked at his drawing and thought

15  that his drawing was, quote, unquote, a bit skinny, there

16  would be a scientific reason to remeasure, wouldn't there?

17  A   There would -- not necessarily.  Not necessarily.

18  Q   Are you telling us, sir, that it doesn't, it doesn't

19  matter to the operator whether he thinks he's capturing, he

20  or she is capturing the entire entorhinal cortex?

21          MR. FRIEDMAN:  Objection, your Honor; misstates the

22  testimony.

23          THE COURT:  Sustained, on that ground.

24  Q   Let's go on to number 9.

25          Now, you say with respect to number 9 in my

1    opinion -- do you have that in front of you?

2    A   Yes.

3    Q   Claim is partially justified and revisions partially

4    correct, but very liberal view of the position of the

5    inferior border potentially outside the limits of

6    pre-established rater reliability.

7            Do you see that?

8    A   Yes.

9    Q   All right.  Now, sir, these terms -- let's go back to

10   the term skinny.  Is that a term you have in a text book?

11   A   No.

12   Q   Is that a term that you use in course materials?

13   A   No.

14   Q   All right.  Is it a term that appears in any guidelines

15   that you're aware of?

16   A   No.

17   Q   All right.  It's not a term that we can test in this

18   courtroom, is it?

19           **MR. FRIEDMAN:**  Objection.

20   Q   To see whether you're correct in saying that the drawing

21   was a bit skinny?

22           **MR. FRIEDMAN:**  Objection, your Honor.

23           **THE COURT:**  No, he may have it in that form.

24   A   Can you repeat the question, please?

25           **THE COURT:**  His concern is we don't know exactly

1    what you mean by skinny and we can't test it against some

2    measure here in the courtroom.  That's what he's suggesting.

3    Is that right?

4              **THE WITNESS:**  Yeah, that's what -- yes.

5              **THE COURT:**  It's a judgment call.

6              **THE WITNESS:**  It's a judgment call.

7              **THE COURT:**  Well, what does skinny mean to you just

8    so we're clear.

9              **THE WITNESS:**  Skinny means that the extent of the

10   entorhinal cortex was according to my understanding of the

11   protocol too narrow, too thin.

12   **Q**   Right.  By the way, sir, you're being paid $300 an hour

13   for your time here?

14   **A**   I have not really talked about that.

15   **Q**   You are being paid for your time, correct?

16   **A**   I'm paid for my time, yes.

17   **Q**   And how much per hour?

18   **A**   I think I had an agreement $240 for my, $240 per hour.

19   **Q**   To work on the report?

20   **A**   To work on the report.

21   **Q**   But then $300 an hour for court time?

22   **A**   Yes, if you say so.  I didn't really --

23   **Q**   It's not important how much you're being paid?

24   **A**   It's not that important to me, no.

25   **Q**   And so, with respect to case number 9 where you use the

1    term partially justified, what does that mean, sir,

2    partially justified?

3    A    Partially justified.  I said partially correct.

4    **Q**    Well, it appears twice.  It says claim is partially

5    justified and revisions partially correct, but very liberal

6    view of the position of the inferior border.

7            So I'm asking you, sir, what do those terms

8    partially justified, partially correct, and very liberal

9    view, what do they mean?

10   A    Partially justified means it's a judgment.

11   **Q**    And liberal, very liberal view, what does liberal view

12   mean, sir?

13   A    Liberal view means in these terms that you may draw

14   boundaries toward lots of volumes, that would be liberal

15   view, rather than staying within a boundary, you would

16   extend the border, the boundary or beyond.  That's a liberal

17   view.

18   **Q**    By how many pixels?  By how many pixels did Dr.

19   Killiany's remeasurement extend into the inferior border?  A

20   half?  One?  Three-quarters?

21           **MR. FRIEDMAN:**  Objection, your Honor; vague.

22           **THE COURT:**  No, he's asking him if he knows.  He

23   may give his answer.

24   A    It looked to me like several pixels.

25           **THE COURT:**  Several.

1          **THE WITNESS:**   Several pixels.

2   **Q**   But you don't know sitting here today, do you?

3   **A**   I cannot count them one by one.  But it looked like more

4   than several pixels.

5   **Q**   All right.  Number, number 56.  Do you have that in

6   front of you?

7   **A**   Yes.

8   **Q**   And there you say that in my opinion initial measures

9   were slightly too short with respect to CS, which is the

10  collateral sulcus, correct?

11  **A**   Right.

12  **Q**   Not inferior surface.  Revisions penetrate into white

13  matter and into subiculum on the right.  Inconsistent with

14  the established protocol.

