```
 1            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                   Civil Action
 3                                 No. 07-11481-WGY

 4   * * * * * * * * * * * * * * * * * *
                                       *
 5   UNITED STATES OF AMERICA, ex rel.,  *
     KENNETH JAMES JONES, Ed.D.,        *
 6                                       *
              Plaintiff,                *   TRANSCRIPT OF
 7                                       *   THE EVIDENCE
     v.                                 *   (Volume 9)
 8                                       *
     BRIGHAM AND WOMEN'S HOSPITAL, et al., *
 9                                       *
              Defendants.               *
10                                       *
     * * * * * * * * * * * * * * * * * *
11
              BEFORE:  The Honorable William G. Young,
12                       District Judge, and a Jury

13   APPEARANCES:

14           HUGHES & NUNN LLP (By William D. Hughes,
         Esq.), 350 10th Avenue, Suite 960, San Diego,
15       California 92101
              - and -
16           LAW OFFICE OF JEREMY L. FRIEDMAN (By Jeremy
         L. Friedman, Esq.), 2801 Sylhowe Road, Oakland,
17       California 94602
              - and -
18           KOHN, KOHN & COLAPINTO, LLP (By Michael D.
         Kohn, Esq.), 3233 P Street, N.W., Washington, D.C.
19       20007-2756, on behalf of the Plaintiff

20
             ROSE, CHINITZ & ROSE (By Alan D. Rose, Sr.,
21       Esq. and Brian D. Lipkin, Esq.), One Beacon
         Street, 4th Floor, Boston, Massachusetts 02108,
22       on behalf of the Defendants

23
                                   1 Courthouse Way
24                                 Boston, Massachusetts

25                                 April 2, 2013
```

## I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

MARTHA ISABEL DAVILA-GARCIA, Resumed

   By Mr. Kohn     8             23

   By Mr. Rose                          14

DEBORAH BLACKER

   By Mr. Friedman  26

RONALD J. KILLIANY, Recalled

   By Mr. Lipkin    41

   By Mr. Kohn        124

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|

   203  Progress Reports Forms . . . . . . . . .37

   204  MBAK 2552 to MBAK 2562 . . . . . . . . .39

   205  E-Mail . . . . . . . . . . . . . .65

 1              THE CLERK:  All rise.  The United States District

 2      Court is now in session, you may be seated.

 3              THE COURT:  Good morning, counsel.

 4          MR. HUGHES:  Good morning, your Honor.

 5          MR. FRIEDMAN:  Good morning, your Honor.

 6          THE COURT:  A juror's late and we're tracking down

 7      why.  Please be seated, ma'am.

 8              THE WITNESS:  Thank you.

 9          THE COURT:  But I was told that you wanted to see

10      me so I came out.

11          MR. FRIEDMAN:  Yes, your Honor.  We, we exchanged

12      the stipulations and discovery responses that we wanted to

13      read into the record today, and Mr. Rose has some objections

14      to them.  And so we thought if we could address them --

15              THE COURT:  Well, there's little to address about

16      stipulations, it's either agreed or not.  But discovery

17      responses makes some sense.

18          MR. FRIEDMAN:  It's the discovery responses that

19      we're --

20              THE COURT:  Yes.

21          MR. ROSE:  It's the discovery responses, and

22      specifically, your Honor, requests for admission as to which

23      we objected and also stated that the information we had

24      available to us was, you know, we were unable to admit or

25      deny, and that has the effect, my understanding under the

1    rules, that has the effect of a denial under Rule 36.

2            THE COURT:  Well, I'm not -- you want to read that

3    they neither admit nor deny something?

4            MR. FRIEDMAN:  Yes.  Three of the facts where they

5    neither admit nor deny.

6            THE COURT:  I don't understand.  Why would that be

7    germane?

8            MR. FRIEDMAN:  It has to do with certain issues

9    that have come out in court, and we want to be able to read

10   to the jury that they have sworn that they can neither admit

11   nor deny those facts.  It has to do with the categorization

12   of some of those numbers.

13           THE COURT:  I have to see, I have to see what you

14   want to read.  Because I don't see why it's relevant.

15           MR. FRIEDMAN:  Okay, your Honor, can I approach?

16           THE COURT:  I think, I think Mr. Rose is right in

17   the sense of the -- again, I don't want to look at your

18   notes.  But these are the actual admissions.

19           MR. FRIEDMAN:  Yes.

20           THE COURT:  And you want to read --

21           MR. FRIEDMAN:  No. 12, it's the last --

22           THE COURT:  No. 12.

23           MR. FRIEDMAN:  But not the whole one, just the last

24   paragraph.

25           MR. ROSE:  What page, Jeremy?

1          **MR. FRIEDMAN:**  It's number --

2          **THE COURT:**  Page 9.

3          **MR. ROSE:**  Okay.

4          **THE COURT:**  All right.  And you want to read

5     starting, Defendants have made reasonable inquiry?

6          **MR. FRIEDMAN:**  Yes, your Honor.

7          **THE COURT:**  Well, that's not -- and what else?

8          **MR. FRIEDMAN:**  And, 12, 13 and 14, the same thing,

9     just the, after reasonable -- what I want to read is after

10    reasonable inquiry --

11         **THE COURT:**  No, no, I can read.

12         **MR. FRIEDMAN:**  Oh, I'm sorry.

13         **THE COURT:**  Twelve, 13 and 14.  You want to read

14    the paragraphs as to those study participants.  And the

15    actual study participants are different in the three

16    answers.

17         I'm going to exclude that because it's not proof of

18    anything.  It doesn't, it doesn't become an admission of

19    anything.  And so, it doesn't add anything.  It's excluded.

20    Your rights are saved.

21         **MR. FRIEDMAN:**  And then the last one they had an

22    objection on is request number 33 where they deny that the

23    final procedure and protocol used to map the entorhinal

24    cortex for purposes of determining the volume measures

25    reported by, in the PPG renewal application, and Killiany,

```
 1   et al. 2000, were in place at the time Gomez-Isla prepared

 2   her maps.

 3            THE COURT:  Wait a minute.  Wait a minute.

 4            So you want to read in so much of this as begins of

 5   the answers, Defendants deny that the, quote, et cetera --

 6            MR. FRIEDMAN:  Yes.

 7            THE COURT:  -- down to the end.

 8            MR. FRIEDMAN:  Yes, your Honor.

 9            MR. ROSE:  And --

10            THE COURT:  Do you object to that?

11            MR. ROSE:  Well, we said, we said that we object on

12   the ground that the term, quote, final procedure and

13   protocol is undefined, vague and ambiguous.  In other words,

14   you know, there's been no testimony here about a term final

15   procedure and protocol.  There has been about protocol, but

16   not final procedure and protocol.  So --

17            THE COURT:  So what difference does this make?  It

18   seems pretty peripheral to me.

19            I'm going to let them read that.  Read the -- well,

20   I'm going to let them read, as follows:  They can read the

21   request.  They can read the first sentence where you make

22   that point, skip the rest, and then pick up reading

23   defendants deny.

24            That's the order.

25            MR. FRIEDMAN:  Thank you, your Honor.
```

1          THE COURT:  All right.  Let's see if we know

2    anything about the --

3          THE CLERK:  They are all here.

4          THE COURT:  They're all here.  Let's go.

5          (Pause in proceedings.)

6          THE CLERK:  All rise for the jury.

7          (Whereupon the jury entered the courtroom.)

8          THE CLERK:  Court is now in session, you may be

9    seated.

10          THE COURT:  Good morning, ladies and gentlemen.

11    Thanks so very much for all your efforts to be here on time.

12          I've been given a juror question which I seem to

13    have mislaid.  I remember the first one of the questions --

14    I'll find it here -- and it was can we see Dr. Schuff's

15    report.

16          The answer to that's no.  The report is just for me

17    to make sure that they stick to it.  And the reason is that

18    we like the opinions to be given in open court where both

19    sides can question them and you can watch the witness.

20    Unlike exhibits, which are something that at least allegedly

21    somebody's willing to testify were prepared at the time, or

22    like that relator's chart, which is a summary, if you

23    believe it, of documents that existed at the time, the

24    report of an opinion witness is something he or she prepared

25    for the litigation.  So that's not an exhibit.

1          Then you wanted a specific exhibit and we'll track

2     that down and make sure you can see it.

3          And, Mr. Kohn, you may go ahead.  Let's remind the

4     witness though first.

5          **THE CLERK:**  I would like to remind you that you are

6     still under oath.

7          **THE WITNESS:**  Yes.

8          MARTHA ISABEL DAVILA-GARCIA, Resumed

9          **REDIRECT EXAMINATION** (Cont'd)

10    **BY  MR. KOHN**

11    **Q**   Dr. Davila, yesterday do you recall question from a

12    juror about what types of requests would require Dr. Albert

13    to launch a informal inquiry according to Partners

14    guideline?

15    **A**   Yes.

16    **Q**   I want to read to you some quotations from Dr. Albert's

17    testimony.  Okay?  Starting on page 216, it will be, I think

18    it's actually on your screen.  Oh, Jennifer's not here.

19    Okay, I'll just read it.

20          It says, on page 216, starting at line 8:  What

21    did -- what were you told at that meeting with respect to

22    this issue?

23          That there was -- Answer:  That there were scans

24    that had been remeasured and that Ken was concerned about

25    them because he thought that they had been selected to

1    magnify the differences between the groups.

2           Question:  And he explained, he explained that to

3    you?

4           Yes.

5           Were you concerned?

6           Answer:  Yes.

7           Why?

8           Answer:  Because if they were, if that were the

9    case, then the data would not be valid.

10          And on 239.  Question:  Wouldn't the easiest thing

11   to do is to call Ron Killiany and ask him why there were two

12   sets of measurements?

13          **MR. ROSE:**  Well, objection, your Honor.

14          **THE COURT:**  I'm unable to rule on it because I'm

15   uncertain about, of what's before the witness.  My fault.

16   Ask the question again.

17          **MR. KOHN:**  I'm just reading the deposition

18   testimony of Dr. Albert for the witness.

19          **THE COURT:**  Very well.

20          **MR. KOHN:**  Okay.

21          **THE COURT:**  But you're going to have to read it

22   again.

23          **MR. KOHN:**  Okay.

24   **Q**   Let's start with 216.  Okay.

25          What did -- what were you told at that meeting with

1    respect to this issue?

2           Answer:  That there were scans that had been

3    remeasured and that Ken was concerned about them because he

4    thought they had been selected to magnify the differences

5    between the groups.

6           Question:  And he explained, he explained that to

7    you?

8           Answer:  Yes.

9           Question:  Were you concerned?

10          Answer:  Yes.

11          Question:  Why?

12          Answer:  Because if that were the case then the --

13          **MR. ROSE:**  Objection.

14   **Q**   -- data would not be valid.

15          **MR. ROSE:**  Objection, your Honor.

16          **THE COURT:**  The objection is overruled, assuming

17   that's accurately read and that's evidence.

18          Now, what's your question for this witness?

19          **MR. KOHN:**  Just one more passage.  Turn to 239.

20   **Q**   Question:  Wouldn't the easiest thing to do is to call

21   Ron Killiany and ask him why there were two sets of

22   measurements?

23          Answer:  It would have been.

24          Question:  Why -- and why didn't you do that right

25   away?

1          Answer:  I think because they were impugning his

2     honesty and I wanted to see if I could resolve without

3     creating a lot of difficulty amongst people in the group.

4          Question:  And when they couldn't resolve it with a

5     three slice and a left-right, is that when you first

6     contacted him?

7          Answer:  Yes.

8          Did you feel like that was impugning his

9     credibility?

10         Answer:  Well, of course it was.  They were

11    accusing him of doing something that was false.

12

13         Dr. Davila, I want you to assume that the testimony

14    given by Dr. Albert in her deposition is believed.  What is

15    your opinion about whether the issues raised by Dr. Jones in

16    this case met the threshold requirement of a formal inquiry

17    or investigation?

18         **MR. ROSE:**  Objection, your Honor.

19         **THE COURT:**  Well, where is that in the report?

20         **MR. KOHN:**  That is in paragraph 17.

21         **THE COURT:**  Overruled.  She may tell us.

22    A    So, this is not the case of people discussing data

23    analysis.  It clearly says here that there was concern

24    raised by the chief statistician that there were remeasured

25    cases that were selected to magnify differences between the

```
1    groups.  There was concern that if this was the case the
2    data would be invalid.
3            THE COURT:  So --
4    A   There was concern -- I'm sorry.
5            THE COURT:  Yes.  I didn't mean to interrupt.
6            THE WITNESS:  I'm sorry.
7            THE COURT:  But he's read it to you and the
8    question is, and so do you think that meets the threshold?
9            THE WITNESS:  Yes, it definitely meets the
10   threshold.  I mean, there's a lot of concerns here.  And the
11   fact that, you know, it was questioning Dr. Killiany's
12   honesty, that in itself is a threshold for an inquiry at
13   least to be started.
14           THE COURT:  So as you understand the NIH
15   procedures, what do you believe should have been done under
16   those procedures?
17           THE WITNESS:  So, under those procedures, under
18   these circumstances there had to be -- Dr. Albert had to
19   contact the research integrity officer immediately.  Under
20   those circumstances, the research integrity officer would
21   have had to start an inquiry and they would have had to
22   start collecting information.  They would have had to do
23   interviews.  They would have had to begin collecting
24   documents for the case.  And they would have had to then put
25   together a panel of experts in the process as well as
```

1   probably experts in the issue at stake that would have been

2   the inquiry committee.  This inquiry committee would then

3   analyze and look at all the data and determine whether there

4   was actually enough evidence to, for the allegation to be in

5   place.  So, they would have had actually, you know, been

6   able to get to the bottom of the allegation with that.  They

7   would have then had to have made a report and the report

8   would have had to go to both the NIH as well as to the

9   decision official which is the person that basically makes

10  the final determination at the institution where Dr. Albert

11  worked.

12           **THE COURT:**  Let me interrupt on something else.

13           We found the juror question.  We think the juror is

14  asking to see Exhibit No. 41.  The clerk will pass it to the

15  jury generally.

16           Go ahead, Mr. Kohn.

17  BY  **MR. KOHN**

18  **Q**   Yesterday you were asked questions by Mr. Rose about

19  submission of progress reports.  Do you generally recall

20  that discussion?

21                (Circulated among the jury.)

22  A   Yes.

23  **Q**   If a grant application for a five year program does not

24  win in the first instance, if the grant is not awarded, can

25  the applicant submit a progress report the next year anyway

1    and receive payment?

2    A    No, if you, if you don't have a winning grant, if you

3    don't have a grant, you cannot submit any reports at all.  I

4    mean, if you don't have a grant, you don't submit reports.

5    You cannot.

6              MR. KOHN:  No further questions.

7              THE COURT:  Nothing further for this witness?

8              MR. ROSE:  Yes, your Honor.

9              THE COURT:  Go ahead.

10                   **RECROSS-EXAMINATION**

11   BY  MR. ROSE

12   Q    And if you don't submit the progress report and don't

13   satisfy the conditions of the grant you don't get money for

14   the following year, do you?

15   A    It depends on the circumstances, but probably not.

16   Q    You have to comply with the conditions, correct?

17   A    Yes.

18   Q    All right.  And one of the conditions is you have to

19   submit a progress report; isn't that right?

20   A    That's correct.

21   Q    All right.  Now, with regard to your statement about,

22   about procedure, when, when Dr. Jones made statements to

23   Dr., Dr. Albert -- and incidentally, you never read Dr.

24   Jones' deposition, did you?

25   A    No, I didn't.

1    Q    Nor did you read his declaration in this case?

2    A    No, I didn't.

3    Q    Right.  Now, isn't it the case that under the Partners

4    policy there is a definition of scientific misconduct?

5    A    Yes, I'm sure there is.

6    Q    Well, have you not read it?

7    A    Yes, I have.

8    Q    All right.  And isn't it the case that scientific

9    misconduct or misconduct in science means fabrication --

10            MR. KOHN:  Can you tell me where you're reading

11   from and --

12            THE COURT:  Yes.

13            MR. KOHN:  -- whether the witness --

14            THE COURT:  Please.

15            MR. ROSE:  The research, research integrity policy.

16            THE COURT:  All right.

17            MR. ROSE:  Perhaps we could bring that up on the

18   screen.

19            THE COURT:  Very well.  But he is entitled to know,

20   of course, what you're reading from.

21            MR. ROSE:  Of course.  Research integrity policy,

22   page, page 3.

23   Q    You read the research integrity policy, correct?

24   A    Yes.

25   Q    All right.  And would you look, please, at the

1    definitions section, which is section 2.  And do you have it

2    in front of you?

3    A    No, I don't.

4    Q    Exhibit 179, please.  And they're unnumbered pages, and

5    then there's a definitions section.  Next page of the

6    definition section 2P, if you go down to the bottom of the

7    page, you see 2P.

8           Do you have that in front of you?

9    A    No, sir.

10   Q    Do you see a -- do you have page 3 on --

11   A    Yes.

12   Q    Do you have page 3 on your screen?

13   A    That's correct.

14   Q    All right.  So, isn't it the case that before the

15   Partners research integrity policy applies there must first

16   be a determination that, that the definitions section is

17   met; isn't that right?

18   A    No, sir, not at all.  Actually what the Partners policy

19   is asking to do is that if there is an allegation, you're

20   not proving anything at that point, if there is an

21   allegation then you have the responsibility to do an

22   inquiry.  That still doesn't mean that there's misconduct or

23   falsification.  After the inquiry, if there's sufficient

24   enough evidence, then you go on to do an investigation.

25   Q    Doctor --

1    A    If the investigation is not enough to do the, you know,

2    to say one way or the other then, you know, you go on to

3    close the case.  But you have to --

4    Q    Doctor?

5    A    -- follow procedure.

6    Q    Doctor?

7    A    Once an allegation is made you have to follow procedure.

8    Q    Do you know, Doctor, that Dr. Jones never said the word

9    misconduct or fraud?  Do you know that?

10   A    He didn't have to.  All he had to do was to say that

11   there was an allegation that somebody was falsifying the

12   data, was doing the measurements, and there was some concern

13   about that.

14   Q    Doctor, he did not use the word falsify.  What you just,

15   what you just looked at --

16   A    No, he said what he said.

17   Q    Please.

18        **MR. ROSE:**  Your Honor?

19   A    Yes.

20        **THE COURT:**  Yes, listen to his questions.

21        **THE WITNESS:**  Yes, sir.

22        **MR. ROSE:**  Correct.

23        **THE COURT:**  Now.

24   Q    You see the definition of scientific misconduct, don't

25   you --

1    A    Yes.

2    Q    -- in front of you?  Scientific misconduct or misconduct

3    in science means fabrication, falsification, plagiarism, or

4    other practices that seriously deviate from those that are

5    commonly accepted within the scientific community for

6    proposing, conducting, or recording research.  It does not

7    include honest error or honest differences in

8    interpretations or judgments of data.

9             Have I read it correctly?

10   A    That's correct, yes.

11   Q    All right.  So, doesn't that mean that if there's

12   several members of a team and the only thing that is said by

13   one member of the team about another member of the team is a

14   question about his honesty, there must also be a statement

15   that there was a fabrication or a falsification or

16   plagiarism or other practice as defined in the section.

17   Isn't that right?

18   A    No, sir, you have to do an inquiry to find that out.

19   Q    Before the inquiry takes place, the person who's

20   complaining must allege, must state that there was

21   fabrication, falsification, plagiarism, or other practices

22   as defined, correct?  Isn't that correct?  That's what it

23   says on the page; isn't that right?

24        MR. KOHN:  Asked and answered.

25   A    That's what the definition of misconduct is.

1    **Q**   All right.  Now, when Dr. Jones spoke to Marilyn Albert

2    what he said was that there were, was that there was more

3    than one measurement.  Isn't that right?

4           **MR. KOHN:**  Objection.

5    **A**   I don't know.  I didn't read his deposition.

6           **THE COURT:**  Overruled.

7           **MR. ROSE:**  All right.

8           **THE COURT:**  But again, this is the witness on the

9    stand, Mr. Rose.  We're going off on other documents.  If

10   she hasn't read them, she doesn't know.

11   **Q**   Well, this is a document you read, isn't it?  The

12   Partners research integrity policy?

13   **A**   Yes, sir.

