```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    Civil Action
 3                                  No. 07-11481-WGY

 4   * * * * * * * * * * * * * * * * * *
                                       *
 5   UNITED STATES OF AMERICA, ex rel.,  *
     KENNETH JAMES JONES, Ed.D.,        *
 6                                      *
 7           Plaintiff,                 *    TRANSCRIPT OF
                                        *    THE EVIDENCE
     v.                                 *    (Volume 10)
 8                                      *
     BRIGHAM AND WOMEN'S HOSPITAL, et al., *
 9                                      *
             Defendants.                *
10                                      *
     * * * * * * * * * * * * * * * * * *
11
12           BEFORE:  The Honorable William G. Young,
                      District Judge, and a Jury

13   APPEARANCES:

14           HUGHES & NUNN LLP (By William D. Hughes,
         Esq.), 350 10th Avenue, Suite 960, San Diego,
15       California 92101
                 - and -
16           LAW OFFICE OF JEREMY L. FRIEDMAN (By Jeremy
         L. Friedman, Esq.), 2801 Sylhowe Road, Oakland,
17       California 94602
                 - and -
18           KOHN, KOHN & COLAPINTO, LLP (By Michael D.
         Kohn, Esq.), 3233 P Street, N.W., Washington, D.C.
19       20007-2756, on behalf of the Plaintiff

20
             ROSE, CHINITZ & ROSE (By Alan D. Rose, Sr.,
21       Esq. and Brian D. Lipkin, Esq.), One Beacon
         Street, 4th Floor, Boston, Massachusetts 02108,
22       on behalf of the Defendants

23
                                    1 Courthouse Way
24                                  Boston, Massachusetts

25                                  April 4, 2013
```

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

RONALD J. KILLIANY, Resumed

| By Mr. Kohn | | 3 | | 25, |
| | | | | 27 |

| By Mr. Lipkin | | | 24, | |
| | | | 27 | |

MARILYN ALBERT, Resumed

| By Mr. Rose | 28 | | | |

| EXHIBITS: | | FOR I.D. | IN EVID. |
|---|---|---|---|
| 206 | E-Mail . . . . . . . . . . . . . . | | .50 |
| 207 | E-Mail . . . . . . . . . . . . . . | | .79 |

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  The United States District Court is now

4    in session, you may be seated.

5          **THE COURT:**  Good morning, ladies and gentlemen.  I

6    really do depend on you.

7          Now, my plan, as I explained on Tuesday, is to run

8    straight through until quarter after 11:00, see how far we

9    can get, ask them what's going to happen tomorrow, but I'm

10   not crowding anyone.  Two hours and 15 minutes is a while.

11   If anyone wants a rest halt don't hesitate to ask for it, we

12   can always take one.

13         We're all ready to go.  Let's remind the witness.

14         **THE CLERK:**  I would like to remind you, Doctor,

15   you're still under oath.

16         **THE WITNESS:**  Thank you.

17         **THE COURT:**  And Mr. Kohn.

18              RONALD J. KILLIANY, Resumed

19         **CROSS-EXAMINATION** (Cont'd)

20   **BY  MR. KOHN**

21   **Q**   Dr. Killiany, do you remember testifying on direct that

22   Dr. Johnson needed accurate outlines of the entorhinal

23   cortex to incorporate into his project because they were

24   looking at SPECT or blood flow within those regions of

25   interest, and so he needed a complete set of the data?

1    A    Yes, I believe that's what I testified to.

2    Q    Can you agree with me that you sent measurements of the

3    entorhinal cortex off to Dr. Johnson in or about 1999?

4    A    I sent outlines to Dr. Johnson.  I don't know if it

5    was '99 or afterwards.

6    Q    Well, if we could --

7    A    But I sent him a complete set.

8    Q    Would you turn to your transcript at page 118.  Does

9    this refresh your recollection, looking at line 9, that you

10   sent it to Dr. Johnson in 1999-ish?

11   A    Yes.  I'm not exactly sure.  1999-ish.

12   Q    Okay.  Can you also agree with me that the inter-rater

13   reliability study was done in 1997, roughly two years before

14   you sent the data to Dr. Johnson?

15   A    Yes, that's correct.

16   Q    Can you also agree with me that the measurements you

17   sent to Dr. Johnson in 1999 are the ones listed on the

18   relator's table as Killiany original measurements?

19   A    I'm not certain about it because those are not numbers

20   that I truly recognize.

21   Q    Well, you have looked at entgeo, haven't you?

22   A    Yes, I have looked at entgeo.

23   Q    And those are the ones you sent to Dr. Johnson, that's

24   where Dr. Jones got them from, right?

25   A    I believe that's correct.  I sent the outlines to

1    Dr. Johnson and I believe Dr. Johnson created entgeo.

2    **Q**   Okay.  And so if that's the case then you would have

3    sent Dr. Johnson the original list on the relator's table

4    here, right?

5    A    Again, I sent Dr. Johnson the outlines.

6    **Q**   Okay.

7    A    Dr. Johnson generated the entgeo from all of the

8    outlines that I sent to him.

9    **Q**   All right.  And this is the entgeo column, the original

10   measurements, right?

11   A    I'm not certain of that.

12   **Q**   Okay.  You don't have any reason to doubt that, do you?

13   A    I have no -- I'm ambivalent, in the middle about that.

14   I sent Dr. Johnson my outlines.  My understanding is he

15   created entgeo from all of the outlines that I sent to him.

16   **Q**   Can you also agree with me that you claim that you made

17   your remeasurements as part of a learning curve?

18   A    I made my remeasurements as both part of a learning

19   curve and in terms of reviewing the cases as I went along.

20   **Q**   Well, if you would look at page 97 of your deposition.

21   A    Uh-huh.

22   **Q**   Starting at the bottom of line 24.  Are you on the page?

23   A    97, yes.

24   **Q**   Okay.  It says, Answer:  So anything that involved

25   remeasurements was something that happened on the fly as we

1  encountered, as we talked about earlier, anatomical

2  anomalies that had to be addressed in the way we were

3  approaching this.  This is something that might happen once

4  in a great while, it might happen twice a week or twice in

5  an afternoon session.  If it required going back and looking

6  back at other cases and changing things, I would have had to

7  send Mary updated data.  There would be times Mary might ask

8  me, could you please take a look and update the data for

9  this or that.  Mary would say something's not right with,

10  not right with this piece of data; take a look at it.

11       These were things that happened, I should add, on

12  the fly.  These are not things that happened after all the

13  cases were measured, and then I retrospectively look and

14  going back.  These were all taking place as the process of

15  outlining the entorhinal cortex was being developed and

16  applied.

17       Is that what you said at your deposition?

18       **MR. LIPKIN:**  Could the question be read as well,

19  please.

20       **THE COURT:**  It may be read.  Read the question.

21       **MR. KOHN:**  Yes, I'm --

22       **THE COURT:**  It was a long answer.

23  **Q**   "Well, how would you know -- you did the original

24  measurements and then in some instances you did

25  remeasurements.  Did you send Mary Hyde just the

1    remeasurements or did you send her first, the first

2    measurements and then the remeasurements?"

3              So, in your answer you said your remeasurements

4    happened on the fly, these are not, and they happened after

5    you were done measuring -- let me rephrase it.

6              These were things that happened, I should add, on

7    the fly.  These are not things that happened after all the

8    cases were measured.

9              Do you remember saying that?

10   A   I don't particularly, but it's right here so I'm certain

11   I did.

12   Q   Well, your assertion that you were changing your

13   measurements on the fly before all the cases were measured

14   would have to be inaccurate, wouldn't it, Dr. Killiany?

15   A   I'm not certain why.

16   Q   Well, the measurements you transmitted to Dr. Johnson

17   established that you completed all 103 of your original

18   measurements in 1999 before you made any changes.

19   A   No, that's not true.

20   Q   Well, that's how Dr. Johnson had this list of all the

21   original measurements without any changes, the disturbing

22   phenomenon he came across; isn't that true?

23   A   I don't understand that question.  Dr. Johnson had a

24   complete set of the data.  He had the original measurements

25   and he had the remeasurements.  So by 1999 that's what

1    Dr. Johnson had.

2    **Q**   Dr. Johnson stumbled across and gave -- isn't it true

3    Dr. Johnson stumbled across and came across the original

4    measurements from 1999?

5    A    I don't know what Doctor -- if he stumbled across

6    anything.  I gave him a complete set of the data, the

7    original measurements and the remeasurements, all 1999-ish.

8    **Q**   So you sent him measurements that were no longer good?

9    A    I sent him a complete set of the data.

10   **Q**   I'm going to show you a document that's been marked as

11   Exhibit No. 3.

12        **MR. KOHN:**  Turn the Elmo on, please.

13   **Q**   Do you recall telling, sending this e-mail to Mary Hyde?

14   A    No, I don't recall sending it to her, but I have no

15   reason to doubt that I did.

16   **Q**   And this would have been sent in May '99, correct?

17   A    Yes.

18   **Q**   And in May of 1999 you're telling her:  I've gone

19   through the entorhinal and STS data.  Originally when we

20   first began outlining the entorhinal cortex we only used one

21   slice.  We changed to three slices in order to get a more

22   accurate measure.

23        Do you see that?

24   A    Yes, I see that.

25   **Q**   All right.

1    A    I also see a sentence saying I'm sending you updated

2    data.

3    Q    Sending her updated data.  Correct.

4         And you acknowledged at your deposition that the

5    updated data you were sending her is the second page here,

6    correct?

7    A    I don't recall seeing this at my deposition.

8    Q    Well, this is Killiany Deposition Exhibit 87.

9    A    Okay.

10   Q    Does that refresh your recollection that you saw it at

11   your deposition?

12   A    No.

13   Q    If you would look at 160 of your deposition.  Does that

14   refresh your recollection that you saw this at your

15   deposition?

16   A    I'm sorry, what line am I looking at?

17   Q    Well, look at Line 18.  Killiany Deposition 87 marked

18   for identification.  That's what this one is, Killiany

19   Deposition 87, correct?

20   A    I'm not doubting you about that.

21   Q    Okay.

22   A    I'm simply not recalling having seen it at my

23   deposition.

24   Q    Well, let's look at --

25        THE COURT:  Let me interrupt with a juror question

1    which fits here.

2           How long was it, in terms of time, between your

3    initial measurement and your remeasurements?  Or did it vary

4    over the course of your analyses?

5           THE WITNESS:  It varied.  As I testified to this

6    was a process that started in 1997 and completed for this

7    cross-sectional data sometime in 1999.  Throughout that

8    period of time as I would measure things or I would see

9    something that wasn't clear to me, I would go back and

10   re-review everything.  So, this was a fluid process.

11          THE COURT:  Can you estimate the range of the

12   variations, shorter to longest?

13          THE WITNESS:  No, it's really not possible.  That's

14   what I talked about on Tuesday that we were trying to

15   reconstruct when the files were created, which would

16   certainly directly answer that question, but because there

17   was no time stamp on the files it's not clear.  It's my

18   opinion they were done early, but I don't have anything to

19   hang that on.

20          THE COURT:  And when you say early what would that

21   distance be?

22          THE WITNESS:  '97, '98-ish, somewhere in that time

23   frame.

24          THE COURT:  In other words, within a year after the

25   original measurement?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Is that fair?

3          **THE WITNESS:**  That's a fair characterization.

4          **THE COURT:**  Also, since I've interrupted, a juror

5    has requested a certain document.  And after talking with

6    the lawyers we've reviewed it and find that that's not a

7    document that's been admitted in evidence, it's an appendix

8    to Dr. Schuff's report as he's an opinion witness.

9          But, I don't think there's any objection to letting

10   them see that appendix.  And hearing none if you -- there

11   is?

12         **MR. ROSE:**  Yes.

13         **THE COURT:**  I didn't think there was.

14         **MR. ROSE:**  Yes.

15         **THE COURT:**  Oh, come to the side bar.

16   SIDEBAR CONFERENCE, AS FOLLOWS:

17         **MR. ROSE:**  I filed a memorandum.

18         **THE COURT:**  I didn't, I didn't read it.  I'm sorry,

19   I haven't seen it.

20         But let me see the document itself.  It's fairly

21   mechanical.  It just gives his conclusion, his opinions as

22   to certain remeasurements.  Unlike various things, it's not

23   terribly argumentative.  But you object to it?

24         **MR. ROSE:**  Yes, I do, your Honor.  In the context

25   of this case it's very argumentative.  I mean, this is the

1   argument that they're making, that the revisions penetrated,

2   for example, into the white matter.

3           THE COURT:  All right.  I think he's right.  I

4   think, against opposition, I don't see how I can admit it.