15         So, again, sir, let me ask you, what does slightly

16  too short mean?

17  **A**   A few pixels.

18  **Q**   Is that definition set forth in any text book that you

19  know of?

20  **A**   There's no -- no, there's no text book.

21  **Q**   Number 59.  You say in my opinion -- strike that.

22         Let's go on to number, number 103.  And now here,

23  sir, I would like you to compare your use of the term error

24  in 103 with no major error in 112 which is two later.

25         Do you see that?

1    A    Yes.

2    Q    So in 103 you say in my opinion there was no error; is

3    that right?

4    A    Yes.

5    Q    In 112 you say there were no major errors.  Now, when

6    you say there were no major errors does that mean there were

7    minor errors?

8    A    There could potentially be minor errors.

9    Q    Well, what's the difference between no error and no

10   major error?

11   A    No major error means that there were several pixels that

12   were drawn incorrectly, the boundary was extending by

13   several pixels outside the expected area of boundary.

14   Q    Let's go on, sir, to 122.  Again, you say no, you say no

15   major errors.  What do you mean by no major errors?  We're

16   talking about the initial drawing, correct?

17   A    Right.

18   Q    All right.  So, when you say there were no major errors

19   in 122 are you saying there were minor errors?

20   A    There were potentially minor variabilities, minor

21   errors, because, for example, for reasons you just outlined,

22   one pixel, that's a minor, minor error.

23   Q    And so if the operator thought there was a minor error

24   in his drawing there would be a scientific reason to correct

25   it, wouldn't there?

1   A    If we know there's an error, yes, there would be a

2   reason to correct it.

3   Q    And you use the term major error in 136; isn't that

4   right?

5   A    Yes.

6   Q    And in 140, correct?

7   A    Yes.

8   Q    And 141, again no major errors?

9   A    Yes.

10  Q    And 142, you say again no major errors?

11  A    Yes.

12  Q    And then on page 4, case number 53.  Do you have that in

13  front of you, sir?

14  A    Case number which?  What case?

15  Q    Fifty-three.

16  A    Fifty-three.  Yes.

17  Q    And here you say no major error but EC very skinny.  Do

18  you see that?

19  A    Yes.

20  Q    What's the difference between skinny and very skinny?

21  A    There is no major difference.  Judgment.

22  Q    A judgment call?

23  A    Yes.

24  Q    Judgment on your part in saying that one drawing

25  produces an EC that's skinny or a bit skinny, or a bit too

1    skinny, or very skinny?

2         **MR. FRIEDMAN:**  Objection, your Honor; misstates the

3    testimony.

4         **THE COURT:**  In that form, I'm going to sustain that

5    objection.

6    **Q**   What is the difference, sir, you use all these terms,

7    skinny, a bit skinny, a bit too skinny, very skinny, what is

8    the difference in pixels between those terms?

9         **MR. FRIEDMAN:**  Objection; asked and answered.

10        **THE COURT:**  No, he may press it.  Overruled.

11   A   So, it would be a minor change in one pixel or so.

12   Between, the difference between very skinny and skinny would

13   be one pixel difference.

14   **Q**   So, skinny might mean that the drawing is one pixel too

15   thin, correct?  Yes?

16   A   Say again?

17   **Q**   Skinny?

18   A   Skinny.  Yes.

19   **Q**   Would be one pixel too thin?

20   A   We're talking about the whole extent of the entorhinal

21   cortex.  So, overall impression.

22   **Q**   You're saying that the whole, you're saying that the

23   whole entorhinal cortex is too thin, right?

24   A   Yes.

25   **Q**   So the operator might be justified in adding a row of

1    pixels?

2    A    Yes.

3    Q    All right.  And if you, if you add on the word very to

4    the word skinny does that mean that now you're two rows of

5    pixels too thin?

6    A    Possible.

7    Q    Possible?

8    A    It depends on the case.

9    Q    Number, number 113, sir.  You say markings are slightly

10   too short at CS border.  And then you say, you use the same

11   language with regard to 161.  Slightly too, slightly too

12   short.

13          So, how many pixels short is short?  If it's

14   simply, if it's simply short, how many pixels short is it?

15   One?  Two?  Three?  Or can't you say?

16   A    Short is just a statement.  I cannot say how many pixels

17   it's short.

18   Q    Well, is it a statement that you derived from a text

19   book?

20   A    It's a statement I derived from my viewing experience,

21   how people draw the area.

22   Q    Is it derived from any course materials or some course

23   you teach?