14   **Q**   Although you formed, you formed your opinions in this

15   case long before you saw the Partners research integrity

16   policy, didn't you?

17   **A**   I based my opinions on reading Dr. Albert's deposition,

18   sir.

19   **Q**   Could you answer my question.  You formed your opinions

20   in this case back in 2010, correct?

21   **A**   Uh-huh.  Yes.

22   **Q**   And that was before you ever saw the Partners research

23   integrity policy, wasn't it?

24   **A**   Yes, sir, but I had the grant from, the grant statement

25   from NIH.

1   **Q**   You had, you had the NIH policy which makes a very clear

2   distinction, doesn't it, between an inquiry and an

3   investigation?  Isn't that, isn't that right?

4   A   That's correct.

5   **Q**   And an inquiry, an inquiry is fact gathering in order to

6   determine whether or not an investigation is necessary?

7   A   And that's what I said.

8   **Q**   Isn't that, isn't that right?

9   A   That's what I said before, yes.

10   **Q**   All right.  So, then after you had formed your opinions

11   in this case, a couple of years later, two and-a-half years

12   later then you see a copy of the Partners research integrity

13   policy; isn't that right?

14   A   Yes.  Which corroborated --

15   **Q**   And this policy, and this policy defines scientific

16   misconduct.  Now, let's go, let's go through this.

17          Scientific misconduct or misconduct in science

18   means, first it says, first it says fabrication.  Correct?

19   A   Yes.

20   **Q**   All right.  And what Dr. Jones said to Marilyn Albert

21   was that there were, that there was more than one

22   measurement, correct?

23   A   I don't know what he said.

24   **Q**   You don't know what he said?

25   A   Well, he said -- well, yes, he said that to --

1   Q   So you do know what he said?

2   A   Yes.

3   Q   And the second word, the second word there is

4   falsification, right?

5   A   Right.  And that's what she said in her deposition and

6   that's what I was going by.  That she already had determined

7   that there were possible, possibility, there was a

8   possibility of falsification.

9   Q   If, if proven.

10   A   You don't have to prove it at that point.  You don't

11   have to prove it.

12   Q   What she said was if it, if it were proven.

13   A   That's correct.

14   Q   Then that would be, then that would be falsity.  But

15   when Dr. Jones, when Dr. Jones first spoke to Marilyn Albert

16   the only objective fact he presented to her was that there

17   was one measurement on one occasion and another measurement

18   on another occasion, isn't that --

19   A   I don't know.

20   Q   Isn't --

21       MR. KOHN:  Objection; misstates Dr. Jones'

22   testimony.

23       THE COURT:  Wait, wait a minute.  It's a question.

24   Do you know -- you're the witness -- do you know whether

25   that assertion he just made is true?

1          **THE WITNESS:**  I don't know if that's true.

2          **THE COURT:**  You don't know.

3    **Q**   And if you had, if you had read -- incidentally, it was

4    Doctor, it was Dr. Jones who was making the statements to

5    Marilyn Albert, wasn't it?

6    **A**   Where?

7    **Q**   Well, you knew, what you were told was that Dr. Jones

8    had made some statements to Marilyn Albert; isn't that

9    right?

10   **A**   I wasn't told.  I was reading it from her deposition.

11   **Q**   All right.  And you knew, didn't you, that there were

12   many depositions that were taken in the case?

13   **A**   That's correct.

14   **Q**   All right.  And since it was the words of Dr. Jones that

15   were significant, why did it not occur to you to ask for the

16   deposition of Dr. Jones?  Did it just not occur to you at

17   all?

18   **A**   It occurred to me.

19   **Q**   So it did occur to you to ask for the deposition of Dr.

20   Jones, but then did you choose not to ask for it?

21   **A**   That's right.

22   **Q**   And did you also know that he had made a declaration in

23   this case?

24          **MR. KOHN:**  Asked and answered.

25   **A**   Didn't know.

1          **THE COURT:**  Overruled.

2     **Q**   You did not know about the declaration?

3     **A**   I'm sure he did.  I don't know whether he did or not.

4     **Q**   But you did know that he gave a deposition in the case?

5     **A**   Yes.

6     **Q**   In which presumably he would have been asked and he

7     would have answered what it was that he said to Marilyn

8     Albert?

9     **A**   I have no idea what he would have said or not said in

10    that deposition.

11    **Q**   You would have had an idea if you had asked for the

12    deposition transcript and received it, wouldn't you?

13          **MR. KOHN:**  Argumentative.

14          **THE COURT:**  Yes, it is.  She says she doesn't know

15    what's in there, and that she didn't ask for it.  That's her

16    testimony.

17          **MR. ROSE:**  Nothing further, your Honor.

18          **THE COURT:**  Nothing further for this witness?

19          **MR. KOHN:**  Just one brief question.

20          **THE COURT:**  Go ahead.

21                    **REDIRECT EXAMINATION**

22    BY  MR. KOHN

23    **Q**   Dr. Davila, I'm going to show you the NIH regulation

24    50.102 of the definitions.  I've highlighted words there.

25    It says apparent instance of misconduct.  And if you would

1    look at the policy Partners statement on page 6 it also says

2    apparent misconduct in science.

3              Can you explain what those statements are referring

4    to?

5              **MR. ROSE:**  Objection, your Honor.  There's no, no

6    question in the --

7              **THE COURT:**  That's correct.  We have been over this

8    and the documents are before the jury, and argument can be

9    based on them.  She's said what she thinks should have

10   happened.

11             **MR. KOHN:**  Okay.  Okay.  Then no questions.

12             **THE COURT:**  Very well.  You may step down, thank

13   you.

14             **THE WITNESS:**  Thank you.

15             **THE COURT:**  Now, that's your last witness and

16   you're going to --

17             **MR. KOHN:**  I have.

18             **THE COURT:**  -- present other evidence.

19             **MR. KOHN:**  Actually one last question.  I made a

20   mistake.

21             **THE COURT:**  Oh, you may.

22             **MR. KOHN:**  Okay.

23   **Q**   Dr. Davila, did you request a copy of Partners policy

24   from us?

25   **A**   Yes.

1           MR. ROSE:  Objection, your Honor.

2           THE COURT:  Sustained as to the request for --

3           MR. KOHN:  Well, we would like a --

4           THE COURT:  No, sustained.

5           MR. KOHN:  Your Honor --

6           THE COURT:  Whether she requested it.

7           MR. KOHN:  Well, your Honor, I think it's relevant

8     that --

9           THE COURT:  I didn't ask for argument.

10          MR. KOHN:  Okay.

11          THE COURT:  I sustained it.

12          MR. KOHN:  Okay.  No further questions.

13          THE COURT:  All right, you may step down.

14          (Whereupon the witness stepped down.)

15          THE COURT:  Now, you have other evidence but not a

16    live witness.

17          MR. FRIEDMAN:  We have one live witness left.

18          THE COURT:  He may be called.  Or she.

19          MR. FRIEDMAN:  Relator calls Deborah Blacker.

20          THE COURT:  She may be called.

21          THE CLERK:  Can you please remain standing and

22    raise your right hand.

23          Do you solemnly swear the testimony you are about

24    to make in the matter now pending before this Court and Jury

25    will be the truth, the whole truth, and nothing but the

1    truth, so help you God?

2              **THE WITNESS:**  I do.

3              **THE CLERK:**  You can be seated.

4                        DEBORAH BLACKER

5                    **DIRECT EXAMINATION**

6    **BY  MR. FRIEDMAN**

7    **Q**    Are you Deborah Blacker?

8    A    I am.

9    **Q**    Have you been employed at Massachusetts General Hospital

10   since July of 1985?

11   A    Yes.

12   **Q**    You took over as the principal investigator on the PPG

13   after Marilyn Albert?

14   A    Yes.

15   **Q**    The PPG was to be performed at both Massachusetts

16   General Hospital and Brigham and Women's Hospital?

17   A    Yes.

18   **Q**    In 1994 you authored an article with Dr. Albert which

19   was published?

20             **THE COURT:**  Excuse me, pull the mic so you're

21   comfortable.  Move it a little closer to your face.

22             **THE WITNESS:**  Thank you, your Honor.

23   **Q**    The title of this article was "Reliability and Validity

24   of the NINCDS-ADRDA Criteria for Alzheimer's Disease"

25   published in Archives of Neurology in 1994?

1    A    Yes.

2    Q    Dr. Blacker, I want to read a portion of Exhibit 171

3    which is the grant application.  I'm reading from page 87.

4    Under the primary findings it says:  Data from multiple --

5         MR. ROSE:  Could you just hold on one second,

6    please, while we, while we get the exhibit.  Thank you.

7         MR. FRIEDMAN:  Madam Clerk, can we have the Elmo

8    on.

9         MR. ROSE:  Page?

10        MR. FRIEDMAN:  MBAK 87.

11        MR. ROSE:  Okay.

12   Q    Data from multiple domains, including

13   neuropsychological, neuroimaging and genetic information,

14   were collected from these subjects at base line.

15        At base line means subjects or participants when

16   they first come into the study; is that correct?

17   A    Yes.

18   Q    I want to show you a portion of what's been marked and

19   put into exhibit as Exhibit 4.  And it's part of the

20   Killiany 2000 article.

21   A    Can you remind me what article that is?

22        Your Honor, is it okay if I ask for clarification?

23        THE COURT:  If you don't understand a question you

24   may always say you don't understand.

25   A    I just wanted to be clear on what article this is.

1   Q    Okay.  This is the, it's in as Exhibit 4, it's the, I

2   think we've referred to it as the Killiany 2000 article.

3   A    Okay.

4         **THE COURT:**  So now do you understand what --

5         **THE WITNESS:**  I would prefer to have the title,

6   just not having -- just so I can be clear which article

7   you're referring to, sir.

8   Q    It's the article that is cited in --

9         **THE COURT:**  Well, why don't, why don't you show her

10  a copy.

11  A    Or you can just scroll up to the title page to see it.

12  Q    "Use of Structural Magnetic Resonance Imaging To Predict

13  Who Will Get Alzheimer's Disease."

14  A    Thank you.

15  Q    And on page 431 of the journal article, MBAK 1713,

16  there's a statement where it says:  At base line these 103

17  subjects were divided into two groups based upon their

18  functional status.  One group consisted of 24 subjects with

19  normal cognition, CDR equals 0.0, and one group consisted of

20  79 subjects with questionable AD, CDR equal 0.5.

21  A    Yes, sir.

22  Q    CDR stands for Clinical Dementia Rating?

23  A    Yes.

24  Q    As far as group status, a CDR score of zero is a normal?

25  A    Uh-huh.  Yes.

1    Q    And a CDR score of 0.5 is a questionable?

2    A    Yes.

3    Q    And at base line these subjects were split into one

4    group or the other, normal or questionable; is that correct?

5    A    Yes.

6    Q    And the next line down below it says:  After three years

7    of follow-up, the 103 participants in the longitudinal study

8    were divided into three groups based upon their functional

9    status at base line and at follow-up.

10          On the next page there's a description of the three

11   groups.  Group 1 are normals, group 2 are questionables, and

12   group 3 are converters.

13          Do you see that?

14   A    Yes, I do.

15   Q    In group 1 normals were normal at cognition, the normal

16   cognition at base line and at follow-up; is that correct?

17   A    Yes, that is stated there.

18   Q    And group 2 was questionables who were questionable at

19   base line and remained questionable at follow-up; is that

20   correct?

21   A    Yes.

22   Q    And group 3 is converters who were questionable at base

23   line and who met the NINCDS/ADRDA criteria for probable AD;

24   is that correct?

25   A    Yes, at follow-up.

1    **Q**   So group 1 is normals who remain normals, group 2 is

2    questionables who remain questionables, and group 3 was

3    questionables who go to probable AD.

4    A   Yes.

5    **Q**   Okay.  Now, you did not anticipate that there would be

6    many normals who would convert to AD within three years; is

7    that correct?

8    A   I don't understand what you mean by I did not

9    anticipate.

10   **Q**   Well, the --

11   A   I didn't work on this paper.

12   **Q**   But the grant application has to do with the same

13   portions of the same groupings that you did work on,

14   correct?

15   A   I don't understand the question here.  It seems like

16   you're asking about this, and maybe you could clarify.

17   **Q**   I would like to turn your attention to page 403 of the

18   grant application which is Exhibit 71.  Based upon our

19   previous experience with our cohort, see Daly, et al. 2000

20   in Core A, we anticipate that very few of the normals, group

21   1, will show significant decline over a three year period.

22          Do you see that?

23   A   Yes.

24          **MR. ROSE:**   What's, what's the MBAK number, please?

25          **MR. FRIEDMAN:**   MBAK 403.

1    A    But just to be clear, this isn't my anticipation, this

2    is from the grant application.

3    Q    Okay.  So, in the grant application it was anticipated

4    that based upon the experience with the cohorts, with the

5    first group of people, that very few of the normals will

6    show significant decline over a three year period; is that

7    correct?

8    A    Right.

9         MR. FRIEDMAN:  Madam Clerk, could I have for

10   witness identification only.  Thank you.

11   Q    Dr. Blacker, I'm showing you an exhibit that's marked as

12   Exhibit GP.  Do you see that?

13   A    Yes.  This makes me a little dizzy when you move this

14   around.

15   Q    I'm sorry, I'll try to do my best.

16   A    No, no.  Forgive me.

17   Q    Do you see the words base line CDR's at the top?

18        MR. ROSE:  What -- objection.  He's identified an

19   exhibit for identification.

20        THE COURT:  Yes, let's not put it up if it's in

21   evidence.  It's not in evidence.  Take it down.

22        MR. FRIEDMAN:  Your Honor, it's only before the

23   witness, I believe.

24        THE CLERK:  It's not before the jury.

25        THE COURT:  Fine.

1          **MR. ROSE:**  Oh, excuse me.

2          **THE COURT:**  It's our mistake.  You go ahead,

3      Mr. Friedman.

4      Q    And do you see the Bates number MBAK 1647?

5      A    Do I see that?  Yes.  I'm sorry.

6      Q    And do you see a series of columns, MRI date, I.D.,

7      case, group?  Do you see those, those --

8      A    Yes.

9      Q    -- columns?

10     A    Uh-huh.

11     Q    Do you see the little computer glitch right here at the

12     top?

13     A    The computer what?

14     Q    The little, little square.

15     A    Yeah.

16     Q    And the date is April 2nd, 1996?

17     A    Yes, sir.

18          **MR. FRIEDMAN:**  Your Honor, I offer this into

19     evidence.

20          **MR. ROSE:**  Objection, your Honor.

21          **THE COURT:**  Do we have a hard copy?  I think I'm

22      going to need to see you at the side bar.

23     SIDEBAR CONFERENCE, AS FOLLOWS:

24          **THE COURT:**  Now, you hit a high note with this last

25      witness and I think ended on that high note, and now we seem

1    to be at sea in what the jury understands is your last

2    witness.  I am still at sea.  I don't know what this is.

3         **MR. FRIEDMAN:**  This is -- I was going to show that

4    is the CDR base line, CDRs, it has it all in chronological

5    order so that people can see the grouping number, the 06's

6    and 07's, that's the extent of the questioning.  So this --

7         **THE COURT:**  Well, what does that have to do -- I

8    mean, I know the '06's and 07's are germane here.  But we

9    already have evidence that tells us the 06's and 07's.

10        **MR. FRIEDMAN:**  This document does it in

11   chronological order so you can follow the number, you don't

12   have to switch page to page, and that's all in chronological

13   order.

14        **THE COURT:**  And that's why we're doing this.  All

15   right.

16        Well, what's the matter with this?

17        **MR. ROSE:**  Your Honor, just there's no -- she said

18   she doesn't recognize this document, never used this

19   document in terms of the MRI data.  She said she didn't even

20   work on the paper.

21        **THE COURT:**  It seems, it seems that is right, with

22   this foundation.  But if you want to strain at it, I'll let

23   you try and lay a foundation.

24        (Whereupon the sidebar conference concluded.)

25

1    **BY  MR. FRIEDMAN**

2    **Q**   Have you seen, Dr. Blacker, have you seen this type of

3    document before?

4    **A**   I'm not sure what you mean by this type of document.  I

5    don't recognize this particular format if that's what you

6    mean.

7              **THE COURT:**  Have you seen documents formatted like

8    that before?

9              **THE WITNESS:**  I've seen tables of data but not, I

10   can't tell how this was produced or what time it comes from

11   or what computer program.  So, in the grant, yes, but

12   specifically, no, I can't say what this is.

13   **Q**   Have you seen documents that list base line CDR's where

14   there's a code 6 or a code 7?

15   **A**   No, I don't know what code 6 and 7 are.

16   **Q**   I can represent to you that this document was produced

17   by defendants in the litigation.

18             **MR. ROSE:**  Objection, your Honor.

19             **THE COURT:**  Well, but -- on this foundation she,

20   she says she doesn't recognize it.  So, I'm sustaining the

21   objection to your offering it.

22             Anything else for this witness?

23             **MR. FRIEDMAN:**  Yes, your Honor.

24             **THE COURT:**  Go ahead.

25   **Q**   Now, as the principal investigator you're required to

1    file a progress report with the NIH on a yearly basis;

2    that's correct?

3    A    Yes.

4    Q    And a progress report is a standard form you see on

5    every grant, correct?

6    A    Yes, pretty much.  There's a little variation, but more

7    or less, yes.

8    Q    It's filed on behalf of the applicant institution,

9    correct?

10   A    Yes.

11   Q    The funds are paid out to the hospital?

12   A    Yes.

13   Q    And you file a progress report in order to get the

14   upcoming yearly budget; is that correct?

15   A    Yes.  And to demonstrate the progress and comply, et

16   cetera.  I mean, it's not -- it's required to get the funds,

17   but that's not the only reason people do it.

18   Q    I'm handing the witness a four page document that was

19   previously identified as EK, EO, CF and CI.

20          **MR. ROSE:**  Could you just give those again, please.

21          **MR. FRIEDMAN:**  EK.

22          **MR. ROSE:**  EK.

23          **MR. FRIEDMAN:**  EO, CF, and CI.

24   Q    Is that your signature on the first, first page?

25   A    Uh-huh.  It is.

1  **Q**   And is it your signature on the second page?

2  A   Yes.

3  **Q**   Is it your signature on the third page?

4  A   Yes.

5  **Q**   And is it the institution's signature on the fourth

6  page?

7  A   Yes.

8  **Q**   And your name is on the fourth page as principal

9  investigator?

10  A   Yes, it is, sir.

11       **MR. FRIEDMAN:**  Your Honor, offer these into

12  evidence.

13       **THE COURT:**  Any objection?

14       **MR. ROSE:**  No objection if the full documents come

15  in, your Honor.

16       **THE COURT:**  All right.  No objection to that?

17       **MR. FRIEDMAN:**  Yes, your Honor, it's just the, it's

18  just the claim form --

19       **THE COURT:**  No, no, there isn't --

20       **MR. FRIEDMAN:**  -- that's relevant.  So, these are

21  just the --

22       **THE COURT:**  Well, all right.  I asked and I

23  shouldn't cut you off.  Let me see them.  Well, let me see

24  what's being offered.

25       No, I'm going to admit these as one exhibit.  It's

1    without prejudice to offering other documents.  But these

2    will all be admitted as one exhibit, and the number that

3    we'll give them is 202 in evidence.

4              MR. ROSE:  Your Honor, may the entire documents go

5    in?

6              THE COURT:  Not at this time.  We'll see in your

7    case.

8              THE CLERK:  Judge, it's 203.

9              THE COURT:  The clerk corrects me.  This is 203 in

10   evidence.

11             (Exhibit marked in evidence.)

12             THE COURT:  Go ahead, Mr. Friedman.

13   Q    Thank you, Dr. Blacker, that's the last of my questions.

14             THE COURT:  Any questions for this witness?

15        MR. ROSE:  None, your Honor.

16        THE COURT:  You may step down.

17        THE WITNESS:  Thank you, your Honor.

18             THE COURT:  Why don't you hand that to me.  Thank

19   you.

20             THE WITNESS:  I figured I wasn't supposed to take

21   it.

22             (Whereupon the witness stepped down.)

23             THE COURT:  And now you're going to put in some

24   non-testimonial matters.