5           MR. FRIEDMAN:  Your Honor, the cases that we cited

6   today show that --

7           THE COURT:  I understand.

8           MR. FRIEDMAN:  Okay.  The witness is on the stand

9   and is --

10          THE COURT:  Oh, I understand that.

11          MR. FRIEDMAN:  Okay.

12          THE COURT:  That does not make hearsay admissible.

13   It's excluded.  I'll tell the jury.

14          (Whereupon the sidebar conference concluded.)

15          THE COURT:  Yes, I'm mistaken.  Since there's an

16   objection it cannot be admitted, and that's our answer to

17   the question.

18          Go ahead, Mr. Kohn.

19          MR. KOHN:  Thank you.

20   Q   So, in 1999 you're sending an e-mail to Mary Hyde

21   talking about first began outlining the entorhinal cortex

22   using only one slice and we changed to three slices in order

23   to get a more accurate measure.

24          And you don't know why that would be relevant to

25   Mary Hyde in 1999, do you?

1   A    What I'm doing is responding to an e-mail from Mary Hyde

2   here.  I'm describing three things I think that are going

3   on.  Originally, data was in the database for one measure,

4   I'm sorry, for one slice instead of three, that's being

5   updated.  There was another e-mail that appears to me that

6   talks about asking me to look at something with cases marked

7   with an asterisk.  And also this is transmitting data for

8   which the right and left hemisphere wasn't in the database,

9   there was only a total entorhinal.

10  Q    Right.

11  A    There's an e-mail describing at least three responses to

12  Mary Hyde.

13  Q    All right.  And the data that you were updating you

14  attach to your e-mail over here, right?

15  A    The data that's updated here is being updated for three

16  reasons.  One is a request from Mary Hyde, the second is to

17  transmit the right and left volumes, and the third is to

18  send her something related to cases she sent me marked with

19  an asterisk.

20  Q    And this -- it turns out, does it not, that all of your

21  remeasurements of the normals are included in this updated

22  set of data you were sending to Dr. Hyde at this point,

23  right?

24  A    I don't know.

25  Q    Well, there's 3001, we know that's on the normal list,

1    right?

2    A    I don't know the normal list, I'm sorry.

3    Q    Well, the ones that were altered.  For the second set of

4    measurements.  The ones on here with the big red lines going

5    on it.  I'm talking about those on the relator's table.

6    A    Is there a question there?

7    Q    Yes.  3001 is one of those with the big, moving from the

8    top of the chart to the bottom, right?

9    A    Yes, 3001 is on the relator's table.

10   Q    And we know 3056 is on the relator's table, right?

11   A    Yes.  Three thousand -- well, 003056 is on the relator's

12   table.

13   Q    The document will speak for itself.  I looked at it.  I

14   believe all of the ones with the red lines --

15           THE COURT:  Well, this isn't sounding like a

16   question.  I looked at it, I believe, all that's stricken

17   out.  You're not testifying.  Ask him questions.

18           MR. KOHN:  Fair enough, your Honor.

19   Q    103's on the relator's next in line, isn't it?  If you

20   look up there, 103.

21   A    Yes, 103 appears to be on the relator's table.

22   Q    And 136 is the next in line on the relator's table?

23   A    I'm sorry, there's a lot of data here in between those.

24   Let me find it.  Okay.

25   Q    I'm pointing to it.

1   A    Yes.

2   Q    And the next one is 142, that's on the relator's table,

3   too, next in line on the red lines going down, correct?  The

4   rank number 16.

5   A    Yes, that one's on the relator's table.

6   Q    And if we go to rank number 25, which would be 112,

7   that's on your list as well, right?

8   A    Yes, that's on the list.

9   Q    And number 1 we already looked at.

10  A    Yes.

11  Q    The next one is 122.  That's on this list, too, isn't

12  it?

13  A    122 is on this list.  Let me check the relator's table.

14  Q    122 would be number 36, ranked 36.

15  A    Yes.

16  Q    And the next one is 140, and that's on this table also,

17  isn't it?

18  A    Yes.

19  Q    And 141 is the next one down, ranked 42, that's on the

20  table as well, correct?

21  A    I think it's ranked 43, but it's on the table.

22  Q    Thank you.  And --

23  A    I might also point out there's a lot of other cases on

24  this table.

25  Q    A lot of other cases on this table.  Okay.

```
 1              So, are these the cases that accounted for -- on

 2     your own testimony, these would be the cases that accounted

 3     for the one slice/three slice update you were making, right?

 4     A    No.

 5     Q    Isn't that what you just testified to, that --

 6     A    No, I --

 7     Q    -- the reason you were transmitting this was to correct

 8     the one slice/three slice mixup?

 9     A    As the e-mail clearly states, there are at least three

10     reasons for the data being transmitted here.  One is to

11     replace data which Mary seemed to only have for one slice,

12     the second is to respond to something related to cases she

13     tagged with an asterisk, and the third was to give her a

14     complete data set because she only had totals, not right and

15     lefts of independent entities.

16     Q    So one of the reasons you will admit then for

17     transmitting this list of data was because there was a mixup

18     between the one and three slices, right?  Isn't that what

19     you just said?  One of the reasons, one of the three

20     reasons?

21     A    I said there are three -- Mary was requesting data for

22     three reasons here.  One is she apparently only had data

23     from one slice, the second is because of something she

24     flagged with an asterisk she was looking at for data on, and

25     the third reason is because she only had a total entorhinal
```

1   cortex volume, not rights and lefts separately.

2   Q   Dr. Killiany, do you teach statistical courses?

3   A   I have.

4   Q   At what level?

5   A   At the graduate level.

6   Q   And would you agree with Dr. Goldstein that the random

7   chance of your selection of the normals and moving them from

8   the top to the bottom of a chart is highly unlikely?

9   A   I don't believe that's what Dr. Goldstein had to say.

10  Q   Do you recall us discussing your being blinded at your

11  deposition?

12  A   Yes.

13  Q   And at your deposition you were unable to identify a

14  single document that indicated any steps that were taken to

15  make sure you were blinded during the course of the study;

16  isn't that true?

17  A   I'm sorry, my deposition was a couple of years ago.  I

18  was unable to recall any document?

19  Q   Well, if you look at page 205 of your deposition.  And I

20  asked on line 23:  What documentation is there to

21  demonstrate the steps taken to ensure that you were blinded

22  during the course of this study?

23          And by the end of your answer you say there was

24  nothing.  Correct?

25          MR. LIPKIN:  Objection.  May the full answer be

1   read.

2           **THE COURT:**  The full answer may be read.

3           **MR. KOHN:**  Sure.

4   **Q**   Question:  What documentation is there to demonstrate

5   the steps taken to ensure that you were blinded during the

6   course of the study?

7           Answer:  Documentation?

8           Question:  Yes.

9           Answer:  Gosh, I'm not sure if there's

10  documentation to ensure I was blinded.  Well, I should back

11  up a step.  I should be a little more precise about that.

12  Documentation that would show evidence I was blinded would

13  be documentation such as this, which I don't recall what

14  exhibit it is at this point in time, which shows the way

15  that we referred to cases at the time for transmitting data

16  to Mary Hyde by case number.  This document here.

17          Question:  Exhibit 87.

18          Answer:  I'm going to take that back, if you don't

19  mind.

20          Do you see that testimony?

21  A   Yes, I see that testimony.

22  **Q**   You were unable to identify any document that indicated

23  that, any document to demonstrate the steps you took to

24  ensure that you were blinded; isn't that true?

25  A   Yeah, you see the e-mail, it's right here.  87.  You see

1    the identification based on case number.

2    Q   Your follow answer:  I'm going to take that back, if you

3    don't mind.

4    A   I see that answer.  But the e-mail's right here, you

5    just showed it to all of us.  Exhibit 87 identifies the data

6    based on subject number.

7    Q   And that's the proof that you were blinded?

8    A   That's an indication that I was blinded.

9    Q   That's what you're submitting to Mary Hyde.  It doesn't

10   show what documentation you had, does it?

11   A   I'm not sure what you're looking for in terms of

12   documentation that you were blinded.  If you were blinded

13   how could you have a document?

14   Q   Did you recall proclaiming at your deposition, I simply

15   had access to a participant number and the MRI scan, nothing

16   else about those individuals?

17   A   I believe that's what I have testified to and in my

18   deposition.

19   Q   That's not true, is it?  You were given data runs

20   identifying the CDR coded status of the study participants

21   that coded them 6's and 7's, right?

22   A   Yes.  And it has no meaning to me.

23   Q   So you will admit, then, that your answer in your

24   deposition is incorrect, you were given more than just a

25   participant number and the MRI scans, right?

1    A    I simply didn't remember this document runs at that

2    point in time.  But, yes, you showed me those when you had

3    me up here testifying.

4    Q    Dr. Killiany, the 2000, the Killiany 2000 paper, is that

5    what is known as a retrospective study?

6            Let me rephrase it.  Would you say a retrospective

7    study is another way of saying that you had to know the CDR

8    status of the participants at the outset of the study so you

9    could compare how the cognitive function of the subjects

10   changed after three years?

11   A    I'm sorry, can you say that again?  The reason I'm

12   struggling with this is it's a retrospective study to look

13   at prospective information, and I don't want to just jumble

14   words there.  But it's to look back at a time point of

15   information to see if that has any bearing on something in a

16   future, in a future time point.

17   Q    Right.  And so, at the outset of the study they had to

18   know the CDR status of all the participants, right?

19   A    Outset being?

20   Q    In the beginning when -- at the very beginning of the

21   study they needed to know the CDR score of all the

22   participants?

23   A    The clinical core needed to and the statistical core.  I

24   didn't need to know anything.

25   Q    And will you agree that with respect to Exhibit 199 that

1    the '06's and 07's turn out to be the key of who was coded

2    in the normal and -- in the beginning of the study, correct?

3    A    I'm sorry, I assumed you were going to show me

4    something.

5    Q    Yes, I'm looking to find 199.  Here we go.

6           This is a document you saw earlier, correct, when

7    you testified?

8    A    Yes.

9    Q    Okay.  That transmitted to you the 07 and 06 codes for

10   the study participants, correct?

11   A    Yes, a column that has -- a column that has 6's, 7's and

12   NA's in it.

13   Q    And we saw the key, we know what the 06 means, normal,

14   right?

15   A    If that's what the key says, yes.

16   Q    Okay.  And if you would look at MBAK page 538 -- and by

17   the way, this report also shows the age and the gender and

18   some other information about each of the subjects as well,

19   correct?

20   A    Yes.

21   Q    Okay.  And if you would look at 538, MBAK 1538, you will

22   see that participant 154 is on this page here.

23           Do you see that?

24   A    Can you zoom that in a little, I believe I can see that.

25   Yes, 154.

1   Q    And it just so happens that 154 at the very beginning of

2   the study was an 06.  So, if you had this document would you

3   agree whoever had this document would think that participant

4   154 was a normal, right?

5   A    No.  154 was an 06.  The document speaks for itself.

6   Q    Okay.  And would you agree if someone was using the data

7   from this chart to figure out who was a normal and who was a

8   questionable they would assume that 154 was a normal, right?

9            MR. LIPKIN:  Objection.

10           THE COURT:  Sustained, on that foundation.  He

11  can't testify to -- well, sustained.

12  Q    So, 156 appears on the -- 154 appears on the following

13  page.

14  A    I'm not seeing it.

15  Q    Or 150, excuse me.  154 --

16  A    I'm sorry, which one are you trying to identify, 150?

17  Q    Yes.

18  A    Yes.  150 appears here.

19  Q    And that, too, is identified as an 06, correct?

20  A    150, yes, is identified as an 06.

21  Q    Okay.  Now, just so we can see -- it's just as easy to

22  put it on the Elmo.

23           Would you agree that you moved 150 -- excuse me,

24  I'll rephrase that.

25           Would you agree that on the relator's table, 154

```
 1    that we just saw identified as an 06, moved from this

 2    location down to here, correct?

 3    A    It's really hard to see on this screen.

 4    Q    150 is here, right?

 5    A    Yes, 150 is there.

 6    Q    And 150 was up here, right?

 7    A    Yes.

 8    Q    All right.  So that moved down like that.  And 154 is

 9    here, and that one moved down to here, correct?

10    A    On your table, the data, yeah, things are moving on the

11    table.  I'm not certain --

12    Q    All right.  So, if I understand it, then, would you

13    agree with me if someone was using 199 as their guide as to

14    which ones were the normals and which ones were the

15    questionables and they wanted to move the normals down to

16    the bottom of the list they would have assumed 154 and 150

17    were normals and moved them to the bottom of the list, too?

18                  MR. LIPKIN:  Objection.

19                  THE COURT:  Yes, sustained on that foundation.  You

20    may ask him if that's what he thought.

21    Q    Is that what you thought?

22    A    I've never seen this relator's table before this case.

23    I've never seen the data organized in this way before this

24    case.  I don't know why you would organize data in this

25    fashion.
```

1          **MR. KOHN:**  All right.  No further questions, your

2     Honor.

3          **THE COURT:**  Nothing further, Mr. Lipkin?