24   A    No.

25   Q    Is it derived from any NIH guidelines?

1    A    No.

2    Q    And so, what's the difference between short and too

3    short?

4    A    Again, it is an order of one or two pixels.

5    Q    All right.  So, if it's short it's one or two pixels

6    short; is that right?

7    A    Yes.

8    Q    If it's too short does that mean it's three or four

9    pixels?

10   A    No, my -- it's obviously too short.  Yes.  So, the too

11   short means it's shorter than short.  It means it's more

12   pixels shorter than short.

13   Q    And what about slightly too short, that's another term

14   you use in your report.  What is slightly too short as

15   contrasted too short and short?

16   A    Judgment statements which mean more or less the same.

17   Q    Your judgment.

18   A    I had to view the images, so it's my judgment, yes.

19   Q    All right.  Subject 47, starts on the bottom of page 4

20   and continues, continues over on to page 5.  Again, you use

21   the word too short.  Correct?

22   A    Yes.

23   Q    All right.  And then the next one is 95 which says

24   slightly too short.  Correct?

25   A    Yes.

1    Q    Again, the difference between too short and slightly too

2    short, help us with that, sir?

3    A    Slightly too short would be one pixel.  Short would be

4    more pixels.

5    Q    Number 10, moving, moving down the page.  And 96.  For

6    number 10 you say slightly too skinny, and number 96 you say

7    too skinny.  Isn't that right?

8    A    Yes.

9    Q    All right.  And on patient 118, or subject 118 you say

10   slight error at hippocampus.  What does slight mean?

11   A    Slight means in the order of one or a few pixels.

12   Q    One or a few pixels?

13   A    Yes.

14   Q    Now, then moving down the page, subject number 16, here

15   you use the term a little too skinny.  Before you've used

16   the term slightly too skinny, as in number 10, but number 10

17   you have slightly too skinny, in number 16 you say a little

18   too skinny.  So what's the difference between slightly too

19   skinny for number 10 and a little too skinny for number 16?

20   A    There's no difference.  I use the same -- I use two

21   different versions of the same thing, slightly and little.

22   Q    And then over on the next page, page 6, back to case 1

23   where you refer to the EC as a bit too skinny.  Correct?

24   A    Which case is this?

25   Q    The next page, page 6.  A bit too skinny.

1    A    Yes.

2    Q    Now, sir, you've looked at 46 scans according to your

3    report, and with respect to some cases you said that the

4    data was not, not available; isn't that right?

5    A    Correct.

6    Q    You said, back to page 1 of your portion of your report

7    that says inspection of EC markings on MRI, you say as to

8    subject 54, unable to judge revised data because the file is

9    missing.

10            Do you see that?

11   A    Yes.

12   Q    All right.  Is it the case, sir, that you asked to see

13   all of the scans that were, that were involved in this case?

14   A    I asked to see all the scans.

15   Q    You asked to see all the scans?

16   A    At some point I asked to see all the scans.

17   Q    All right.  But with regard to subject 54 you recorded

18   that unable to judge revised data because the file is

19   missing; isn't that right?

20   A    That's what I wrote.  That's, that's what I wrote at the

21   time for my information.

22   Q    So does it surprise you, sir, in here that subject 54 is

23   Exhibit 93 in the case?

24            MR. FRIEDMAN:  Objection, your Honor.

25            THE COURT:  No, overruled.

1   A    It didn't come to my attention.

2   Q    All right.  And that, sir, I'll represent to you was a

3   questionable whose second measurement increased by

4   6.9 percent.  You were not aware of that?

5   A    I was not aware of that.

6   Q    And subject 78, also listed on the first page of the

7   document entitled Inspection of EC markings on MRI, you say

8   unable to judge revisions because revised markings not

9   available.

10  A    Yes.

11  Q    So, did you ask to see that scan?

12  A    Yes.

13  Q    All right.  You did not receive it, did you?

14  A    I didn't receive it.

15  Q    And that exhibit is number 102 in this case.  Did you

16  come to learn that fact, sir?

17       **MR. FRIEDMAN:**  Objection, your Honor.

18  Q    Do you know, sir?

19       **THE COURT:**  Well, wait.

20  Q    Have you learned --

21       **THE COURT:**  There's been an objection, and I'll

22  treat the question as withdrawn.  Put a question.

23       **MR. ROSE:**  All right.

24  Q    Have you learned, sir, that subject 78 was a converter

25  whose second measurement led to an eleven percent increase

1   in the volume?