25             MR. FRIEDMAN:  It is a stipulated undisputed fact

1    that defendants Marilyn Albert and Ronald Killiany were

2    acting pursuant to the course and scope of their employment

3    with the defendant organizations.

4         **THE COURT:**  I've told you what a stipulation is.

5    There is one.  And even though it comes from the mouth of an

6    attorney that's agreed to, no dispute about that.

7         **MR. FRIEDMAN:**  In 1994, Massachusetts General

8    Hospital and Brigham & Women's Hospital merged into a single

9    entity, Partners Health Care, Inc.

10        I'm going to read from a request for admissions.

11        **THE COURT:**  Okay.  So he's just read two

12   stipulations.  No dispute about that.

13        Request for admissions are somewhat different.

14   It's another way to get evidence.  And what it is, it says

15   to the other side we request that you admit or deny.  And if

16   the something is admitted, well, then that's a given, no

17   dispute about that, the other side admits it.

18        Go ahead, you may read pursuant to my instructions

19   from requests for admission.

20        **MR. FRIEDMAN:**  Defendants admit that on

21   October 1st, 2001, Dr. Marilyn Albert, the principal

22   investigator/program director, and Massachusetts General

23   Hospital, submitted a renewal application of the Program

24   Project Grant "Age Related Changes of Cognition in Health

25   and Disease" P01AG04953 to the National Institutes of Health

1    for the five year period between August 1st, 2002 through

2    July 31st, 2007, seeking $14,965,700 in support of the NIH.

3            Further answering, for purposes of clarification,

4    the NIH did not pay MGH the $14,965,700 that was requested

5    in the grant application, rather, the NIH ultimately paid

6    $12,308,967.01 in grant funds for the PPG during the five

7    year period between 2002 and 2007.

8            I'm going to read an answer to an interrogatory,

9    request for production.

10           **MR. ROSE:**  What page, please?

11           **MR. FRIEDMAN:**  It's going to be number 2, page 21.

12           Defendants state that the PPG renewal application

13   submitted on October 1st, 2001, resulted in funds being

14   awarded by the federal government to MGH.  The total amount

15   received during the five year period covered by the PPG

16   renewal application, year 19 to year 23, was $12,308,967.01.

17   See MBAK 2552 to MBAK 2562.

18           Your Honor, we move that those MBAK numbers be

19   admitted into evidence.

20           **MR. ROSE:**  No objection.

21           **THE COURT:**  They may be admitted.  And those

22   numbers collectively will be Exhibit 204, and you can

23   collect them at the appropriate time.

24           (Exhibit marked in evidence.)

25           **MR. FRIEDMAN:**  One last request for admission to

1    read.

2             The request was --

3             **MR. ROSE:**  Page, please.

4             **MR. FRIEDMAN:**  Oh.  Page 20.  The request was:  The

5    final procedure and protocol used to map the entorhinal

6    cortex for purposes of determining the volume measures

7    reported in the PPG renewal application and Killiany, et al.

8    2000, were in place at the time Dr. Gomez-Isla prepared her

9    maps of the EC that were used in the reliability study.

10            The answer:  Defendants object to request number 33

11   on the grounds that the term final procedure and protocol is

12   undefined, vague and ambiguous.

13            Defendants deny that the final procedure and

14   protocol used to map the entorhinal cortex for the purposes

15   of determining the volume measures reported in the PPG

16   renewal application and Killiany, et al. 2000 were in place

17   at the time Dr. Gomez-Isla prepared her maps of the EC that

18   were used in the reliability study.

19            **THE COURT:**  And with that Mr. Jones rests?

20            **MR. FRIEDMAN:**  Yes, your Honor.

21            **THE COURT:**  Call your first witness.

22            **MR. LIPKIN:**  Your Honor, we call Ron Killiany.

23            **THE COURT:**  He may be recalled.

24            And again just so you follow the procedure, now

25   we're in their part of the case.  Now, they can't lead

1  witnesses they call, and we're not going to hear the same

2  stuff over again.  That's sort of a rough approach to it.

3  But it's perfectly appropriate to proceed this way.

4          If you'll remind the witness.

5          **THE CLERK:**  I would like to remind you that you are

6  still under oath.

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  Mr. Lipkin, you may.

9              RONALD J. KILLIANY, Recalled

10                 **DIRECT EXAMINATION**

11  **BY  MR. LIPKIN**

12  **Q**   Good morning, Dr. Killiany.

13  **A**   Good morning.

14  **Q**   When did you start working on this study?

15  **A**   I started volunteering on this study in 1992.

16  **Q**   What were you doing?

17  **A**   At that point, I was outlining regions of interest on

18  MRI scans.

19  **Q**   What is a region of interest?

20  **A**   A region of interest is typically an anatomically

21  defined area, and one goes about typically measuring it by

22  drawing by hand or using a computer system an outline of

23  that area.

24  **Q**   Which areas of the brain were you studying?

25  **A**   Back in 1992 we were studying areas of the brain such as

1    the hippocampus, the amygdala, the lateral ventricles, the

2    third ventricle, the inferior horn of lateral ventricles,

3    and the basal forebrain.

4    Q    At some point did your work on the study change?

5    A    It evolved over time.  We measured those structures back

6    in '92 through about '95, and then, as you've heard in this

7    case, we started measuring the entorhinal cortex in 1997.

8    Q    Did your role on the project change starting in 1997?

9    A    My role evolved over the time as well.  So from 1992 to

10   1997, I served as a volunteer on this project.  In 1997, I

11   started earning a supplemental salary for working on this

12   project.  That was in '97.  I believe that was $10,000 a

13   year, with a three percent increase.  And then in 2002 I

14   became a project leader as you've heard, and as a

15   consequence of that I had to give up the supplemental

16   salary, the responsibilities were too great.

17          So, what happened is we wrote a subcontract from

18   Mass. General and Brigham & Women's Hospital to Boston

19   University and those funds were simply wrapped into my base

20   salary at Boston University.

21   Q    Were you paid more in 1997 or in 2002?

22   A    1997, by this grant.

23   Q    Starting in 1997 you told us about your work with the

24   entorhinal cortex.  Were there other areas of the brain that

25   you were looking at?

1    A    Yes, in 1997 we were measuring the entorhinal cortex, we

2    were measuring another structure called the banks of

3    superior temporal sulcus, and then we were measuring a third

4    structure referred to as the cingulate gyrus.  We were

5    subdividing that into three.  And following the date from

6    all of those, we want into the discriminate analyses you've

7    heard about in that 2000 paper.

8    Q    For how many people did you measure the entorhinal

9    cortex?

10   A    For, for this base line study, I believe I measured the

11   entorhinal cortex in just over 140 individuals.

12   Q    Of those people how many were included in your 2000

13   article?

14   A    I believe 103 were in the 2000 article.

15   Q    And of those 140 people, how many were included in the

16   grant application that you submitted in 2001?

17   A    I believe, I would have to verify, but I believe that's

18   103.  There may be more in the grant application.

19   Q    For some of those participants did you make

20   remeasurements?

21   A    Yes.

22   Q    For how many people?

23   A    I believe for about 31 individuals I remeasured the

24   entorhinal cortex, because when I went back to review the

25   measurements I had made there were errors in the way I

1    applied the protocol.

2    **Q**   Can you explain what you mean?

3    A    By errors in the protocol?  Well, as you've heard in

4    this case, both from myself and others, Dr. Schuff, the

5    entorhinal cortex is a very difficult structure to identify.

6    The structure has vague boundaries pretty much in every

7    direction, and there's a lot of subjectivity in how you

8    apply the protocol.  And I can go through with you and

9    summarize scans, some of the images themselves and the

10   outlines themselves, but in brief the boundaries are often

11   difficult to see and that requires you to judge how you're

12   going to see them.  And as you do this more and more you get

13   better at doing this and over time you can go back and you

14   find that you made mistakes in how you applied the protocol.

15   This is what's standardly done in anatomical studies.

16   **Q**   What were some of the difficulties that you had?

17   A    The difficulties occur on pretty much every boundary

18   except the two that we fixed in the operational definition.

19   So it's difficult at times to identify the rhinal sulcus,

20   which was the starting point for this measure.  The measure

21   from the rhinal sulcus, the measure requires you to identify

22   the grey-white boundary, which is not a very easy thing to

23   do, on a number of MRI scans.  From there you have to

24   identify the subiculum, the hippocampus, which is just a

25   vague hint on most MRI scans, and then follow along the

1    inferior border of the brain back to the starting point.

2         The inferior surface of the brain, there are often

3    times other structures that are in the scan which can

4    interfere with your ability to discern the inferior

5    structure.

6    Q   Now, you told us that you made remeasurements for 31

7    participants, correct?

8    A   Yes.

9    Q   And did you look at those 31 participants again, or how

10   many people did you look at a second time?

11   A   I looked at all of the subjects.  I would go along, I

12   would see something which would cause me to be perplexed

13   about how I had done something in the past and as a

14   byproduct of that, I would simply review everything I had

15   previously done.  That's how it was discovered that I had

16   done something incorrectly in the maps.

17   Q   What time period are we talking about?

18   A   We're talking about a time period between 1997 and 1999.

19   Q   Is that when you made your initial measurements?

20   A    It was a continuous process.  There was no initial

21   measurements and remeasurements.  It was simply a continuous

22   process of outlining these regions on the brain.  As I said,

23   I would run into something, I would then go back and

24   reevaluate what I had done by reviewing what I had done.

25   Q   Did you remeasure once or more than once?

```
 1   A    In at least one case I actually remeasured more than

 2   once.

 3            MR. LIPKIN:  Your Honor, may the witness step down

 4   to use the projector?

 5            THE COURT:  He may.

 6   Q    I'm showing Exhibit 72.  Dr. Killiany, could you please

 7   tell us what we're looking at?

 8   A    So, what you're looking at here, as you've been shown

 9   before, let me actually slide it up just slightly on the

10   monitor, what you're looking at here is an MRI scan, one

11   slice of an MRI scan from one of the participants in this

12   study.  This would be participant 003017.

13            The MRI scans that were required on these

14   individuals required at least 124 slices in what's referred

15   to here as the coronal plane.  The coronal plane is a plane

16   that separates bodies into a front and a back portion,

17   through the head it's in this direction here, and in looking

18   at image number 65 from that individual.

19            When you look at an MRI scan such as this there's a

20   variety of things that you can see.  The most obvious is

21   that some things are black and some things are white and

22   some things are shades of gray, lighter and darker shades of

23   gray.

24            Those colors correspond to different things.  So,

25   in this MRI scan, what you're seeing here is in black there
```

1    are things such as air.  This is the air surrounding the

2    subject in the scanner itself.  Also in black is the

3    cerebral spinal fluid which happens to occur in structures

4    we referred to as ventricles in the brain.  The cerebral

5    spinal fluid also is surrounding the brain.  The brain is

6    pretty much bathed in cerebral spinal fluid.  What's less

7    evident is that the bone is also black in this image.  That

8    is to say, the bone of the skull would be located somewhere

9    up in this region right here, and harder to point out for

10   you, because it's not a good example, is that blood is also

11   black in these MRI scans.

12          You've seen sort of some bright white that appears.

13   In particular the bright white that you see surrounding the

14   head, and often times when you first look at scans like this

15   you might misinterpret that to be the skull.  But that's the

16   subcutaneous fat layer, and fat on an MRI always appears as

17   a bright white signal.

18          Also, also, the whitish color or powder to it is

19   the actual white matter of the brain itself.  The brain is

20   organized into several tissue classes.  One being the grey

21   matter, which is the darker gray color in the brain itself,

22   and you can see that there's gray surrounding the outer edge

23   of brain, and then deeper white matter, and then deeper grey

24   matter structures.

25          The grey matter is where the neurons are located.

1    You heard Dr. Gomez-Isla talk about the neurons and neuron

2    loss.  The neurons are located in this grey matter.  It's

3    the cortical ribbon and the subcortical grey.  The white

4    matter is the processes through which the neurons talk to

5    each other.

6         In particular in this case, what we've been talking

7    about is the structures which are located deep in this

8    region here.  Now, as a neuroanatomist all areas of the

9    brain have been assigned names and labels to them, though we

10   still fight about exactly where the boundaries are.

11        The brain is organized into the tissue bulges that

12   you see such as this, and this, and this, are referred to as

13   the gyri, or gyrus of the brain.  The spaces between the

14   gyrus is --

15             MR. KOHN:  Your Honor, is there a question pending?

16             THE COURT:  Yes, he asked him to explain it and he

17   may.

18   A   The space between is the sulcus.  This is the black

19   region here.

20        What you can also see on the scan is the term S,

21   referring to superior.  It's an anatomical direction.

22   Slightly down below is the term I, which refers to the

23   direction of inferior.  It's just a road map, if you will.

24        And so if we're talking about the superior surface

25   of the brain, we would be talking about this area up here;

1    if we were talking about the inferior surface of the brain,

2    we would be talking about this region in through here.

3         Much like when we talk about -- it's not simply a

4    direction down, we also use those in the anatomy to try to

5    identify surfaces of the structures.

6    Q    Now, there are also some labels R and L on this scan.

7    What do those mean?

8    A    Yes.  So the label L actually refers to left and the

9    label R actually refers to right.

10        Now, they look, as you and I look at this they look

11   to be inversed to you and I, and that's because we are

12   viewing this subject as if we were looking them in the face,

13   and so their side of the body is opposite our side of the

14   body.

15        Other directions which you may hear talked about in

16   this case are the direction medial, stands for towards the

17   middle, and then lateral, actually it stands for any

18   direction off the middle.

19        And so in this case we've been focusing heavy on

20   this region of the brain referred to as the medial temporal

21   region.

22   Q    What happens in the medial temporal region?

23   A    The medial temporal region is a very important region of

24   the brain for memory function.

25   Q    Which areas of the medial temporal region did you look

1    at between 1997 and 1999?

2    A    So, between 1997 and 1999, we were primarily focused in

3    this, in the medial temporal region looking at the

4    entorhinal cortex.

5    Q    Why did you decide to look at the entorhinal cortex?

6    A    Our decision to look at the entorhinal cortex, as you've

7    heard alluded to already, was based in large part on the

8    work of Brad Hyman and Teresa Gomez-Isla in their

9    neuropathological study looking at the medial temporal

10   region.

11   Q    What happens in the entorhinal cortex?

12   A    The entorhinal cortex, functionally it is debated, it

13   may also have an independent role for memory, or it may

14   serve as the main pathway into the deeper brain, the

15   structure referred to as the hippocampus, in that area.

16   Q    Would you please show us for this study what was your

17   definition of the entorhinal cortex?

18   A    Sure.  Is it possible to move this mic over?

19           THE COURT:  It's possible if it moves.  Yes.

20   Apparently it does.

21   A    All right.  For this, for this study, we're trying to

22   identify the entorhinal cortex, three coronal images.  The

23   coronal images were centered on another structure in the

24   brain which serves as a landmark, and that structure was the

25   mammillary bodies.  And we would be expecting to see the

1    mammillary bodies right in this region here as two small

2    dimples in the brain.  So this would give us a landmark to

3    tell us that we were in the right neighborhood, much like

4    the Citgo sign tells us we're near Fenway Park.

5    **Q**   Do the mammillary bodies have anything to do with the

6    entorhinal cortex?

7    A   No, they're just a landmark and they're a very small

8    landmark.  So it helps us to define exactly what we're doing

9    with less ambiguity.

10   **Q**   Okay, please go ahead.

11   A   All right.  In order to identify the entorhinal cortex,

12   the entorhinal cortex is a structure located in the medial

13   temporal region.  It's actually located right here and right

14   here.  That's not the challenge.  The challenge is to

15   outline the structure.

16           And so in order to outline the structure we needed

17   to use information in this scan in front of you in order to

18   define its boundaries.

19   **Q**   How did you decide on the definition?

20   A   So the definition follows very closely the classic

21   neuroanatomical definition but adapted to information that

22   we don't have.  And what I mean by that is the classic

23   definition comes from histology sections.  The level of

24   resolution is not the same as with an MRI scan.

25   **Q**   And what is a histology section?

1   A   I'm sorry.  Histology is an autopsy section, or a

2   looking at the brain under the microscope.

3          And so we needed to use landmarks that are visual

4   in the MRI scan because we don't have the higher level of

5   resolution of a microscope.  And that boundary, the

6   boundaries that, and the protocol that we put in place was

7   to at first identify an important sulcus, and that sulcus is

8   called the rhinal sulcus.

9          As you go from the medial surface of the brain

10  laterally along the inferior surface, as you come across the

11  medial temporal region you'll find a small sulcus, a small

12  indentation.  That sulcus on both sides is the rhinal

13  sulcus.  In order to start outlining the entorhinal cortex

14  you're going to take a look at the junction, or the angle

15  formed by the rhinal sulcus and the inferior surface of the

16  brain, you're going to then bisect that angle to try to find

17  the white matter boundary.  As you can see at my pen point

18  here there is a very subtle band of white matter.  And you

19  can see that on both sides.

20  Q   So we have the colors of white and gray and black.

21  Which color does the entorhinal cortex appear to be in?

22  A   The entorhinal cortex is gray.

23  Q   You told us that the bottom then is this angle at the

24  inferior surface of the brain and the rhinal sulcus,

25  correct?

1    A    That's correct.

2    Q    So you start at the bottom, where do you go next?

3    A    So in bisecting that we're going to find the white

4    matter boundary.  We're going to then try to follow along

5    the white matter boundary, and then we're going to need to

6    try to separate, this is the hippocampus located right here,

7    and we need to find a distinction in order to separate the

8    hippocampus located here from the entorhinal cortex, located

9    here.  We come up along the white matter boundary, we come

10   across the subiculum, and then trace our way back down to

11   the starting point.

12   Q    How do you know when you've reached the top of the

13   entorhinal cortex?

14   A    Well, you're trying to identify the subiculum in that

15   level, and it's just a faint hint of the structure.

16            You're all looking at these on a computer, on a

17   monitor, a projection, a paper.  It's hard on a computer

18   screen when you're doing this in an anatomical section.

19   It's incredibly difficult to see any of these things here.

20   I'm just trying as we go through to give you these markings

21   as best I can.

22   Q    From 1997 to 1999 how were you looking at these images?

23   A    I was looking at these on a computer workstation in my

24   lab.  It happened to be a Sun SPARC workstation.  It was

25   running specialty designed software in order to do this.

1   Instead of tracing along as I'm trying to do with a fat pen

2   here to point out these tiny structures, I would be moving

3   an optical mouse on an optical mouse pad and clicking along

4   every time I wanted to turn, the computer could draw

5   straight lines, so in order to make an arc or curve you

6   simply had to keep clicking along in order to make the

7   curve, or less than straight shape.

8   **Q**   Would you please come over with me to the yellow chart.

9        **MR. LIPKIN:**  Can I borrow a marker, please.  A

10  marker.

11  **Q**   So, Dr. Killiany, what is a voxel?

12  **A**   The easiest way to respond to that is a voxel is a pixel

13  with a depth to it.  You've all seen computer screens,

14  you've all seen that they have resolutions to them.  That's

15  what we refer to as pixels.  When we're dealing with things

16  such as MRI scans, we're dealing with not only that surface

17  but we're dealing with a depth to it.

18        For example, in this case, the MRI scans that were

19  acquired, what you see there as that image is averaged over

20  a millimeter and-a-half of tissue, the depth to it.  And so

21  we refer to them as voxels because they have X, Y and Z

22  directions to them.

23  **Q**   On the scans that you were looking at, how big was a

24  voxel?

25  **A**   On the scans we were looking at a voxel was somewhere

1    about .93 by .93 millimeters by one and-a-half millimeters

2    deep.

3    **Q**    Would you please draw for us a couple of voxels.

4    A    (Witness complied.)

5    **Q**    Now, can you please draw a sample entorhinal cortex on

6    your, on your paper.

7    A    A sample entorhinal cortex.

8    **Q**    Or a sample shape that you might have drawn.

9    A    I might need a few extra voxels.

10           **THE COURT:**  Are they boxiles, as in B?

11           **THE WITNESS:**  V O X E L.

12           **THE COURT:**  Oh, V.

13           **THE WITNESS:**  V.

14           **THE COURT:**  They're voxels.

15           **THE WITNESS:**  Pardon my stutter.

16           **THE COURT:**  Not at all.