4          **MR. LIPKIN:**  I have just a few questions, your

5     Honor.

6          **THE COURT:**  Go ahead.

7                    **REDIRECT EXAMINATION**

8     BY MR. LIPKIN

9     **Q**   In the context of your study, Dr. Killiany, why would it

10    not make sense to organize data in this fashion?

11    A    Well, for many reasons.  To start with, what you're

12    looking at is raw values of the entorhinal cortex.  And when

13    we're doing regions of interest we have to express that data

14    as a percent of intracranial volume because individuals have

15    different head sizes.  So what you're looking at here is raw

16    volumes, you have no way of controlling for whether or not

17    there's somebody with a small brain or a big brain, it's

18    simply raw data listed out here.

19    **Q**   When you saw the 06's and 07's what did that mean to

20    you?

21    A    Simply 06's and 07's.  They don't really have any

22    meaning to me at that time.

23          **MR. LIPKIN:**  No other questions, thank you.

24          **THE COURT:**  Nothing further, Mr. Kohn?

25          **MR. KOHN:**  One last question.

1                **REDIRECT EXAMINATION**

2    **BY MR. KOHN:**

3    **Q**   In this chart, the largest entorhinal cortex out of all

4    103 that was not subject to a change was 4.56.  Do you see

5    that?

6    A   Yes.

7    **Q**   And with the altered measurements all of a sudden the

8    entorhinal cortex goes to 6.33.  Did --

9    A   I'm sorry.

10    **Q**   Did someone's brain increase in size, or these are --

11    these are the same scans on both sides, right?

12           Let me rephrase the question.

13           This plumping out in the entorhinal cortex to 6.33,

14    when the largest one before had been 4.56, you're looking at

15    the exact same scan and the exact same EC, right?

16    A   And as we went through on Tuesday there were errors in

17    the application of the operational definition.

18    **Q**   Errors enough that all of these up to here, one, two,

19    three, four, five, six, seven, eight, nine, were all plumped

20    out with larger entorhinal cortex volumes than any of the

21    ones you didn't change originally.  Is that true?

22    A   There's no plumping out.  We went through these scans on

23    Tuesday.  The operational definition was not applied

24    correctly.  When I remeasured those cases to correct the

25    mistakes or the missing pieces that were left out that's the

1    volumes that you see.  What I don't know is does this person

2    with an entorhinal cortex of 6.33 have a brain much larger

3    than someone else on that table.  So percentage of

4    intracranial volume is equal, it's not represented there in

5    that table.

6    Q    Well, we do know that 103 has the ninth smallest

7    volume --

8    A    Yes.

9    Q    -- originally.

10   A    Yes.  When there was an incorrect measurement of the

11   entorhinal cortex.  That's what happens when you make

12   errors.

13   Q    So you're saying your set of measurements were so

14   incorrect that you drew this one as, one of the smallest and

15   you ended up making it larger than any of the original 103

16   measurements?

17   A    Yes.

18   Q    Okay.

19              THE COURT:  Nothing further for this witness?

20              MR. KOHN:  Nothing further, your Honor.

21              MR. LIPKIN:  One more question.

22                      REDIRECT EXAMINATION

23   BY MR. LIPKIN

24   Q    Dr. Killiany, why did your initial measurements increase

25   in size when you made your remeasurements?

1   A   Because when I first started outlining the entorhinal

2   cortex, I was being very conservative in what I viewed as

3   the entorhinal cortex.  When you see something on an MRI

4   scan, as I showed you on Tuesday, it's fairly

5   straightforward to point to here is this.  The hard part is

6   to outline this.  And so initially starting to do this you

7   want to make sure, my approach to this, as others such as

8   Dr. Gomez-Isla, is to make sure you're capturing what it is

9   you're capturing and not too much information.  As you do

10  this over time you come to realize that that initial

11  capturing was excluding things which should have been

12  included and as a byproduct of that the measurements got

13  bigger.

14          **MR. LIPKIN:**  No other questions, thank you.

15          **THE COURT:**  Nothing further for this witness?

16          **MR. KOHN:**  One last question.

17                  **RECROSS-EXAMINATION**

18  **BY MR. KOHN**

19  **Q**   As a byproduct of that, the measurements on the

20  inter-rater reliability changed from .96 to .54, correct?

21  A   I never saw the second number that you cited until this

22  lawsuit.

23  **Q**   Well, do you think Dr. Albert should have told you that

24  you had changed four of the measurements in the inter-rater

25  reliability study?

```
 1              MR. LIPKIN:  Objection.

 2              THE COURT:  Sustained; beyond the scope.  We've

 3      been over this.

 4              MR. KOHN:  No further questions.

 5              THE COURT:  Very well.  Nothing further?  You may

 6      step down.

 7              (Whereupon the witness stepped down.)

 8              THE COURT:  Call your next witness.

 9              MR. ROSE:  Defense calls Marilyn Albert.

10              THE COURT:  She may be recalled.

11              THE CLERK:  I would like to remind you that you are

12      still under oath.

13              THE WITNESS:  Yes.

14                   MARILYN ALBERT, Resumed

15                   DIRECT EXAMINATION

16      BY MR. ROSE

17      Q    Looking at the chalk which is to your right, would you

18      just briefly tell us about the progression of Alzheimer's

19      disease and how that relates to the PPG?

20      A    Could I get up?

21      Q    Yes.

22      A    Okay.  Do you have a pointer, maybe?

23              THE COURT:  Yes, we did, ma'am.

24              THE WITNESS:  I think Mr. --

25              THE COURT:  There it is.
```

1          **THE WITNESS:**  Oh.

2          **THE COURT:**  I mean -- oh, he has --

3          **MR. ROSE:**  I have one, too.  Either, either works.

4          **THE COURT:**  All right.

5  A    Well, this is just a simple chart trying to describe the

6  progression of Alzheimer's disease both in relation to what

7  happens in mental abilities and also opportunities for

8  intervening to treat the disease.

9          We now know that when people are cognitively normal

10  some of them have Alzheimer's pathology in their brain.  So,

11  what I mean is the hallmark pathology of the disease is

12  something we call plaques and tangles.  You heard

13  Dr. Gomez-Isla talking about looking at the brain under the

14  microscope and this is how you see the plaques and tangles.

15  And you can't see it on an MRI scan, but you can see it when

16  somebody has died and you can look at brain tissue.

17          We know that a good number of people who are normal

18  have that pathology, but they don't have nerve cell loss.

19  And when nerve cells start to die in the entorhinal cortex,

20  the hippocampus, regions that are affected early in the

21  disease, that's when we start to get symptoms.  And that's

22  when people begin to have memory problems like forgetting

23  conversations, repeating themselves, misplacing things,

24  things of that sort.

25          As the disease spreads and begins to affect other

1    regions then other symptoms develop, things like difficulty

2    with planning or organization.  So that's when you start to

3    see --

4               **MR. KOHN:**  Objection, your Honor, as a narrative.

5               **THE WITNESS:**  No, I'm just going to explain the --

6               **THE COURT:**  Well, wait, wait.

7               **THE WITNESS:**  Okay.

8               **THE COURT:**  I'll let the attorneys spar back and

9    forth.

10              **THE WITNESS:**  Okay.

11              **THE COURT:**  But when he objects I need just a

12   second to figure out where I'm going.  And now that we've

13   stopped, we'll ask for another question and we'll go from

14   there.

15              **MR. ROSE:**  Correct.

16   **Q**   I noticed that the word prodromal --

17   A   Right.

18   **Q**   -- is on, is on the chalk.  Could you explain what's

19   meant by prodromal?

20   A   So, prodromal is about the stage of the disease that we

21   were talking about with regard to the program project.  So,

22   people who have mild symptoms, they're getting progressively

23   worse and the question in the program project was could we

24   predict who was going to progress from being mild to having

25   dementia.  And the reason that that's so important is that

1    if we could identify people in that mild stage, we might be

2    able to intervene.  We might be able to identify them early

3    if we had good drugs, and we might be able to use the

4    measurements that we had developed to track the disease and

5    actually finding better drugs.

6         **THE COURT:**  Now, this is just a general question,

7    sparked by my curiosity.  Are there drugs that are, just

8    today, as you're in this area, that have some effect upon

9    the progression of Alzheimer's?

10        **THE WITNESS:**  There are five drugs that have been

11   approved for Alzheimer's disease.  They've been approved for

12   people at the dementia stage of the disease, but they're not

13   very effective.  And that's actually why this grant and work

14   like it was so important because people have begun to be

15   increasingly worried that if they wait until people are

16   demented it's too late.  So, there have been lots of drug

17   trials that have failed, and they've all been, almost all of

18   them have been at this dementia phase.  And right now what's

19   happening is that people are designing clinical trials to

20   intervene here, when people have mild symptoms, hoping that

21   they might be able to delay the progression and the drug

22   might be more effective.

23   **Q**   So, what were the goals of the PPG relative to drug, the

24   possibility of drug therapies?

25   **A**   So, the goals of the program project were to see if any

```
 1    of these measures that we were looking at were good at

 2    identifying people in this early stage and good for tracking

 3    the progression of disease.

 4          MR. KOHN:  Your Honor, could we have a side bar,

 5    please, your Honor?

 6          THE COURT:  We may.

 7    SIDEBAR CONFERENCE, AS FOLLOWS:

 8          MR. KOHN:  They're putting --

 9          THE COURT:  Yes.

10          MR. KOHN:  I believe we are getting into chalks I

11    don't even know if we've ever seen before.  This one is

12    identifying the structure of the core and who was hired and

13    how many people there were which has nothing to do with the

14    question of this case which is did they make false

15    submissions.

16          MR. HUGHES:  Your Honor, we objected to it as well.

17    Sorry.

18          THE COURT:  I know there are three of you.  One of

19    you speak.

20          MR. HUGHES:  All right.

21          THE COURT:  Now, Mr. Rose, have they seen this?

22          MR. ROSE:  Yes.  I believe we've given it to them

23    in the last couple of days.

24          MR. FRIEDMAN:  Yes.

25          MR. ROSE:  Now, there's a 450 page grant
```

1    application.  It's enormous.  This chalk is simply a way of

2    trying to let the jurors make sense of this 450 page

3    application.  I'm going to be very brief.

4         **THE COURT:**  I will, be brief and I will say it's a

5    chalk.

6         (Whereupon the sidebar conference concluded.)

7         **THE COURT:**  We're getting things put up on the

8    easel.  The ones that have been put up during this

9    examination, they are chalks, demonstrative aids, not

10   evidence.  It's up to you whether you believe the witness

11   and whether the chalk helps you understand the witness's

12   testimony.  You may, but you need not.

13        And go ahead, Mr. Rose.

14   **BY  MR. ROSE**

15   **Q**   Now, the chalk that we've placed next to you, what is

16   this?

17   A   This is an outline of the organization of the program

18   project, the grant that is the subject of this litigation.

19   And there were four cores and four projects.  And you can

20   see all the projects indicated below.

21        So Project 1 had to do with neuropsychology, which

22   means testing of mental abilities, like memory and planning

23   and organization.  The second project had to do with SPECT

24   which you've already heard about.

25   **Q**   Excuse me, before we go to the second project.

```
1    A    Yes.

2    Q    In the grant application, how many people were to be

3    supported by Project 1?

4    A    There were five personnel on that project.

5    Q    And these are personnel from where?

6    A    Those were all at Mass. General, and some of them were

7    part-time individuals, only part of their salary was

8    supported on that project, and some were full-time.

9    Q    So is it the case that you were part of core A, the

10   administrative and clinical core, and also the

11   neuropsychology project?

12   A    That's correct.

13   Q    All right.  Moving to Project 2, what is that?

14   A    That's SPECT, that is measuring as you've heard blood

15   flow in the brain.  And Dr. Johnson was the head of that.

16   That project was at the Brigham and Women's Hospital.

17   Q    And there were six personnel?

18   A    There were six personnel on that project.

19   Q    Project 3?

20   A    That's the MRI project that Dr. Killiany was the project

21   leader, and there were eleven personnel on that project.

22   Q    And where were those personnel working?

23   A    Some of them were at Mass. General Hospital and some of

24   them were at Brigham and Women's Hospital.

25   Q    Project 4 was what?
```

1    A    That was Functional MRI.  The director of that was Reisa

2    Sperling.  There were eleven personnel.  And again, some of

3    them were at Mass. General Hospital and some at Brigham &

4    Women's.

5    Q    And in two sentences, if it's possible, could you just

6    tell us what Functional MRI is?