2   A   I didn't learn that.

3   Q   All right.  Subject 150, you say data not available.

4   Correct?

5   A   Yes.  Yes.

6   Q   Did you ask to see the scan for subject 150?

7   A   Yes.

8   Q   And had you asked to see the scan for subject 78, the

9   last one I asked you about?

10   A   Yes.

11   Q   And you didn't receive it?

12   A   No.

13   Q   And did you learn that with respect to subject 150 that

14   that subject was a questionable and the second measurement

15   increased the volume by 43 percent?  Have you learned that?

16   A   No, I didn't know that.

17   Q   Subject 151.  You report in your, you report here that

18   data was not available, correct?

19   A   Yes.

20   Q   And did you ask to see that scan?

21   A   Yes.

22   Q   And you did not receive it?

23   A   No.

24   Q   And have you learned, sir, that that subject was a

25   questionable and that the second measurement increased the

1    volume by 2.9 percent?  Have you learned that?

2    A    No.

3    Q    And subject 154, again, you said data not available;

4    isn't that correct?

5    A    Which subject, please?

6    Q    Subject 154.

7    A    154.  Yes.

8    Q    Correct.  And did you ask to see that scan?

9    A    Yes.

10   Q    And did you receive it?

11   A    No.

12   Q    And have you learned, sir, that subject 154 was another

13   questionable and that the second measurement of that

14   questionable increased the volume by 72 percent?  Have you

15   learned that?

16   A    No.

17        **MR. FRIEDMAN:**  Your Honor, could we have a side

18   bar, please?

19        **THE COURT:**  We may.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21        **MR. KOHN:**  Your Honor, the witness is using a

22   report where he's using those and after the report was

23   issued.  I have my e-mail showing the scans being sent to

24   him.  So the witness is being confused as to looking at a

25   report and saying I didn't see this scan and not knowing

1    that he did see that.

2              THE COURT:  Well, you have redirect.

3              MR. KOHN:  Okay.

4              (Whereupon the sidebar conference concluded.)

5    BY MR. ROSE

6    Q    Incidentally, sir, these scans that you saw, did you

7    notice that the subjects were identified only by a number;

8    isn't that right?

9    A    That's right.

10   Q    All right.  There was no information which gave the

11   group status of the subjects; isn't that right?

12   A    At the time of my review?

13   Q    Yes, at the time of your review.

14   A    I did not know.

15   Q    No information on those scans about the group status,

16   correct?

17   A    That's right.

18   Q    And isn't that what you would expect to see, sir, in a

19   study of this type; in other words, no information about the

20   subject other than a case number?

21   A    That would be what I would expect for a study, yes.

22   Q    In your lab when you are asking an operator to outline

23   an entorhinal cortex or some other, or some other region of

24   interest you would give him simply a case identifier number,

25   correct?

1    A    That's right.

2    Q    You would not provide the group status?

3    A    That's right.

4    Q    All right.  Why do you not provide group status?

5    A    We don't provide a group status so the rater is not

6    informed about the conditions.  That defies the purpose of

7    measuring the entorhinal cortex whether it's large or small

8    in one group or the other group.

9    Q    By the way, sir, you don't know whether the revisions

10   that Dr. Killiany made were more reliable or less reliable

11   than the first measurements, do you?

12   A    That's right.

13   Q    Are you aware, sir, of any rule, regulation or policy

14   statement issued by the NIH that prohibits the remeasuring

15   of the boundaries of the entorhinal cortex?

16   A    No.

17        MR. ROSE:  May I have one moment, your Honor?

18        THE COURT:  You may.

19        (Pause in proceedings.)

20        MR. ROSE:  May I have 177, please.

21   Q    Do you have 177 on your screen, sir?

22   A    Yes.  I see a table.  Is that 177?

23   Q    You can see the numbers, sir?

24   A    Can you zoom in a little, one more, one scale more.

25   Okay.  Thank you.

1    Q   All right.  And so these are, these are the volumes

2    derived from the measures done by Dr. Killiany and Dr.

3    Gomez-Isla in the reliability study; isn't that correct?

4    A   I see the numbers.  I don't know where the numbers come

5    from you say, so.

6    Q   Right.  All right.  And have you, have you studied this,

7    this data before, sir?

8    A   I think I saw that table.

9    Q   You saw that table back in 2010 when you were preparing

10   your report?

11   A   Yes.

12   Q   Did you, did you notice, sir, the number of occasions --

13   let's start with Dr. Killiany and Dr. Gomez-Isla on the

14   left.  Did you notice, sir, on how many occasions Dr.

15   Killiany and Dr. Gomez-Isla, that their drawings produced

16   the same volume on the left?

17   A   I can't answer your question correctly because, what you

18   mean by same volume?