17   **Q**    What is the difference between a voxel and a pixel?

18   A    Oh, a pixel doesn't have the Z direction to it, or the

19   thickness to it.

20   **Q**    So is a pixel two dimensional?

21   A    Yes.

22   **Q**    And is a voxel three dimensional?

23   A    Yes.

24   **Q**    Okay.

25   A    All right.  A sample entorhinal cortex might look

1   something, longer shape, depending on how it went, it could

2   look something on the order of this.

3   Q    And you are not drawing this on a piece of paper,

4   correct?

5   A    No, I was drawing this on a computer screen moving a

6   mouse and clicking around to connect points.

7   Q    Now, once you told the computer that this was what your

8   tracing looked like, would the computer do anything with it?

9   A    Yes.  The technology we used at the time would not allow

10  us to split voxels.  What I mean by that is that a voxel

11  could either be included in the measure or excluded in the

12  measure.  It couldn't be a third in the measure or a quarter

13  in the measure.  So, the rule was if it was half in the

14  measure it was included and if it was less than half it was

15  excluded.

16  Q    So, using your example, can you please show us which

17  voxels would be included and which voxels would be excluded.

18  A    This would be excluded.  This would be excluded.  This

19  would be excluded. Obviously this.  This.  This is less

20  than half.  This looks to me to be less than half.  Maybe

21  that's half.  Maybe that's half.  This would be less than

22  half.  Probably could go either way with that one, whether

23  it's more or less than half.  This one looks more than half.

24  Q    So after you made your tracing and the computer edited

25  it what would your tracing look like in final form?

1    A    It would look very jagged and cubus.  And if you look at

2    these pictures that's what you see involved with these

3    tracings.  None of them are smooth curves.  And it would be

4    different than the actual outline that you employed.

5    **Q**    Could you please color in for us which voxels the

6    computer would have picked up in your example.

7              **MR. KOHN:**  Objection, your Honor.  The scale is off

8    on the -- and he cannot identify which voxel.

9              **THE COURT:**  The scale is off, and it's only a

10   chalk, but it helps to illustrate his testimony.  And that's

11   what a chalk does.  So that's all right.  This isn't

12   evidence.  It just illustrates his testimony.

13   A    If we assume this one is over half, the drawing would

14   look something like that.

15            **THE COURT:**  Now, in fairness to Mr. Kohn's

16   objection, those voxels, now that I've learned to spell

17   them, they're very small?

18            **THE WITNESS:**  They're in the order of .93 by .93

19   millimeters, in the X and Y, in the direction.  Clearly

20   nowheres near this size.

21            **THE COURT:**  Of course not.  Of course not.  And

22   though you've given us an example, in the actual drawing you

23   transect, if that's the question, a whole bunch of them,

24   lots of them, voxels.

25            Well, I'm not trying to put words in your mouth.  I

1    am questioning, or I'm asking that when you get done, while,

2    as you've said, the border of the entorhinal cortex tends to

3    be jagged and cubus, those were your words.

4             **THE WITNESS:**  Yes.

5             **THE COURT:**  That's correct.  It, it traces the

6    boundary with more accuracy, with more accuracy than your

7    example of five across and two on top there that you have

8    just drawn for us, because you're doing it like, as though

9    on a large sheet of graph paper.  Is that accurate?

10            **THE WITNESS:**  Yes, this is just a demonstration.

11            **THE COURT:**  Right.  And so, if we have a large

12    sheet of graph paper with small little cubes on the graph

13    paper and you did what you've described to the jury, you

14    would more closely approximate the boundary of the

15    entorhinal cortex; is that correct?

16            **THE WITNESS:**  I believe so.  And we can look at

17    that on the actual scans themselves in relation to the

18    actual drawings themselves, if that would be helpful.

19            **THE COURT:**  Go ahead, Mr. Lipkin.

20    **Q**  When you were making your tracings how many of the

21    voxels do you think you would split?

22    **A**  The hard part of answering that question is everyone's

23    entorhinal cortex is different.  It's a different shape,

24    it's a different length, it's a different thickness.  And so

25    it's very challenging.

1        What I'm trying to think about in terms of

2    responding to that is as you've seen the pixel counts in

3    terms of the total voxels that have, that's incorporated an

4    entorhinal cortex across three slices, those aren't very

5    large numbers.  And so, the boundaries would be -- I'm

6    sorry, I'm not getting a good answer here.

7        The boundaries would be somewhat greater than the

8    actual numbers included.

9    Q    Can we go back and take a look at some more scans.

10   A    Sure.

11   Q    So we've taken a look for participant number 17 at a

12   blank scan, correct?

13   A    Yes.

14   Q    And next I would like to show you for the same person,

15   this is labeled as slice number 65.  And at the top there's,

16   there's a label that says rater Killiany ENT00.

17       Do you see that?

18   A    Yes.

19   Q    Who came up with that labeling system?

20   A    That would be my labeling system.

21   Q    And why did you call this drawing ENT00?

22   A    Because it would be the first entorhinal outline I would

23   have drawn on this participant.

24   Q    When you were looking at this person's scan did you know

25   anything about this person?

1    A    Only what you see right here.

2    Q    Did you know what group the person belonged to?

3    A    No.

4    Q    Had you met this person?

5    A    No.

6    Q    Were you involved in recruiting participants to come

7    into this study?

8    A    No.

9    Q    Now, please show us what the blue and red markings

10   represent.

11   A    So the blue and the red markings are the actual

12   outlines, or the computer saved component of the outlines

13   that I drew on this participant.  The blue one being the one

14   on side L and the red one being on side R.  It's a little

15   challenging to see.  But you can see the jaggedness.  I know

16   these screens aren't the greatest.  I should put my glasses

17   on, that would help.

18         You can see the jaggedness.  It's probably more

19   evident on side L.  And those, the jaggedness is at the

20   voxel level.  So I was being asked about the voxel size

21   level, in comparison to the actual drawing itself.  Here's

22   an actual drawing and here's the actual voxel based

23   resolution of it.

24   Q    So would you please describe for us how you traced the

25   boundaries of the entorhinal cortex?

1    A    Sure.  Do you mind if I fold this over so we can look at

2    the blank and the drawing at the same time?

3    Q    I'm putting on the bottom the scan that you traced and

4    on the top, is this a blank copy of the same scan?

5    A    Yes, it is.

6    Q    Okay.  Please show us what you did.

7    A    So, this is the scan I showed you in terms of using the

8    references in the landmarks.  And as I pointed out to you

9    before, here's the rhinal sulcus on both sides.  And the

10   rhinal sulcus is the back boundary of the tracing of the

11   entorhinal cortex.

12        Coming across from the junction of the rhinal

13   sulcus to the inferior surface of the brain, we come across

14   to the white matter, we follow along the vaguely defined

15   white matter boundary to the subiculum of the hippocampus,

16   and then back down to our starting point.  You can see that

17   on both sides, from the rhinal sulcus and inferior surface

18   up to the white matter boundary, up to the subiculum, and

19   then back down again.

20   Q    How many times did you measure participant number 17?

21   A    Just once.

22   Q    How many times did you look at participant 17's

23   tracings?

24   A    A number of times.  It's hard to really reconstruct.

25   Q    Why did you only measure participant number 17 once?

1    A    Because this is, the tracings that you see here look to

2    me to be an accurate and consistent application of our

3    protocol for measuring the entorhinal cortex.

4    Q    Now, we've been looking at slice number 65 for

5    participant number 17.  How many slices did this participant

6    have in all?

7    A    In all, the participant had 124 images in the MRI scan.

8    And the entorhinal cortex was measured on three of those.

9    Q    So, I would like to take away your tracings for a

10   moment.  And here we have for participant number 17, we have

11   slice number 64, slice number 65, and slice number 66.

12          When were these images made?

13   A    So all three of these are three separate slices of the

14   same MRI scan.  Again, the MRI scan included 124 separate

15   images to it, and these were just sequential images.  So,

16   64, 65 and 66 come from the, they're consecutive images from

17   the same MRI scan itself.

18   Q    Are the different slices intended to show a progression

19   of disease?

20   A    No.  They're different locations in the brain.  They're

21   adjacent to each other, but they're different locations in

22   the brain.

23   Q    Who decided that the entorhinal cortex should be

24   measured on three slices?

25   A    I believe that was decided in conjunction with Brad

1    Hyman and Teresa Gomez-Isla.

2    **Q**   And why was the entorhinal cortex going to be measured

3    on three slices instead of just one?

4    A    It was, it was going to be measured on three slices

5    instead of one to come up with a more consistent

6    measurement.

7    **Q**   Now I would like to go back to your tracing.  So you're

8    sitting in your lab at Boston University, correct?

9    A    Yes, that's correct.

10   **Q**   And you've completed your tracing.  What's the next

11   thing that you do?

12   A    So once I've completed the tracing -- and it wouldn't

13   just be of the entorhinal cortex.  It would also be of the

14   banks of the superior temporal sulcus.  I would save the

15   tracings that I created and then at some point later I would

16   generate the volumes from these tracings in order to send my

17   data in to Mary Hyde.

18   **Q**   Why did you save your tracings?

19   A    I saved my tracings for two reasons.  One is to preserve

20   a record that they were done, and the second is to share

21   with Keith Johnson on the SPECT run.

22   **Q**   How would you calculate what volume was produced by your

23   tracings?

24   A    It's something that actually the computer program did

25   for us.  It amounts to counting the, I'm sorry, counting the

1   volume in each of the voxels.

2   Q   And in what unit would the volume come out?

3   A   I believe we reported unit volumes in cubic centimeters.

4   Q   Once you knew the volume what would you do with that

5   information?

6   A   So, I would do measurements in batches of 10 or 15 at a

7   time.  And when I completed a batch, I would put the data

8   together, the volume data together, and put that into a file

9   to send to Mary Hyde.

10          The computer -- I should say this was a Sun

11   workstation, it was an isolated computer, and so from this

12   computer the volumes would be generated, the volumes I would

13   then have to write down and take to the computer in my

14   office, perform, create a temporary Excel file.  The Excel

15   file would then contain the information until I transmitted

16   everything to Mary Hyde.  And then I wouldn't keep the

17   transmittal information because the database is the sole

18   source of information.

19   Q   Why would you send information to Mary Hyde?

20   A   Mary Hyde was my report, the person I reported to in

21   terms of data.

22   Q   I'm showing you a document that's been marked for

23   identification as Exhibit CX.  So, I'll ask you not to place

24   it on the monitor just yet.  And let me know if you can

25   identify that document?

1    A    Yes.   This appears to be an e-mail to Mary Hyde from me

2    showing an example of one of my data transmissions.

3               MR. LIPKIN:   Your Honor, we offer Exhibit CX.

4               MR. KOHN:   One second.

5               MR. FRIEDMAN:   May we have one second, please.

6               THE COURT:   Yes.   He has it.

7               MR. KOHN:   No objection.

8               THE COURT:   CX is admitted Exhibit 205 in evidence.

9               (Exhibit marked in evidence.)

10   Q    You told us that this is one example of an e-mail you

11   sent, correct?

12   A    Yes.

13   Q    Would you please tell us about information that's in

14   this example?

15   A    Sure.   Do you mind if I move it up?

16   Q    Go ahead.

17   A    So, this is an e-mail as I said from myself to Mary

18   Hyde.   And what I'm reporting at least in the body of the

19   e-mail itself is that I'm sending in the data from 17

20   additional MRI scans that I had outlined, and I'm giving

21   her, telling her the organization of the data that's coming

22   in in an enclosed file.   That it's in 25 columns, the first

23   one being the case number, then all the various structures

24   that I've outlined, including the entorhinal cortex listed

25   lower here on the page.

1    Q    Would you please turn to the second page of your e-mail.

2    What information is on this page?

3    A    So, on this page this is the actual volumetric

4    information itself.  So you can see the first number on the

5    first line is the subject's I.D. 003105, and then each of

6    these columns of numbers represents the different region of

7    the brain that I had outlined.  And that was what was

8    decoded on the first page.

9    Q    How can we tell which numbers refers to your

10   measurements of the entorhinal cortex?

11   A    If I went back a page, it says the columns 22 and 23

12   were the entorhinal cortex.  So that would be these two sets

13   of numbers right here.

14   Q    And if we look at the participant numbers it looks like

15   the first one is 105 and then we have 73 and then we have

16   number 8.  So, why are the participant numbers in that

17   order?

18       MR. KOHN:  Your Honor, objection.  He's talking

19   column 22 and 23.  I don't see how we can figure out what

20   column 22 and 23 is.

21       THE COURT:  Why don't you ask another question.

22   Q    If we look, if we look at the first column of the

23   information, the first column says 003105, and then down two

24   lines 003073.  Do you see where I'm referring to?

25   A    I'm sorry, could --

1    **Q**    Sure.  So the first number on this spreadsheet is

2    003105, correct?

3    A    Correct.

4    **Q**    And then down two lines there are 003073.  Right?

5    A    Yes.

6    **Q**    And then down two more lines we end up with 3008?

7    A    Correct.

8    **Q**    What are those numbers?

9    A    Those are the subject I.D. numbers.

10   **Q**    And why do they not go in order?

11   A    This is how I would receive the information, and I

12   wasn't really part of the recruitment or assigning subject

13   I.D.'s so I can't really speak to that part of it.  But this

14   is how I would receive a request to measure something.  It

15   wouldn't follow order please measure 7, 8, 9, 10.  It would

16   be in this kind of order that you see.

17   **Q**    For example, if we know that you made measurements for

18   participant number 1, do you know when you made those

19   measurements?

20   A    Well, I can reconstruct because I believe subject 1 was

21   in the reliability study.

22   **Q**    What if we were going to talk about a participant not in

23   the reliability study, what about participant 81, for

24   example?

25   A    I wouldn't have any idea whether I measured that person

1    early in the study or later in the study.

2    Q    Have you tried to determine when you made your

3    measurements?

4    A    Yeah, you would think that would be something that

5    should be straightforward to reconstruct because computer

6    files usually encode creation dates on them.  But in

7    preparing for this lawsuit, when we tried to look into this

8    the UNIX operating system doesn't time stamp files when

9    they're created.  And so that information's not available.

10   Q    Would you please turn back to the first page of your

11   e-mail.

12   A    Sure.

13   Q    The date of this e-mail appears to be August 20th, 1999.

14        Do you see that?

15   A    Yes.

16   Q    Why were you sending data to Mary Hyde at that time?

17   A    I'm not really sure.  Even in the e-mail it doesn't, it

18   sounds like this is just a housekeeping, that is to say, we

19   found these cases, we don't have measurements on them yet,

20   please measure these cases.

21   Q    The next participant I would like to show you is

22   participant number 1 which has been marked as Exhibit

23   No. 66.

24        I'll start with slice number 65 with that

25   participant.  Can you please orient us to this scan.

1  A   Sure.  In a bit of a brief orientation.  So, again, this

2  is a coronal image of the brain.  You can see the white and

3  the grey matter of the brain.  And you can see the medial

4  temporal region which has become the focus of this case.

5  Q   Where is the entorhinal cortex on this scan?

6  A   So, again, the entorhinal cortex itself is pretty

7  straightforward to point to, it's right here and right here.

8  It's the outlining of it that's the challenge.

9  Q   Well, can you please do your best to show us the

10  boundaries of the entorhinal cortex.

11  A   Sure.  So when I look at the scan, we can see that it

12  has a pretty good grey-white contrast in this area.  And as

13  we look at the participant side L, if we move our way along

14  the inferior surface we find the rhinal sulcus as a shallow

15  sulcus, and the inferior surface of the brain, you bisect

16  that angle, coming across the white matter to the subiculum,

17  and then, let's see if I can do this left handed, follow

18  along back to the inferior surface of the brain.  So, side L

19  follows our classic expectation of what the rhinal, of what

20  the entorhinal cortex should look like.  The other side is

21  where we find an anomaly, or an anatomical variation that's

22  taken place.

23      So, if we move our way back along the inferior

24  surface, we don't have a shallow sulcus, we have a very deep

25  and long sulcus.  And this is actually something we run

1    across a number of times in anatomy.  So, the long sulcus,

2    which is actually located right here, on the other side, is

3    called the collateral sulcus.  And I don't see a distinct

4    rhinal.  What I see on this side, in my opinion, is a

5    collateral sulcus.

6          What happens sometimes in anatomy is that the

7    sulci, or the two sulci, will actually merge and run

8    together.  That may sound like an odd concept, but to all of

9    us who try to drive around the Boston area, we have 93, 95

10   and 128, which are sometimes separate and sometimes merged

11   entities.  The same can be true of anatomy.  And so what we

12   see here is the rhinal sulcus running with the collateral

13   sulcus.

14         And so we would need to use the junction of now the

15   collateral sulcus and the inferior surface to come up along

16   the white matter, again along the apex of the subiculum, and

17   then down to our starting point again.

18   **Q**   Before this study had you tried to measure the

19   entorhinal cortex?

20   A    No, I had not.

21   **Q**   Before this study did you know about the rhinal sulcus

22   and the collateral sulcus and how sometimes they would merge

23   together?

24   A    No, I did not.

25   **Q**   Next I would like to show you the same participant, the

1    same slice.  And this scan is labeled as rater Killiany

2    ENT00.

3              What does that information tell you?

4    A    Again that tells me this was the first tracing on this

5    individual.

6    Q    Would you please tell us about the tracings that you

7    made?

8    A    Sure.  You can see the tracings that I've made outlined

9    in blue on side L and red on side R.  And what you start to

10   see is that there's portions of the entorhinal cortex that

11   have been missed.  So, on side R you can see a hint of white

12   matter which is above the tracing on this side.  And you can

13   see grey matter of the inferior surface of the brain which

14   was missed on this side.

15   Q    How many times did you measure this participant?

16   A    I believe I measured this participant twice.

17   Q    Now, I'm folding over your initial measurement.  And I'm

18   also going to show you Killiany ENT01.  Is this your revised

19   measurement?

20   A    Yes, it is.

21   Q    So the initial measurement is on top and the revised

22   measurement is at the bottom, correct?

23   A    Well, the remeasurement is on the bottom.

24   Q    Please tell us about your remeasurement?

25   A    So, you can see -- it's hard to compare these two.  So,

1    as I indicated, so, if we look at side L you can see that

2    they both start at around the collateral sulcus.  They come

3    up.  This one captures the subiculum.  It comes in deeper to

4    capture more of the grey-white boundary, and then back to

5    the collateral sulcus.

6           Similarly, on the other side, we see the

7    starting point being the rhinal sulcus now, up across to the

8    white matter junction, up to the subiculum, and then

9    capturing matter of the inferior surface of the brain.

10   Q    Which of these tracings follows the protocol that you

11   and Dr. Gomez-Isla agreed upon?

12   A    Well, they both follow the protocol.

13   Q    How could that be the case?

14   A    Because as I've described both of them, I've used the

15   same landmarks and tried to identify the same boundaries of

16   both of them.  It's just that through looking at more scans

17   and getting better at doing this you can do so more

18   consistently.

19   Q    Which of these tracings do you believe more accurately

20   captures the volume of the entorhinal cortex?

21   A    Today I believe that the lower one does.

22   Q    Why is that the case?

23   A    I believe the lower one does because the upper one

24   excludes the grey matter of the entorhinal cortex at this

25   level, which would have been, which is inconsistent with our

1   protocol.

2   **Q**   Now, if we look at this scan on the top, once you

3   calculated the volume what did you do with that information?

4   A    The scan on the top?  Once I calculated the volume of

5   the entorhinal cortex, I transmitted that to Mary Hyde.

6   **Q**   And now if we talk about your remeasurement on the

7   bottom, when you calculated that volume what did you do with

8   it?

9   A    I transmitted that data to Mary Hyde.  And I saved,

10  obviously I saved both measurements, that's why they're here

11  in front of us in court.

12  **Q**   Let's talk about the computer system that you were

13  using.  Did you have the ability in that computer system to

14  alter measurements?

15  A    If you're referring to editing measurements?  Yes, by

16  all means, we had the ability to edit measurements.  I had

17  the ability to edit measurements.

18  **Q**   And if you had wanted to edit a measurement how would

19  you have gone about doing that?

20  A    I would have gone about bringing the image up such as

21  the top one here and then going ahead and adding voxels to

22  the measure itself.