7    A    It's using MRI to evaluate the activity in the brain.

8    So typically people lie in the scanner and they see

9    something, and in this instance they were seeing something

10   they were being asked to try to remember and the MRI

11   measures the activity in the brain that's going on when

12   they're doing that task.

13   Q    So those -- and there were eleven people supported by --

14   A    Exactly.

15   Q    -- that project?

16        And you referred to cores.  Were there four cores?

17   A    Four cores, yes.

18   Q    Right.  Core A is the administrative and clinical core,

19   and what's the, what's the function of core A?

20   A    So, apart from just overall administration, because I

21   was the director of that core, that was the main group of

22   individuals who evaluated the subjects each year and came up

23   with the diagnoses for them and followed them over time.

24   Q    And core B?

25   A    That was the core led by Dr. Jones.  That was the data

1    management and statistics core, and as you've already heard

2    it had to do with handling all the data and doing all the

3    statistical analyses.

4    Q   And this, this says personnel, four.  In addition to Dr.

5    Jones who else?

6    A   It was myself, Mary Hyde, and Jack McArdle.

7    Q   And why were you included in core B, the statistical

8    core?

9    A   Because I worked a lot with Mary Hyde to try to help her

10   be sure she had the data she needed.

11   Q   Core C is what?

12   A   That's the genetics core run by Dr. Tanzi, and there

13   were two personnel on that core.

14   Q   And what did the genetics core do?

15   A   So, Dr. Tanzi is a very well-known geneticist.  He and

16   other people around the world would identify genes that

17   might be related to Alzheimer's disease, and then we would

18   look at our subjects to see how it related to any of these

19   other things, people's mental abilities, volumes of brain

20   regions, whatever.

21   Q   And finally core D?

22   A   That was the neuropathology core run by Dr. Hyman.

23   There were three personnel on that core, and that was the

24   core when, we followed people, if any of them died then we

25   would look on their brains after death.

1   Q   And we've heard the name of Dr. Hyman before.  Was it he

2   who had looked at entorhinal cortices under a microscope?

3   A   Yes.

4   Q   And did he and Dr. Gomez-Isla write a paper in 1996?

5   A   Correct.

6   Q   And were his findings somehow involved in a decision

7   that you made concerning measuring the entorhinal cortex?

8   A   They reported to me these findings that they had gotten

9   on brain autopsy as you heard from Dr. Gomez-Isla, and we,

10  he and I both wondered if it might be possible to measure

11  MRI scans to get a reflection of the nerve cell loss that he

12  saw on the brain.

13  Q   Thank you.

14          Now, on occasion, Dr. Albert, did the PPG have

15  hypotheses that did not work out?

16  A   Absolutely they had hypotheses that did not work out.

17  Q   Can you give us some examples?

18  A   Well, the major example was that for a long time one of

19  the projects involved looking at electrical activity in the

20  brain.  And when we had been studying patients with

21  full-blown dementia that project was very useful.  But once

22  we started looking at prodromal disease we found that

23  measuring electrical activity wasn't a really good predictor

24  of progression, at least the way we were doing it, and we

25  had to drop that project.

1    **Q**   So then is it the case that the failure or the inability

2    test to bear out a hypothesis, it's just something that

3    happens in the course of science; isn't that right?

4    A    Absolutely.

5    **Q**   And is there actually value to science in having

6    hypotheses occasionally not work out?

7    A    It's very important to know about hypotheses that don't

8    work out because you don't want to go down a path that's not

9    going to be fruitful.

10   **Q**   Now, we've heard reference to group status.  Who in the

11   PPG was responsible for determining group status?

12   A    So the group status as I mentioned was determined by the

13   people in core A.  That consisted of nurses, physicians,

14   neuropsychologists, research assistants, that we would

15   review the evaluation of the subjects each year and make a

16   decision about their group status.

17   **Q**   Who were the people who were making the decisions about

18   group status?

19   A    So, it was the people who saw them.  So, some of them

20   were physicians, some of them were nurses, some of them were

21   research assistants.  And those individuals were all located

22   at Mass. General Hospital where the subjects were seen.

23   **Q**   Was Dr. Killiany involved in any way --

24        **MR. KOHN:**  Objection, your Honor.  Can we have a

25   side bar, please?

```
 1              THE COURT:  All right.
 2   SIDEBAR CONFERENCE, AS FOLLOWS:
 3              THE COURT:  It's a leading question, but we didn't
 4   need a side bar for that.
 5              MR. HUGHES:  Your Honor, if I may, this has to do
 6   with Mr. Rose having called Marilyn Albert during our case.
 7   He already examined her on the issue of blindness and a
 8   number of other subjects.  And the way we do it is, someone
 9   takes a great risk when they don't reserve entirely with a
10   witness.
11              THE COURT:  Oh, well, I think that's right.  And
12   you're saying what?
13              MR. HUGHES:  He's already touched this base.
14              THE COURT:  Oh, I don't think so.
15              MR. ROSE:  No.
16              THE COURT:  So, he may do this.  We're not going
17   over --
18              MR. HUGHES:  Okay.
19              THE COURT:  -- the same things though.
20              (Whereupon the sidebar conference concluded.)
21              THE COURT:  Don't lead the witness, Mr. Rose.
22              MR. ROSE:  I will not, your Honor.  I will try not
23   to.
24   Q   Now, you've identified who was involved in determining
25   the group status of --
```

1    A    Right.

2    Q    -- the subjects; is that right?

3    A    Yes.

4    Q    Was Dr. Killiany involved in any way in determining

5    group status?

6    A    No, he was not.

7    Q    After group status was determined what steps did you

8    take to make sure that Dr. Killiany did not learn group

9    status?

10   A    So the information about group status was sent to the

11   central database.  That database was password protected.

12   Mary Hyde organized that database and she knew that she was

13   not supposed to release that information to Dr. Killiany.

14   Q    Now, we've heard the term blinding.  What is blinding?

15   A    Blinding is that you want somebody who's doing something

16   that might unintentionally be influenced by knowing the

17   status of the subject not to know it.

18            **MR. ROSE:**  May I have 182, please.  In evidence,

19   Exhibit 182.

20   Q    Dr. Albert, you have Exhibit 182 on the screen in front

21   of you?

22   A    Yes.

23   Q    There's handwriting in the upper right corner of that

24   document.  Whose handwriting is that?

25   A    That's my handwriting.

1   **Q**   Who prepared this document?

2   A   I prepared it.

3   **Q**   And when did you prepare it?

4   A   I believe I prepared it in early 1995.

5   **Q**   Why did you prepare it?

6   A   Because there was a phase in all of our work when we

7   were having MRIs from so many different projects and so many

8   things going on that we needed to have a document that

9   summarized how the MRIs were going to be handled, how they

10  were going to be coded, and I wanted to prepare a formal

11  document for Mary Hyde that she could use going forward.

12  **Q**   All right.  To whom was this document given in 1995?

13  A   It was given to Mary Hyde.

14  **Q**   At any time did you give this document to Dr. Killiany?

15  A   I did not.

16  **Q**   Why not?

17  A   Because this document was the key to the codes and he

18  was not supposed to have the key to the codes.

19  **Q**   Now, there's a reference in the first line to OIT.  It

20  says as of February 14, '95 all MRI data sent to OIT must

21  include the variables listed below for the purposes of

22  identification.

23          What is OIT?

24  A   OIT is the Office of Information Technology, which at

25  that time was the Harvard computer center, and it was in the

1    days of mainframe computers, when computers went from the

2    floor to the ceiling, and at that time that was where we

3    kept our data in a password protected server.

4    Q    Who had the password to the password protected server?

5    A    Mary Hyde.

6    Q    Did you have the password for the password protected

7    server?

8    A    I did not.

9    Q    Why not?

10   A    Because I didn't know how to use the data.  They were

11   files that Mary had created.  They were done in a software

12   language that I was unfamiliar with.  And there was no

13   purpose in my having the password.

14   Q    And I believe you said that OIT was located at Harvard

15   University; is that right?

16   A    It was.  It was near Harvard Square.

17   Q    Right.

18            On occasion did you go to OIT?

19   A    I did on occasion.  I would meet with Mary Hyde and we

20   would sit at one of the terminals and do some initial

21   analyses of the data, because it was more efficient to work

22   that way.

23   Q    To your knowledge, did anyone from the PPG, anyone else

24   from the PPG ever go to OIT?

25   A    Not to my knowledge, no.

1    Q    And that includes Dr. Killiany?

2    A    It does.

3    Q    Now, looking at the -- if you would scroll down, please,

4    on that, on that page.

5         There are references, there are references to

6    studies, correct?

7    A    Correct.

8    Q    And what studies are these?

9    A    So, when the program project began we were studying

10   normal aging and people with Alzheimer dementia, and we also

11   included people with other forms of dementia, and the first

12   two codes referred to that study.

13   Q    Where is the PPG study reflected on here?

14   A    It's called the CDR study.

15   Q    The CDR study.  003?

16   A    Correct.

17   Q    All right.  And further down, please.

18         Now, the second page of this document refers to

19   normals.  And then it says CDR normals, CDR questionables,

20   CDR AD, and CDR other.  Is that right?

21   A    Correct.

22   Q    And were those four codes, 6, 7, 8 and 9, were those the

23   codes to be used for the inputting of MRI information

24   relative to the CDR study?

25   A    Those were the codes -- the 8 and 9 was never on

1   anything -- those were the codes that we used for the

2   diagnosis of the subjects over time.

3   **Q**   Now, when Dr. Killiany was given a list of participants

4   or subjects whose MRI scans he was supposed to review --

5           **MR. KOHN:**  Objection, your Honor.

6   **Q**   -- what, what information did you give him?

7           **THE COURT:**  Overruled.

8   A   The only information that Dr. Killiany had about the

9   subject was the I.D. number, which was a consecutive number

10  based on when people were enrolled in the study.

11  **Q**   And with regard to group status, was the group status of

12  the subjects reviewed on some regular, periodic basis?

13  A   The people came in every year, every year our consensus

14  panel met, and every year somebody's status could change.

15  And we've been talking about defined groups that we used in

16  a particular analysis.  But in point of fact people could

17  change in any direction.  So, the normals could become

18  impaired, the impaired people sometimes were coded as

19  normal.  Whatever.

20  **Q**   And when there were changes in group status who would be

21  notified?

22  A   That data would get entered in the central database by

23  Mary Hyde.

24  **Q**   Would Dr. Killiany be notified of any change in group

25  status?

1    A    He would not.

2    Q    Now, I won't go over questions that I asked you two

3    weeks ago when you testified concerning Dr. Jones' concerns.

4    However, let me ask you, at some point did you ask Dr.

5    Killiany why he had remeasured?

6    A    I did ask him why he had remeasured.

7    Q    And what did he say?

8    A    He gave the answer that he gave in court the other day.

9    That he had reviewed the scans, he had seen some errors he

10   thought that were, that needed to be addressed, and when he

11   saw that then he went through all the cases and he tried to

12   correct them.

13   Q    Did Dr. Jones -- strike that.

14        Do you recall being in court when Dr. Jones

15   testified about an analysis he did, he said in November 2001

16   with regard to the reliability study?

17   A    Yes, I remember that.

18   Q    Did he say anything to you at that time about that?

19   A    No, he did not.

20   Q    When was the, when was the first time you heard this .54

21   figure?

22   A    I believe the first time I heard it was in 2008.

23   Q    After the complaint was filed?

24   A    It was after the amended complaint was filed.  I don't

25   believe it was in the original complaint.

1      **MR. ROSE:**  May I have Exhibit 21, please.

2  **Q**   Now, is this, is this the e-mail that you received from

3  Dr. Jones on March 15, 2001?

4  **A**   Yes, it is.

5  **Q**   And after you, after you received this e-mail from Dr.

6  Jones and you wanted an evaluation to be made of these

7  cases, why did you not simply send this e-mail or forward

8  this e-mail to Dr. Killiany?

9  **A**   Because this e-mail contained a lot of information about

10  the subjects and I wanted to remove that from the document

11  that I sent to Dr. Killiany, and I believe I sent that in an

12  e-mail response.

13  **Q**   All right.  Does the second line refer to these 12 as

14  being in the gold, or normal group?