19   Q   Well, let's look at participant I.D. number 1.  Do you

20   see that?

21   A   Yes.

22   Q   All right.  You see Killiany left and right and then

23   Gomez-Isla left and right?

24   A   Yes.

25   Q   And Killiany and Gomez-Isla both had .11 on the left,

1    correct?

2    A    Yes.

3    Q    And then if you, if you would just scan down, look down,

4    what's the next occasion when you see that Dr. Killiany and

5    Dr. Gomez-Isla had the same, had the same volume for the

6    left?  It's number 53, isn't it?

7    A    I'm not there yet.  Yes, fifty-three, .005.

8    Q    Yes.  And do you see any others where they had the same

9    volume on the left?

10   A    No.

11   Q    So it looks like on the left Killiany and Gomez-Isla had

12   only two instances out of 25 where they got the same volume

13   on the left, right?  Isn't that correct?

14   A    Yes.

15   Q    And how about on the right side?

16   A    Well, there's number 21.  Twenty-seven.  Thirty-six.

17   Q    And 50, correct?

18   A    And 50.  Okay.  Yes.

19   Q    Four, a total of four out of 25 where Killiany and

20   Gomez-Isla had the same volume on the right.  Isn't that

21   correct?

22   A    That's correct.

23   Q    All right.  So, that means on the left side they

24   produced the same -- they produced different volumes 92

25   percent of the time.

1          **MR. FRIEDMAN:**  Objection, your Honor.

2    **Q**   Isn't that right?  Twenty-three out of 25?

3          **THE COURT:**  He may ask the question.  I caution, as

4    I have before, it's the testimony that's the evidence.  But

5    you may answer.

6    **A**   From, from those numbers you show me, yes, I didn't make

7    the calculation quickly, but I don't know how many -- I

8    didn't count the lines.  But you're probably right.

9    **Q**   All right.  And then, and then on the right, on the

10   right side, where there were four instances where their

11   volumes were the same, that's four out of 25, that means

12   that on the right side it means that in 84 percent of the

13   cases their drawings produced different volumes, didn't

14   they?

15   **A**   Yes.

16   **Q**   All right.  So then it's the fact that people can follow

17   the protocol and get different results; isn't that right?

18   **A**   Yes.

19   **Q**   All right.  In fact, sir, would you look at case number

20   56.  And look at the measurements on the left for Killiany

21   and for Gomez-Isla.  For Gomez-Isla it's .04; isn't that

22   correct?

23   **A**   Yes.

24   **Q**   And for Killiany it's .06?

25   **A**   Right.

1  Q   And since we've heard a lot about percentages in this

2  case, isn't it the case, sir, that Killiany's drawing on the

3  left was 50 percent greater in volume than Gomez-Isla's

4  drawing on the left?  Six is two more than four, two over

5  four is 50 percent, correct?

6  A   Yeah.

7  Q   All right.  And yet this Pearson correlation coefficient

8  produced a reliability factor of .96; isn't that right?

9  A   That's right.

10  Q   All right.  How many occasions were there when Dr.

11  Killiany to your knowledge, if you have knowledge,

12  remeasured cases that were part of the reliability study?

13  A   I don't have this knowledge.

14  Q   Well, let me represent to you, sir, that one of them was

15  case number 59.  And it's the last of the reds over on the

16  right.  Do you see that?

17  A   Yes.

18  Q   Okay.  And so, Dr. Killiany's remeasurement of case

19  number 59 on the left produced a volume change, well, it

20  went from .16 to .1752, correct?

21  A   Yes.

22  Q   And on the right it went from .14 to .20, correct?

23  A   Right.

24  Q   Right.  And let's -- those are not significant changes,

25  would you say, sir?

```
 1    A    I don't know.  Significant has a specific statistical

 2    meaning.  They are small changes.

 3    Q    They're small, they're small changes.

 4              And look, please, at number 31.

 5    A    Okay.

 6    Q    You see that this was another case that Dr. Killiany

 7    remeasured.  And now in this, in this case, his drawing of

 8    the left entorhinal cortex went from .16 to .1780.  Correct?

 9    A    Yes.

10    Q    A small change, correct?

11    A    Correct.

12    Q    And then on the right the volume went from .17 to .1670.

13    Is that right?

14    A    Yes.

15    Q    All right.  Again, small, small changes.  In fact, one

16    of them went down, didn't it?

17    A    Yes.

18    Q    Went down, went down by a tiny amount.  Is that right?

19    A    Yes.

20    Q    All right.  Now, that leaves two cases out of, it leaves

21    two cases out of 25 with larger changes.  And that would be

22    case number 1 and case number 56.  Isn't that right?

23    A    Yes.

24    Q    And so what we're left with, sir, is a situation in

25    which 23 of the 25 cases that are the subject of the
```

1    reliability study, there's very little difference between

2    Killiany and Gomez-Isla, or between Killiany's first

3    measurement and his second measurement; isn't that right?