23  **Q**   In this study did you edit your measurements?

24  A    No.

25  **Q**   Why not?

1    A    Because that would be using information that's already

2    in front of you.   The goal of this study was to outline the

3    entorhinal cortex using the information in the scan itself.

4              THE COURT:   Are you about done with this witness?

5              MR. LIPKIN:   No, your Honor, I have some additional

6    questions for him.

7              THE COURT:   Then let's take the morning recess.

8              We'll recess for 20 minutes until five minutes

9    after 11:00.   You've not heard all the evidence.   Please,

10   therefore, keep your minds suspended.   Do not discuss the

11   case either among yourselves nor with anyone else.

12             We'll stand in recess for 20 minutes.

13             THE CLERK:   All rise for the jury.

14             (Whereupon the jury left the courtroom.)

15             (Recess.)

16             THE CLERK:   All rise for the jury.

17             (Whereupon the jury entered the courtroom.)

18             THE CLERK:   Court is back in session, you may be

19   seated.

20             THE COURT:   There's a juror question and I'm going

21   to respond to it on the record first.

22             The jury would now like copies of Exhibit 41.   And

23   we'll send the clerk --

24             (Whereupon the Court and the Clerk conferred.)

25             THE COURT:   And we'll make copies -- that's

1    short -- and pass them out to each of you.  Again, no

2    overemphasis on Exhibit 41, it's just another exhibit you

3    can have.

4         And then the question goes to another exhibit they

5    would like to see.  And if you folks -- or at least one

6    juror would like to see.  If you folks can figure out what

7    it is pass it up.  Otherwise, we'll deal with it later.

8         Mr. Lipkin, you can continue.

9              **DIRECT EXAMINATION** (Cont'd)

10   **BY MR. LIPKIN**

11   **Q**   Dr. Killiany, before the break you were talking about

12   the software that you used to make these tracings.  What was

13   that software called?

14   A   The software was called NeuroView.

15   **Q**   Did NeuroView allow you to edit measurements that you

16   had already made?

17   A   Yes.  It had the capacity to do so.

18   **Q**   Did you edit measurements that you already had made?

19   A   No.  Editing measures already made would be altering

20   those measures.  Instead, what I would do is remeasure a

21   case if I thought the protocol had been not applied

22   correctly.

23   **Q**   If we look at the bottom tracing, which is your

24   remeasurement, what were you looking at on the screen when

25   you did that?

1    A    I was looking at, when I did -- well, when I did both of

2    these tracings, I was looking at the blank MRI scan when I

3    did the tracing itself.

4    Q    Did the NeuroView software allow you to zoom in?

5    A    Yes, it did.

6    Q    Did you use that feature?

7    A    I didn't find that feature very useful because as soon

8    as you start to zoom in, what happens is the images become

9    very cubus or voxelated.  And I actually found from my

10   perspective that makes it harder to do rather than easier.

11   Q    Did the NeuroView software allow you to adjust the

12   brightness or the contrast?

13   A    Yes, it did.

14   Q    Next I would like to show you Exhibit No. 95, which is

15   the set of scans for participant number 56.

16          Do you know now which group participant 56 belongs

17   to?

18   A    I would have to look it up.

19   Q    Did you know when you were making these measurements --

20   A    No.

21   Q    -- which group participant 56 belonged to?

22   A    No.

23   Q    Please give us your impression of the blank scan.

24   A    So, once again, we can see a coronal image of the brain,

25   at the level around it the mammillary bodies.  The

1    mammillary bodies themselves appear to be more distinct than

2    in the previous example that I showed you, located right in

3    here, these two dimples.  But on this scan the quality of

4    the image in terms of the medial temporal lobe regions is

5    not very good.  You can see it appears -- none of these

6    appear great.  But you can see this appears even more fuzzy

7    than some of the other examples we've looked at.

8    **Q**   What would cause the MRI to come out fuzzy?

9    A   The MRI can come out fuzzy or you will have artifact

10   issues, really what we refer to this as, for a variety of

11   reasons.  By example, if the participant were have moved

12   while in the MRI scanner that can induce artifact.  If it

13   happened to be an individual who tends to get nervous and

14   bite their lip or chew their tongue that induces movement

15   artifact.  If they happen to move a limb that can induce

16   movement artifact.  There's a whole other class of artifact

17   or problems that can be related to the equipment itself.

18   MRI scanners are basically driven by computer systems.

19   Those computer systems get updated on a regular basis.  If

20   this was pre- or post-update that could deteriorate the

21   quality of the scan.  The scanner may not have been working

22   appropriately on this day.  There are a whole list or litany

23   of things that can affect the quality of the MRI scan.

24   **Q**   Where is the entorhinal cortex on this scan?

25   A   So, as before, identifying the entorhinal cortex is

1    pretty straightforward, even though the image is fuzzy, in

2    that it's located here and here.  But defining the

3    boundaries is really a challenge.  As you can look at this

4    image, especially here you can see how unclear the tissue

5    looks.  This side, at least what I'm projecting as I'm

6    looking at the screen, the tissue itself is very, very faint

7    below the grey-white border here.

8    Q    If you were being asked today to outline the entorhinal

9    cortex how would you do it on this scan?

10   A    If I were asked today, much like I've gone through with

11   all of these, on this side, we move from the inferior

12   surface, you see a small sulcus, it's the rhinal sulcus, the

13   collateral behind it, because we have a rhinal sulcus we can

14   discern the rhinal and we can really look closely to see the

15   inferior surface of the brain.  We would bisect the rhinal

16   up along the very, very faint white matter, subiculum, and

17   then back on down to the rhinal sulcus.

18   Q    Next I would like to show you your first tracing for

19   this participant.  Same participant, same slice.  Can you

20   please tell us about what you traced?

21   A    Well, as I just outlined for you, I would have traced

22   from the rhinal sulcus to the, what I thought was the white

23   matter boundary on up through what I thought would be the

24   subiculum and then coming on back down here.

25   Q    Do you believe that this measurement follows the

1   protocol?

2   A   I think it follows the protocol, but I think it's a poor

3   representation of what the protocol was meant to capture.

4   Q   Why is that the case?

5   A   Well, it appears to fall a little short of the subiculum

6   and on the inferior surface, I believe it falls very short

7   of the inferior surface of the brain.

8   Q   Please tell us about your tracings of the right

9   entorhinal cortex on the side of R.

10   A   So, on the right side, again it starts at the junction

11   of the rhinal sulcus, it should have come along the rhinal

12   sulcus, grey-white boundary, to the subiculum, and then on

13   back down.  But it misses the subiculum and it misses the

14   inferior surface of the brain.

15   Q   I would also like to show you your revised measurements

16   for this participant.  And for comparison, I'm also going to

17   show you your initial measurements.

18        Why did you decide to make these revisions?

19   A   I decided to because on re-reviewing 56, the initial

20   tracings, I felt that it erred in the way that I found the

21   inferior surface of the brain and the subiculum.

22   Q   Can you please point out to us what you mean.

23   A   Sure.  So the inferior surface of the brain on this one

24   is slightly below this tracing.  The subiculum is this apex,

25   right up in here at the tip of the pen.  Again on this side

1  the inferior surface of the brain is not captured correctly

2  by this tracing.  Down here you can see, we come across to

3  the subiculum, along the inferior surface of the brain, and

4  back to the starting point on both sides.  White matter of

5  the subiculum, inferior surface of the brain.

6  Q   Which tracing do you think is more accurate?

7  A   I think the second tracing in this case is more

8  accurate.

9  Q   Now, have you heard in this case that for participant 56

10  there was an increase in volume of 283 percent?

11  A   Yes.

12  Q   Did you know when you were making your tracings what

13  percentage change was caused by remeasurement?

14  A   No, the information I used was this information in front

15  of me.

16  Q   What were you told about the statistical significance

17  after measurements?

18  A   I wasn't told anything about the statistical

19  significance after measurements.

20  Q   What were you told about the results of the reliability

21  study?

22  A   I was told that the reliability study was good and that

23  I could go on and continue measuring additional subjects.

24  Q   Were you given a value of 0.96 as the reliability

25  coefficient?

1    A    I don't believe so, not at the start of the study.

2    Q    Were you told that there was ever a reliability value of

3    0.54?

4    A    No.

5    Q    Next I would like to show you Exhibit 68 which is the

6    set of scans for participant number 9.  I'm showing you

7    slice number 66.

8            Incidentally, Dr. Killiany, for each of these

9    participants we have three slices, correct?

10   A    Of the entorhinal cortex outline, that's correct.

11   Q    Why are we choosing these three slices to show the jury?

12   A    Just as a representative of the errors I've run across

13   in re-reviewing these cases.

14   Q    So starting with the blank scan, can you please tell us

15   about what you see?

16   A    Sure.

17   Q    Do you need me to zoom it in for you?

18   A    It just looks like the autofocus isn't working quite

19   appropriately.

20   Q    Is that better?

21   A    That looks better here.

22           Okay.  So, this is participant number 9.  Without

23   going too far afield of the medial temporal region, you can

24   see the mammillary bodies, or actually you can see what

25   should be the mammillary bodies, there's actually one and a

1    piece of a second mammillary body.  So, this could cause

2    some problems in terms of figuring out where the center

3    slice was for the entorhinal cortex measure.

4           In terms of the actual tissue itself in the medial

5    temporal practical regions, you can see that the tissue

6    itself has nice grey-white contrast, at least on side L.

7    Side R, the grey-white contrast is a bit weaker.  The

8    entorhinal cortex, again pointing to it, is here and here.

9    It's the outline again, that's a subjective process.

10          I should also say as I follow the sulcus here there

11   appears to be a bit of tissue which is unclear if it's part

12   of the brain or excluded from the brain, right in here.

13   Q   Now, I'm showing you your initial measurement ENT00.

14   Can you please describe what you did?

15   A   Sure.  So, as we've gone through, I started at the

16   rhinal, junction of the rhinal, there's actually a rhinal

17   and collateral combined, going across to the white matter

18   surface, up to the subiculum, and down and around.

19          On this side it was my, it was my opinion that this

20   small indentation is the rhinal sulcus and that this is the

21   collateral sulcus here.  And so starting here up along the

22   white matter boundary, and down again, missing some grey

23   matter.

24   Q   During the study how many times did you look at this

25   slice, at the scans for participant number 9?

1    A    Well, I can tell you at least three times because I made

2    three measurements on subject number 9.

3    Q    Next I'm going to show you your first remeasurement,

4    ENT01, in comparison with your initial measurement which is

5    on top.

6         Can you please tell us why you made revisions for

7    this participant?

8    A    Sure.  Because the initial tracing again left out

9    portions of the entorhinal cortex that were supposed to be

10   included based on our operational definition.  So, on this

11   side, side R, there's grey matter both below and above the

12   entorhinal cortex, which is now captured in a second

13   measurement.  And there's a piece of the entorhinal cortex

14   here which is missing from this tracing, which is now

15   included in this tracing here.

16   Q    And finally, I will show you your second remeasurement

17   which is identified as ENT02.  So I have on the top your

18   initial measurement, on the top your initial measurement, in

19   the middle your first revised measurement, and on the bottom

20   your second revised measurement.

21        Would you please tell us why you decided to

22   remeasure this participant a second time?

23   A    Yes.  In looking at this a second time, I believe I went

24   too far into the, above the subiculum on side L and in

25   remeasuring I didn't go quite as far up into the subiculum.

1    I also included a bit more of the grey matter that was

2    seemingly missing on the side of R.

3    **Q**   Do you hold an opinion about which, if any, of these

4    measurements followed your protocol?

5    A    All three followed the protocol.

6    **Q**   How can it be that three different looking measurements

7    would all follow the same protocol?

8    A    Because it's so challenging to identify the boundaries

9    of this structure.   It's constant subjective decisions that

10   you're making as you're tracing along.

11   **Q**   I would like to have you retake the witness stand for a

12   few minutes, I have questions for you, then we'll go back to

13   the scans.

14   A    (Witness complied.)

15   **Q**   You told us that you made your measurements in this case

16   from 1997 to 1999, correct?

17   A    Yes, that's correct.

18   **Q**   At that time did you feel qualified to do this work?

19   A    Oh, yes.

20   **Q**   Why?

21   A    By that point I had outlined a large number of the

22   regions of interest in the brain between 1992 and 1997.

23   **Q**   Why hadn't you tried to outline the entorhinal cortex at

24   the beginning?

25   A    Most of the work before this was focused on the

1   structures adjacent, being the hippocampus.  And it's the

2   hippocampus that I had studied both before this and did a

3   fair amount of graduate training on.  The entorhinal cortex

4   as I said came into light before us based on the works of

5   Dr. Hyman and Teresa Gomez-Isla.

6   **Q**   Where did you go to college?

7   A   I went to John Carroll University which is in, outside

8   of Cleveland, Ohio.

9   **Q**   What degree did you earn?

10  A   I earned a bachelor's degree in physiological

11  psychology.

12  **Q**   What is, what is that field?

13  A   That's the study of the brain and behavior.

14  **Q**   After your bachelor's degree did you receive any more

15  schooling?

16  A   Yes, I received a master's degree from the University of

17  Hartford in Connecticut in physiological psychology.  And

18  then I went on to complete my doctorate in physiological

19  psychology at Northeastern University.

20  **Q**   What did you do after getting your doctorate?

21  A   After getting my doctorate, I became a post-doctoral

22  fellow on NIH training grant at Boston University School of

23  Medicine in the department of anatomy and neurobiology.

24  **Q**   What does it mean to be a fellow?

25  A   A fellow means you're in training.

1   **Q**   What were you studying?

2   A   I was studying neuroanatomy, and that's when I started

3   working with Dr. Albert on her project to learn about MRI.

4   **Q**   Where do you work now?

5   A   I'm, I'm still at Boston University School of Medicine

6   as an associate professor.

7   **Q**   What does your job entail?

8   A   My job entails a wide variety of things.  I'm the

9   director of the Center for Biomedical, Center for Bioimaging

10  at Boston University School of Medicine.  I also am the

11  co-director of the master's program for biomedical imaging.

12  I teach first year medical students as part of our

13  neuroscience courses.  And I mentor a variety of graduate

14  and doctoral students.  I'm sorry, graduate students and

15  post-doctoral fellows.

16  **Q**   Are you currently doing any research?

17  A   Yes.  I'm doing a variety of research.  My, no surprise,

18  my specialty is in working with MRI scanning, and so in my

19  research we're using MRI to explore aging and other aspects

20  of disorders of the nervous system, some of the most recent

21  going into Gulf War illness.

22  **Q**   Who currently funds your research?

23  A   Most, all the research I'm involved in is funded by the

24  National Institute of Health.  There's a small amount that's

25  funded, I believe by the Army.

1    Q    Do you work with patients?

2    A    Yes.  I see patients one day a week.  I'm a clinical

3    neuropsychologist as well.

4    Q    What types of patients do you see?

5    A    I work with a neurology group and primarily I see

6    patients for the diagnosis of Alzheimer's disease.

7    Q    Why do you see patients?

8    A    Because it helps to round the other research that I do.

9    So, it's very easy to get over involved in something like

10   MRI scanning and follow up that technology for technological

11   reasons and lose track of what the patients, or the medical,

12   the patient side of medicine looks like.

13   Q    What is the ADNI, A D N I?

14   A    The A D N I is a project that was started up by the

15   federal government in 2002.  What became clear at that point

16   in time is studies like you're hearing about here, a program

17   project grant, there are a number of them throughout the

18   country but they weren't really designed to bring people

19   together to work together to try to combat a disease or

20   disorder.  And so the ADNI was formed to respond to

21   basically the worldwide crisis that is Alzheimer's disease

22   in order to try to put methods together to basically combat

23   this crisis.

24   Q    What is your role on the ADNI study?

25   A    So, the ADNI study is a very large study but it looks

1  much like this program project grant that you're hearing

2  about.  The ADNI study has an MRI core which oversees the

3  development of MRI sequences and the acquisition of MRI

4  scans at some 60 sites across the U.S., and I'm a volunteer

5  on the ADNI core, MRI core.

6  Q   If you would please step down, I would like to show you

7  a few more scans.

8          Next I'm going to show you Exhibit 147 which is

9  participant number 142.  And I'll show you slice number 64.

10          Can you please comment on this slice?

11  A   Well, the first thing you might see when you look at

12  this is that it looks very different than the other images

13  that we've seen so far.  And this is what we refer to as

14  anatomical variability.  And when I'm saying it looks very

15  different, I'm just asking you to focus your attention in

16  the medial temporal lobe regions.

17          So, before we saw what looked to be far greater

18  tissue in this region, and this individual what you see is

19  what there is.

20  Q   Looking at the scan are you able to tell what group the

21  participant belongs to?

22  A   No.

23  Q   And as the study went along is it the case that

24  participants would change groups?

25  A   It's my understanding that they could change groups as

1    the study went along.

2    **Q**   Were you made aware when a participant changed groups,

3    for example, when someone --

4         **MR. KOHN:**  Objection.

5    **Q**   -- would go from being a normal to a questionable?

6         **THE COURT:**  No, sustained.  You may inquire.  But

7    that's leading.

8    **Q**   What information were you given when participants

9    changed groups?

10   A   I wasn't given any group information throughout the

11   study.  I was unaware if they changed group, that they

12   stayed in the same group.  It wasn't part of -- it wasn't

13   what I was involved with in this study.

14   **Q**   Where is the entorhinal cortex on this slice?

15   A   So, on this individual, in this individual, once again,

16   it's not too hard to point to, hard to outline, it's right

17   here on side R.  So it's just at the tip of the pen.  And if

18   I can do this left handed, at the top tip of the pen here in

19   terms of its location.

20   **Q**   I'll show you your first tracing, ENT00.  What does this

21   show to you?

22   A   It shows me that I was in error the first time I applied

23   the protocol.  If you look on side R, you can see there's a

24   big gap in the tracing of the entorhinal cortex.

25   **Q**   And what is the significance of that gap?

1    A    Well, the entorhinal cortex doesn't have a gap or a hole

2    in it like this.   The entorhinal cortex is a continuous

3    structure from the, in this case, the junction of the

4    collateral and rhinal sulci on up to the subiculum.   So this

5    is tissue that was excluded from the first tracing.

6    Q    Do you know why the tissue was excluded?

7    A    I speculate it has to do with the voxels system that we

8    had at the time, whereas if your tracings came too close

9    together that it would result in several voxels being

10   excluded.

11   Q    Well, you're not allowed to speculate.   Do you have an

12   understanding about, about why there's a space?

13   A    It is my opinion that in tracing the two borders came

14   too close together.

15            MR. KOHN:   Objection, your Honor.

16            THE COURT:   No, he can give us his opinion.

17   A    That the two borders came too close together and that

18   resulted in the voxels being excluded from the tracing.

19   Q    Do you have any other comments on your tracings here?

20   A    That's the most obvious comment that I have on this

21   tracing here.

22            The other side does fall a little short of some of

23   the grey matter in this region up here.

24   Q    Now, I will show you your remeasurement for this person.

25   The initial measurement is on the top, the remeasurement is

```
 1   on the bottom.

 2           Why did you remeasure?

 3   A   Again, I remeasured primarily because of what's on the

 4   right and to a far less extent what was on the left.  When I

 5   was remeasuring the case, I would remeasure both the left

 6   and the right, I wouldn't simply remeasure one side.

 7           And what you're seeing here now to me looks to be a

 8   better representation of our entorhinal cortex operational

 9   definition.  On this side we've got the rhinal and

10   collateral sulci running together up, though it's not much

11   of a white matter boundary at all, but up to the subiculum,

12   and down on the inferior surface of the brain.  On this side

13   you have a separate rhinal sulcus, collateral sulcus, again

14   out to the white matter boundary, then up to the subiculum,

15   and then back down, and back down again.

16   Q   When you were making remeasurements why would you decide

17   to do both side L and side R?

18   A   Just for consistency sake, so in any individual subject

19   the measurements came from the same time.

20   Q   The next exhibit is number 143, participant number 136.

21   What is your impression of this scan?

22   A   So this scan also appears to have artifact in it.  It

23   certainly appears to be fuzzy.  And one of the other

24   reasons, other things we used to try to determine artifact

25   versus something that's wrong with an individual is that
```

1    artifact doesn't respect anatomy.  So when you see things

2    that are present in the scan here and it goes through what

3    we know to be anatomical boundaries, that's one of the hints

4    that it's an artifact itself.