15  **A**   Correct.

16  **Q**   The reference, the reference gold, what does that mean?

17  **A**   That was a term that Dr. Jones used for people who were

18  normal and had stayed normal.

19  **Q**   And so, when you, when you forwarded information to Dr.

20  Killiany, what information did you give him?

21  **A**   I just gave him the case numbers.

22  **Q**   And why did you give him just the case numbers?

23  **A**   Because I didn't want to give him any information about

24  the subjects.  I didn't want him to be unblinded.

25      **MR. ROSE:**  May I have Exhibit 28, please.  Excuse

1    me, before doing 28, go back to Exhibit 22.

2    **Q**   And is this an e-mail that you sent to Dr. Jones and

3    Dr. Johnson responding to Dr. Jones' e-mail to you on

4    March 15?

5    A   Yes, it is.

6    **Q**   All right.

7    A   And as you can see, it says that I'm going to delete all

8    the information except for case numbers.

9          **MR. ROSE:**  And now could I have Exhibit 28.

10   **Q**   Now, this is April, this is April 13; is that correct?

11   A   Correct.

12   **Q**   And is this an e-mail that you sent to Dr. Jones with a

13   copy to Keith Johnson?

14   A   Yes.

15   **Q**   And were you attempting to set up a meeting with Mark

16   Moss?

17   A   I was.  I indicated that Mark had already reviewed the

18   scans and they had wanted to meet with him.

19   **Q**   And did you offer proposed dates?

20   A   I did.

21         **MR. KOHN:**  Objection.  I believe this was covered

22   earlier.

23         **MR. ROSE:**  I don't believe so, your Honor.

24         **THE COURT:**  Well, with respect to the dates it was.

25   Yeah.  Sustained.

1      **MR. ROSE:** May I have Exhibit 30, please.

2    **Q**   Did Dr. Jones respond to your e-mail in which you were

3    trying to set up a meeting?

4    **A**   He said he was unavailable, he was going to be meeting

5    his daughter on those dates.

6    **Q**   Now, there's been, there's been testimony concerning the

7    Partners research integrity policy.  Do you recall --

8    **A**   Yes.

9    **Q**   -- hearing that testimony?

10   **A**   Yes.

11   **Q**   All right.  Did you believe that you were complying with

12   Mass. General Hospital policy in the way in which you

13   addressed Dr. Jones' concerns?

14   **A**   I did believe that I was.

15   **Q**   Why did you believe that?

16   **A**   Because the concerns that had been raised were that

17   there were two sets of measures.  The primary question was

18   which of these sets to use.  There was a concern from an

19   analysis that Dr. Jones had made that the second set of

20   measures increased the statistical significance, and he was

21   worried about that.  But that was a hypothesis, and

22   according to the Partners research integrity policy, what I

23   was supposed to do was to respond to his concerns and try to

24   have them evaluated in a way that seemed best to address the

25   question.

```
1    Q    And after the Moss review was completed and you received

2    the notes of that review, did you believe that Dr. Jones,

3    that Dr. Killiany --

4         MR. KOHN:   Objection; leading.

5    Q    -- had engaged in scientific misconduct?

6    A    I did not.

7    Q    Why not?

8         MR. KOHN:   Objection.

9         THE COURT:   Why not?   She may state her belief at

10   the time.

11        MR. KOHN:   Objection.   This was already covered.

12   Page 131 of the transcript.

13        THE COURT:   She may state it.   Why not?

14   A    Because the evidence indicated that almost all of the

15   remeasurements were to make them more accurate rather than

16   less accurate, and I believed that addressed the issues that

17   had been raised.

18   Q    Did Dr. Jones tell you at any time that he thought a new

19   reliability test should be done?

20   A    He did not.

21   Q    Did you believe that the methods that had been used in

22   order to outline the boundaries of regions of interest,

23   including the entorhinal cortex, were reliable?

24   A    I did.

25   Q    Now, do you recall, do you recall the date when you, or
```

1    do you recall what the date was when you received the notes

2    from Dr. Moss's review?

3    A    I believe it was July 27th, 2001.

4         **MR. ROSE:**  May I -- may I have one moment, your

5    Honor?

6         May I have this document marked for identification.

7         **MR. KOHN:**  Your Honor, there's a motion pending

8    with this document.

9         **THE COURT:**  May I, may I see it.  I have the

10   motions in mind.  No, I just want to see the document.

11        **MR. ROSE:**  Yes.

12        **THE COURT:**  I have the motions.

13        No, overruled.  The document, you may use the

14   document, and in fact it may be admitted.  There's no doubt

15   about its authenticity.

16        It will be admitted as Exhibit 205 in evidence.

17        **THE CLERK:**  206, Judge.

18        **THE COURT:**  Yes, thank you.  206 in evidence.

19        **THE CLERK:**  Yes.  206.  CX was 205.

20        (Exhibit marked in evidence.)

21   Q    And just in terms of timing, you had received the Moss,

22   the notes from the Moss report July 27th, correct?

23   A    Correct.

24   Q    And is this an e-mail or letter that you received from

25   Dr. Jones five days later?

1    A    It is.

2    Q    All right.  And did you have more than one conversation

3    or communication with Dr. Jones concerning his role in the

4    project going forward?

5    A    I did.

6    Q    And by this time were you working on the -- strike that.

7              Could we just scroll down, please.

8              Did Dr. Jones want to increase the level of his

9    effort or his percentage effort on the PPG going forward?

10   A    Yes, going forward he wanted to increase his effort to

11   75 percent.  In relation to a hundred percent, that would be

12   full-time employment.

13   Q    And did you agree?

14   A    I did agree.

15   Q    Why did you agree?

16   A    Because as outlined in his letter, he had responsibility

17   for a lot of things on the program project, he was working

18   hard on the statistics of many different aspects of the

19   study, and I agreed to his request.

20   Q    Was there anybody whose percent effort was greater than,

21   was to be greater than his going forward?

22   A    No, there wasn't.

23   Q    Including yours?

24   A    Including mine.

25   Q    What was yours to be?

1    A    Mine was 55 percent.

2    Q    Now, at what point did you begin to prepare the grant

3    application?

4    A    We had been preparing it all along, I mean for the last

5    prior months preceding this.

6    Q    Who took the lead in terms of preparing the grant

7    application?

8    A    I took the lead, but everybody contributed by drafting

9    different sections.

10        **MR. ROSE:**  May I have Exhibit 171, please.  I

11   believe it's M -- and then interior page MBAK 7.

12   Q    Is this, is this the overview of the proposed grant for

13   the years 2002-2007?

14   A    Yes, it is.

15   Q    And who drafted this document?

16   A    I drafted it.

17   Q    Could you --

18   A    It's the most important document in the grant.

19   Q    Did you circulate it to anybody?

20   A    I circulated it to everybody because it's really

21   important to get it right, it's important for everybody to

22   see it and give you feedback on it.

23   Q    And everybody includes Dr. Jones?

24   A    Yes, including Dr. Jones.

25   Q    Did he agree with it?

```
 1    A    He did.
 2              MR. ROSE:  May I have, please, MBAK 78.
 3    Q    And what is this?
 4    A    This is the beginning of this overall review, talking
 5    about the long-term goals of the grant and the prior
 6    accomplishments of the grant, and what we were proposing to
 7    do going forward.
 8    Q    Who drafted this section of the application?
 9    A    I drafted it.
10    Q    Did you circulate it?
11    A    I did.
12    Q    To Dr. Jones as well?
13    A    To Dr. Jones, to everybody.
14    Q    Did he agree with it?
15    A    He did.
16    Q    And this section, the research plan of overall program,
17    I won't show you every page, but does it continue on for a
18    number, for a number of pages?
19    A    Yes.  I think possibly ten pages.
20    Q    So it's a lengthy, a lengthy section?
21    A    Yes.
22    Q    But your testimony is you circulated the entire section
23    to --
24    A    Absolutely.
25    Q    -- others?
```

1    A    Absolutely.

2    Q    Including Dr. Jones?

3    A    Yes.

4          **MR. ROSE:**  Will you turn, please, to MBAK 79.

5    Q    And there's a reference there to the major finding which

6    was underlined in the application, correct?

7    A    Correct.

8    Q    All right.  It starts with our major finding and so

9    forth.  I won't read it.  Who, who did the statistical

10   analysis that underlies that major finding?

11   A    Dr. Jones.

12   Q    Did Dr. Jones ever tell you that he disagreed with the

13   major finding as set forth in the grant application?

14   A    No, he did not.

15   Q    Did you believe that the major finding was based upon

16   accurate data?

17   A    I did.

18   Q    Did you believe that your statement about the major

19   finding was truthful?

20          **MR. KOHN:**  Leading, your Honor.

21          **THE COURT:**  No, it is, but in my discretion he may

22   have that question.

23          Did you?

24   A    Yes, I believed it was truthful.

25   Q    All right.  Do you still believe the major finding

1    today?

2    A    I believe the major finding today and it's been

3    replicated by many other people.

4    Q    When you say replicated what do you mean?

5              MR. KOHN:  Objection, your Honor.

6              THE COURT:  No, overruled.

7    A    That other --

8              THE COURT:  Well, wait a minute.  On this

9    foundation.  I mean, how do you know that?

10             THE WITNESS:  Because there are publications from

11   other groups with similar finding.

12             THE COURT:  You're basing it on such public

13   documents?

14             THE WITNESS:  Absolutely.  Absolutely.

15             MR. KOHN:  Your Honor, this was -- I raise an

16   objection.

17             THE COURT:  Well, in the context of the case,

18   you've got to -- I'll treat that as a motion to strike.  I'm

19   going to deny the motion to strike.  What she's testified to

20   may stand.

21   Q    What is --

22             THE COURT:  Well, I guess, I guess I should ask her

23   this question though.

24             And you, you consider those other publications

25   authoritative?

```
 1              THE WITNESS:  I do.  They're by leading people

 2    around the world.

 3              THE COURT:  No.  No.

 4              THE WITNESS:  Yes, I'm sorry.

 5              THE COURT:  You're adding stuff.

 6              THE WITNESS:  They're authoritative, yes.

 7              THE COURT:  That's what you think?

 8              THE WITNESS:  Yes.

 9              THE COURT:  And so I'll adhere to my ruling.

10    Q    Why do you consider those publications authoritative?

11              MR. KOHN:  Your Honor, the objection is that --

12              THE COURT:  I'll hear you but not, I'm not having

13    argument.  Do you want to be heard at the side bar?

14              MR. KOHN:  Yes, your Honor.

15              THE COURT:  You may.

16    SIDEBAR CONFERENCE, AS FOLLOWS:

17              THE COURT:  Is it that these things are all post

18    this period?

19              MR. KOHN:  No.  They identified Dr. --

20              THE COURT:  Yes.

21              MR. KOHN:  They identified Dr. Saykin as their

22    expert on this and his report covered all this information.

23    They did not identify this witness as their expert on this

24    subject matter.

25              THE COURT:  She's -- none of this is expert
```

1    testimony.

2            MR. KOHN:  So I think it should be, I think --

3            THE COURT:  I don't think it's expert testimony.

4    So, if so -- she isn't a forensic expert under 702.  This is

5    why she had her subjective belief which, of course, does go

6    to the heart of the case.  And that's why I allowed him

7    these few, I thought conclusory statements, because they go

8    to the two questions that we're going to put to the jury.

9            You're about done with her, aren't you?

10           MR. ROSE:  No, your Honor.

11           THE COURT:  You're not.

12           MR. ROSE:  While we're up here, in anticipating the

13   next objection, I have a summary of articles regarding

14   entorhinal cortex findings.  This has previously been shown

15   to counsel for the other side.

16           THE COURT:  How are you going to get that in?

17           MR. ROSE:  This is the basis for the opinion that

18   she has just expressed.

19           THE COURT:  Well, aren't you sliding into exactly

20   what his objection is.  Her subjective view, which I have

21   allowed you to have, based upon documents that she thinks

22   are authoritative is in my judgment an appropriate

23   application of the rules of evidence because her subjective

24   view goes to the issue of whether there was fraud here.  Now

25   you want what I think Mr. Kohn is exactly right on, you want

```
 1    her expert view.  I'm not getting into it.

 2              MR. KOHN:  Your Honor, I would also --

 3              THE COURT:  You're winning now.

 4              MR. KOHN:  No.

 5              THE COURT:  All right.

 6              MR. KOHN:  Her subjective view at the time she

 7    submits the grant.  She's testifying about studies that

 8    happened in the first grant.

 9              THE COURT:  I thought you were going to object to

10    that.  You didn't.  I leave the record as it is.

11              MR. KOHN:  Okay.

12              (Whereupon the sidebar conference concluded.)

13    BY  MR. ROSE

14    Q    Now, going back to the, going back to the major finding.

15    A    Uh-huh.

16    Q    Do you have that language in front of you?

17    A    Yes.

18    Q    There are references here to, I noticed there are

19    references here to other regions of interest; is that

20    correct?

21    A    Correct.

22    Q    When I say other, I mean other than entorhinal cortex.

23    A    Yes.  Yes.

24    Q    And those are what, Dr. Albert?

25    A    The hippocampus, the caudal portion of the anterior
```

1    cingulate.