4    A    For these numbers, yes.

5    Q    All right.  And for the other -- and 23 is what

6    percentage of 25?  Ninety-two percent?

7    A    Yes.

8    Q    All right.

9    A    Yes.

10   Q    Wouldn't you say, sir, that there's remarkable

11   consistency between Killiany and Gomez-Isla?

12           MR. FRIEDMAN:  Objection, your Honor.

13           THE COURT:  Well, he may be asked his opinion.

14   A    Yes.

15   Q    Remarkable consistency?

16   A    Yes.

17   Q    In fact, sir, there's still remarkable consistency

18   between Killiany and Gomez-Isla even after factoring in the

19   two changes where there is a significant increase in the

20   measurement?

21           MR. FRIEDMAN:  Objection, your Honor.

22           THE COURT:  No, the question isn't evidence of

23   anything.  We'll see what the witness says.

24   A    The consistency is to be calculated.  I cannot directly

25   respond to that.  The changes are small, I agree with that.

1    But to make quantitative evaluation you have to do some

2    calculations.

3    **Q**   But you would agree with me, sir, wouldn't you, that as

4    a general proposition when you look at these, when you look

5    at these numbers you see 23 out of 25 cases where there is

6    consistency between Killiany and Gomez-Isla even factoring

7    in the changes which you've described as small on case

8    number 31 and case number 59?

9    A   Yes.

10   **Q**   Yes, you would.  Thank you.

11          Now, sir, you have met Dr. Killiany in the past,

12   haven't you?

13   A   Yes.

14   **Q**   Right.  There was an occasion when your laboratory

15   needed some, some information, I believe about segmentation?

16   A   Right.

17   **Q**   All right.  What is segmentation?

18   A   Well, segmentation is when you try to label the brain by

19   anatomical markers.  So you say this is forebrain, parietal

20   lobe, this is the hippocampus, it gives them label.  So,

21   that's segmentation.

22   **Q**   And so, what was it that your lab -- what work was your

23   lab engaged in in that connection?

24   A   Well, our lab was engaged and still is engaged in

25   measuring, estimating quantitative measurement of all

1    regions of the brain simultaneously.

2    Q    And did you reach out and speak to Dr. Killiany?

3    A    Yes, I think we made, I made the first contact, yes.

4    Q    Why did you make the first contact?

5    A    Because we had a question, our lab had a question, or I

6    had a question.

7    Q    When was this, sir?

8    A    I think it was five or six years ago.

9    Q    And what was the information that you needed?

10   A    I don't remember specifically, but we had some questions

11   about particular regions in the brain, how that was marked

12   and traced.

13   Q    And you knew -- and was this in connection with

14   development of automated measures for, automated

15   computerized measures for measuring regions of interest in

16   the brain?

17   A    Yes.

18   Q    And, sir, isn't it the case that the field has tried to

19   get away from manual measurements of regions of interest?

20   A    That's right.  That's right.

21   Q    Because computerized measurements you believe are more

22   accurate; isn't that correct?

23   A    They're more consistent.

24   Q    They're more consistent.  A computer is more consistent

25   than a fallible human being, correct?

1    A    Yes.

2    Q    All right.  And so, you reached out to Dr. Killiany

3    because you thought that he could help answer some questions

4    for you, didn't you?

5    A    Yes.

6    Q    And when you did that you discussed with him in general

7    how brain parcellation was derived because you knew that Dr.

8    Killiany played a major role in the generation of this brain

9    parcellation?

10   A    Right.

11   Q    All right.  What is brain parcellation?

12   A    It's the same as segmentation.  I mean, there's some

13   details for specialists, but in this context it's the same.

14   Segmentation/parcellation means more or less the same thing.

15   Q    Right.  Did Dr. Killiany answer your questions?

16   A    Yes, he did.

17   Q    All right.  And isn't it the case, sir, that your

18   opinion is that the entorhinal cortex volume is a predictor

19   of who develops Alzheimer's disease?

20   A    It's one of the potential predictors of Alzheimer's

21   disease.

22   Q    Okay.

23        MR. ROSE:  May I have one moment, your Honor?

24        THE COURT:  You may.

25   Q    Also, sir, you have never used the NeuroView software,

1    have you?