5           The scan itself appears to be more granulated, and

6    the medial temporal lobes appear to be affected by this so

7    that in particular on side R it's very, very difficult to

8    identify the grey-white boundary.

9           And on side L the boundary between the inferior

10   surface of the brain and the entorhinal cortex is very hard

11   to differentiate.

12   Q   This is your initial measurement.  Can you please tell

13   us about it?

14   A   Sure.  So the initial measurement was the first attempt

15   to outline the structure in this individual.  You can see it

16   becomes very thin on top, missing what should be the

17   entorhinal cortex above it.  On the other side it also

18   appears to be just short of the subiculum.

19   Q   Your revised measurement is on the bottom and your

20   initial measurement is on the top.  Why did you remeasure?

21   A   I remeasured because I felt that the initial measurement

22   excluded too much of the entorhinal cortex.  It did not

23   accurately represent the protocol we were using.

24   Q   In what ways?

25   A   As I pointed out just a few moments ago, so there's grey

1    matter of the entorhinal cortex which is missing on the top,

2    which is now present on the bottom.  And on this side the

3    measure fell short of the subiculum.  I'm trying to point to

4    it right in here.  Which is now captured in this bottom

5    drawing.  And this falls also short of the grey-white

6    boundary located just next to the pen.

7    **Q**   When you're looking for the subiculum on an MRI scan

8    what are you trying to find?

9    A    You're trying to find a very poorly defined structure.

10   So, the hippocampus is located right in here.  And the

11   hippocampal grey matter wraps around sometimes forming an

12   apex and becomes continuous with the entorhinal cortex.  So

13   you're looking for something to guide your eye to split

14   those two apart.

15   **Q**   Which of these measurements do you think is more

16   accurate?

17   A    I think the second measurement is more accurate.

18   **Q**   Now, I'm showing you Exhibit 118.  It's a blank scan for

19   participant number 103.  What do you see here?

20   A    So this scan, like all we've seen, coronal images of the

21   brain, going into the medial temporal lobes on one side.

22   We've got a fairly distinct grey-white boundary.  We've got

23   the collateral and rhinal sulci running together here.   On

24   this side we have a separate rhinal and collateral sulcus.

25   And we have a very, very hard to define grey-white boundary

1    here, though, at the, at the entorhinal cortex.

2    Q    Here's your initial measurement.  Can you please tell us

3    what you traced?

4    A    So, again, I would be tracing from the junction of the

5    collateral and rhinal sulcus here, inferior surface of the

6    brain, trying to find the white matter boundary which I

7    didn't do very well, and falling short of the subiculum in

8    this case and missing grey matter on the outside here.  This

9    side we have the rhinal/collateral coming up falling just

10   short of the subiculum again, and missing grey matter on the

11   inferior surface of the brain.

12   Q    When you say that you were missing things and that you

13   didn't do it very well, were you being careless?

14   A    Oh, by all means, no.  This was the best I could do at

15   the time.  It's not -- I'm not sure I could do a whole lot

16   better today.

17   Q    How long did you spend making these tracings?

18   A    Each measurement, probably, each, each -- well, the

19   entorhinal cortex was measured on three slices so it

20   resulted in six tracings.  It would probably take me on the

21   order of 15 or 20 minutes, perhaps longer, if the case was

22   very hard to discern.

23   Q    For how many people would you trace the entorhinal

24   cortex in one sitting?

25   A    Well, I wouldn't just trace the entorhinal cortex in one

1    sitting.  I would also be tracing other regions of the brain

2    at the same time.  You can't do this kind of work for more

3    than about an hour or two hours at a time before just

4    becoming so fatigued that your drawing quality really falls

5    off.

6    **Q**   Next I'm going to show you participant 103.  Here's your

7    revised measurement, and for comparison here's your initial

8    measurement on the top.

9         Could you please tell us why you made these

10   remeasurements?

11   A    Sure.  To correct what I thought were errors in the

12   original measurement.  So I would remeasure the case.  In

13   the bottom, the grey matter of the entorhinal cortex matter

14   is captured, and I feel this, on this other side L, we went

15   back, we went out -- sorry.  The inferior surface of the

16   brain is better captured in this tracing.

17        I could also point out, and I haven't pointed this

18   out before, if the tracings -- the area that was being

19   measured is within the tracing itself.  So this looks like

20   it's fully colored in, and the lower one looks like it's

21   separated.  That's just because these lines are very close

22   together up here, and down here they're further apart so you

23   can see distance between them.

24   **Q**   So, just to clarify, Dr. Killiany, when you were making

25   this tracing were you looking at, when you were making your

1   revised tracing, were you looking at your initial tracing or

2   were you looking at a blank scan?

3   A   I was looking at a blank MRI scan, much like you see on

4   the screen from the projection here.

5   Q   Next I would like to show you participant number 112.

6   Here's a blank scan.  Can you please identify the entorhinal

7   cortex?

8   A   Yes, again, I can point to it.  But, again, you can see

9   the quality of the scan, the medial temporal region, is

10  really not that good.  The entorhinal cortex would be

11  located right here, and on the opposite side it would be

12  right here.  Here's an example of another form of artifact

13  that's called a bone and hardening artifact, where the

14  actual bone of the skull could impact the image itself.

15  Q   When you say that the quality of some of these scans is

16  not very good, did you exclude them from the study?

17  A   No, that's something that we've, that I at least

18  particularly really agonized a lot about.  These

19  participants really were very generous with their time and

20  energies to be willing to take part in these studies.  And

21  many of, many of them were at somewhat a time of crisis in

22  their lives.  And so I felt it was my obligation --

23          MR. KOHN:  Objection as to relevance.

24          THE COURT:  Well, we'll let him finish that answer.

25  Because the objection is not timely.

1           You may finish.

2    A   I felt it was my obligation to work with as many of

3    these as I could.

4    Q   Now, this is still participant number 112.  It's

5    Exhibit 123.  And here is your initial measurement.

6           Can you please tell us about what you traced?

7    A   Well, yes, I traced the entorhinal cortex on side L and

8    R going from the rhinal sulcus, through white matter

9    boundary, trying to get the subiculum, inferior surface.

10   This side here, you can see it falls short of the subiculum

11   and that it misses some of the grey matter.

12   Q   For the same participant, the same slice, I'm now going

13   to show you your revised measurement.  And I'll put the

14   initial one on top.

15          Why did you make these revisions?

16   A   I made these revisions because of the tissue that was

17   excluded the first time I traced this participant scan.  And

18   so, in order to correctly apply our operational definition

19   the retracing was done to capture the tissue that was missed

20   in the initial tracing.  Especially --

21   Q   Do you have an opinion about which, which measurement is

22   more accurate?

23   A   I believe the lower image, the second tracing is more

24   accurate in this case.

25   Q   Next I would like to show you one final scan in this

1    batch.   It's Exhibit No. 96, participant number 59.

2              Would you please tell us what you see here?

3    A   So, again, we're looking at a coronal image.  We're

4    looking at the, focusing mainly on the medial temporal

5    region.  Rhinal sulcus here.  Rhinal sulcus here.  And the

6    difficult to discern grey-white boundary here.  Somewhat

7    better on this side here.  I'm sorry, somewhat better on

8    side R.  It's also challenging on side L.

9    Q   I'm going to show you your initial measurement for this

10   participant and I'm going to zoom in on it.

11             What do we see here?

12   A   Well, we can see that especially on side L that there's

13   an island, if you will, or there's a missing portion of the

14   entorhinal cortex.  The tracing's not continuous.

15   Q   Now, forgetting about MRI scans for a minute, in a

16   person's brain is it possible to have an island where the

17   entorhinal cortex or a piece of it is off on its own?

18   A   No.

19   Q   What does that tell you about this tracing?

20   A   It tells me this tracing misses a portion of the

21   entorhinal cortex that it was supposed to capture.

22   Q   Do you know why that's the case?

23   A   My opinion is it was because of the tracing system we

24   had at the time where if a boundary came too close together

25   it could be excluded.

1    Q    Would you please tell us how you found these boundaries?

2    A    Certainly.  So you can see the rhinal sulcus located

3    here, the shallow sulcus, rhinal sulcus here, the shallow

4    sulcus, up to the white matter, should have been coming up

5    to the subiculum and coming back down again.

6           On this side, rhinal sulcus, white matter, missing

7    some grey matter here, and on back down around the inferior

8    surface.

9    Q    And I'll show you your revised measurement, in

10   comparison with the initial one.

11          Why did you make these revisions?

12   A    In order to make sure that I was consistently applying

13   our protocol, the first set of measures excluded portions of

14   the entorhinal cortex which, which should have been

15   captured.  So, on this top side you can see that there's

16   gray above the tracing of the entorhinal cortex, and that's

17   not the case in this lower one.  And here as well you can

18   see where it goes up towards the subiculum and this is a

19   better representation missing the island.  Or removing over

20   islands in the initial tracing.

21   Q    I would like to have you retake the witness stand and I

22   have a few more questions for you.

23   A    (Witness complied.)

24   Q    When did you finish tracing the entorhinal cortex in

25   connection with this part of the study?

1    A    In 1999.

2    Q    Did you continue working on this study after that?

3    A    On this program project study?  I continued working on

4    it until it ended in 2007, 2008.

5    Q    What did you do from 1999 until 2001?

6    A    So, from 1999 until 2001 we began looking at some

7    longitudinal measures of change.  I'm sorry, we began

8    looking at, focusing on longitudinal analyses.  I was

9    working on manuscripts during that period of time.  And we

10   were working on preparing the grant for submission.

11   Q    What happened in early 2001?

12   A    In early 2001, I believe that's when Marilyn called me

13   and told me that there was some concerns about the accuracy

14   of the entorhinal cortex measurements.

15   Q    Did she explain what she meant?

16   A    I don't recall her explaining in detail what she meant

17   by the accuracy, but I believe she said that, I believe I

18   recall she said that Dr. Jones and Dr. Johnson had expressed

19   concerns that there were more than one measure and that

20   there was concern about them being accurate.

21   Q    When you heard that information what was your reaction?

22   A    Well, I was puzzled.  I thought I was doing a good job

23   in trying to make sure the measures were accurate.

24   Q    What happened next?

25   A    In that conversation, I believe Marilyn asked at that

1   point in time if I would go about and remeasure a subset of

2   the cases.

3   **Q**   What was your response?

4   A   Sure, I would be happy to remeasure them.  I probably

5   told her the time frame it would take.

6   **Q**   Did you end up making remeasurements at Marilyn's

7   request?

8   A   No, at some point that request changed and instead it

9   was decided that Dr. Moss would review the measurements.

10  **Q**   Who was Dr. Moss?

11  A   Dr. Moss was my supervisor and chairman at Boston

12  University School of Medicine.

13  **Q**   Did you believe that he was qualified to look at the

14  scans?

15  A   Yes.  He is -- he had done some work himself with MRI

16  scanning and outlining regions of interest, and he had spent

17  a great amount of time early in his career studying the

18  entorhinal cortex and medial temporal lobe.

19  **Q**   Did you believe that Dr. Moss was an appropriate person

20  to review your work?

21          **MR. KOHN:**  Objection.

22          **THE COURT:**  We'll let him say what he thinks.  What

23  do you think?

24  A   Yes.  As my supervisor at Boston University School of

25  Medicine, he had supervised pretty much all aspects of my

1    professional life at that point.

2    Q   Did you -- what was your interaction with Dr. Moss?

3    A   In terms of --

4    Q   In connection with his looking at your work.

5    A   Oh.  At various points, at times we would talk about

6    experiments, we would talk about experimental design, we

7    would talk about lectures, give me guidance on professional

8    talks.  He would always be, in my opinion, he would always

9    be genuine about his opinion.  He would tell me things when

10   he thought they were wrong and he would affirm things if he

11   thought they were correct.

12   Q   Now, let's go back to this study and Dr. Jones'

13   concerns.  So you told us that Dr. Moss was going to be

14   brought in.  What was the next thing to happen?

15   A   Right.  So, at some point I believe Dr. Moss or I was,

16   we both were given a list of cases for him to review.  I set

17   up the computer for Dr. Moss so that he would be able to

18   review those cases.  I met with him and had gone through how

19   to operate the computer.  He had done so in the past but I'm

20   sure he would have needed a refresher.  We discussed the

21   operational definition that we published in 2000.  And I let

22   him go about doing his review.

23   Q   Were you there when Dr. Moss was reviewing?

24   A   No.

25   Q   Did you have any other discussions with Dr. Moss about

1    his review?

2    A    Only that at a later point, I think it was in July,

3    perhaps, he asked me to type up his notes of the review and

4    send them off to, to Dr. Jones, Dr. Johnson, and I also sent

5    them to Marilyn Albert and Mark Moss himself.

6    Q    After you, after you sent out Dr. Moss's notes what

7    happened next?

8    A    I believe very shortly thereafter I got an e-mail

9    message from Dr. Jones asking which of the subjects were

10   measured on three slices and which were measured on only

11   one.

12   Q    Did you get back to Dr. Jones?

13   A    Yeah, I believe I got back to him pretty much

14   immediately and said that they were all measured on three

15   slices.

16   Q    Did you hear anything else from Dr. Jones about this?

17   A    Not at that point.

18   Q    When was the next time that you communicated with Dr.

19   Jones about this?

20   A    The next time that I heard about this was actually in

21   December, late December of 2008, it was actually the period

22   at the university between Christmas and New Year's, the

23   inter-session, the university was closed, I was there trying

24   to get some work done and I got a phone call from a process

25   server indicating they had paperwork to give to me.

1    **Q**    Paperwork in connection with this case?

2    A    Paperwork in connection with this case, which was

3    basically the allegations being filed against me.

4    **Q**    Now, after July of 2001 did you continue to work on the

5    grant?

6    A    Oh, yes.

7    **Q**    And did you submit the grant?

8    A    Yes, the grant was submitted, I believe it was

9    October 2001.

10   **Q**    Was the grant funded?

11   A    Yes, the grant was funded.

12   **Q**    And what was the period of time during which the grant

13   was funded?

14   A    I believe the funding started in 2002 and ran until

15   2007.  And I believe there was an extension on the grant, so

16   it ended in 2008, 2009.  I'm vague on the ending date.

17   **Q**    From 2002 to 2008 what was the amount of money that was

18   paid for your time?

19              **MR. KOHN:**  Objection, your Honor.

20              **THE COURT:**  No, overruled.

21   A    So from -- I'm sorry, can you remind me of the dates,

22   please?

23   **Q**    2002 to 2007/2008, this funding period.

24   A    So during that funding period, I saw no direct moneys as

25   payment from this grant.  Moneys from this grant were paid

1    to Boston University, through a subcontract of this grant

2    were paid to Boston University School of Medicine and that

3    went towards my salary at Boston University School of

4    Medicine.

5    **Q**    What were you working on during that time?

6    A    During 2002 to 2007?  I was working on this project.  I

7    was working on other projects at Boston University School of

8    Medicine.  I was teaching.  I was seeing patients in

9    clinical practice.

10   **Q**    Well, let's talk about this grant.

11   A    Okay.

12   **Q**    From 2002 to 2007, what did you do for this grant?

13   A    I was the project leader for the MRI project in 2002

14   until 2007, whenever the grant ended.

15   **Q**    What were you working on?

16   A    So, during this grant period the main, one of the main

17   focuses of this grant was to actually develop automated

18   software that could identify regions of the brain with

19   anatomical specificity so that we wouldn't be doing hand

20   drawn tracing any longer.

21   **Q**    Why were you trying to do that?

22   A    Because of all the problems that are associated with

23   hand drawn regions of interest.  There's operator error,

24   there's challenges in terms of reliability.  There's

25   challenges in terms of identifying enough of the brain.

```
 1              So, throughout the grant, up until 2002, I had done

 2     a number of tracings in a number of regions of the brain.

 3     And they can take hours to do, but we never came to capture

 4     more than perhaps a quarter of the brain.  There are vast

 5     areas of the brain we simply weren't able to measure at that

 6     point in time.  The technology now evolved to the point that

 7     if we could have automated measures we could actually

 8     measure every structure in the brain.

 9     Q    Did your team succeed in developing automated

10     measurements of the brain?

11          MR. KOHN:  Objection, your Honor.  This is

12     post-grant.

13          THE COURT:  Yes.  I'm going to sustain that.  We're

14     interested in what happened during the course of this.

15     What's happened thereafter is, is not in this case.

16          Go ahead.

17          MR. LIPKIN:  Your Honor, may I clarify whether I

18     could ask the witness a question about the period from 2002

19     to 2007 during the funding of the study.

20          THE COURT:  During the funding of the study, yes.

21     Q    During the funding of this study, Dr. Killiany, did

22     you -- what was the result of your attempt to develop

23     automated measurements of the brain?

24          MR. KOHN:  Objection, your Honor.

25          THE COURT:  Overruled.
```

1    A    So, during the funding period we actually were

2    successful in getting a computer program available that

3    would measure automated, use automated measures to measure

4    the entire brain.

5    Q    What was the name of your program?

6    A    That program was, is still called today Freesurfer.

7    Q    And why is it called that?

8    A    I believe one of the computer, the computer science

9    person who really spearheaded this effort came up with that

10   acronym of Freesurfer.

11   Q    How much does it cost for someone to get Freesurfer?

12   A    There's no cost whatsoever to get Freesurfer.  It's free

13   for anyone around the world to download and use in their

14   studies or at their house if that's what they so choose in

15   order to measure the brain on MRI scans.

16   Q    Now, a minute ago you talked about the reliability

17   study.  How many people were in the reliability study?

18   A    I believe there were 25 people in the reliability study.

19   Q    Who made measurements for the reliability study?

20   A    Both myself and Dr. Gomez-Isla.

21   Q    When you decided to make remeasurements did you have any

22   communication with Dr. Gomez-Isla about that?

23   A    No, I did not.

24   Q    Why not?

25   A    Well, she left the Boston area, I believe by the summer,

1    perhaps fall of 1997.

2    Q    Did you tell Dr. Albert that you made remeasurements?

3    A    No, I did not.

4    Q    Why not?

5    A    My communication in this study was really on a data

6    level with Mary Hyde.

7    Q    Who did you tell that you made remeasurements?

8    A    Well, through e-mails to Mary Hyde, I told her that I

9    updated data.

10   Q    Did you tell anyone else that you made remeasurements?

11   A    Indirectly I had told Keith Johnson I was making

12   remeasurements and I sent him a complete set of the data.

13   Q    Why did you send that information to Dr. Johnson?

14   A    Well, Dr. Johnson needed accurate outlines of the

15   entorhinal cortex to incorporate into his project because

16   they were looking at SPECT or blood flow within those

17   regions of interest.  And so he needed a complete set of the

18   data.

19   Q    When did you finish the reliability study?

20   A    I believe, at the latest, mid-1997.

21   Q    Were you asked to participate in any other reliability

22   studies?

23   A    Not that I recall.

24   Q    If you had been asked to participate in a second

25   reliability study what would your reaction have been?

1      **MR. KOHN:**  Objection.

2   A   Of course.

3      **THE COURT:**  Sustained.  The answer is stricken;

4   disregard it.  It's hypothetical.

5   Q   Dr. Killiany, I would like to show you five more scans.

6   Would you please come pack to the projector.

7      Showing you Exhibit 154 which happens to be

8   participant 154, on slice number 63.

9      Would you please identify -- first of all, what is

10  your impression of this scan?

11  A   So, again, much like most of these scans at the time,

12  you can see that in general the scan looks fairly, looks

13  okay.  There's some slight artifact in them.  The medial

14  temporal lobe regions are unfortunately some of the

15  difficult areas to discern.

16     So we're looking here, you can see our landmarks.

17  Here's the rhinal sulcus on both sides, on side L and side

18  R.  Collateral sulcus slightly behind it.  You can see the

19  hippocampus located here and here.  Entorhinal cortex,

20  again, we can point to it, it's right here and right here.

21  But the quality of the scan in the neighborhood of the

22  entorhinal cortex is not all that great.