2    **Q**    This, this major finding, was it based upon a

3    combination of several factors?

4    A    It was.  It was, it was reflecting all the aspects of

5    the program project, the cognitive assessments, the SPECT

6    data, the MRI data, saying that all of those in combination

7    were good predictors, and individually as well.

8    **Q**    And does that, does that reflect that an effort was made

9    to pull together data from different cores and projects

10   together?

11   A    Yes.  Absolutely.

12   **Q**    Who, who was responsible for the statistical analysis

13   that produced the major finding?

14   A    Dr. Jones.

15   **Q**    And further down in that paragraph it says:  In the

16   current application we propose to expand the longitudinal

17   evaluation of the subjects to get a more detailed

18   understanding of the variables that predict course during

19   prodromal AD.

20        Could you just help us with what that means?

21   A    Well, as I was showing on that graph, the time that

22   people have mild symptoms is very long and we were

23   hypothesizing that it might be possible to say something

24   about people at the early stages of that prodromal phase

25   versus the late to try to understand the whole entire

1    course, and to do that we needed to have more subjects.

2    **Q**   What is a longitudinal evaluation, in this context?

3    **A**   It means following people, in this context, every year

4    and seeing how they change or stay the same over time.

5          **MR. ROSE:**  Would you go to MBAK 85, please.  The

6    sentence beginning there is general agreement.  If you could

7    highlight.  Perhaps, perhaps not.

8    **A**   Where is that?  Yes, I see it.

9    **Q**   Perhaps, if you have it, perhaps you could help us with

10   where it is.

11   **A**   I just see -- I thought it was general agreement, but

12   now I'm seeing that the sentence says less agreement so it's

13   not the right sentence.

14         **MR. ROSE:**  Could you back up to the previous page,

15   please.

16         Well, let me, let me -- may I have one moment, your

17   Honor, I'm trying to find a reference.

18         **THE COURT:**  Go ahead.

19   **Q**   Showing you Section 2.32.

20   **A**   Yes.

21   **Q**   It says:  Magnetic Resonance Imaging in Prodromal AD.

22   **A**   Correct.

23   **Q**   It says:  There is general agreement among all of these

24   studies that measures of the medial temporal lobe, such as

25   the hippocampus or entorhinal cortex, are useful for

1    differentiating the groups, but there is controversy

2    concerning which measures are optimal.

3              Why did you make that statement?

4    A   Because we were trying to be fair to the data to

5    describe the fact that some people had found that one

6    measure was better than another and we had found slightly

7    different findings.  And in general it's helpful if the

8    field can come to an agreement on what they're learning.

9    Q   And there have been references to automated methods?

10   A   Correct.

11   Q   And was one of the, was one of the goals of the PPG

12   going forward to develop automated methods?

13   A   It was the primary goal of the Project 3 of the MRI

14   project to develop automated methods.

15   Q   And what do you mean by automated methods?

16   A   The goal was to have an MRI scan to have it analyzed

17   completely by computer, to have all the brain regions that

18   were really important outlined so that you could know the

19   volume of them and you could measure them automatically and

20   you wouldn't need to have an individual outlining by hand

21   every region.

22   Q   And did the last -- and does the last sentence of that

23   paragraph, the one where the highlighting appears, does that

24   refer to the development of automated methods?

25   A   Yes, it does.

1   Q   And what was to be the role of manually drawn ROIs in

2   the next five year period?

3   A   Well, they were to manually draw regions of interest and

4   then see how well the computer could identify them

5   automatically and compare the two things together.

6           MR. ROSE:  May I have, please, MBAK 87.

7   Q   And you see the section 3.1, Prediction of Conversion to

8   AD.

9   A   Yes.

10  Q   And is there a reference, is there a reference there to

11  primary findings?

12  A   Yes.

13  Q   All right.  What does that mean, primary findings?

14  A   It's similar to the major finding that we talked about

15  earlier, trying to highlight the general conclusions of the

16  program project that we had accomplished.

17          MR. ROSE:  May I have MBAK 88, please.

18  Q   Is there a reference here just below the underlined

19  portion to a relatively small number?

20  A   Correct.  It was a relatively small number of

21  individuals who had progressed from having mild impairment

22  to having dementia in the study.

23  Q   Why was that information given to the NIH?

24  A   Because in order to really look at the questions that we

25  wanted to answer fully, we needed more people to progress.

1    I mean, it's a terrible thing for people to have Alzheimer's

2    disease, but in the context of the study that was the

3    outcome we were trying to be able to predict, and so far

4    relatively small numbers had progressed over time.

5    **Q**   The portion that is above the yellow highlighted

6    sentence, was that underlined in the original grant

7    application?

8    A   Yes, it was.

9    **Q**   And who was responsible for the statistical analysis

10   that produced those findings?

11   A   Dr. Jones.

12   **Q**   Did he ever tell you that those findings were incorrect?

13   A   No.

14          **MR. ROSE:**  May I have, please, MBAK 91.

15   **Q**   And do you see a reference to, it is important to

16   emphasize that we did not include an MRI project in the last

17   submission.

18   A   Yes.

19   **Q**   I won't read the entire sentence.

20          But why, why were you telling the NIH there that

21   the MRI data that you had previously evaluated did not

22   appear to be promising?  What was that a reference to?

23   A   It was a reference to measurements that we had been

24   making of different, different parts of the brain that

25   seemed not to be good predictors of progression.  They had

1    come primarily from the work we had been doing with people

2    who had full-blown dementia, and we found that those regions

3    were not sufficiently well affected early in the disease,

4    that they weren't good predictors.  And so we didn't have a

5    project, we just had a core.

6    **Q**   When you say you didn't have a project, was it the case

7    that in 1996 when you applied for funding for the five year

8    period '97 to '02 you did not seek funding for an MRI

9    project, correct?

10   A    Correct.  But we sought funding for an MRI core because

11   the MRI needed to be used in the SPECT and it needed to be

12   used in the FMRI.  So the core was serving those projects.

13   **Q**   And in the period between 1992 and 1997 had Dr. Killiany

14   measured the entorhinal cortex in that period?

15   A    He had.  Oh, no, not, not -- well, he started doing it

16   in 1997, but it wasn't included in that grant.

17   **Q**   But this, this reference to the data, the MRI data we

18   had evaluated at the time of the submission did not appear

19   to be promising with respect to understanding prodromal AD,

20   was that based upon drawings of the entorhinal cortex or

21   other regions of interest?

22   A    No, other regions of interest.  I'm sorry.

23   **Q**   All right.  And then if you could just continue on with

24   that sentence:  However, it subsequently became evident that

25   new MRI measures that Dr. Killiany and Dr. Hyman had

1    developed, and then continuing on.

2              And is Dr. Hyman the person who had worked with

3    Teresa Gomez-Isla?

4    A   Yes, that's right.

5    Q   On neuro, I'm sorry, the term is neuropathological?

6    A   Yes.  Yes.  Dr. Hyman and Dr. Gomez-Isla were the ones

7    that had this finding about the cell loss in the entorhinal

8    cortex.  And as you've already heard, they, together with

9    Dr. Gomez-Isla, helped Dr. Killiany develop a protocol for

10   examining the entorhinal cortex and the superior temporal

11   sulcus.

12   Q   And the next sentence refers to limited funding?

13   A   Yes.

14   Q   What does that mean?

15   A   Well, because the work that was being done initially by

16   Dr. Killiany was part of the core, it hadn't been separately

17   supported by funding.  But we thought the work was important

18   and so we managed to get some funds to help him do those

19   initial studies.

20   Q   From other sources?

21   A   From other sources.

22   Q   And did that include work on the entorhinal cortex as

23   well?

24   A   Yes, it did.  At the very end of that funding period.

25              **MR. ROSE:**  Now, could I have MBAK 325 and 326.

1   Q   Now, was there discussion in this portion of the grant

2   application to a debate concerning measures of the

3   hippocampus and the entorhinal cortex?

4   A   Yes, there was.

5   Q   So what were you referring to?

6   A   Well, we had found the hippocampus to be less predictive

7   than other groups and the entorhinal cortex to be more

8   useful.  And in retrospect, we believe it was because our

9   subjects were milder so they were less far along in the

10  disease and that's why the hippocampus wasn't as useful in

11  predicting progression.

12  Q   Now, did Dr. Jones work on the grant application?

13  A   Yes, he did.

14  Q   And was there a portion of the grant application that

15  specifically related to Dr. Killiany's project, Project 3?

16  A   Yes, there was.

17  Q   Did you send a draft of that section to Dr. Jones?

18  A   I did because it contained statistical sections that he

19  had to look at and be sure that they were accurate.

20  Q   And was it important that he make sure that they were

21  accurate?

22  A   It was absolutely important.  Statisticians want things

23  framed in just a certain way.  I knew a statistician was

24  going to be reviewing the grant, and it was important for

25  him to look at the statistical section of the MRI project to

1    be sure it was okay.

2    Q    Now, let me ask you about another, another section of

3    the grant application.

4         **MR. ROSE:**  May I have Exhibit 188, please.

5    Q    And what is, what is this document, Dr. Albert?

6    A    This is a document that I believe came from Dr. Jones

7    and it shows that it's a draft of the data management and

8    statistics core while the draft was in progress.  You can

9    see various track changes, there were people making

10   different comments on the text.

11        **MR. ROSE:**  And may I have page Jones 1605.

12   Q    Now, is this still a portion of Exhibit 188 which is the

13   section pertaining to core B?

14   A    Yes, it is.

15   Q    And the highlighted portion here says:  Using these

16   three groups of subjects has permitted us to identify

17   predictors of conversion to AD with substantial power within

18   each project.

19        Do you see that?

20   A    Yes.

21   Q    All right.  Who was responsible for that analysis?

22   A    Dr. Jones.

23   Q    And what does substantial power mean?

24   A    It means that the analyses were significant and we were

25   citing publications here from our group to support that

1    statement, that each project had produced publications that

2    were useful at predicting progression.

3              **MR. ROSE:**   May I have Exhibit for identification

4    DH, shown initially only to the witness.

5    **Q**   Now, do you recognize this document?

6    **A**   I think this is the document we looked at before.   No?

7    **Q**   Well, research plan of overall program, and then in the

8    upper left hand corner does it say 9-14-01?

9    **A**   Yes.   So that's a draft.

10   **Q**   All right.

11   **A**   So that's not from the grant.   Yes, it's a draft that we

12   prepared.

13   **Q**   And if you could just look at this page, and then there

14   are two more pages, it's a three page document.   Excuse me,

15   it's not.   It's a, it's a 20 page document.

16   **A**   Uh-huh.

17   **Q**   If you could just scroll through the document and

18   identify it for us, please.

19   **A**   Yes.   So, this is a draft of the overall plan that we

20   were talking about earlier, and this particular draft came

21   from Dr. Jones.

22   **Q**   All right.   And could you go back, please --

23             **MR. ROSE:**   I offer this document, your Honor.

24             **THE COURT:**   Any objection?

25             **MR. FRIEDMAN:**   Can we have one moment, your Honor?

1          **THE COURT:**  You may.

2          **MR. KOHN:**  I'm not sure -- it may lack foundation

3     so far.  I don't --

4          **THE COURT:**  Well, do you object?

5          **MR. KOHN:**  I object.

6          **THE COURT:**  Sustained.

7     **Q**   Now, once again, do you, do you recognize what has been

8     marked as Exhibit DH?

9     A   I do.  It's a draft of the overall plan for the program

10    project.  That was an earlier version of the final version

11    that was in the grant.

12    **Q**   Did Dr. Jones see this document?

13    A   He did.

14         **MR. KOHN:**  Objection.  Objection.

15         **THE COURT:**  Sustained.  How do you know that?

16         **THE WITNESS:**  Because he produced this document.

17         **THE COURT:**  How do you know that?

18         **THE WITNESS:**  Because it says Jones on it.

19         **THE COURT:**  Well, can I see a hard copy of it.