2    A    No.

3    **Q**    All right.  You've never used 3D Slicer?

4    A    We, we tested it once.  We didn't like it so much, so we

5    didn't use it, continue to use it.

6    **Q**    So you've never used the software that Dr. Killiany and

7    Dr. Gomez-Isla used back in the time period 1997, 1998,

8    1999 --

9    A    No.

10   **Q**    -- have you?

11   A    No, we did not use it.

12   **Q**    And, sir, you have --

13            **MR. ROSE:**  Nothing further, your Honor.

14            **THE COURT:**  Mr. Friedman.

15                     **REDIRECT EXAMINATION**

16   **BY MR. FRIEDMAN:**

17   **Q**    On your screen is Exhibit 177, I think.

18            Mr. Rose asked you about, he didn't ask you about

19   the two of the 30, of the 25 that were changed.  If you

20   could look at number 1.  There was agreement between -- was

21   there agreement between Dr. Killiany and Dr. Gomez-Isla with

22   respect to these drawings in the reliability study remaining

23   within the protocol?

24   A    With the -- which numbers now, the red ones?

25   **Q**    The left, yes -- no, not the red ones, but on the left

1    side on number 1.

2    A    Good agreement.

3    Q    Good agreement.

4         And then on the right hand column, the ones that

5    are red, those are the ones that were after the revisions --

6    A    Yes.

7    Q    -- of Dr. Killiany.

8         Is there agreement with the red ones on the right

9    with either of Dr. Killiany or Dr. Gomez-Isla?

10        **MR. ROSE:**  Objection, your Honor.

11        **THE COURT:**  No, he may ask it.  Overruled.

12   A    In individual cases, I responded to that already.

13   Overall, actually I compared the numbers statistically and

14   there was systematic difference between the first and second

15   measurement.

16   Q    And isn't it true that he doubled the volume with

17   respect to his initial drawings and his subsequent drawings?

18   A    That's suspicious change, yes, from protocol.

19   Q    And number 1, we have already identified --

20        **MR. ROSE:**  Your Honor, may that go out, the word

21   suspicious.

22        **THE COURT:**  No, you may inquire.  That's what he

23   thought, he so testified.

24        But you were able to ascertain that the volume had

25   been doubled?

1        **THE WITNESS:**  Yes, I looked at it.

2        **THE COURT:**  You could see it.

3        **THE WITNESS:**  I could see it, yes.  I looked at it.

4        **THE COURT:**  All right.  That may continue.

5   **Q**   Number 1 we've identified as one of the normals that

6   was, that was changed, correct?

7   A   Yes.

8   **Q**   All right.  Now, the other one was number 56.  That

9   one's on the reliability study as well?  Can you look at

10  that table.

11  A   Yes.  Right.

12  **Q**   And Mr. Rose asked you some questions about the

13  differences between Dr. Gomez-Isla and Dr. Killiany's

14  drawings during the reliability study, and he asked you to

15  calculate the differences in those.

16        Do you recall that testimony?

17  A   Right.

18  **Q**   Now, he didn't ask you, and I want to ask you, how about

19  comparing it to the red lines, the red numbers on the right

20  hand side.  Can you, can you say what kind of change there

21  was when Dr. Killiany revised the drawings for number 56?

22  A   Yes.  I testified to this already.

23  **Q**   Looking now at the table, though, can you tell us what

24  kind of change that is?

25  A   It's a substantial increase.

1    Q    And isn't it like a 3.58 increase?

2    A    It's more than that.  It's almost, I think fourfold

3    increase.

4    Q    Fourfold.  And we're talking about number 56, right?

5    That's one of those normals?

6    A    Yes.

7    Q    And when he changed it, it went from third smallest all

8    the way down here to 83rd smallest; is that correct?

9    A    Yes.

10   Q    Now, Mr. Rose asked you some questions about skinny and

11   too skinny and slightly skinny or short and slightly short.

12   Can you explain to the jury what it is you were trying to

13   explain in connection with what you would expect with a

14   reliability study in this case?

15   A    Well, I made judgments to the way I see the boundaries

16   drawn to extend, they're overdrawn in one direction or not

17   in another direction.  So when I say skinny, tiny skinny

18   changes, that means that, or too short actually, that means

19   that there was few pixels which you might have corrected.

20   But when it was really separated then there were several

21   pixels.  You could see on the image that the bottom was

22   substantially shifted by several pixels.

23   Q    And when you testified earlier about major errors, were

24   you trying to exclude -- explain to the jury what the

25   difference is between the major error and the too skinny and

1    skinny testimony?