23  Q   What did you capture in your initial tracing?

24  A   So, in my initial tracing I tried to capture what I

25  could see of the entorhinal cortex.  So, again, starting at

1    the rhinal sulcus, up to the white matter boundary, which

2    wasn't very good, to the subiculum and back down to the

3    inferior surface, and again on side R, from the collateral

4    sulcus, the rhinal sulcus, white matter boundary to the

5    subiculum, and back down again.

6    Q    Here's your revised measurement.  Why did you make these

7    changes?

8    A    Because the initial tracings missed areas of the

9    entorhinal cortex which were, you can see gray above the

10   tracing here, and you can see gray above the tracing here.

11   And the remeasurement was done in order to capture portions

12   of the entorhinal cortex that were missed in the original

13   measurement.

14        **MR. KOHN:**  What exhibit are we looking at?

15        **MR. LIPKIN:**  154.

16   Q    Do you have an opinion about which tracing is more

17   accurate?

18   A    In this case, I think I would prefer a third tracing,

19   slightly less than the second one.

20   Q    Why is that the case?

21   A    Because I think the second tracing comes too far into

22   the white matter on this side and this side.  Somewhere, my

23   best estimate would be about ten voxels or so.

24   Q    The next participant is number 115.  Exhibit No. 126.

25        Please tell us what you see in this blank scan?

1    A    Okay.  So, in this blank scan, once again, we can see

2    the difficulties in this scan and the entorhinal cortex,

3    where the entorhinal cortex is unlike the first scan that we

4    looked at where things were very crisp and clear.  We find

5    our landmarks of our rhinal sulcus on both sides.  But the

6    grey-white boundary and even finding the subiculum is very

7    hard, even on this scan, without any tracing.

8    Q    What do you see in your initial tracing here?

9    A    From my initial tracing, I can see that on side R

10   there's grey matter above the entorhinal cortex, and on side

11   L there's some grey matter missed on the inferior surface of

12   the entorhinal cortex.

13   Q    What is your impression of the revised measurement on

14   the bottom?

15   A    So, the revised measurement on the bottom of this case I

16   do think better captures the entorhinal cortex, using our

17   operational definition or protocol.  So, we can see that

18   there's a portion that was missed here that's now evident in

19   the tracing here.  You can see in this other side that it

20   becomes better to capture the missing entorhinal cortex

21   located here on side L.

22   Q    Now, I'm showing you the scans for participant 141.

23   This is Exhibit 146 for the record.

24             What do you see in this scan?

25   A    So, in this scan, again, focus your attention to the

1     medial temporal lobe where the entorhinal cortex is located

2     here and here.  You see a faint hint of a rhinal sulcus

3     here.  We can see the rhinal sulcus here.  We can see that

4     on side R the grey-white separation is not very distinct.

5     And on side L it seems to drop off fairly quickly.

6     Q     What is shown by your initial tracing?

7     A     My initial tracing is, of course, the first time I

8     applied the protocol to this individual.  We start at the

9     rhinal sulcus, to the grey-white boundary, up to the

10    subiculum, and coming back down again.  And this opposite

11    side, the same thing, rhinal sulcus up to the grey-white

12    boundary.  It looks to me here like it falls short of the

13    grey-white boundary, it should be coming up to the subiculum

14    and back down.  It looks like it falls a little short to the

15    subiculum as well.

16    Q     This is a revised measurement.  Would you please compare

17    it with your initial measurement?

18    A     Sure.  In the revised measurement, you can see that the

19    grey matter of the entorhinal cortex which the initial

20    tracing left out is now included on side R, and on side L we

21    can see that the tracing goes further up to the subiculum

22    which was missed on side L.

23    Q     The next participant is the next in order number 142.

24    Please tell us what you see on this scan?

25            MR. LIPKIN:  Exhibit 146.

1      **MR. HUGHES:**  It's number 122.

2      **MR. LIPKIN:**  Was it?  I'm sorry.

3    **Q**   Well, let's look then at participant number 111.  I'm

4    showing you slice number 62.  This is Exhibit 122.

5          Would you please tell us what you see?

6    A   So, again, you can see in the MRI scan, you can focus on

7    the medial temporal lobe, you can see some artifact being

8    this sort of waviness in the upper portion of the scan.  And

9    in the lower portion of the scan you can once again see the

10   entorhinal cortex is here at the point of my pen, and here

11   at the point of my pen that the inferior surface is hard to

12   discern, and the grey-white separation really break down.

13         On this side L, the separation between the grey

14   matter of the entorhinal cortex and the inferior has an

15   extra brain surface here, this structure -- I'm sorry, the

16   inferior surface of the brain is very difficult to discern

17   here.

18   **Q**   Can you please tell us about your initial tracings?

19   A   Sure.  So, here you can see my first attempt where,

20   again, starting with the rhinal sulcus, up to the grey-white

21   boundary, across what should have been the subiculum falling

22   a bit short, and back on the inferior surface of the brain.

23   This side, across the white matter, coming up, falling

24   again, missing some of the entorhinal cortex, coming back to

25   the inferior surface of the brain.

1    **Q**    Would you tell us about your remeasurement, please?

2    A    Sure.  You can see primarily the remeasurement here is

3    that on the first tracing on side R that the subiculum,

4    which is located right here above the tracing, has now been

5    included in the tracing itself.

6          The other side, the grey matter that was missed

7    initially tracing the entorhinal cortex is now included in

8    the measurement.

9    **Q**    You started with side R and you mentioned the subiculum.

10   A    Yes.

11   **Q**    Should the tracing go up to the subiculum or should it

12   go short of the subiculum?

13   A    Thank you.

14          It should fall just short of the subiculum, I'm

15   sorry.  The subiculum is being -- we're coming up to the

16   subiculum and then back down again.  And the subiculum is

17   actually in a portion of the hippocampus itself.

18   **Q**    Which measurement do you believe is more accurate?

19   A    I believe the second measurement in this case is more

20   accurate.

21   **Q**    Now, I'll show you the last scan.  This is Exhibit No.

22   145, and it's of participant number 140.

23          Would you please tell us about this scan.

24   A    Sure.  One of the things you can notice about this scan

25   when it comes on the screen compared to the one that was

1    just there is actually the brain looks much bigger in this

2    scan, which just means this is just an MRI scanning.

3    Individuals have different size heads and different size

4    brains.  The one we just had on the screen was relatively

5    small.  This one is a relatively larger size.  As far as, as

6    far as I know, they are all at the same resolution being

7    projected here.

8    **Q**   Did you have more to tell us about the blank scan?

9    A    Just to point out again, the entorhinal cortex is

10   located here and located here.  The rhinal sulcus is located

11   here.  Rhinal sulcus located here.  This is a breakdown of

12   the grey-white separation here.  And grey-white is not very

13   distinct on side R.

14   **Q**   Here's your initial measurement.  Would you please tell

15   us about what you traced?

16   A    Sure.  So, again, from the rhinal sulcus, the boundary

17   of the rhinal sulcus and inferior surface of the brain, it's

18   meant to come up to the boundary of the white matter,

19   grey-white boundary, to the subiculum and back down again.

20   And similarly on this side, on side R, we're falling short

21   of the white matter boundary, capturing the subiculum right

22   here.  This side, we're falling, it looks to me to be

23   falling short at the subiculum.

24   **Q**   Can you tell us about your remeasurements, please?

25   A    Sure.  The remeasurements once again are to include

1    regions of the entorhinal cortex that were missed in the

2    first application of our, of the operational definition.

3    So, the grey-white boundary was not, was excluded from the

4    first drawing and is now better captured in the second

5    drawing.  In the first drawing on this side, this drawing

6    fell short of the subiculum which is located up in here.

7    **Q**    Incidentally, Dr. Killiany, what is the name of the

8    protocol that you were following?

9    A    The name of the protocol?

10   **Q**    Does it have a name?

11   A    Not that I recall.

12   **Q**    How many protocols are there for measuring the

13   entorhinal cortex?

14   A    Oh, there are probably four or five protocols out there

15   for measuring the entorhinal cortex.

16   **Q**    Do you know which protocol was used by Dr. Schuff?

17   A    I believe the protocol that Dr. Schuff uses was

18   published by Dr. Insausti.

19   **Q**    What does the Insausti protocol involve?

20          **MR. KOHN:**  Objection, your Honor.

21          **THE COURT:**  Wait a minute.  I have a more

22   pedestrian issue.  Are you going to leave him sit back there

23   or -- I'm more comfortable if he's up here close to me.  But

24   are you done with these slides?

25          **MR. LIPKIN:**  Yes, I wanted the witness to point out

1  one last thing on this slide and then I had some more

2  questions for him on the witness stand, if that would be

3  okay with the Court.

4        **THE COURT:**  Well, it's your case, now I have to

5  deal with the objection.

6        On this foundation, sustained.

7  **Q**   Are you familiar with the Insausti protocol?

8  **A**   Yes.

9        **MR. KOHN:**  Objection, your Honor.  Could we have a

10 quick side bar?

11       **THE COURT:**  You could.

12 SIDEBAR CONFERENCE, AS FOLLOWS:

13       **THE COURT:**  What's the objection?

14       **MR. KOHN:**  The protocol that Dr. Schuff used was

15 the protocol in this study.  The Insausti protocol is what

16 he used in other stuff, it has nothing to do with his

17 opinion in this case.  It's confusing to the jury.

18       **THE COURT:**  I think that I'm going to sustain it.

19       While we're up here, a couple of things.  Here's a

20 draft, it's only a draft, verdict slip, but it will show you

21 what I think I'm doing here.

22       And also, I don't mean this critically, but it

23 doesn't look like we're going to get this to the jury on

24 Friday.  Unless you feel something different.

25       **MR. ROSE:**  We're still going to try for Friday,

1  your Honor.  We expect to finish this witness's questioning

2  today.

3  　　　　THE COURT:  Well, they still have some time.  So,

4  do you think -- all right, I'm for it.  Good.

5  　　　　MR. ROSE:  I can't promise.

6  　　　　(Whereupon the sidebar conference concluded.)

7  BY MR. LIPKIN

8  Q  Dr. Killiany, would you --

9  　　　　MR. ROSE:  Wait for the court reporter.

10 　　　　THE COURT:  Wait, wait.  I'm talking time over

11 there.  And we do have to wait for the court reporter.

12 　　　　All right, I've sustained the objection, you go

13 ahead.

14 Q  Would you please retake the witness stand.

15 A  (Witness complied.)

16 Q  Now, a minute ago we were talking about reliability

17 studies.  Correct?

18 A  Yes, that's correct.

19 Q  And what was your role in the reliability study?

20 A  I was one of the individuals to trace the boundaries of

21 the entorhinal cortex for the reliability study.

22 Q  Do you know who oversaw the reliability study?

23 A  I'm not certain what you mean by oversaw.

24 Q  Who was in charge of it?

25 A  Well, I believe Dr. Albert actually identified the cases

1    that we were to measure for the reliability study, and I

2    believe the statistical core ran the analysis for the

3    reliability study.

4    Q    Who was in charge of the statistical core?

5    A    That would be Dr. Jones.

6    Q    I would like to show you Exhibit 199, Dr. Killiany.

7    What is this document?

8    A    This document appears to be a cover page from a fax that

9    I sent to Marilyn Albert.

10   Q    What is the subject of the fax?

11   A    The subject appears to say CDR analysis.

12   Q    What does that mean?

13   A    It sounds, it sounds to me like it's in relationship to

14   an analysis being run by this, on this data set for the CDR

15   study.

16   Q    Do you know why you sent this fax?

17   A    It looks to me like I was just letting Marilyn know

18   where things stood with some of the subjects she asked me to

19   measure, some problems that we had encountered, and looking

20   for clarification on a couple of issues.

21   Q    In the last line of the fax you say the following pages

22   contain the lists I've used to identify the subjects.

23        Can you explain what you meant by that statement?

24   A    Sure.  There were some problems identified earlier in

25   this fax, in particular with two of the participants or

1    subjects in this study where I was trying to identify the

2    correct MRI scans and measure for them.

3    **Q**   If we turn to the next page of this document, what does

4    this look like to you?

5    A    So, this looks like a table or a printout perhaps

6    from -- sorry.  This looks like a table or a printout from

7    the information related to the MRI scans.

8    **Q**   Now, what is the meaning of the column here on the

9    right?

10   A    The one labeled CA?

11   **Q**   Yes.  CE.

12   A    C -- CA?

13   **Q**   I'm asking about this information along the right side

14   of the document?

15   A    Oh, CE.  Oh.  I have no idea what any of that is.

16   **Q**   What about this column which is labeled GP.  On

17   November 23rd, 1995, what was your understanding of the GP

18   column?

19   A    I had no understanding of that column.

20   **Q**   At that time did you know which participants belonged to

21   which groups?

22   A    No, I had no idea what the information in that column

23   referred to.

24   **Q**   Next I would like to show you Exhibit No. 198.  What is

25   this?

1    A    So, this looks like a printout of the MRI data that Mary

2    Hyde sent to me in 2002 after the program project grant was

3    funded.

4    Q    Do you know why you were sending data to Mary Hyde at

5    that time?  Why Mary Hyde was sending you information at

6    that time?  Excuse me.

7    A    I believe Mary was sending me this information as we

8    were developing definitions and measurement systems for the

9    automated software to use for comparison purposes with our,

10   our hand drawn regions.

11   Q    Now, there's also a column on this document that's

12   labeled GP.  Do you see where I'm pointing to?

13   A    Yes.

14   Q    On November 13th, 2002, what was your understanding of

15   the information in the GP column?

16   A    Simply that -- I had no understanding of it.  There's

17   6's, 7's, and blank information.

18   Q    The next document, Dr. Killiany, is Exhibit No. 182.

19   What is this document?

20   A    I'm not really sure what this document is.  It appears

21   to be a protocol for working with MRI data to be sent to a

22   location called OIT.

23   Q    What is OIT?

24   A    I can't say because what I would tell you would be a

25   guess.

1      THE COURT:  Well, when you say you're not sure,

2   have you ever seen it?

3      THE WITNESS:  This document?

4      THE COURT:  Yes.

5      THE WITNESS:  I've seen this document only in the

6   course of this lawsuit.

7   Q   So, the first line of this is as of 2-14-1995.  Did you

8   receive this document at that time?

9   A   No.

10  Q   Did you have this document when you were making your

11  measurements between 1997 and 1999?

12  A   No.

13  Q   The second page of this document has a section which

14  appears to have lists of words and numbers.  Do you see

15  where I'm referring to?

16  A   Yes.

17  Q   Did you have this list when you were making your

18  measurements?

19  A   No.

20  Q   Did you know what number 01, 02, up to 10 meant?

21  A   No.

22      MR. LIPKIN:  May I have one moment, please, your

23  Honor?

24      THE COURT:  You may.

25      (Pause in proceedings.)

1    Q    Dr. Killiany, did you alter measurements in connection

2    with this study?

3    A    No.

4    Q    Why not?

5    A    I wouldn't alter measurements.  I would remeasure

6    things.  Altering measurements is just something that

7    scientifically is wrong to do.

8    Q    Why did you think it was okay to make remeasurements?

9    A    I thought it was okay to make remeasurements because we

10   retained the original measurements and if there were ever

11   any concern that the original measurements were, I'm sorry,

12   the remeasurements were in error that the information would

13   exist to look into it.

14   Q    Did you use reliable methods in this study?

15   A    I believe I did.

16   Q    Why?

17   A    Well, when you're doing anatomical studies, re-review of

18   your anatomical boundaries or your measurements is common

19   practice in the field.

20   Q    Did you make any false statements to the NIH?

21   A    No.

22         MR. LIPKIN:  I have no other questions, your Honor.

23         THE COURT:  Mr. Kohn, any questions for this

24   witness?

25         MR. KOHN:  Thank you, your Honor.

1               **CROSS-EXAMINATION**

2    **BY  MR. KOHN**

3    **Q**   Dr. Killiany, I'm going to show you the grant

4    application at MBAK 344.  Now, on the top it has, Albert's

5    name has a hole punched in it and Killiany.  So, would this

6    be a portion of the grant application that you helped draft?

7    A   Yes, it appears to be that.

8    **Q**   Okay.  So there's a heading that says:  Hypothesis

9    Concerning Comparisons of Different Methods.

10             Do you see that?

11   A   Yes, I see that.

12   **Q**   And underneath it says:  Accuracy of automated versus

13   manual ROIs.

14             Do you see that?

15   A   Yes.

16   **Q**   Okay.  And when it says, We will be using the same

17   regional definitions for both the automated and manual ROIs,

18   what are you referring to?

19   A   Referring to the development of the automated system for

20   measuring regions of interest in the brain.

21   **Q**   And you're telling the NIH in the grant application that

22   you'll be using the same regional definitions for both the

23   automated and manual ROIs and predict a high degree of

24   overlap in the volume produced by the two methods.  Correct?

25   A   That's what the sentence says.

1    Q    And you're saying you will use Pearson correlation

2    procedures and t-tests to compare the two sets of data,

3    correct?

4    A    That's what the statement says, that's correct.

5    Q    Okay.  So you were telling the NIH that you were going

6    to continue using your hand measurements in order to

7    demonstrate the accuracy of the automated measurements,

8    correct?

9    A    Yes, we were telling the NIH we were going to be using

10   hand drawn regions to validate the automated system.

11   Q    Right.  And you never redid another entorhinal cortex

12   hand measurement, correct?

13   A    I'm sorry?

14   Q    After, after 1990's, right?

15   A    No, I did entorhinal cortex measurement through the, I

16   believe through the submission of this grant as part of

17   pilot data for longitudinal analysis.

18   Q    You don't recall last time testifying the last

19   handwritten EC measurement you did was in the late 1990's?

20   A    I don't believe that was my testimony last time.

21   Q    I'm looking at the same page down on the bottom.  Do you

22   see D10, potential problem for proposed research plans?

23   A    Yes, I see that.  You're describing a section of the

24   methods section of the grant?

25   Q    And this is a required section that you have to address

1   in the grant, correct?

2   A    It is a required section describing the proposed methods

3   you plan to use in the future.

4   Q    And you have to address potential problems with what

5   you're saying you're going to do, correct?

6   A    It's what we did here.

7   Q    Right.  And the reason you're doing that is because you

8   want to be up front with the NIH and say, look, this is a

9   real potential problem and try to give the NIH reassurance

10  of how you can overcome the problem, right?

11  A    Because you want to give the reviewers insight that you

12  have identified, know that there are some problems that may

13  exist with the work you're doing and that you've thought

14  about the problems that may exist.

15  Q    Okay.  And the potential problem for the proposed

16  research plan was the accuracy of anatomic definitions.

17            Do you see that?

18  A    I see a heading.  I don't see a potential problem saying

19  accuracy of anatomic definitions.

20  Q    Well, it's above the heading, you're talking about

21  potential problems, and the first thing is accuracy of

22  anatomic definitions.  Was that identified as a potential

23  problem?

24  A    It's a sub-heading.  Yes.

25  Q    Okay.  And it says:  This problem depends upon the use

1    of accurate anatomical information for its success.  Regions

2    of the cortex pose the biggest challenge to anatomic

3    accuracy, paren, for both manual and automated procedures,

4    close paren.  With respect to the manual measure we have

5    attempted to address this problem by adopting rigid

6    operational definitions.

7              Do you see that?

8    A   Yes, I see that.

9    Q   Okay.  And then down later you say:  The operational

10   definitions are tested among various operators to assure the

11   reliability before any final decisions are made.

12             Do you see that?

13   A   Yes.

14   Q   So, the rigid operational definitions are established by

15   the reliability study, correct?

16   A   I'm sorry, I --

17   Q   It says it right here, doesn't it?  The operational

18   definitions are tested among various operators.  There are

19   only two operators who tested the entorhinal cortex, right,

20   you and Dr. Gomez-Isla?  Right?

21   A   You're referring to a very broad statement and a very

22   narrow entity.  So please clarify that for me.

23   Q   It says the operational definitions are tested among

24   various operators.  With respect to the entorhinal cortex,

25   who were those various operators?

1    A    But I'm not certain what you're talking about here is

2    the entorhinal cortex.  You're talking about a section of

3    anatomical accuracy for automated measures here.  I don't

4    see the word entorhinal cortex in this text.

5    Q    Well, it says right above that you're doing it for

6    manual and automated procedures.  You're not talking about

7    just automated, are you?