20         Oh, no, on this foundation, sustained.

21    **Q**   At various times during the course of the development of

22    the grant application did you exchange drafts with Dr.

23    Jones?

24    A   Yes, I did.

25    **Q**   And why did you do that?

1    A    Because it was imperative for him to have input into all

2    the parts of the application, particularly the statistical

3    sections and the overview and the data management core.

4    Q    And is the document which has been marked as Exhibit DH

5    for identification one of the drafts that you exchanged with

6    Dr. Jones?

7    A    Yes, it is.

8    Q    Did he --

9          **THE COURT:**  Come to the side bar, maybe we can save

10   some time.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12         **THE COURT:**  I have no doubt at least as a

13   foundation matter that you've established he saw this.  I

14   just don't think that's enough.  He doesn't author it.  So

15   it passed over his desk.  It's a draft.  You rise or fall on

16   the application that actually was submitted and approved.

17         So, I just think this is peripheral.

18         **MR. ROSE:**  I'll move on.

19         **THE COURT:**  Thank you.

20         (Whereupon the sidebar conference concluded.)

21   **BY MR. ROSE**

22   Q    If you would turn, please, to Exhibit 171 MBAK 131.  And

23   what is, what is this?

24   A    This is a cover page of the data management and

25   statistics core of the grant.

1    Q    And does it identify Dr. Jones to be the project leader?

2    A    Correct.

3    Q    And there are figures referred to here, direct costs,

4    first 12 months, direct costs, entire period, and so forth.

5              What are they?

6    A    So each segment of the grant had a budget, and the

7    direct cost was money that would go to the project or the

8    core to use for its work, and the indirect costs would go to

9    the institution to support the various things that needed to

10   be provided by the institution.

11   Q    And when you, when you say support are you referring to

12   support of a salary?

13             **MR. KOHN:**  Objection, your Honor.

14             **THE COURT:**  Sustained.  Don't lead the witness.

15   Q    All right.

16   A    No, the direct costs --

17             **THE COURT:**  No, I sustained the --

18             **THE WITNESS:**  I'm sorry.

19             **THE COURT:**  -- objection.  He has to ask another

20   question.

21   Q    All right, when I get to another section, I'll pursue

22   that.

23             Referring, please, to MBAK 134.  And does this

24   refer both to Dr. Jones and to you?

25   A    That's correct.

1          **MR. KOHN:**  Objection.

2          **THE COURT:**  Sustained.  Don't lead the witness.

3     The answer is stricken.

4          **MR. ROSE:**  All right.

5     **Q**    And do you see column effort on project?

6     A    Yes.

7     **Q**    And what does the number -- what do the numbers mean

8     there?

9     A    So the numbers refer to the percent of somebody's salary

10    that's covered by this particular budget.  In this case,

11    it's the budget for the data management core, and it says

12    that 35 percent of Dr. Jones' salary will come from it and

13    ten percent of my salary.

14    **Q**    And with regard, and with regard to the ten percent that

15    relates to you, what does that mean in dollar terms?

16    A    It's ten percent of the base salary that's shown on the

17    document which is, that base salary was set by the NIH.  So

18    in that case, in this instance it was $161,200.

19    **Q**    And in the column that says salary requested, there's a

20    figure of $16,120.  What does that mean?

21    A    That means that that would have been the portion of my

22    salary that was paid from this particular project.

23    **Q**    Where would the money be paid to?

24    A    It would be paid to Mass. General Hospital and it would

25    be going to help support my salary.  So, my salary was set

1    and a portion of my salary came from this project, or core.

2    Q    So did you receive checks -- did you receive checks

3    payable to Marilyn Albert from the NIH?

4            MR. KOHN:  Objection.

5            THE COURT:  No, they're entitled to know how it

6    works.  And the answer to that is?

7    A    No, I received checks from Mass. General Hospital.  The

8    money goes to the hospital and then according to the budget

9    that is approved the money goes to support the things that

10   are outlined in the budget.

11   Q    Did you receive a promotion or a raise as a result of

12   what happened to this grant application?

13   A    No, I didn't.  My salary was set and all that happened

14   was that a portion of my salary came from the grant.

15           MR. ROSE:  MBAK 136, please.

16   Q    And in the, in the middle of this highlighted portion

17   does it say he will provide, referring to Dr. Jones, he will

18   provide statistical consultation to other projects and cores

19   within the program project?

20   A    Correct.

21   Q    And is that a reference to all other projects?

22   A    Yes.  All other projects and cores that need statistical

23   assistance, he will provide it.

24   Q    And did that include the MRI project?

25   A    It did.

1          **MR. ROSE:**  And may I have MBAK 136, please.  Excuse

2     me, MBAK 141.

3     **Q**   At the bottom, the bottom of the page, did Dr. Jones see

4     this section from his, from the grant application?

5     **A**   He would have drafted it and reviewed various versions

6     and approved the final version.

7          **MR. ROSE:**  May I have MBAK 142, please.

8     **Q**   If you go down to the bottom of the page, approximately

9     eight lines up, is there a reference, is there a reference

10    to the entorhinal cortex?

11    **A**   Yes, there is.  This says that the data analysis will

12    include evaluation of the entorhinal cortex and hippocampus

13    as well as other brain regions.

14         **MR. ROSE:**  Now, may I have MBAK 142.

15    **Q**   Is there a reference to volumetric, volumetric measures

16    from the entorhinal cortex?

17    **A**   Where are you looking?

18    **Q**   Could you -- yes, in the conclusions section.

19    **A**   Yes.

20    **Q**   Do you see the highlighted portion which says MRI --

21    well, it's the middle of the sentence.

22    **A**   Right.

23         **MR. ROSE:**  If I could just read this sentence, your

24    Honor?

25         **THE COURT:**  You may.

1      **MR. ROSE:**  The findings from these analyses, which

2   are summarized in Jones, et al., paren, submitted, suggest

3   the following conclusions:  Number 1.  There are systematic

4   correlations between MRI and SPECT measures of the brain and

5   neuropsychological test performance.  Number 2.  These

6   correlations are evident whether or not one utilizes

7   individual test scores or factor scores.  Number 3.  MRI

8   volumetric measures that predict conversion to AG -- to AD,

9   e.g., the entorhinal cortex and caudal portion of the

10  anterior cingulate, and SPECT vector scores that predict

11  conversion to AD are correlated with the neuropsychological

12  measures that are also important in this prediction, for

13  example, total learning score on the CVLT and time to

14  completion on the Trail Making Test, Part B.  And four,

15  there were some differences between the pattern of

16  correlations between the two imaging methods, paren, MRI

17  versus SPECT.

18  **Q**   Dr. Albert, who was responsible for the statistical

19  analyses that underlie those conclusions?

20          **MR. KOHN:**  Asked and answered.

21          **THE COURT:**  Yes, sustained on that ground.

22  **Q**   Did Dr. Jones ever tell you that he disagreed with the

23  conclusions that are set forth there?

24  **A**   No, he didn't.

25  **Q**   Who drafted that paragraph?

1  A   Dr. Jones did because it particularly related to the

2  SPECT vector scores and he was the one who did all those

3  analyses.

4      **MR. ROSE:**  May I have MBAK 146, please.

5  **Q**   Now, there's a figure 1 on the right.  Do you see figure

6  1, data processing and analysis?

7  A   Yes.

8  **Q**   And who prepared that figure?

9  A   I think it was prepared with all of us together trying

10  to summarize, I mean, Dr. Jones, Dr. Hyde, myself, trying to

11  summarize the data in the program project.

12     **MR. ROSE:**  And may I have MBAK 148, please.

13  **Q**   Section D, Section D22.3, which says longitudinal design

14  for our forthcoming study of prodromal AD.

15     Who wrote this section?

16  A   Dr. Jones did.

17  **Q**   How do you know that?

18  A   Because he was the one that conceptualized what he

19  called the transition group design which was the primary

20  design of the study going forward.  He gave a lot of thought

21  to it.  He spent a lot of time drafting documents and he

22  would have drafted this.

23     **MR. ROSE:**  All right, may, may I have MBAK 76,

24  please.

25  **Q**   Do you recognize table 2?

1   A    Yes.

2   Q    Is this a part of the grant application?

3   A    This summarizes the level of effort of all, what we call

4   the key personnel, the senior people on the grant, what

5   percentage of effort for each individual will be paid on the

6   grant.

7   Q    And was there anyone who had a higher percentage of

8   effort than Dr. Jones?

9   A    No.

10   Q    Now, why did you not include in the grant application

11   anything about the fact that Dr. Killiany had remeasured the

12   entorhinal cortex?

13        MR. KOHN:  Leading, your Honor.

14        THE COURT:  Sustained, on that ground.

15   Q    Did you, did you include anything in the grant

16   application concerning Dr. Killiany's remeasurements?

17   A    I did not.

18   Q    Why not?

19   A    Because it was clear, particularly having reviewed the

20   data, that this was, these were changes made in an effort to

21   make them more accurate.  It was the same way you would

22   evaluate any measurement and check any measurement over time

23   which we did with everything to try to make them more

24   accurate.

25   Q    Did Dr. Jones say anything further to you about the

1    remeasurements of the entorhinal cortex by Dr. Killiany

2    after you had discussed the notes from the Moss review with

3    him in late July of 2001?

4    A    He did not.

5    **Q**    Did you file the grant application with the NIH on

6    October 1, 2001?

7    A    I did.

8    **Q**    And did you believe that the statements in it were true,

9    complete and accurate to the best of your knowledge?

10   A    I did.

11   **Q**    Did you make any false statements to the NIH?

12   A    I did not.

13   **Q**    At any time did Dr. Jones tell you that he believed that

14   the grant application was not accurate?

15        **MR. KOHN:**  Leading.

16        **THE COURT:**  No, he may have that.  It is leading,

17   but it's conclusory and we're getting to the end of her

18   testimony.  He may have it.

19   A    No, he never did.

20        **MR. ROSE:**  May I have, may I have Exhibit CZ for

21   identification.  May that be shown to the witness.  It's

22   three pages.

23        **MR. FRIEDMAN:**  Give me one second, please.  Your

24   Honor, may I have a moment?

25        **THE COURT:**  You may.

1           MR. FRIEDMAN:  What was it?

2           MR. ROSE:  CZ.  And then DB as well.

3    Q    Do you have Exhibit CZ in front of you on the screen,

4    Dr. Albert?

5    A    Yes, I do.

6    Q    And do you recognize this document?

7    A    I do.  It's an e-mail from me in response to Dr. Jones

8    sent on August 14th, 2001.

9           MR. ROSE:  I offer this, your Honor, next in order.

10          THE COURT:  Any objection?

11          MR. FRIEDMAN:  One minute, your Honor.

12          THE COURT:  Say again the letters.

13          MR. ROSE:  CZ.

14          THE COURT:  Thank you.

15          MR. KOHN:  No objection, your Honor.

16          THE COURT:  CZ is admitted Exhibit 207 in evidence.

17          (Exhibit marked in evidence.)

18          MR. ROSE:  And may this be shown to the jury, your

19    Honor?

20          THE COURT:  It may be.

21          MR. ROSE:  And I think --

22    Q    Now, the e-mail that you have in front of you, which is

23    the first page of this exhibit, says:  I have read your, I

24    have read your memo about the finances and have been working

25    on the budgets.

1          Do you know what, do you know to what memo you are

2     referring?

3     A   I think it's the memo that we saw previously that was

4     sent on August 1st.

5     Q   On August 1st.  All right.  Thank you.

6          And do you say in this e-mail what you were

7     planning to list for Dr. Jones as his percent effort?

8     A   I outlined the percent effort I think for everybody.

9     And it says that I was -- we were working on the budget, and

10    I was listed at 50 percent effort.  I was going to increase

11    it to 55.  Keith was listed at 40 percent, we were going

12    increase to 50.  Then Dr. Jones was going to receive 75

13    percent effort.

14         **MR. ROSE:**  May the witness be shown Exhibit DB.

15    Q   Do you recognize, do you recognize that e-mail?  Or

16    those e-mails?

17    A   Yes, I do.

18    Q   And what are they?

19    A   This is more correspondence about Dr. Jones' salary

20    because he wanted to know what the base salary was, in other

21    words, if it was 75 percent, what was it 75 percent of.  And

22    so I had to find out what the base salary was from the grant

23    office.