2    A    Well, a major error is an error where you can visibly

3    see the boundary is outside what you think is entorhinal

4    cortex.  And skinny is, what I described as skinny is that

5    you draw the entorhinal cortex maybe a little too short by a

6    few pixels where you would think the boundary could be

7    extended a little bit depending on the landmarks you see.

8    Q    Now, when you wrote your initial report that was August

9    2nd, 2010; is that correct?

10   A    Yes.

11        **THE COURT:**  It's one o'clock.  You're going on to a

12   different topic.

13        **MR. FRIEDMAN:**  Can I beg your --

14        **THE COURT:**  No, we're stopping at one o'clock.

15   We'll start at nine o'clock tomorrow.

16        **MR. FRIEDMAN:**  Judge, may I quickly ask for a side

17   bar?

18        **THE COURT:**  You may.

19        **MR. FRIEDMAN:**  Thank you.

20   SIDEBAR CONFERENCE, AS FOLLOWS:

21        **THE COURT:**  If you're going to tell me you only

22   have this witness for this day, I'm going to be unhappy.

23        **MR. FRIEDMAN:**  I'm sorry, Judge, his wife is having

24   surgery tomorrow.

25        **THE COURT:**  Well --

```
1              MR. FRIEDMAN:  I'm sorry.

2              THE COURT:  -- you know you knew this when you

3    brought him.  You're on cross, you haven't got anywhere,

4    very much.  So, he has nothing more from the cross that was

5    just made, on recross, do you?

6              The surgery is tomorrow, Mr. Rose.

7              MR. ROSE:  I understand that.

8              THE COURT:  We'll let him go.

9              (Whereupon the sidebar conference concluded.)

10             THE COURT:  All right, given the witness's needs

11   for travel, we're done with testimony for this witness,

12   because it's one o'clock, correct, Mr. Friedman?

13             MR. FRIEDMAN:  That's correct, your Honor.

14             THE COURT:  And you have no further recross?

15             You may step down, thank you.

16             Ladies and gentlemen, we'll take a recess now until

17   tomorrow morning at nine o'clock.  I can't begin to tell

18   you -- you may step down.

19             (Whereupon the witness stepped down.)

20             THE COURT:  -- how grateful I am for your

21   promptness.  And so we all know, and I'll tell counsel now,

22   starting tomorrow, because we're going to accommodate one of

23   your number, we're going to take 20 minute breaks and we'll

24   stop at ten minutes of 1:00.  We'll stay right on track.  So

25   that everyone can make the bus.  We are right on track but
```

```
 1    for the snow day we lost.  But I'm hopeful that counsel will

 2    be able to make that up.

 3             So tomorrow a 20 minute break, but we'll stop ten

 4    minutes of 1:00.  We all rely upon you to be ready to go at

 5    nine o'clock tomorrow morning.

 6             You haven't heard all the evidence.  We'll be back

 7    to Mr. Jones tomorrow.  Keep your minds suspended.  Do not

 8    discuss the case either among yourselves nor with anyone

 9    else.

10             You may stand in recess.  I'll remain on the bench.

11        THE CLERK:  All rise for the jury.

12        (Whereupon the jury left the courtroom.)

13        THE COURT:  Please be seated.

14             At the end of four days of trial, out of the six

15    days available to each side, the plaintiff has used up two

16    days, two hours, five minutes; the defense has used up one

17    day, one hour, 25 minutes.

18        (Pause in proceedings.)

19        THE COURT:  You might want to take a look at these

20    questions.  They're interesting questions.

21             Now, we all work for the jury.  I made this crystal

22    clear when we started that we were going to stick to this

23    schedule.  You've got an engaged and prompt jury, and I'm

24    going to honor their time, make no doubt about it.

25             All right.  We'll recess until nine o'clock
```

1    tomorrow morning.  We'll recess.

2            **THE CLERK:**  All rise.

3            **MR. FRIEDMAN:**  Thank you.

4            (Adjournment.)

5

6                **C E R T I F I C A T E**

7

8

9            I, Donald E. Womack, Official Court Reporter for

10   the United States District Court for the District of

11   Massachusetts, do hereby certify that the foregoing pages

12   are a true and accurate transcription of my shorthand notes

13   taken in the aforementioned matter to the best of my skill

14   and ability.

15

16

17

18            /S/ DONALD E. WOMACK 4-3-2013
              _____
19               DONALD E. WOMACK
               Official Court Reporter
20                P.O. Box 51062
            Boston, Massachusetts 02205-1062
21              womack@megatran.com

22

23

24

25