8    A    We're talking about the development of automated

9    procedures which requires the outlining of all areas on the

10   brain in order to train the automated software.

11   Q    You're saying the project depends upon the use of

12   accurate anatomical information for its success.  Regions of

13   the cortex pose the biggest challenge to anatomic accuracy

14   for both manual and automated procedures.

15        Do you see that?

16   A    Yes.

17   Q    And above it you said you were going to identify the

18   accuracy of the automated versus manual procedures.  We will

19   be using the same regional definitions for both the

20   automated and the manual ROIs, correct?

21   A    That's what the text says, yes.

22   Q    You were --

23   A    We were planning, we were planning --

24        THE COURT:  Wait.  Don't talk over each other.

25   Q    You answered my question yes?

1    A    I did.

2    Q    Okay.  So, once you -- and then it says underneath that

3    the operational definitions are tested among various

4    operators.  With respect to the entorhinal cortex, who were

5    the various operators?

6    A    During 19 --

7    Q    I'm asking you a simple question.  Give me the names of

8    the two operators.

9            MR. ROSE:  Let him finish.

10           THE COURT:  Wait a minute.  First of all, you'll

11   address the Court, and have in mind that I'm the one who

12   presides here.  Let me do my job.

13           All right.  Put your question again.  Well, I know

14   what it is.  The question is who were the operators?  Who

15   were they?

16           THE WITNESS:  The two operators for outlining the

17   entorhinal cortex back in 1997 were myself and Dr. Teresa

18   Gomez-Isla.  That's not what this paragraph is referring to.

19   Q    So the operational definitions are tested among various

20   operators to assure their reliability.  Who were the

21   operators who tested entorhinal cortex to assure its

22   reliability?

23   A    The reliability study in 1997 was done by myself and

24   Teresa Gomez-Isla.  That's not the definition that was used

25   for the entorhinal cortex for this grant.

1    Q    So, if I understand it now, you're saying you identify

2    that you were going to compare the hand entorhinal cortex

3    drawings with the automated ones and then you come up and

4    provide a definition of accuracy of automatic, of anatomical

5    definitions, but you're not going to apply them to both

6    the --

7    A    I'm sorry, I'm sorry, you're jumping all around the

8    screen here with your pen.  You're trying to show me some

9    text up high and then some text down low.  And you're

10   showing me text -- you're pointing to, reading text that's

11   not --

12   Q    I'm sorry.  I'm sorry.  Let me try to focus you.  I

13   apologize for that.

14          You say:  We have attempted to address this problem

15   by adopting rigid operational definitions.  Correct?

16   A    Of all the cortical regions.

17   Q    Okay.  And then you go on to say that, referring to this

18   rigid operational definitions, the operational

19   definitions -- we're talking about the rigid operational

20   definitions, correct?

21   A    Talking about the operational definitions that weren't

22   changing.

23   Q    Right.

24   A    For development of the automated system.

25   Q    The ones you're going to apply --

1    A    For development of the automated system.

2    Q    The ones you're going to apply to the manual and

3    automated drawings?

4    A    For development of the automated system.

5    Q    This is not -- this says potential problems with

6    proposed research plan.  It doesn't say potential problems

7    with proposed automated research plan, does it?

8    A    The proposed --

9    Q    Yes or no?

10   A    -- research plan was to develop the automated system.

11   Q    And the proposed research plan was also to compare the

12   automated to the manuals, correct?

13   A    The manuals were being made in order to develop the

14   automated system.

15   Q    And you were going to compare the automated to the

16   manuals, at least you're telling the NIH, and predict a high

17   degree of overlap the volume produced by the two methods.

18   You wanted, you wanted to show the NIH that your handwritten

19   one -- well, first, didn't you want to determine whether

20   your hand measurements would be more accurate than your

21   automated ones?

22   A    No.  We wanted the automated ones to be more accurate

23   than the hand drawn.  But this is --

24   Q    Excuse me.  You wouldn't know which one was more

25   accurate until you compared them, right?

1    A    As we did for the site visit and as clearly is stated in

2    the pink sheets.

3    Q    So, when you're preparing this grant and you're saying

4    the operational definitions are tested among various

5    operators to assure their reliability should the -- weren't

6    you telling the NIH -- I'll withdraw it because I think the

7    document speaks for itself.

8         So, if I understand it, before you can come up with

9    what you call the rigid operational definition you had to do

10   an inter-rater reliability study, correct?

11   A    No.

12   Q    Well --

13   A    You have to come up with a definition before you can

14   even start to think about a reliability study.

15   Q    Rigid operational definition.  Yes?  You have to come up

16   with a definition and test it.  And once your reliability

17   study says you got it perfect or as good as you're going to

18   get then it becomes a rigid definition, right?

19   A    No, not in my view.

20   Q    Okay.  So, in your view the entorhinal cortex

21   definitions were never rigid?

22   A    I didn't say that.

23   Q    Okay.  Well, they, they weren't rigid -- they were loose

24   enough that you could change it by 283 percent volume and

25   that would still both be following the same rigid definition

1    in your view?

2    A    As I've testified to, I followed the same protocol every

3    time I outlined the entorhinal cortex in the context of the

4    images for this case.

5    Q    So, are you saying there was a rigid definition in place

6    when you did your measurements?

7    A    Yes, there was a rigid definition in place.

8    Q    And that's the rigid definition that in place when

9    you did the measurements in the inter-rater reliability

10   study?

11   A    It was the same definition the entire time through the

12   entire study.

13   Q    So you have a rigid definition of the entorhinal cortex

14   but you change one of the measurements from the inter-rater

15   reliability study by 283 percent.  Is that your concept of a

16   rigid definition?

17   A    In terms of anatomical definitions, yes.  It's a very

18   subjective process to apply these definitions.

19   Q    And if it was so subjective that each time you measured

20   it you were going to have vast differences by 283 percent,

21   didn't that simply mean you had not developed a method to

22   reliably report the data to the NIH?

23   A    I'm sorry, you lost me in that question, you have to

24   restate that question.

25   Q    If your measurements are going to be able to change by

1    283 percent, aren't you telling the NIH we don't have a

2    reliable method to report it because we can have variations

3    as much as 283 percent based on our rigid definitions?

4    A    I don't recall reporting data to the NIH at any point.

5    Q    Well, the reliability study's reported and those, one of

6    those has changed by 283 percent.

7    A    Outcome of the reliability study based on the

8    information I had when the grant was being prepared and

9    submitted was reported to the NIH.

10   Q    And, in fact, you modified the operational definition,

11   didn't you?

12   A    As I've testified to here, no, I haven't modified the

13   definition.  I went through case by case, applied the same

14   operational definition.

15   Q    I'm going to ask you one more time.  Did you modify the

16   operational definition?

17   A    No.

18              MR. ROSE:  Objection.

19              THE COURT:  No, the objection is overruled, his

20   answer "No" may stand.

21   Q    Would you turn to page 39 of your deposition.  Do you

22   see where you say to me:  It would require us to modify the

23   operational definition of the entorhinal cortex?

24              MR. LIPKIN:  Objection.  May the entire question

25   and answer be read.

1          **MR. KOHN:**  Absolutely.

2          **THE COURT:**  It may be.

3  **Q**   Question:  When did you or what prompted you to decide

4  to remeasure any of the measurements that you initially did?

5          Answer:   Anatomical variability.  As we came across

6  an individual subject/participant who had anatomical

7  variability we hadn't foreseen or accounted for, it would

8  require us to modify the operational definition of the

9  entorhinal cortex, in which case we would also have to look

10  back at cases, participant scans we had already outlined to

11  make sure that we were applying the operational definition

12  consistently across scans.

13          Do you see that?

14  A   Yes, I see that.

15  **Q**   Does that refresh your recollection that in fact you did

16  modify the operational definition?

17  A   I modified the application of the operational definition

18  in order to consistently trace the entorhinal cortex across

19  this entire study.

20  **Q**   Okay.  Now, when you're giving your answer here, we came

21  across and you say we would and we were applying, who's the

22  we?

23  A   I tend to speak in the colloquial rather than in single

24  person.

25  **Q**   So you're saying I?

1    A    Yes.

2    Q    So we can read it:  I came across an individual

3    subject/participant who had anatomical variability I hadn't

4    foreseen or accounted for it, it would require me to modify

5    the operational definition of the entorhinal cortex, in

6    which case I would have to look back at cases, participant

7    scans I had already outlined to make sure that I was

8    applying the operational definition consistently across

9    scans.

10            Correct?

11   A    If you're just substituting words, I assume that's a

12   correct reading.

13   Q    And was -- and when did the actual operational

14   definition in your mind come into place?

15   A    At the start of the study back in early 1997.

16   Q    And wasn't the operational definition just continuing to

17   evolve throughout the entire period and only came into

18   effect as far as you were concerned in 2000?

19   A    It became formalized in 2000 when we published it to the

20   world.

21   Q    If you would look at your deposition on the same page.

22   A    I'm sorry, what page are we on?

23   Q    Page 39.  Question at line 14:  Was there a published

24   operational definition?

25            Answer:  No, not until 2000.  The operational

1  definition was continuing to evolve throughout this entire

2  time period.

3         Question:  So how could you do a reliability study

4  if you didn't even have an operational definition?

5         Answer:  I'm sorry, I don't understand that.

6

7         Do you see that?

8  A   Yes, I see that.

9  **Q**   Can you answer my question now?  How could you do a

10 reliability study if you don't even have an operational

11 definition?

12 A   Certainly.  We had the whole, the same operational

13 definition across the entire study.  What evolves is how you

14 apply an operational definition to anatomical areas, to

15 brain regions which are clearly defined, and through imaging

16 studies which don't often have good contrast.

17 **Q**   So, in your deposition when you said it would require us

18 to modify the operational definition, what you're really

19 saying is when you looked at the scan a second time you

20 decided to change the boundaries based on the same

21 definition, correct?

22 A   No, I'm saying that when I would relook at a scan, I

23 would remeasure the area and reapply the operational

24 definition, based on increasing amount of information about

25 measuring the structure on MRI.

1   **Q**   Now, you alone controlled what measurements were being

2   sent to Mary Hyde, correct?

3   A   Yeah, I think that's a fair statement.

4   **Q**   And, in fact, after the inter-rater reliability study

5   was completed you may not have even shared your initial,

6   your first set of measurements with Mary Hyde?

7   A   I shared all my measurements with Mary Hyde.

8   **Q**   Well, would you look at transcript page 102, line 15.

9   It says:  She may never have gotten the --

10          **MR. LIPKIN:**  Objection.

11  **Q**   -- first measurement.

12          **THE COURT:**  Wait.  Well, in context, I'm going to

13  sustain that.  You can read a question and answer and ask

14  him about it.

15  **Q**   Question:  Right.  So if she didn't have the data in her

16  database and she was asking you for a measurement, she would

17  get just your most accurate measurements, correct?

18          Answer:  She would get the --

19          **MR. LIPKIN:**  Objection.

20  **Q**   -- most recent measurements.

21          **THE COURT:**  No, the objection is overruled; he may

22  read the answer.

23          **MR. LIPKIN:**  May the question be reread accurately,

24  your Honor.

25          **MR. KOHN:**  I'll try -- I'll do my best.

1   **Q**   Question:  Right.  So if she didn't have the data in her

2   database and she was asking you for a measurement, she would

3   get just your most accurate remeasurement, correct?

4           She would get the most recent measurement, which

5   could be the first, it could be the third.  She would simply

6   get the most recent measurement.  She may never have gotten

7   the first measurement.

8           Do you see that?

9   A   Yes, I see that.

10  **Q**   Okay.  So, is it your testimony that you may have never

11  transmitted the original measurements to Mary Hyde?

12  A   My testimony is that I would make measurements of the

13  entorhinal cortex, generate the data and transmit that to

14  Mary Hyde.

15  **Q**   So, if it's possible that you're saying here that you

16  never transmitted the original measurements to Mary Hyde,

17  how is Mary Hyde to know whether you were changing that?

18  A   You're, you're -- the passage you're reading here, it

19  sounds to me like you're asking me whether Mary Hyde had

20  something, not whether I transmitted something to Mary.

21  **Q**   If you're saying she may never have gotten a first

22  measurement and you're transmitting data, wouldn't she have

23  reason to believe she was now getting the first

24  measurements?

25  A   I'm sorry, I don't follow that question at all.

1        THE COURT:  Well, I think, listening, I think he's

2   asking something like this.

3        You'd work along and do your measuring.

4        THE WITNESS:  Yes.

5        THE COURT:  Now, did it occur from time to time

6   that you would do a measure, look at it and think to

7   yourself, I didn't get that right, or I can do better, do

8   another measure, and then send what you thought was most

9   accurate to Mary Hyde?  Did that ever happen?

10       THE WITNESS:  Oh, I'm sure that would happen that

11  as we're tracing, before you even save the file you would

12  say, whoops, what was that about and go back and do that

13  right away.

14       THE COURT:  But in those instances you wouldn't

15  have what you called a first measurement because you would

16  recognize that you had bollixed it up while you were doing

17  it.

18       THE WITNESS:  Yes, that's correct.

19       THE COURT:  So his question, and I'll try to ask

20  it, did you ever get one, reflect on it, do another one, and

21  send what you thought was most accurate to her?

22       THE WITNESS:  No, if I had a saved version of it

23  because I had said I'm done, this is correct, there would

24  be, she would get both sets of data.

25       THE COURT:  Go ahead, Mr. Kohn.

1   **Q**   Not at the same time?

2   A   No, not at the same time.

3   **Q**   And you never told Mary Hyde that you had made a second

4   set of measurements, correct?

5   A   I told Mary Hyde that I was sending her updated data.

6   **Q**   And we saw these data runs, they're long, big and

7   complex, right?

8   A   I'm not sure what you mean by data runs.

9   **Q**   Well, on your direct we saw a chart that had numbers

10   for --

11   A   Oh, yes, by all means.

12   **Q**   So, you didn't point out which one of these you were

13   changing for Mary Hyde, did you?

14   A   On that e-mail that's all brand-new data going to Mary

15   Hyde.  And those aren't data runs, that's what confused me,

16   those are all hand typed entering.

17   **Q**   And you would transmit new data to Mary Hyde without

18   instruction or indication that you were overwriting the old

19   data; isn't that true?

20   A   As we discussed last time in my testimony, testifying, I

21   never overwrote any data.

22   **Q**   Well, let's look at your deposition on page 100.  And if

23   you would look at, starting on line 15:  So you would

24   transmit new data to Mary Hyde --

25           Answer:  I would transmit --

1          Question -- for the same participant?

2          Answer:  I would transmit the remeasurement to Mary

3   Hyde.

4          Question:  With an instruction to --

5          Answer:  Often not with an instruction.  Mary Hyde

6   should have been able to know in overseeing the database

7   when there was replacement data that was coming.

8          Correct?

9   A   That's what the transcript says.

10  Q   So you would transmit data to Mary Hyde without any

11  instruction or indication that you were overriding prior

12  measurements, correct?

13  A   I never had the ability to override anything.  I didn't

14  enter data into the database.  I transmitted my data to Mary

15  Hyde.

16  Q   And it's a fact you're not aware of anyone knowing of

17  your second set of measurements, were you?

18  A   I'm sorry, was that --

19  Q   Let me rephrase it.  You didn't discuss your second set

20  of measurements with anyone?

21  A   Well --

22  Q   Up to the point in time where Dr. Jones raised it as an

23  issue?

24  A   Again, I sent Mary Hyde e-mails and I would have told

25  her that I was sending her updated data.

1    Q    Where's the e-mails that say that you're changing your

2    entorhinal cortex measurements?

3    A    In what years?  97, '95, '98, I don't have e-mails from

4    that era.

5         THE COURT:  All right.  We're going to stop taking

6    testimony at this time and let the jury go.

7         You may step down, sir.

8         (Whereupon the witness stepped down.)

9         THE COURT:  Well, here's where we stand.  The

10   lawyers are working very hard.  They still have some hope

11   that we'll give you the case on Friday.  Now, there's no

12   promises for that, and if they don't it's nobody's fault

13   because we took a snow day.  And you know that we're going

14   to do it on Tuesday.

15        I'm going to make it a little more complex, but it

16   isn't going to lose us any time.  I have to go to the

17   doctor's tomorrow afternoon, and that's been set for a long

18   time and it's not a problem, except for the fact now they

19   tell me I have to show up early because of tests and we have

20   to be there early.  I'm not too happy with the doctors.  But

21   here's how we're going to -- we're not going to lose any

22   time.  But here's how it's going to work so every -- I'll

23   tell the lawyers, too.

24        Tomorrow, I know I can count on you, we're going to

25   start at the, start right at the appropriate time, and we're

1    going to run for two hours and a little more.  So make rest

2    halts before we get on the bench.  And sometime between

3    11:00 and 11:30 I'm going to let you go so I can go and have

4    my tests.

5            If, at that stage, and I'll talk with the lawyers,

6    we think we can do it Friday, we'll just build that hour

7    into Friday.  We'll work lunch in there somewhere and we'll

8    just give you the case a little later than I planned on

9    Friday.  If we can't do that, and it won't be because I've

10   shorted yesterday, but because they've gauged out their

11   time, if we can't do that, and it's nobody's fault, because

12   we said twelve days for this, then we'll be back on Tuesday

13   and we'll give you the case on Tuesday.

14           So before you leave tomorrow, I will tell you

15   whether we need you in the afternoon on Friday.  And if not,

16   we know we will need you all day on Tuesday.

17           Now, you've not heard all the evidence.  Please,

18   therefore, keep your minds suspended.  Do not discuss the

19   case either among yourselves nor with anyone else.  You may

20   stand in recess --

21           **A JUROR:**  We're supposed to be off tomorrow.

22           (Whereupon the Court and the Clerk conferred.)

23           **THE COURT:**  Oh, the clerk is correcting me.  And I,

24   I noticed, I got some -- you know, I can tell actually.

25   Sometimes the lawyers do the same thing.  I'll say something

```
 1   foolish and the lawyer will just sort of stare at me.  And

 2   I'm saying why, I'm being so specific.

 3         Yeah, tomorrow's off because I'm in New York.

 4   We're talking Thursday.  And we're sticking to our plan.  I

 5   stand corrected.  The clerk keeps me straight, and so do you

 6   all.

 7         So we'll stand in recess until 9:00 a.m. on

 8   Thursday morning.

 9         The jury may stand in recess.  I'll remain on the

10   bench.

11         THE CLERK:  All rise for the jury.

12         (Whereupon the jury left the courtroom.)

13         THE COURT:  Please be seated.

14         Total elapsed time, plaintiff, four days, three

15   hours, 25 minutes; defense, four days, five minutes.

16         That leaves the plaintiffs, just so we're counting,

17   two hours and 20 minutes short of final argument and my

18   charge.

19         We'll recess until 9:00 a.m. on Thursday morning.

20   We'll recess.

21         THE CLERK:  All rise.

22         MR. FRIEDMAN:  Your Honor?  Your Honor?  I'm sorry.

23         THE COURT:  Yes.

24         MR. FRIEDMAN:  There was a jury question and I

25   would like to try to address it before we leave today, if
```

1    possible.

2            THE COURT:  I'm somewhat under the gun, but go

3    ahead.  Are we agreed on the exhibit?

4            MR. FRIEDMAN:  They have asked for an exhibit, it's

5    the, it's an appendix to Dr. Schuff's report, it's not his

6    report but, and he was examined at --

7            THE COURT:  But it's not in evidence.

8            MR. FRIEDMAN:  Well, we would like to move it into

9    evidence.

10           THE COURT:  We'll address that first thing on

11   Thursday morning.

12           MR. FRIEDMAN:  Thank you.

13           THE COURT:  Won't you pass it up to me so I can

14   look at it.

15           MR. FRIEDMAN:  Yes, your Honor.

16           THE COURT:  I do try to accommodate jurors.  And I

17   do thank you.  So we'll address it first thing Thursday

18   morning.

19           MR. FRIEDMAN:  Thank you.

20           THE COURT:  We'll recess.

21           THE CLERK:  All rise.

22           (Adjournment.)

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK 4-2-2013
            _____
15              DONALD E. WOMACK
              Official Court Reporter
                 P.O. Box 51062
16         Boston, Massachusetts 02205-1062
                womack@megatran.com

17

18

19

20

21

22

23

24

25