24    Q   Did he ask you to check with someone?

25    A   He did.  And I was responding saying that I had just

```
1    checked with our grants office and the salary limit, the

2    professorial limit had been raised, so a hundred percent was

3    161,200 which is what we saw in the prior budget.

4         MR. ROSE:  May I have, please, Exhibit DI.  Shown,

5    I think to the witness.  I don't believe it's in evidence.

6    Q    Do you recognize Exhibit DI?

7    A    Yes, it's an e-mail sent on September 18th sending the

8    various budgets to Dr. Jones to look at and to approve.

9    Q    Had he requested seeing the actual pages that you were

10   planning to submit with the grant application with regard to

11   the budget?

12   A    Yes, he did.

13        MR. KOHN:  Objection.

14        THE COURT:  Well, I'm going to sustain that

15   objection.  Strike the answer.

16   Q    What had, what had he asked you to do?

17   A    In a prior e-mail, Dr. Jones --

18        MR. KOHN:  Objection.

19   A    -- had asked me to send him the budgets.

20        THE COURT:  No, that may stand.

21        MR. KOHN:  I think there's a pending motion on all

22   these exhibits.

23        THE COURT:  It's overruled.  And I don't mean to

24   create confusion.  There is such a motion.  I have reviewed

25   it.  It's overruled.  And forgive me, you did properly make
```

```
 1     a motion, but I've overruled it.

 2               Go ahead.

 3          MR. ROSE:  All right.  Now, may I have Exhibit DJ

 4     which I believe is an eight page -- oh, excuse me, your

 5     Honor.  I offer Exhibit DI as next in order.

 6          THE COURT:  Now, may I have it.  Because you object

 7     to it.  The fact --

 8          MR. KOHN:  Yes.

 9          THE COURT:  -- that I've overruled the motion

10     doesn't mean that -- no, it's sustained.  It's cumulative.

11     There appears to be no dispute over it.

12          MR. ROSE:  May --

13          THE COURT:  No, come to the side bar.

14     SIDEBAR CONFERENCE, AS FOLLOWS:

15          THE COURT:  Well, I did overrule their properly

16     filed motion in limine, but the grounds of my action were

17     that I considered the animus between the parties is germane.

18     So you can go ahead.  But the actual budgets don't seem to

19     me to amount to anything.  But I'll have to go document by

20     document.  They're objecting.

21               Now, let's be serious.  You're not finishing

22     tomorrow?  We're not finishing tomorrow?

23          MR. ROSE:  I am finishing tomorrow.

24          THE COURT:  Well, are we going to give the case to

25     the jury tomorrow?
```

```
 1              MR. FRIEDMAN:  It depends on how much longer we're

 2     going into tomorrow.

 3              THE COURT:  Well --

 4              MR. ROSE:  I have another, no more than 30 minutes.

 5              THE COURT:  Yes.  So, you're into tomorrow.

 6              MR. ROSE:  So I'm into tomorrow.

 7              THE COURT:  And tomorrow I'll give you, even

 8     restoring the hour I'm taking today, because I'm stopping at

 9     11:15, restoring that you've got to get the case, the

10     testimonial part of the case done by 11:30 and we'll work

11     through lunch with arguments and charge.

12              Are we going to do that?

13              MR. FRIEDMAN:  I think that's doable.

14              THE COURT:  And you want to commit to it?

15              MR. HUGHES:  It depends how much time they use.

16              THE COURT:  Don't tell me it depends.  If you

17     commit to it, I will cut off the time.  I will fairly

18     allocate it.

19              MR. HUGHES:  If --

20              THE COURT:  But if we commit to it, we're done.

21     Okay?  Tell me.

22              MR. FRIEDMAN:  Can we have one moment?

23              THE COURT:  Yes.  I'm not pressing you.

24              MR. FRIEDMAN:  Okay, thank you.

25              (Pause in proceedings.)
```

1          **THE COURT:**  Okay.

2          **MR. HUGHES:**  Okay.  We'll do it.

3          **THE COURT:**  All right, we're going to -- that's

4     fine.  We can do it that way.

5          (Whereupon the sidebar conference concluded.)

6          **THE COURT:**  Go ahead, Mr. Rose.

7          **MR. ROSE:**  May I have Exhibit 43 on the screen.

8     This is in evidence.

9     **Q**   Is this the 2002 neurology paper?

10    A   Yes, it is.

11    **Q**   And do you know when the paper was accepted to

12    publication by the Journal of Neurology?

13    A   I think it was accepted right after the new year in

14    2002.

15    **Q**   And is there a reference on that MBAK 1725 to the date?

16    A   Yes, it says accepted January 2nd, 2002.

17    **Q**   Have you, have you circulated to the coauthors a draft

18    of the neurology article?

19    A   I would have circulated multiple drafts.

20    **Q**   Did you give Dr. Jones a chance to comment on prior

21    drafts?

22    A   Dr. Jones had input on all the prior drafts.

23    **Q**   Did Dr. Jones ever tell you that you should not go

24    forward with that paper?

25    A   No, he did not.

```
 1    Q    And was he listed as a coauthor?

 2    A    He was.

 3    Q    Did he ever say anything to you to suggest that he did

 4    not want to be listed as a coauthor?

 5    A    No, he did not.

 6    Q    If he had said that to you --

 7              MR. KOHN:   Objection.

 8    Q    -- that he did not wish to be listed as a coauthor what

 9    would you have done?

10              THE COURT:   Sustained.   It's hypothetical.

11    Q    All right.   Directing your attention to January 8, 2002,

12    was there a meeting in your office?

13    A    There was a meeting at Charlestown to begin to plan the

14    program project on January 8th.

15              MR. KOHN:   Objection.

16              THE COURT:   No, overruled.

17    Q    What was the purpose of the meeting?

18    A    To plan the program, to plan the reverse site visit for

19    the program project.

20    Q    Was Dr. Jones present at that meeting?

21    A    He was.   He testified to that.

22              MR. ROSE:   May I have Exhibit 191, please.

23    Q    And this is a document which is in evidence, and what's

24    the date of this e-mail?

25    A    The date is December 28th, 2001.
```

1    Q    And does this e-mail refer to the, the meeting planned

2    for January 8th?

3    A    Correct, to begin planning the site visit.

4    Q    And who else was present at the meeting on January 8th?

5    A    On January 8th, I think it was Dr. Jones, myself, Ron

6    Killiany, Brad Hyman, Frank Jolesz, Ron Kikinis, I think

7    were all present.

8         MR. ROSE:  May the witness be shown Exhibit DX for

9    identification.

10   Q    Now, for how many years did you and Dr. Jones work

11   together?

12   A    We worked together for over 30 years.

13   Q    And were you familiar with Dr. Jones' handwriting?

14   A    I was.

15        MR. KOHN:  Objection, your Honor.

16        THE COURT:  The objection is overruled.

17   Q    Were you familiar with Dr. Jones' handwriting?

18   A    I was.

19   Q    And on what basis did you become familiar with Dr.

20   Jones' handwriting?

21   A    Well, every time we had to submit a progress report Dr.

22   Jones had to sign it.  If he was having his credentialing

23   documents approved by the Mass. General Hospital he had to

24   sign it, and of course there were many times that he just

25   wrote things down, you know, and so I know what his

```
 1   handwriting is like.

 2   Q    And would you look, please, at M --

 3           MR. KOHN:  Objection.

 4           THE COURT:  Well, he may propose it.  That doesn't

 5   mean we're going to get into it.  M what?

 6           MR. ROSE:  MBAK 1665.

 7   Q    Do you have that document in front of you?

 8   A    I do.

 9   Q    Do you recognize the signature on MBAK 1665?

10           MR. KOHN:  Objection, your Honor.

11   A    I do.

12           THE COURT:  Overruled.

13   Q    Whose signature is it?

14   A    That's Mr. Jones' signature.

15   Q    And is there anything distinctive about any of the

16   letters in his signature?

17           MR. KOHN:  Objection, your Honor.

18           THE COURT:  Well, she's not a handwriting expert,

19   but she can give us her view.  Anything you thought was

20   distinctive?  You?

21           THE WITNESS:  The K is particularly distinctive.

22   He wrote it in a very unusual way.

23   Q    Right.  And do you --

24           THE COURT:  Well, the "Right" is stricken.

25   Disregard that.
```

```
 1              MR. ROSE:  Your Honor, I would like to direct the

 2    witness's attention to 1666.

 3    Q    Do you have that document in front of you?

 4    A    Yes, I do.

 5    Q    And did Dr. Jones sign that document as well?

 6              MR. KOHN:  Objection.

 7    A    Yes, he did.

 8    Q    And --

 9              THE COURT:  Wait a minute.  Again, you're leading

10    the witness.  But let's see what she said.

11              Who signed that in your view?

12              THE WITNESS:  Well, there were all the people who

13    were present at the meeting.

14              THE COURT:  But where it is indicated, who signed

15    where his name is indicated?

16              THE WITNESS:  His name is on the fourth line.

17              THE COURT:  And whose signature is that?

18              THE WITNESS:  That's Dr. Jones' signature.

19              THE COURT:  All right.

20              MR. ROSE:  Your Honor, I offer what has been

21    marked, what has been marked as DX for identification.

22              MR. KOHN:  I object.

23              THE COURT:  Well, we're going to stop now and we'll

24    deal with that tomorrow morning.

25              You may step down, ma'am.
```

1          Well, here's what they tell me.  The case is going

2     to be in your hands tomorrow.  Now, you've worked -- you may

3     step down.

4          (Whereupon the witness stepped down.)

5          **THE COURT:**  You've worked very hard now and I'm not

6     going to extend this, we'll deal with it tomorrow morning.

7     But the schedule tomorrow is going to be this, and they

8     agree to this.

9          We're going to be done with taking testimony by

10    11:30 tomorrow morning.  Now, two important parts of the

11    case remain.  They have a chance to argue, to sum up, to

12    really advocate their client's cause.  And that's a very

13    important part of the case.  And then I have to explain to

14    you the law that you must follow, it's not different than I

15    explained at the beginning, but I have to, now that I've

16    presided over the case, I can be more precise in explaining

17    to you the law that you must follow.

18         Now, usually I say, well, lunch is between 1:00 and

19    2:00 and I've stuck to that.  We're going to work into the

20    lunch hour, pretty clearly.  But if we follow that schedule,

21    and we'll take breaks during the course of it, you probably

22    won't -- I'm not exactly sure how long my charge will take.

23    But they have narrowed things down, the lawyers, in a very

24    good way, and we can ask you some specific questions.  So my

25    charge shouldn't take that long.  The short of it is I

1   expect to send you out to start deliberating certainly by

2   2:00, but probably closer to 2:00 than 1:00.  And I'm all

3   right with that, because that gives you the full afternoon

4   to deliberate about the case.  And there's no pressure on

5   you to return a verdict.  If you do not conclude on Friday,

6   we'll figure out what will happen since I told you you would

7   come back on Tuesday.  If you've made plans for Monday,

8   maybe we can come back on Tuesday and go on from then.  But

9   we'll see.  The point is it's in your hands tomorrow.  So,

10  we need you all day tomorrow.  No later than five o'clock in

11  the afternoon as I promised at the outset.  But tomorrow is

12  finish up, argue the case to the jury, instruct them as to

13  the law, and you will start your deliberations no later than

14  two o'clock tomorrow afternoon.

15          You may stand in recess until 9:00 a.m. tomorrow

16  morning.  The jury may recess.  I'll remain on the bench.

17          **THE CLERK:**  All rise for the jury.

18          (Whereupon the jury left the courtroom.)

19          **THE COURT:**  Please be seated.

20          Now, to do this, since I am not kidding, I have to

21  go to the doctor's here, we need a charge conference so we

22  must meet at 8:30 tomorrow morning to have a charge

23  conference.

24          A juror's asked for a copy of Exhibit 43.  It will

25  be passed.

1          Now, you're going to get this case to the jury by

2    11:30 tomorrow morning.  That gives the plaintiff an hour

3    and ten minutes on their feet, and the defense -- I reverse

4    it -- plaintiff an hour and 15 minutes, the defense an hour

5    and ten minutes.  It will be done by 11:30.

6          **MR. ROSE:**  Your Honor, excuse me.  Three matters,

7    if I could.

8          **THE COURT:**  No.  Tomorrow morning.  We'll recess.

9          **THE CLERK:**  All rise.

10         (Adjournment.)

11

12              **C E R T I F I C A T E**

13

14         I, Donald E. Womack, Official Court Reporter for

15   the United States District Court for the District of

16   Massachusetts, do hereby certify that the foregoing pages

17   are a true and accurate transcription of my shorthand notes

18   taken in the aforementioned matter to the best of my skill

19   and ability.

20

21

22         /S/ DONALD E. WOMACK 4-4-2013
           ------------------------------
23              DONALD E. WOMACK
              Official Court Reporter
                P.O. Box 51062
24        Boston, Massachusetts 02205-1062
              womack@megatran.com

25