UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 07-11481-WGY

* * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA, ex rel., KENNETH JAMES JONES, Ed.D.,

Plaintiff,

v.

BRIGHAM AND WOMEN'S HOSPITAL, et al.,

Defendants.

* * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF JURY CHARGE CONFERENCE, THE EVIDENCE, CLOSING ARGUMENTS** and **JURY INSTRUCTIONS**
(Volume 11)

BEFORE: The Honorable William G. Young, District Judge, and a Jury

APPEARANCES:

HUGHES & NUNN LLP (By William D. Hughes, Esq.), 350 10th Avenue, Suite 960, San Diego, California 92101
- and -
LAW OFFICE OF JEREMY L. FRIEDMAN (By Jeremy L. Friedman, Esq.), 2801 Sylhowe Road, Oakland, California 94602
- and -
KOHN, KOHN & COLAPINTO, LLP (By Michael D. Kohn, Esq.), 3233 P Street, N.W., Washington, D.C. 20007-2756, on behalf of the Plaintiff

ROSE, CHINITZ & ROSE (By Alan D. Rose, Sr., Esq. and Brian D. Lipkin, Esq.), One Beacon Street, 4th Floor, Boston, Massachusetts 02108, on behalf of the Defendants

1 Courthouse Way
Boston, Massachusetts

April 5, 2013

# I N D E X


Jury Charge Conference . . . . . . . . . . . . . . . . 3

Closing Argument by Mr. Rose . . . . . . . . . . . . . 88

Closing Argument by Mr. Kohn . . . . . . . . . . . . . 107

Jury Instructions . . . . . . . . . . . . . . . . . . 125

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARILYN ALBERT, Resumed | | | | |
| By Mr. Rose | 15 | | 83 | |
| By Mr. Hughes | | 55 | | |

| EXHIBITS: | FOR I.D. | IN EVID. |
|---|---|---|
| 208 Author Disclosure Form | | 16 |
| 209 Response | | 38 |
| 210 Progress Reports | | 47 |
| 211 List of Publications | | 49 |

**THE CLERK:** All rise. The United States District Court is now in session, you may be seated.

**THE COURT:** Well, good morning. I've reviewed your requests for instructions which are very helpful and they inform me that, as follows. I think I should change Question Number 1 by, in the manner that the relator suggests, and change did Dr. Killiany knowingly falsify scientific data by, et cetera. And Question 2 is fine.

Now, the second question that I have for you is do you want me to charge first or last? The rules now permit me to charge first. Actually, and we'll go over this, but I don't know as this is such an extraordinarily complex charge really, and I mean this as a compliment to you, because you've narrowed it down to these two questions. We're not jaunting off in different directions and the like. Nevertheless, you might think it would be helpful if I charged first, and I'm happy to do it. If I do, know that first is first and last. It has these implications.

The order of argument is going to be half an hour a side, no rebuttal, defense first, then relator. So, first and last, in part that's to take us away from what I'm sure will be a stem winding closing, but it's just, it's five, seven minutes about how they deliberate together and the importance of deliberations, the real charge is before. Or I can do it in the traditional format.

I don't mean this to be off-putting, but if I charge first, I'm out there and no one's going to put a spin on what I charge. I won't wait for an objection, I'll simply correct, if I go first. But it's fairly straightforward. So I don't think that's a problem.

What's, what's your preference? Start with the relator.

**MR. HUGHES:** Precharge would be our preference, your Honor.

**THE COURT:** And how about you, Mr. Rose?

**MR. ROSE:** I prefer the traditional method, your Honor.

**THE COURT:** I hope not just because they went for the other.

**MR. ROSE:** No.

**THE COURT:** All right. I think I'm going to -- I think I'll follow the traditional form. I don't think it's that difficult.

All right. The format of all my charges is the same. You people appropriately have focused on the key issues in your requests for instructions. Let me go over the format and then we can briefly discuss.

I charge as to the function of the jury. You pretty much have heard that before. I charge as to the function of the judge. And in that regard I will say not to

pick out any particular aspect of my charge, listen to the entire charge, and the like.

In terms of the sources of proof. The burden is on -- well, I'm not going to call them the relator. I'm going to call them the plaintiff here. People understand plaintiff.

I will explain the structure, the statute in much the fashion that I did at the outset of the case. But the burden of proof is proof by a fair preponderance of the evidence.

In this case, the sources of evidence are many and I will go over them. I'll start with the testimony of the witnesses. I will call out what I call the opinion witnesses that we otherwise know as experts. And I will say that they can believe an opinion witness, disbelieve an opinion witness, they want to focus on the bases for the opinion witnesses' opinions.

I give a stock charge on credibility. I give a charge on reasonable inferences.

And at that stage I turn to the case, and at that stage we pass out the verdict slips. I give each one a verdict slip, even though only one is going to be turned in by the jury.

And while we're doing that, I remind them what's not evidence. I will compliment you, deservedly so, on the

presentation of the case and then tell them to disregard it.

I will also tell them that they're not to take any clues from me because I have no clues to give them. And I will tell them honestly that, you know, I have no clues to give them. This is their case to decide, not mine.

Then we'll go into what has to be proved. And though I'm going to turn to these specific questions as the Court of Appeals has framed them, I think that what I am going to say and define is that, what it is that Mr. Jones has to prove here is that there was a knowing misstatement of material fact in order to secure the funding, made with the, made with the idea of securing the funding or continued funding of this research. Now, that's key and that has to be interpreted.

So, I'm going to start by facts. And as the Court of Appeals said, we're not, in the language I'm going to say here, we're not concerned with the accuracy of these measurements down to the pixel or voxel. What we are concerned with is that the best available data, as reasonable scientists would have conceived it, be conveyed and be supported or be used as supported.

A misstatement -- well, I'll do knowing misstatement. A knowing misstatement is, it includes an intentional misstatement. It includes a reckless misstatement.

I am not going to charge willful disregard. Willful disregard doesn't make any sense in this case. And it's not a negligence case. Either this was done intentionally, as the relator's table, at least there's circumstantial evidence would tend to, tend to show, or the case fails in my mind. There's just no evidence, no sufficient evidence to support the conclusion that anyone was walking away from knowing the evidence here. So, a knowing misstatement, and then material is a fact that would have made a difference to the grant, the people who give the grant.

And then having done that, we'll turn to the specific questions and using those definitions go over knowingly falsify scientific data, and the specific thing is exaggerating certain remeasurements of the entorhinal cortex, I'll say that's what EC is supposed to mean, to cause, and they say, the Court of Appeals says it in a very understandable way, to cause proof of a particular hypothesis to emerge from the data.

And then the Question 2, were the statements made in the grant application without having use blinded, reliable methods to produce the measurements, were those statements material to the federal grant, granting authority, and were they knowingly false, knowingly untrue as I have defined it.

I will tell them that their verdict can be, they can answer both questions no, they can answer both questions yes, they can answer either one no or yes, like no to the first one, yes to the second, yes to the first one, no to the second.

That does have an implication and I propose to tell them this implication. If they answered yes to Question 1, but no to Question 2, the hospitals would both be liable and Mr. Killiany would be liable, but not Ms. Albert. It's the reverse if they answer Question 1 no and Question 2 yes. In either event, the hospitals are going to be liable because they are the employers on whose behalf this conduct was taken, but Killiany is not liable if Question 1 is no but the answer to Question 2 is yes.

The only thing I'm going to say about damages is that it's joint and several, and it's for me. I think -- to determine.

I think I should probably say something, because I think the jury should be fully informed, all I'm going to say about damages is if that's so, if they answer yes, the government will get the funds back from the defendants joint and several. Mr. Jones -- and I will say why I'm using the words Mr. and Ms. throughout, and I'll continue doing that. And Mr. Jones will get a piece.

There is the potential for punitive damages, right?

**MR. HUGHES:** No, your Honor.

**MR. FRIEDMAN:** No.

**THE COURT:** Attorneys' fees?

**MR. HUGHES:** Yes.

**MR. FRIEDMAN:** Yes.

**THE COURT:** And I will tell them, just because it's in the, it's the damages.

**MR. HUGHES:** Your Honor?

**THE COURT:** Wait a minute. Wait a minute only because I'm thinking whether I'm done. And I am done.

Now, let's -- I can go over these specifically. I've indicated one that I won't give, but it's probably more helpful to discuss the matter. And so, that's pretty much the charge. And I'll hear from plaintiffs first.

**MR. FRIEDMAN:** Your Honor, on the, on the knowledge standard, will you be including the acts with deliberate ignorance of the truth?

**THE COURT:** No. That's what I said I was not going -- I don't think the evidence will support that.

Now, understand in the First Circuit when I'm done I will invite you to the side bar. You've got, even though I'm having this all on the record, it's obvious you object to that because you've requested that, you have to make that known to me again after I give it. All right? But I'm not going to give it for the reasons that I said.

**MR. FRIEDMAN:** Your Honor, on that --

**THE COURT:** Reckless, yes.

**MR. FRIEDMAN:** On that point, I understand the Court's ruling with respect to deliberate ignorance as it applies to Dr. Killiany in the first question. But the second question, there are issues about deliberate ignorance as to whether or not the writers of that statement didn't want, deliberately did not want to pursue. And that's what the evidence is on the policy.

**THE COURT:** There's something to that. I should probably charge as to that. Yes. Yes, in that guise, yes, I will.

**MR. FRIEDMAN:** And then --

**THE COURT:** What else?

**MR. FRIEDMAN:** With respect to attorneys' fees.

**THE COURT:** Well, I'm -- you've heard everything -- I'm just going to say -- I'm going to like praise you. I am going to say, now, the lawyers have narrowed this all down, but you're entitled to know the implications of what you do. And so, if -- and I will say if your answers to both questions are no, the case is over, no one's liable. If your answers to both are yes or your answers to either one, and I'll explain the implications of either one, then I will determine with specificity what it is the government lost, the government will get that back. Under the law Mr. Jones

is entitled to a piece of that. He's also entitled to recover the attorneys' fees that the attorneys have reasonably expended in pursuing this action on behalf of the United States. And that's it. I think jurors should understand the implications of their action. But since there's no issue, because that is for me, and we may never get there, we'll see.

**MR. FRIEDMAN:** And with respect to the liability of Dr. Killiany, if there's an answer to no on 1 but yes on 2 --

**THE COURT:** Yes.

**MR. FRIEDMAN:** -- Dr. Killiany was the author as well on those statements. His name is on each page of the Project 3.

**THE COURT:** Not, not enough.

**MR. FRIEDMAN:** Okay.

**THE COURT:** Not enough. I mean, it's a matter of sufficiency of the evidence. Ms. Albert was the head person.

Mr. Rose?

**MR. LIPKIN:** Your Honor --

**THE COURT:** Mr. Lipkin, excuse me.

**MR. LIPKIN:** -- you addressed most of our requests. There are just a few that I wanted to direct your attention to.

Regarding No. 6 which is on page 3 of our requests.

**THE COURT:** Yes.

**MR. LIPKIN:** This has to do with scientific judgments. And this is a quote from the Court of Appeals opinion. And what the Court of Appeals said was, we agree with the district court that expressions of opinion --

**THE COURT:** No, no. I, I intended to cover that, maybe not in the language that you have proposed. But yes, we're not talking here about which measurements are more accurate. So I intend to cover both your requests 5 and 6, though not in that language. All right.

**MR. LIPKIN:** In terms of No. 10, will the Court be instructing on innocent mistakes?

**THE COURT:** Yes, I will. This is not a negligence case.

**MR. LIPKIN:** And the final question had to do with damages. We understand the Court's position that damages are for the Court. We've said --

**THE COURT:** You don't differ with it?

**MR. LIPKIN:** We do believe that the jury should be asked to assess damages based on the cases that we have cited.

**THE COURT:** No, the way we have, the way we've tried this, I don't think you can now claim that. And if you, if you put me to it, you know, materiality means making

a difference as to this particular grant. We know what this particular grant was, and I will tell the jury that. Is that what you want?

**MR. LIPKIN:** We want, we want the jury to be asked to determine the amount of the grant that, that was, that should not have been funded as a result of any false statements.

**THE COURT:** There's no, there's no way that they can break it down other than the whole. There just isn't, on this evidence.

**MR. LIPKIN:** The grant application contains a breakdown by core and by project, and also today we're going to be introducing the progress reports which go through year by year the amount that was paid for each core and each progress. So we believe there would be a basis in the evidence if the jury wanted to apportion a lesser amount of damages.

**THE COURT:** Let me put it to you this -- I think that makes some sense. And we'll see what the evidence is today. But I'll add a Question 3 that, and award damages of blank. It will be that general. And in the charge then I'm going to say, in my language, what the whole amount was. But you're okay with that?

**MR. LIPKIN:** That's fine with us, yes, your Honor.

**THE COURT:** Okay.

**MR. FRIEDMAN:** Your Honor?

**MR. LIPKIN:** Thank you.

**MR. FRIEDMAN:** We do object on this. This is a fraud in the inducements, not a fraud in the performance. And they either win it as a whole, that's what the evidence is, or they win nothing.

**THE COURT:** Well, that's what I thought. And you'll both make motions at the close of all the evidence which I will take under advisement. But I'm going to raise that. It may be as matter of law if you get an answer yes. But we'll, we'll see about that.

Now, Mr. Rose, you had three things and I never mean to be brusque, but I always -- I mean, what I told the jury was true, I had to go. But are these things --

**MR. ROSE:** They've been addressed already, your Honor.

**THE COURT:** Not, not surprisingly.

**MR. ROSE:** Correct.

**THE COURT:** All right, we'll recess and just as soon as we have the jury we'll go ahead.

So the plan is, unless I can't sit here long enough, to sit here until the evidence is done, take a 15 minute break. Arguments, take a 15 minute break, charge. That's how we're going to proceed in the morning. Although you've got until 11:30, and I may need a break before then

and we'll take a brief break.

We'll recess until we've got the jury. Thank you.

**THE CLERK:** All rise.

(Recess.)

**THE CLERK:** All rise for the jury.

(Whereupon the jury entered the courtroom.)

**THE CLERK:** Court is back in session, you may be seated.

**THE COURT:** Just as we closed yesterday a juror asked can we have a copy of Exhibit 43. And here are copies for everyone of Exhibit 43. And you may continue.

Well, let me remind the witness. Ma'am, you understand that you are still under oath?

**THE WITNESS:** I do.

**THE COURT:** Mr. Rose.

MARILYN ALBERT, Resumed

**DIRECT EXAMINATION** (Cont'd)

**BY MR. ROSE**

**Q** Good morning, Dr. Albert.

A Good morning.

**Q** Yesterday when we, when we broke for the day I had shown you Exhibit DX.

**MR. ROSE:** May that be shown on the screen, please?

**THE COURT:** It's not evidence, so to her.

**MR. ROSE:** Not in evidence.

**THE COURT:** Right.

**MR. ROSE:** And may I have MBAK 1665.

**Q** And I believe I had asked you whether or not you recognize a signature on MBAK 1665.

**MR. HUGHES:** Objection; asked and answered.

**THE COURT:** Overruled. He may have it.

A I recognize --

**Q** Do you, do you recognize the signature?

A I do.

**Q** And whose signature is that?

A It's Ken Jones.

**Q** And turn, please, to 1666. Do you recognize any signatures on that document?

A I recognize all the signatures on that document.

**Q** And whose signatures are there?

A So it's Ron Killiany, Brad Hyman, myself, Ken Jones, Mark Moss, Ron Kikinis, and Frank Jolesz.

**MR. ROSE:** Your Honor, I offer this package of documents as next in order.

**THE COURT:** May I see them in hard copy. Or is there an objection?

**MR. HUGHES:** Yes.

**THE COURT:** There is an objection. No, overruled. DX may be admitted Exhibit 208 in evidence.

(Exhibit marked in evidence.)

**MR. ROSE:** And may 1665 be shown to the jury, please. Perhaps it already is. Thank you.

And if you could go to the top, please.

**Q** What is this document?

A This is a document that each of the authors on the manuscript, in this case it's a manuscript that was published in 2002, signed indicating what their disclosures were, whether they had participated in the writing of the article, in what capacity, and if they had any conflicts with regard to the publication.

**Q** And when, when were the authorship disclosure forms signed?

A This particular set was signed on January 8th at the meeting that we were having when we were planning the reverse site visit.

**Q** And if you would look at Question 1 on the document in front of where you it says, if no, please explain how the first draft was generated.

Do you, do you recognize the handwriting there?

A Yes --

**MR. HUGHES:** Objection.

A -- I do. It's Dr. Jones' handwriting. He wrote the name Dr. Killiany.

**Q** And I believe you referred yesterday to something --

**THE COURT:** There's an objection, but overruled, so

the record is correct.

Go ahead.

**Q** Did you notice something distinctive about one or more of the letters in Question 1?

A The K of Dr. Killiany's name is particularly distinctive, and it's Dr. Jones' signature.

**Q** It's your testimony that Dr. Jones --

A Wrote the K.

**Q** -- wrote Dr. Killiany there?

A Yes. Correct.

**Q** All right.

**MR. ROSE:** Now, could you turn, please, to 1666.

**Q** This is the document which you've indicated was signed by seven people?

A Correct.

**Q** And were all seven of these among the authors on the 2002 paper?

A Right. They were all the authors on the paper and they were all present at the January 8th meeting.

**Q** And the first sentence of that form says: The undersigned authors and coauthors have read and agree with the content of manuscript, followed by a number, being considered for publication in Neurology.

Was that the manuscript that became what we've called the 2002 paper?

A Yes, it was.
**Q** Now, may we go to -- and what happened to the signature sheets after they were signed?
A These were all sent in to the journal in support of, required by the journal before an article can be published.
**Q** And then was the article in fact published?
A It was.
**Q** Did Dr. Jones say anything at that meeting on January 8th or at any time to suggest that he did not want to be associated with that paper?
A No, he did not.
**MR. HUGHES:** Objection; leading.
**THE COURT:** Yes, the objection is sustained; the answer is stricken. Do not lead this witness.
**Q** All right, let me try it this way. Did you hear Dr. Jones say anything about the paper at that meeting?
A No, he did not say anything about the paper. He's never indicated in any way that he did not agree with the content of it.
**MR. HUGHES:** Move to strike everything after the word "No," your Honor.
**THE COURT:** No, in the exercise of discretion that may stand.
**MR. ROSE:** All right. May we have -- and may we have Exhibit 43, please. Page, can you turn to the next,

turn to the next page.

**Q** Are the authors, are the authors listed on this page?

A Yes, they are.

**Q** And I count -- well, you tell me, how many authors were there?

A Nine authors.

**Q** And you have indicated that there were seven, seven signatures on the form. Did you also obtain the other two coauthors' signatures?

A Yes, at a later date. So, one of the coauthors was Dr. Gomez-Isla, and she was out of the country at that time so we sent her the document. And Doctor -- I can't remember now. Dr. Tanzi was not at the meeting and so he signed it later.

**Q** He signed on a later occasion?

A Correct.

**Q** All right. Now, Exhibit 43 is on the screen. Could you turn, please, to page 3.

**MR. ROSE:** May I have one moment, your Honor?

**THE COURT:** You may.

**Q** If you could scroll down to the page. And looking at the paragraph beginning with the word, with the word based on?

A Yes.

**Q** Is there a statement at the end of that paragraph that

says we hypothesize?
A Yes.
**Q** We hypothesize that even without the addition of these other brain regions the entorhinal cortex would be a useful marker of individuals in the preclinical phase of AD.
A Correct.
**Q** And could you turn, please, to page 4 of the article.
Does, does this page set forth the MRI procedures in the column on the right?
A Yes, it does.
**Q** Would you scroll down, please. And would you turn, please, to -- and looking at the last paragraph, beginning with the words after this normalization process, does, does this paragraph describe a reliability test that was done?
A Yes, it does.
**Q** And the second sentence says: The inter-rater reliability for two independent operators to assess these ROI blinded to subject status has been demonstrated, and then citing two footnotes. And then does it say: For example, the intraclass correlation for the entorhinal cortex R equals .96 and hippocampus R equals .95 R equivalent. And does the next sentence say: The reliability of the program used to calculate the volumes of each region once it has been manually outlined also were established previously.

A Correct.
**Q** Now, the statement in the middle of that highlighted portion which says, for example, the intraclass correlation, et cetera, who did the statistical analysis on which that statement was based?
A Dr. Jones.
**Q** And would you turn, please, to page 5. I believe it would be the next page.
And did this page contain figures relative to, or drawings relative to the entorhinal cortex?
A Yes, and it contains also the broad guidelines for how you outline the entorhinal cortex.
**Q** And the next page, please.
And on the next page are the results of the study set forth?
A Yes.
**Q** All right. Who was responsible for the statistical analysis which underlay the results as reflected on the page on the screen?
A Dr. Jones.
**Q** And would you turn to the next page, page 7. In the top, in the top left is there a table with group, group comparisons?
A Yes.
**Q** Table 2, the accuracy of pairwise discriminant

functions?
A Correct.
**Q** Who was responsible for that statistical analysis?
A Dr. Jones.
**Q** What does that table mean, Dr. Albert?
A Well, the table is showing how well either the entorhinal cortex or the volume of the hippocampus can discriminate the different sets of groups, and it essentially says that if you are looking at the subjects who clinically are most different from each other you can use both methods, the entorhinal cortex and the hippocampus, to discriminate them, but as the subjects become milder the entorhinal cortex is a better discriminator.
**Q** And when you say discriminate, can you just explain for the jury what you mean by that term?
A So it's correctly, going just on the basis of the measures in the brain, identify which individual is in which group, just based on this one, one measure.
**Q** Now, I believe you indicated in your testimony yesterday that the purpose of the January 8th meeting was to begin preparations for the reverse site visit?
**MR. HUGHES:** Objection; leading.
**Q** Do you recall that testimony?
**THE COURT:** Sustained.
**Q** All right. Were there -- did you hold meetings in

preparation for the reverse site visit?
A Yes, we did. We held a series of meetings.
**Q** And did these meetings include everyone who ultimately went down to Bethesda, Maryland to the site visit?
**MR. HUGHES:** Objection.
**THE COURT:** Sustained. Don't lead this witness.
**MR. ROSE:** All right.
**Q** What was the purpose of the meetings that you held?
A So, all of the meetings were aimed toward enabling us to prepare the presentations for the site visit. And some of them involved everybody in the group and some of them involved just subsets of people depending on the presentations that we were talking about.
**Q** And do you recall, Dr. Albert, how many meetings were held in preparation for the reverse site visit?
A I would guess at least five or six.
**Q** And directing your attention to March 25 and 26, 2002, was there a reverse site visit?
A Yes, there was.
**Q** All right. Could you please explain for the jury what a reverse site visit is?
A Well, when you submit a grant to the NIH, at least in those days, and it was a grant complicated like ours with all these different pieces called a program project, it would be reviewed by a team of individuals who are

essentially your peers, other people in the field who are experts in the different areas that are involved in the grant. And in this case we called it a reverse site visit because those people didn't come to us but we went to Bethesda where the NIH is located and everybody met there.

So, we would go, we would each present every core and every project. The people who were on the review team would ask us questions and then they would end up making up their minds what score they would give the grant, and in the end that would determine whether the grant was going to be funded.

**Q** In the course of your own work, Dr. Albert, have you, yourself, been a NIH reviewer?

A Many, many times, particularly on site visits.

**Q** How many times?

A I've been a reviewer over a hundred times, but many times on site visits, which is unusual.

**Q** All right.

**MR. ROSE:** May we have Exhibit, Exhibit 194, please. The last page, which is MBAK 1851.

**Q** And do you have that document in front of you?

A I do.

**Q** And who are these people who are named in MBAK 1851?

A So all the people in the left hand column were our peers who were reviewing the grant. The chairman was Dr. Ronald

Petersen at the Mayo Clinic, and then everybody else you see listed on the left, and then the two people on the right were representatives of the National Institute on Aging.

**Q** You used the term peer to describe --

A Uh-huh.

**Q** -- the people on the left. Would you explain to the jury what you mean by the term peer?

A They're colleagues, other people who are working in the field and particularly chosen because they have expertise in what the grant was about.

**Q** And I noticed that one of the names there on the right is, last name Buckholtz?

A Correct.

**Q** And who is he?

A At that time, Dr. Buckholtz was the director of the dementia branch of the National Institute on Aging.

**Q** And did he play some role with regard to the PPG?

A He did. He also was what we call the project officer. So he was my contact for the grant. And he had been essentially since the grant had been funded.

**Q** And who from the PPG attended the reverse site visit, if you recall?

A It was all of the core leaders, all of the project leaders, and then some additional people who we thought we needed to assist us in presenting the grant. Particularly

there were a few people related to the MRI project because we were proposing these very novel automated methods, that we wanted our colleagues there to talk about.

**Q** And who were those additional colleagues?

A Dr. Anders Dale and Dr. Bruce Fischl.

**Q** Bruce Fischl?

A Uh-huh.

**Q** And what was their area of expertise?

A They're the ones that are expert in making these software programs that enable you to divide up the brain into regions of interest automatically, and they were the creators of the software package you heard about the other day called Freesurfer.

**Q** Do you recall, was there a professor from Kentucky at the reverse site visit?

A Yes, there was.

**Q** And do you recall whether there was any discussion between Dr. Jones and the professor from Kentucky?

A There was. The professor from Kentucky, Dr. Kryscio, was the person on the team selected to review the statistics. He's a professor of statistics. And he asked a lot of questions of Dr. Jones about the statistics that had been proposed.

**Q** Did he ask, did he ask a question about a particular statistical method?

A He was particularly concerned that we hadn't included a method called survival analysis that he thought was more appropriate than the methods we had been using. And he asked about why we weren't going to be using it and hadn't proposed it in the application.
**Q** And did Dr. Jones respond to Professor Kryscio's question?
A He said he thought that survival analysis was an inappropriate technique to use in this instance.
**Q** How did Doctor, how did Professor Kryscio respond to Dr. Jones' statement?
A He was extremely concerned at the response. He kept trying to elicit a more positive approach. And ultimately we had other members of the team who were there, Dr. Deborah Blacker and Dr. Jack McArdle, address his, the questions that he had about survival analysis.
**Q** Were you concerned about Dr. Jones' response?
A I was very concerned about it.
**Q** Why?
A Because you're going to try to present your case, you want the grant to be funded. Even if you think somebody is slightly off-base in what they're asking you to do, you have to try to incorporate their suggestions. It could have been that you would say, well, we haven't used it yet, but it's certainly a good suggestion, we might use it in the future.

But to say no, it's inappropriate was really not a very good thing to do.

**Q** And what were the, what were the consequences of Dr. Jones' statement?

**MR. HUGHES:** Objection; leading, assumes facts.

**THE COURT:** Well, on that -- it isn't leading, but there isn't a sufficient foundation.

**MR. ROSE:** I'll put --

**THE COURT:** How does she know? You can ask her what then happened.

**MR. ROSE:** And that's exactly what I'm going to do, your Honor, thank you.

**Q** What happened next?

A Well, the way a site visit is run, after everybody makes presentations and all the questions and answers are over there's a break and then you have an opportunity for the principal investigator, which in this case was me, to go back and talk to the people who were reviewing the grant. And it was clear that they were very unhappy with the statistics in the grant. And I told them that I understood their concern and that we would try to address it.

**MR. HUGHES:** Objection; move to strike the hearsay.

**THE COURT:** No, but I'll limit it. I'll limit it. Afterwards she was told certain things. If you believe this witness, you can believe she was told those things. We

don't have the people here so we don't know whether they were really concerned or not. But she was told certain things if you believe it. And so with that limitation it may stand.

**Q** All right. The conversation you've just described, were you the only -- who was present from the PPG team at that part of the meeting?

A Just me.

**Q** Just you?

A Just me.

**Q** And with whom are you speaking at that point?

A All the people listed on the page at the end of the grant, the representatives from the NIA and all the peer reviewers.

**Q** And after, after that meeting did you speak with Dr. Jones and the other members of the team about what had just happened at the reverse site visit?

A I described the general concerns that had been raised and said we would just have to wait and see whether or not they had enough concerns that in fact the grant wouldn't be funded.

**Q** And what happened, what happened next, relative to the process of seeking funding from the NIH?

A The next thing that happened was that Dr. Buckholtz told me verbally the score on the grant which was 181 which I

believed was probably good enough for the grant to be funded, but that wasn't for certain because it was sort of just on the edge.
**Q** And ultimately did you receive what had been referred to as the pink sheets?
A Yes, I did.
**Q** And the last page of the pink sheets is in front of you on the, on the screen. Would you, would you turn to MBAK 1810.
All right. Dr. Albert, if you recall, when did you receive the pink sheets?
A I think that it was sometime in June, but I'm not positive.
**Q** Well, let's just drop back one page, please, to 1809. You see a release date?
A April, the end of April.
**Q** April. April 25.
A Right.
**Q** 2002.
And could you scroll down, please. Yes.
There's a reference in the middle of the, in the middle of the page to project year.
A Yes.
**Q** 19, 20, 21, 22. What do those refer to?
A Those refer to the number of consecutive years that the

grants had been funded. It actually, the grants had been funded longer than that, but originally I had been at the Beth Israel, and when I moved to Mass. General then the numbers started at 1 again. But this indicates that we were going from year 19 to year 23.

**Q** So was it the case that if the grant were funded year 19 would be 2002 to 2003?

A Correct.

**Q** All right. And is there a line there in this section for SRG action?

A Yes.

**Q** What is SRG?

A I'm not -- just the grant review process. And next to it you'll see the priority score that I mentioned earlier, 181.

**Q** And it says priority score 181.

A Right.

**Q** What does, what does that mean?

A Well, the best score is a hundred. So the lower the score the better. And in that, at that moment in time grants of 190 probably were not being funded. So that gives you an idea that it was good, but it was not great.

**Q** And then it says percentile. What does that mean?

A That's the percentile that it falls in with respect to all the other applications that were submitted in that

particular round of grants. So all kinds of grants, training grants, individual grants, program projects.

**Q** And there are columns here containing figures for direct costs and estimated total cost. And was the figure of -- what was the total amount that the grant application sought?

A The total amount was $14,965,700.

**Q** And if you recall, did the, did the National Institute of Health award that amount?

A No, they cut the grant. They, they cut one of the projects by two years, the SPECT project, and then they made individual cuts in specific sections.

**Q** Had Dr. Jones spent time working on the SPECT project?

A He did.

**Q** Now, please turn to MBAK 1810, the next, the next page.

And is there a sentence about six lines up from the bottom of that paragraph beginning with the word, the major concern. Do you see that sentence?

A Yes.

**Q** The major concern in the application regards the lack of attention to time dependent analyses of the data.

What does that term time dependent analyses of the data refer to?

A It referred back to the question that had arisen at the site visit about survival analysis, and the fact that the major concern they had was in the statistical approaches

that were being used in the grant.

**Q** And could you turn, please, to MBAK 1819.

And is there, is there -- the sentence beginning -- excuse me. The paragraph in the middle, which begins further?

A Right.

**Q** Which says the proposed statistical analysis of the data that will emanate from this new design is questionable as well.

Did that sentence concern you?

A Yes, it was just one example of the concerns they had about the statistics. They were very concerned also about the overall study design, and that was something that Dr. Jones had devoted a lot of time and attention to.

**Q** And continuing down that paragraph, four lines up from the bottom of that paragraph, where it says the appropriate statistical tool.

A Yes.

**Q** It says the appropriate statistical tool is survival analysis.

A Correct.

**Q** And was that the subject of Dr. Kryscio's comment?

A Yes, it was.

**Q** Continue down, please. And the last sentence on this page says the recruitment of a person with a background in

survival analysis methodology to this team could prove useful in its upcoming funding cycle.

And did you read that sentence when you received the pink sheets?

A Yes, I did.

**Q** And what did that mean to you?

A It says that they wanted us to add somebody to the team because they were essentially very concerned about the statistics and they wanted us to bring somebody else on in addition to Dr. Jones.

**MR. HUGHES:** Objection; move to strike, the document speaks for itself.

**THE COURT:** Well, the document may speak for itself, and she's just testified what it spoke to her. I'll let that stand.

**Q** Did you -- in addition to reading the, the pink sheets on this issue, did you have conversations with, with Mr. Buckholtz about the same issue?

A Yes. Dr. Buckholtz said that he thought it was likely that the grant would be funded but he wasn't sure, and that he wanted us to write what's called a response to the pink sheets, a document that would address some of the concerns that were raised. And he said in particular he wanted us to address all the questions about the statistics and what we were going to do about it, and the concerns about the SPECT

project which they had been very unhappy with.
**Q** Now, could you turn, please, to MBAK 1820, the next page.
And does this page give an evaluation score?
A Yes, this is the score for the statistics section, and it's 230.
**Q** Were you concerned about that score?
A Yes, I was.
**Q** Why?
A Because the lower the score the better, and over 200 was really a terrible score.
**Q** And did you, did you speak with Dr. Jones concerning the pink sheets?
A Yes, we spoke about it, and I indicated that we really had no choice but to follow the advice that they had asked us to follow, to respond to the pink sheets by saying that we would add another statistician to the grant and pursue survival analysis in the upcoming, upcoming years.
**Q** And was another statistician hired?
A He was. And it's somebody named L.J. Wei who was at the School of Public Health, the Harvard School of Public Health.
**Q** Did you speak with Dr. Jones about the hiring of someone new?
A I did.

**Q** And what did you say and what did he say?
A I said that we really had to do this because if we had any chance of getting funded we had to agree to these concerns. And the concerns were actually very well taken. We all agreed that we should have paid more attention to this issue. And he was not happy about that.
**Q** What did he say?
A He said he thought that survival analysis really was not needed in this, in this project.
**Q** And did you, did you respond in writing to the concerns raised by the NIH reviewers?
A Yes, we did.

**MR. ROSE:** May I have Exhibit EE shown to the witness, please. It's not yet in evidence.

**THE COURT:** EE?

**MR. ROSE:** Yes.

**THE COURT:** While that's being done come to the side bar for just a moment.

SIDEBAR CONFERENCE, AS FOLLOWS:

**THE COURT:** Thirty-five more minutes on your feet, so whoever's going to be put on as the last witness, he's going to be short.

(Whereupon the sidebar conference concluded.)

**BY MR. ROSE**

**Q** Do you have Exhibit EE in front of you?

A I do.
**Q** And what is this?
A This is what I referred to as the response to the pink sheets that was sent on May 21st to Dr. Buckholtz at the National Institute on Aging.

**MR. ROSE:** I offer this document, your Honor.

**MR. HUGHES:** Objection; relevance.

**THE COURT:** I need to see it.

No, in light of the objection, I'm going to admit this. But I'm limiting it in this way. To the extent this says what the applicants, Mass. General and the people applying, to the extent that this says this is what we're going to do, states their intention, you can believe it if you want to. You can disbelieve it. But it's in substantively for that, this is what we're going to do. But if there's other facts in here that they assert, it's not before you whether that's true or not. You've got the witness on the stand. But this is evidence, if you believe her testimony, that this is the document and this is what they sent back.

So EE with those limitations is admitted Exhibit 208.

**THE CLERK:** 209, Judge.

**THE COURT:** 209. I'm sorry.

(Exhibit marked in evidence.)

39

**Q** And looking at the first page, did you, did you refer on the first page to the reviewers comment about the recruitment of a person with a background in survival analysis?
A Yes, we did.
**Q** All right.
A We quoted from the pink sheets in this instance, the recruitment of a person as we just read, and then we told them how we were going to respond.
**Q** And was this the first statement or representation that you made in this letter about what you intended to do?
A Yes, it was.
**Q** All right. Now, as a result of hiring Professor, was it Wei?
A Wei, yes.
**Q** As a result of the hiring of Professor Wei, what happened to the budget for Dr. Jones' work?
A Well, since we had to give Dr. Wei a salary to work on the grant, we had to reduce the amount of effort that we were going to pay to Dr. Jones because of a finite amount of money in the grant, assuming at this point it would be funded.
**Q** And did your, did your response to the pink sheets also refer to the SPECT project?
A Yes, we did.

**MR. ROSE:** All right. Now, could we please have Exhibit 195 on the screen. May I, may I have, please, part of that exhibit, which is I believe MBAK 1372. Just drop down slightly. Thank you.

**Q** Now, the e-mail in the lower left, from whom did you receive this e-mail?

A The e-mail was from Dr. Jones.

**Q** And did it concern your response to the pink sheets?

A Yes. He, of course, was aware, we had sent him the draft, we had talked about it, and he is now saying in this e-mail that he's very concerned about the decisions to reduce his effort and to reduce the SPECT project.

**Q** And the last, the last sentence says: If my role were to change substantially, I think it only fair to say that I am not willing to advise a truncated PPG.

What did that mean to you?

A To me it meant that he was thinking that if his salary was going to be cut then he would no longer work on the grant.

**Q** Did you have conversations with Dr. Jones in this period of time which is May, late May 2002?

A We had a lot of conversations about how to address the concerns of the reviewers, about whether or not in fact the grant was going to be funded, and what his role would be going forward.

**Q** Now, would you turn to MBAK 1375. And is this an e-mail that you sent to Dr. Jones?
A Yes, it is.
**Q** And the date of that was?
A The date is the end of July, the beginning of July, July 3rd, 2002.
**Q** And were you attempting to arrange a meeting with Dr. Jones to discuss these issues?
A Yes, I was.
**MR. ROSE:** May I have 1377, please.
**Q** And was this an e-mail exchange between you and Dr. Jones in July?
A Yes. It's referring to the fact that I sent him many drafts of the response to the pink sheets, and had also of course sent them to other people on the team as well.
**Q** Did Dr. Jones tell you whether he still wanted to continue as a member of the team?
A Ultimately he did, yes.
**Q** And when did you find out whether or not the grant was going to be approved?
A I believe that it was in the fall, but I don't remember the specific date.
**Q** All right.
**MR. ROSE:** Could we have Exhibit 196, please.
**Q** Now, this is in October; is that correct?

A Correct.
**Q** It appears to be October 11, 2002. Do you see that on the top line?
A Right. This was after we knew the grant was going to be funded.
**Q** How did you learn the grant was going to be funded?
A I first heard from Dr. Buckholtz and then ultimately we got a notice of grant award from the National Institutes of Health.
**Q** And in this e-mail to Dr. Jones did you make him a proposal?
A I did. I was proposing what his level of effort would be going forward, and I proposed that he should be getting 40 percent effort on the grant.
**Q** And when you say 40 percent effort, would that be, is that -- what would his compensation be?
A So, it would be 40 percent of his base, $161,200, which was the NIH cap at that time.
**MR. ROSE:** Could I have, I think this may be out of sequence, but could I have MBAK, I'm sorry, Exhibit 195, MBAK 1378.
Well, this is pretty much earlier. Let me, let me move ahead.
**Q** Now, in the last exhibit that we, that we saw, Exhibit 196, the one in which you had made him a proposal,

did he respond to your proposal?

A At first he said that he wasn't going to participate.

**MR. ROSE:** May I have MBAK 1383, which is a part of Exhibit 196. Is this 1383? Thank you.

**Q** And was this a response to your proposal?

A Yes, it was.

**Q** His first response to your proposal?

A Yes, his first response.

**Q** So this came in on October 15 at 10:20?

A Yes, it did.

**Q** And did he make you a counter proposal in this e-mail?

A He said he wanted his level of effort to be raised to various projects which had been cut.

**MR. ROSE:** May I have the next page, please, which is MBAK 1384.

**Q** So is this another e-mail on the same day, October 15, at approximately one o'clock?

A Yes, he's saying that he will accept the 40 percent effort on the grant.

**Q** And did Dr. Jones continue to work on the project in 2002 and early 2003?

A He did.

**Q** Was he being given less work to do than he had been before?

A I think he was. That was a time when I was getting

ready to move from Boston to Baltimore and Dr. Blacker was taking over the grant. So I do think he was given less work. But it was paid nevertheless.

**Q** And when did you move from the Boston area?

A I moved in January of 2003.

**Q** And why did you move to Baltimore?

A I had been remarried five years earlier and my husband was at Johns Hopkins, and Johns Hopkins recruited me to run a new division, a division of cognitive neuroscience. And it was a very good job and I was pleased to be able to join my husband.

**Q** Although you moved to Baltimore, did you continue your work on the PPG?

A I did, but not as the principal investigator. So, I turned over the running of the grant to Deborah Blacker and I continued as the project leader on Project 1, the neuropsychology project, and for at least a year or so I came up every month to meet with everybody to facilitate the transition.

**MR. ROSE:** May I bring up on the screen Exhibit EK.

**MR. HUGHES:** This is not in evidence.

**THE COURT:** No, I understand that. EK. So, we'll just show it to the witness.

**MR. ROSE:** Your Honor, I believe that in fact the first page --

**THE COURT:** Well, it may be, but the whole thing isn't. And if it's, the first page is what you're showing and it's got a number, that's fine.

**MR. ROSE:** Great.

**Q** Do you have in front of you the first page of EK?

A Yes, I do.

**Q** All right. And what is this?

A This is the regular progress report in this case. It's a progress report for the, for the '02 to '03 period asking, describing to the NIH what progress has been made.

**MR. ROSE:** And now could I have placed in front of the witness Exhibit EO.

**Q** What is this document?

A This is the progress report for the following year.

**Q** Exhibit EQ. What is this document?

A Again, the year after that, the '04 to '05 year.

**Q** EQ. Would EQ be for '05-'06?

A I think that that's the upcoming period. I guess what I'm saying is the progress report is for the prior year asking for money for the subsequent year.

**Q** And finally, Exhibit ES.

A This is the progress report for the last year of the grant.

**Q** And what was the date of the grant progress report for the last year?

A It was --

**Q** If you could scroll down to the bottom, please.

A The date on which it was signed, it was June 6th, 2006.

**Q** And if you know, was the PPG required to submit the progress reports?

A Yes, every grant is required to submit progress reports in order to get funding for the subsequent year, and they have to be adequate obviously.

**Q** If no progress report were filed what would have happened?

**MR. HUGHES:** Objection.

**THE COURT:** Yes. No, overruled. What did you understand would happen?

A That the grant wouldn't be funded for the following year without the progress report.

**MR. ROSE:** Your Honor, I offer into evidence -- and the first page, the first pages of these are already in evidence, but I now offer the full exhibits, EK, E0, EQ, and ES in order.

**THE COURT:** Objection.

**MR. HUGHES:** Yes, may we be heard on this, your Honor?

**THE COURT:** You may.

SIDEBAR CONFERENCE, AS FOLLOWS:

**THE COURT:** She's your last witness, right?

**MR. ROSE:** Yes, she is.

**THE COURT:** Of course she is. Now, that makes sense. All right.

**MR. ROSE:** I was going to clarify that.

**THE COURT:** All right.

**MR. HUGHES:** This gets into the fraud in the inducement and the all or nothing aspect of it and all the other parts of the --

**THE COURT:** I understand that's your position.

**MR. HUGHES:** Right.

**THE COURT:** But I am going to let it in, and of course it's over your objection, your rights are saved. And when we're done you'll make cross-motions because this is a motion that you'd want to make as plaintiff. And my mind is open on it.

**MR. HUGHES:** Thank you.

**THE COURT:** But they come in.

**MR. HUGHES:** Okay.

(Whereupon the sidebar conference concluded.)

**THE COURT:** We will admit these collectively as Exhibit 210.

(Exhibit marked in evidence.)

**BY MR. ROSE**

**Q** Now, during the, during the following five year period, that is, 2002 to 2007, did you continue to work on the

project?
A I did.
**Q** Which project or core?
A Project 1.
**Q** And Project 1 was what project?
A Project 1 had to do with what we call neuropsychology; this is assessment of people's mental abilities like memory and planning and organization and language and so forth.
**Q** Did you -- in addition to working on Project 1, did you also continue your involvement with other aspects of the project?
A I did. I actually worked with a student who Ron was mentoring, an MP/PHD student, so I was helping with the MRI project, and I was involved with things related to the clinical core and with the SPECT project and the FMRI project.
**Q** What was the MRI -- what work was the MRI project engaged in?
A So the MRI project as we've heard was focused on trying to develop these automated methods. And there were several publications showing that in fact we could be successful in outlining regions of interest and then having them be reproduced by a computer.
**Q** And what were the results of those, those efforts to develop an automated method for mapping the regions of

interest in the brain?

**MR. HUGHES:** Objection.

**THE COURT:** No, overruled.

A So the results were as you've heard that we completed a program that's called Freesurfer. Freesurfer had existed but it hadn't, at that time, originally been able to identify all these subregions in the brain. And that was successfully completed and it's now available to everybody in the field for free.

**MR. ROSE:** May I have Exhibit FB on the screen, please.

**Q** Do you have Exhibit FB for identification in front of you?

A I do.

**Q** All right. And what is Exhibit FB?

A FB is a list of all the publications for the program project during that period of time from 2002 until recently.

**MR. ROSE:** Your Honor, I offer Exhibit FB as next in order.

**THE COURT:** Any objection?

**MR. HUGHES:** Along the same lines as before, your Honor.

**THE COURT:** I thank you. Your rights are saved. But it may be admitted as Exhibit 211.

(Exhibit marked in evidence.)

50

**Q** So, you've indicated that this is a list of publications arising from the grant during that, during that five year period?
A Correct.
**Q** And are you a coauthor on some of these?
A I'm a coauthor on most of them. Not all of them but most of them.
**Q** And without going into every one, could you, could you please identify the more significant, if I may use that word, of these publications?
A Well, there were ten publications related to the MRI project. Eight of them had to do with the automated methods that we had developed. There were I think 13 publications related to the Functional MRI project. And then there were a number of publications related to the cognitive testing and the clinical aspects of the subjects.
**Q** What is the expectation, if you know, of the NIH with regard to publishing?
A So, one of the primary standards by which somebody judges a grant is whether or not, the word is productive, and what people mean by that are producing publications. So it's extremely important that publications be produced and that they be of a high quality.
**Q** Why is it important that there be publications?
A Because basically we're trying to further work in the

field. If we keep this information just to ourselves it's not helpful. We need to share it with everybody and everybody needs to benefit from what we do. And everybody needs to see, if they think it's relevant, if they can reproduce the findings that we have.

**Q** Let me turn to a different subject. Exhibit 177, please, which is in evidence.

Do you have Exhibit 177 in front of you, Dr. Albert?

A I do. Yes.

**THE COURT:** Fifteen minutes left total. Go ahead.

**Q** When, when did, when did you first see this analysis?

A I first saw that analysis in relation to this litigation.

**Q** Do you recall when during the core of the litigation you saw it?

A I think it was not until 2010.

**Q** Did Dr. Jones at any, at any time tell you about an analysis of his regarding the reliability study that showed a reliability figure of .54?

A No, he did not.

**MR. HUGHES:** Objection; asked and answered.

**THE COURT:** Sustained. The answer is stricken. It has been asked and answered.

Go ahead.

52

**Q** Did Dr. Jones tell you that he was going to file a lawsuit against you under the False Claims Act?
A No, he did not.
**Q** When did you first learn of the lawsuit?
A I first learned of the lawsuit in 2008 in December. So it was almost 2009.
**Q** So that's approximately seven or so years after the events at issue here in 2001?
**MR. HUGHES:** Objection.
**THE COURT:** Don't lead the witness. The answer is -- she can't answer that question.
**Q** Did you have any conversation with Dr. Jones between July, late July 2001 -- strike that.
Did you have any conversation with Dr. Jones after July 27th, 2001 regarding his concerns about Dr. Killiany's remeasurements?
A No, I've never had any conversations with him about that.
**Q** And were you surprised to learn of the lawsuit?
**MR. HUGHES:** Objection.
**THE COURT:** Sustained.
**Q** What was your reaction to the lawsuit?
**THE COURT:** No, sustained.
**Q** When you received, when you received the lawsuit, the complaint, did you read it?

A Yes, I did.
**Q** All right. And did you notice any reference in the complaint to the figure of .54?
A No, in the original complaint there was no mention of .54 reliability.
**Q** And do you recall the date of the original complaint?
A It was sometime in December, I think, or October of 2008.
**Q** Of 2008, when you heard about it?
A When I heard about it, yes. Oh, the date of the original complaint --
**Q** Yes.
A -- was 2006.
**Q** But you did not learn about it?
A I did not know about it, no.
**Q** All right.

**MR. ROSE:** May I approach, your Honor? One final question.

**THE COURT:** You may. I mean, I should caution the jury, and we've been over this, the way you do this is you file your complaint secretly and it gets a date stamp. And there's a reason for that. So that, because Mr. Jones, his lawyers, they're in contact with the government and the government does its own investigation and decides whether it's going to take over or let Mr. Jones' lawyers in essence

push the case on behalf of the government. All that's appropriate, and later on I lift the seal. Nothing turns on this. That's why -- well, now we'll see. We'll ask another question.

Go ahead.

**MR. ROSE:** All right.

**THE COURT:** But those dates, nothing turns on the dates and the fact that it, originally it was secret because that's the way the statute reads, it's supposed to be.

**Q** Did you read the original complaint in the case?

A Yes, I did.

**Q** At the time that you received it, which was in, I believe you said December 2008?

A Right.

**MR. HUGHES:** Objection, your Honor. This line of questioning --

**THE COURT:** Well, I'm going to allow that question and we'll see.

**MR. ROSE:** All right.

**THE COURT:** You've got about ten minutes more for this witness.

**Q** And do you recall the date of the original complaint in the case?

A I think the date was from 2006.

**Q** All right.

A I believe it was June 2006.

**Q** Right.

**MR. ROSE:** May I have one moment, your Honor?

**THE COURT:** You may.

**MR. ROSE:** I think I'm close to done.

**Q** At any time, Dr. Albert, did you make false statements to the National Institute of Health?

**MR. HUGHES:** Leading.

**THE COURT:** It is, but it's conclusory and he's winding up. So she may be allowed to answer.

A I did not.

**MR. ROSE:** No further questions, your Honor.

**THE COURT:** Mr. Hughes.

**MR. HUGHES:** Yes, thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. HUGHES**

**Q** Dr. Albert, good morning.

A Good morning.

**Q** Do you have any understanding about how the seal works in a lawsuit like this?

A Not really, no.

**Q** One of the documents that Mr. Rose showed you about the amount applied for showed to the penny, was just under 15 million was applied for, right?

A Correct.

**Q** And how much were you actually paid over the five years? And I'll represent that's an undisputed fact at this point. But what is your understanding as to the, as to the amount?
A I think it was about $12 million.
**Q** Does $12,308,967.01 sound right?
A Yes.
**Q** Exhibit 210, I believe, that was just up on the screen, had a list of publications.
A Right.
**Q** Right? And one of those was a publication by Dr. El Fakhri in 2003?
A Yes.
**Q** And you know that publication incorporated some of the EC data that was concluded in the 2000 paper and the 2002 paper, right?
A Correct.
**Q** And you know that Dr. Jones refused to sign the El Fakhri 2003 paper, right?
A I know that he didn't want to be an author on it because he said he hadn't actually done any of the analysis on it.
**Q** I'm going to ask the question again. Do you know -- and this calls for a yes or no -- do you know whether Dr. Jones refused to sign that paper?
A He did not want to be an author.
**Q** And he did not sign it?

A Correct.
**Q** Now, I'm going to show you -- I'm going to show you a page within Exhibit 210.
**MR. ROSE:** Which page, Bill?
**MR. HUGHES:** MBAK 821. 821.
**MR. ROSE:** 821?
**MR. HUGHES:** Yes.
Jennifer, may we have the Elmo.
**Q** Is this the El Fakhri paper that we just discussed that was published in 2003?
A Yes, it is.
**Q** And that lists Dr. Jones as an author?
A It does.
**Q** What does in press mean?
A It means that it's been accepted for publication.
**Q** So this is incorrect, Dr. Jones was not an author of the El Fakhri 2003 paper, right?
A That's correct. There are quite often mistakes in a grant of 400 pages long.
**Q** And this was submitted to the National Institutes of Health, correct?
A It was.
**Q** While we're talking about papers. The 2002 paper, that went out, of course, after the application to NIH that brings us here today, right?

A I'm not sure when it originally was sent in. I know when it was accepted, but I don't remember exactly when it was sent in.
**Q** The application was submitted on October 1st, 2001, correct?
A That's correct.
**Q** And the 2002 paper was published well after that?
A It was, yes. But I don't know when it was submitted. But the article itself would say when.
**Q** And the 2002 paper, to the extent that it referred to the EC data and the reliability study Pearson score, that was from the same analysis that was contained in the 2000 paper, right?
A It was for the same images.
**Q** And the same analysis that was contained in the application, right?
A It wasn't the same analysis. It was the same images.
**Q** And the same Pearson score was, was .96 in the 2000 paper, right?
A The publication cited that article as the source of the information.
**Q** And the application made numerous references to the 2000 paper --
A Correct.
**Q** -- by citing to it, correct?

A Correct.
**Q** Now, your score, your NIH score was 181, right?
A Correct.
**Q** And that was the overall score?
A Yes.
**Q** And like golf, the lower the score the better?
A Correct.
**Q** How many components are there to that 181 score, meaning you had a number of cores and projects, right?
A We had four cores and four projects.
**Q** Did each core and each project have its own score?
A They did, yes.
**Q** And then is that all tallied up to ultimately result in the 181 score?
A It's not really a summation of all the scores because one of the important things about a program project is whether or not the whole is greater than the sum of its parts. So, they factor things in differently to come up with a final score.
**Q** Did Dr. Killiany have a score for his MRI project?
A He did.
**Q** Do you remember what that was?
A I don't. I think it was 179, but I don't remember exactly. We would have to look at the pink sheet.
**Q** To the extent it was lower than 181 it would have tended

to bring the overall score down?
A No, as I'm saying the overall score is dependent upon people's judgment of the overall grant. So they don't just add them all up. It could be that a few really bad parts of the grant would make the score terrible even though there were only a few of them.
**Q** How was Keith Johnson's score in comparison to Ronald Killiany's?
A Keith Johnson's scored was quite bad. I think it was the worst score in the grant. I think it was 249.
**Q** And his, his -- that's Dr. Johnson, the same Dr. Johnson that brought to the attention of Ken Jones what he called disturbing phenomena, right?
A Keith Johnson was the head of the SPECT project.
**Q** Now, do you know who Marie Kijewski is?
A Yes, I do.
**MR. ROSE:** Your Honor, may we approach?
**THE COURT:** You may.
SIDEBAR CONFERENCE, AS FOLLOWS:
**MR. ROSE:** The basis of my objection, your Honor, is the Court dismissed Marie Kijewski from the lawsuit in 2009 after a hearing and extensive, extensive briefing.
**THE COURT:** Yes.
**MR. ROSE:** I'm --
**THE COURT:** All right. And where are we going with

this?

**MR. HUGHES:** We're just going with, she said that Jones never sent anything about the measurements after July 27th, 2001, and in the year 2002 that he complained to Marie Kijewski, and she knows about it.

**MR. ROSE:** But didn't complain to her.

**THE COURT:** Well, no, he -- oh, I see what you mean. But he adds in, and she knows about it. So the two, the two are consistent. I'm going to allow her to be asked did she know about such a complaint to this lady. I'll let him have that.

**MR. HUGHES:** Thank you, your Honor.

(Whereupon the sidebar conference concluded.)

**THE COURT:** Just so I can get oriented, who is the person that he just asked about? Who is this person?

**THE WITNESS:** She is an investigator who was at the Brigham and Women's Hospital and worked on the SPECT project.

**BY MR. HUGHES**

**Q** Now, you know that in the spring, probably May of 2002, Ken Jones complained to Marie Kijewski about the Killiany remeasurements that are the subject of this, lawsuit correct?

A Yes, I do.

**Q** So that was, just to be clear, well after July 27th,

2001. May of 2002 is well after June 27th, 2001, right?
A The question I was asked was whether or not --
**Q** Excuse me.
A -- Dr. Jones --
**Q** Yes or no answer --
A -- said anything to me.
**Q** Excuse me, yes or no answer, please.
A Yes.
**Q** And how did you learn about Dr. Jones' discussion with Dr. Kijewski?
A Dr. Kijewski called me.
**Q** Did you tell NIH about the concerns at that time?
A Dr. Kijewski was the person who was asked to address them.
**Q** So you did not, correct?
A I did not.
**Q** Did she?
A No, she did not.
**Q** So NIH doesn't know anything about it, right?
**MR. ROSE:** Objection, your Honor.
**THE COURT:** Sustained. Sustained. Sustained. Witnesses can only testify to what they themselves know, not what some other entity knew or didn't know.
**Q** As far as you know, Marie Kijewski did not contact NIH about her discussion with Dr. Jones, right?

**MR. ROSE:** Objection, your Honor.

**THE COURT:** No, she can answer that. As far as you know.

A As far as I know, Dr. Jones never said there was falsified data.

**MR. HUGHES:** Move to strike, your Honor.

**THE COURT:** Motion to strike denied in the exercise of discretion.

**MR. HUGHES:** Your Honor --

**Q** I'll restate the question. I asked you if, as far as you know, Marie Kijewski contacted NIH about Dr. Jones' discussion with her about the remeasurements, right?

**MR. ROSE:** Objection.

**THE COURT:** Overruled.

A As far as I know, no.

**MR. HUGHES:** Would you turn the iPad on, please, Jennifer.

**Q** You've got Exhibit 21 up on the screen, Dr. Albert. Do you recognize that?

A Yes, I do.

**Q** And this is, this is an e-mail that Ken Jones sent to you on March 15th, 2001?

A Correct.

**Q** And he told you that the data contained in this e-mail are pivotal to many of his analyses, right?

A He, he did say that in the e-mail, yes, but this is a small subset of all the cases.

**MR. HUGHES:** Move to strike everything after he said that in the e-mail.

**THE COURT:** No, in the exercise of discretion that may stand.

**Q** And he also indicated that the data should be evaluated or verified by an independent evaluator, right?

A With all due respect to Ron's hard work.

**Q** Is that, is that -- was I right? Is that -- can I get a yes or no to that?

A Yes, he did.

**Q** All right. Now, I'm going to draw your attention and the jury's attention to this part of the exhibit for the moment.

**MR. ROSE:** I'm sorry, Bill, what exhibit?

**MR. HUGHES:** Twenty-one.

**Q** Now, this lists twelve cases in the gold controls. And we know from previous testimony, including yours, I believe, that the gold controls were normals, right?

A Correct.

**Q** And we'll see, if I clear this back, we've got something called cdrsum1. Cdrsum1 means that at base line those subjects were normal, right?

A Correct.

**Q** And the CDR score is zero?
A Correct.
**Q** And if someone had a CDR score of 1 they were questionable, right?
A No, they were -- .5 was questionable.
**Q** What is the 1? What does 1 mean?
A The 1 is that they have dementia.
**Q** So, .5 is questionable, 1 or higher would be that they have Alzheimer's?
A Oh, actually this is sum. I'm sorry. I'm mistaken. No, it could be -- this is a different number here, I think, if I'm interpreting it correctly.
**Q** What is --
A So it would be, 4 or 5 would be dementia.
**Q** All right. But the zeros, it's clear to you that the zeros here for the twelve and the five above are all normals at base line, right?
A That's what I believe this says, yes.
**Q** And normals at base line mean that when they entered the program they were normal?
A Correct.
**Q** And there were others that entered the program that were classified as questionables, right?
A Correct.
**Q** And that was determined, what, three years after the

initial determination of testing, three years later you did another set of tests, right?
A No, we did tests, we evaluated people every year and we gave them scores every year. The evaluation was annual.
**Q** So over time, because of the additional testing you did, some categories changed, right?
A Some people changed.
**Q** Right. Some of the subjects' classification from normal to questionable, questionable to converter changed, right?
A Correct.
**Q** And the study did not anticipate that base line normals would change status within three years, correct?
A We didn't -- when we began we had really no way of knowing how rapidly people would change. In fact, it turned out that people changed much more slowly than we had anticipated.
**Q** I'm just going to refer to MBAK 403 without putting it up on the board, where I'm going to quote. Based on previous experience with our cohort, we anticipate that very few of the normals will show significant cognitive decline over a three year period.
Is that what was contained within the application?
A Yes, but I think you're referring to the application at the end of this experience. I thought the question was what we had anticipated when we first started recruiting the

subjects.

**Q** Is what I just read a true statement, though, that based on previous experience with your cohort, your anticipation at the time this was written was that very few of the normals would, would show significant cognitive decline over a three year period?

A Could you reread it. I think it talks about more than -- well, if you could reread the sentence.

**Q** I'll show it to you. I'm going to put MBAK 403 up on the Elmo.

Based on previous experience with our cohort, see Daly, et al 2000 and Core A, we anticipate that very few of the normals (Group 1) will show significant cognitive decline over a three period.

Did I get that right?

A Do you want to read the rest of the sentence?

**Q** Thus, we anticipate re-imaging only four subjects showing decline and controls, and two controls from this group.

A Correct.

**Q** All right. So let's get back to Exhibit 21. I'm going to put up the relator's table on the chalk on the easel.

And you having been in the courtroom for the last few weeks are familiar with the relator's table, are you not, Dr. Albert?

A Yes, I am.
**Q** Now, the twelve that are listed on Exhibit 21, you were aware that four of the twelve that are listed on Exhibit 21, all of which are normals, were also included in the reliability study, right?
A I think there's an e-mail indicating that I knew at some point that four of the twelve were in the reliability study.
**Q** So your answer is yes then?
A Yes.
**Q** You knew that four of the twelve were in the reliability study?
A Yes.
**Q** And when Ken Jones gave you Exhibit 21, did you notice that each of these twelve normals had increases in their overall volumes, based on a comparison between the first set of measurements and the second set of measurements?
A When I got this document from Ken it was intended to give me a list of the people who were to be reevaluated. We had agreed on that and that was the way in which I looked at the document. I did not look at the details.
**Q** Well, let's look at it right now then. If we look at number 1, you'll see a positive change of 112 pixels for the right entorhinal and 115 pixels for the left.
Do you see that there?
A For which subject?

**Q** One.
A Uh-huh.
**Q** KOBRI. And then if we look -- and 1 by the way is on the relator's table, and it shows, using the numbers, there are two sets of numbers, one metric and one nonmetric. Using the nonmetric numbers here, the original measure for KOBRI was 2.35 and subsequent was 5.35 which reflected a 127.7 increase in volume. You're aware of that now having been sitting in court --
A Yes --
**Q** -- for several weeks.
A -- now I'm aware of that, yes.
**Q** And then if we just go down the list briefly. We've got 31, slight change, negative on one side, four, positive of 12 on the other, for a net gain of eight. And then on and on. But each of these twelve normals had an increase in entorhinal volume. You know that now, right?
A Yes, I do.
**Q** And then if you look at the five normals above the twelve you'll see that every one of the five had positive changes. Their entorhinal volumes went from the first set, they were increased in the second set, right?
Do you see that?
A It's really hard to see on this document.
**Q** How about this one.

**MR. HUGHES:** May I approach the witness, your Honor?

A They look like, they look like slight increases to me.

**Q** All right. Well, let's go over them. 114, right here.

A Uh-huh.

**Q** Seventy-six pixels, another 76 pixels. 115. Plus 76 pixels on the right, plus 76 pixels left. Do you see that?

A Yes.

**Q** Do you see the other one? I mean, these numbers are pixels. You can see these are all positive numbers on the top five, right?

A Correct.

**Q** Now, if you can't see the bottom five, these are all not normals at base line, right? Numbers 9, 54, 101, 151 and 78, right?

A That's what it looks like, yes.

**Q** And you'll notice for number 9, which is also on the board here -- number 9 by the way in the first set of measurements, out of 103 subjects number 9 was the biggest. It had -- its number, its number was 4.9. And you'll see number 9 here. If you compare 9 original to 9 second set, there's a negative 34 and a negative 45. And that's, to be clear, number 9 is not a normal, right?

A Yes. But I actually don't know if these figures are adjusted for head size. They may be raw volumes, which

would not be the correct way to --

**THE COURT:** Keep your voice up even though he's close to you.

**THE WITNESS:** I'm sorry.

**MR. HUGHES:** Your Honor, I move to strike everything after the affirmative response.

**THE COURT:** No, in the exercise of discretion that may stand.

**Q** All right. I don't want to belabor this, but if we look at number 54, non-normal, that one actually had a net of one extra pixel. Do you see that? One side was minus 20 and the other side was plus 21. So the net was one plus pixel, right?

A Yes.

**Q** And then if we look at the, at 101, we got minus 3 and minus 13 pixels. Right?

A Right.

**Q** 151, we have minus two but a plus nine for a total of, if my math's good, plus seven pixels?

A Uh-huh.

**Q** And then we have number 78 where we have plus four and a plus two for a grand total of plus six pixels.

A Right.

**Q** Do you see a pattern here? Do you see the non-normals have very minor changes, negative or very small plus

changes, but if you look at all the normals you've got some pretty significant changes here, don't you? Would you agree they're significant changes?

A I don't know how significant because I don't know if they're represented as adjustments by head size. I can't make any judgment if they're only in total volume.

**Q** Do these numbers tell you anything?

A It tells me that there are changes in a positive direction in some of the individuals.

**Q** And you can see from the relator's table, we've got eleven arrows here, and I'll represent to you, to try to save some time, that eleven of these arrows are among the twelve here, the twelve normals on this sheet.

Do you have any reason to disbelieve that statement?

A No, I don't.

**MR. HUGHES:** Your Honor, at this point I would like to read a very brief passage from Dr. Albert's trial testimony, from volume 2, page 44, lines 22 through -- strike that, page 17, lines 7 through 17.

**MR. ROSE:** May we have one moment, your Honor.

**THE COURT:** Well, yes, but I have a question. You're going to ask her a question about it, I take it.

**MR. HUGHES:** Yes.

**THE COURT:** All right. You may read it.

**MR. HUGHES:** Okay. As a principal investigator, the person in charge, the buck stops there. Did you ask Dr. Killiany immediately, hey, are there two sets of data?

Answer: Well, we knew that there were two sets of data because Dr. Killiany had sent images from the outlines he had drawn to Dr. Johnson. And Dr. Johnson had two sets of images and that is exactly what had prompted this discussion.

Do you remember that testimony?

A Yes.

**Q** When did you learn that Dr. Johnson had the second set of data?

A When Dr. Johnson and Dr. Jones told me that.

**Q** And, I remember this.

**THE COURT:** Well, we're not interested in what you remember --

**MR. HUGHES:** Strike that. Sorry.

**THE COURT:** -- respectfully. Ask a question.

**MR. HUGHES:** Yes, I will. Sorry, your Honor.

**Q** Does February 7th, 2001 comport with your memory as to when the various witnesses testified that Dr. Johnson notified Dr. Jones about the second set of data?

**MR. ROSE:** Objection.

**THE COURT:** Yes, sustained. You may ask her.

A I really don't know when Dr. Johnson spoke to Dr. Jones about it.

**THE COURT:** That's her testimony.

**Q** And you didn't learn about it until March 15th, and we just went over this --

A No, I believe I testified that it was slightly earlier because by March 15th we had decided that we were going to send these cases to be reevaluated.

**Q** In fact, wasn't it that same day, this e-mail that Ken Jones sent to you on March, Thursday, March 15th, followed the meeting that you had with him earlier that day?

**MR. ROSE:** Objection; covered previously, your Honor.

**THE COURT:** Yes, it really was. Sustained.

**Q** You are not a research integrity officer, are you?

A No, I'm not.

**Q** And Dr. Moss was not a research integrity officer for the grant when he was involved with regard to looking at the measurements, was he?

A I don't think grants have research integrity officers.

**Q** So, yes or no, was Dr. Moss a research integrity officer?

A No.

**Q** Now, I'm going to read from page 44 of Dr. Albert's trial testimony and ask her a follow-up question.

Okay. What Dr. Jones was saying is that in the second set of the altered data, Dr. Killiany was taking these small, say these are the small ones up here -- referring to the relator's table -- he was taking them and changing the measurements and moving them down to the bottom, right?

Answer: Some of the measurements had been made larger in some of them normals on the second set of images.

Question: And he was concerned when he looked at it, all the ones that were really made larger were all in the normals group, that was his concern?

Your answer was: That was not the truth.

Do you remember that testimony?

A Yes.

**Q** What's not the truth about that if you look at this relator's table?

A Because this doesn't represent all the data that was examined. I think there were all together 37 cases that had increases in sizes.

**Q** Which ones are not examined here? There are 103 subjects that are listed in here. The 2000 paper listed these very same 103 subjects, correct?

A If you say so.

**Q** I would just like to direct your attention to the

application that brings us here. And you've already gone over the fact that you signed it on the signature page?
A Correct.
**Q** In ink?
A Correct.
**Q** And you understood when you signed that that you were giving the government the complete information that meant that you had to be as honest as you possibly could, correct?
A Yes.
**Q** And in order to be complete you had to disclose what's called negative data, right?
A You are writing a grant, you have great limitations in space, you try to be as honest and straightforward as you can be. But you can't include everything.
**Q** I'm going to ask the question again, I would like to get a yes or no answer.
In order to be complete you must disclose negative data where it bears on the science you are presenting, correct?
A Yes. Correct.
**MR. HUGHES:** Would you turn the iPad on, Jennifer, please.
**Q** Yesterday --
**MR. HUGHES:** I've got MBAK 91 and 92 up.
**Q** Yesterday Mr. Rose read a portion of this passage --

A Uh-huh.
**Q** -- to you.
A Right.
**Q** I'm going to read the rest of it. Dr. Killiany, the leader of Project 3 has also been involved with the program project for many years. During the last submission -- and that's referring to the one that, which one, the '98 to 2002 submission?
A '97 to two thousand -- yes, that's correct.
**Q** During the last submission he was a co-investigator on the image analysis core with the responsibility of providing manual regions of interest on a subset of the MRI's?
A Correct.
**Q** It is important to emphasize that we did not include an MRI project in the last submission because of the fact that the MRI data we had evaluated by the time of the submission did not appear to be promising with respect to understanding prodromal AD.
Right?
A Correct.
**Q** Paren, i.e., many of our findings were negative and we did not feel the work warranted inclusion.
A Correct.
**Q** However, it subsequently became evident that new MRI measures that Dr. Killiany and Dr. Hyman had developed

collaboratively were very useful in the study of prodromal AD. We therefore continued this work with very limited funding from the program project and now feel it more than warrants inclusion in the application with Dr. Killiany as project leader.

Right?

A Correct.

**Q** So, you knew that four of the twelve subjects identified in the March 15th e-mail were part of the reliability study, right?

A So did Dr. Jones.

**MR. HUGHES:** Objection, your Honor. Yes or no answer.

**THE COURT:** Yes, listen to his questions.

**THE WITNESS:** Sorry. Yes.

**THE COURT:** Answer his questions. If you can't answer them yes or no -- I mean, he says sometimes answer this yes or no.

**THE WITNESS:** Yes.

**THE COURT:** You can always say, if it can't honestly be answered yes or no, you can always say I can't answer it yes or no. But this is his chance to ask questions. So, don't just launch off on something you think people want to know.

That's stricken. Now put your question,

Mr. Hughes.
**Q** So you knew that four of the twelve normals were part of the reliability study, right?
A I did.
**Q** And you, and you saw the changes. They were all positive changes?
A I had no idea what changes were in those four cases. No idea.
**Q** So you didn't read the e-mail? You didn't read the March 15th e-mail?
A I did not know which of the cases had what kinds of changes.
**Q** And you didn't have any discussions with Ken Jones in weekly meetings that followed from March 15th up until the end of July where he was talking to you about his concern about the remeasurements, right?
A We addressed his concerns within a month. And we had all the cases examined, these cases are on this list examined by Dr. Moss.
**Q** And you had them examined by Dr. Moss. What did Ken Jones say when he heard about Dr. Moss? He was not agreeing that Dr. Moss was the right person to do that, right?
**MR. ROSE:** Objection, your Honor; covered previously.
**THE COURT:** Yes, that was covered. Sustained.

**Q** In fact, Dr. Jones from time to time, from March 15th until the very end of July of 2001, would bring up his concern about the measurements and about Dr. Moss's involvement in it?

**MR. ROSE:** Objection; the same.

**THE COURT:** Overruled.

A That's not my recollection.

**Q** In fact --

**THE COURT:** The testimony is that of the witness. Okay, go ahead.

**Q** In fact, toward the end of July when Dr. Jones saw for the first time what Dr. Killiany told him were Dr. Moss's notes, Dr. Jones told you that it was unacceptable for Dr. Moss to have been the person to have generated what he thought were Dr. Moss's notes, right?

A I don't believe that's true.

**Q** And at the end of that meeting you said that's the end of this matter, Dr. Jones. Right?

A That's not true.

**Q** I take it you didn't tell NIH that four of the twelve had significant changes and your reliability study didn't take into account those significant changes, right?

A I didn't know that four of the twelve had significant changes, and to this day I don't believe that statement is true.

**MR. HUGHES:** Move to strike.
**THE COURT:** That may stand.
**Q** Now, the grant application process is a competitive process, right?
A Correct.
**Q** And honest scientists are trying to win scarce funds, right?
A Honest scientists are all able to get funded.
**Q** So you're saying the funds aren't scarce?
A They are scarce.
**Q** And you believe that NIH's intent is to, based on your understanding during your entire career of dealing with NIH that they're interested in doing business with honest science, honest scientists with honest science, right?
A Yes, of course.
**Q** And the reviewers at NIH can't independently review the data you submit to them, right?
A Well, sometimes they can. But that's hard to do.
**Q** And it's hard to do at least in part because the person applying is generating the data, right?
A You try to present as much data as you can in a grant application so that people can evaluate it.
**Q** So you agree with my question?
A What was the question?
**Q** It's difficult for them to independently evaluate the

data because it's the applicant that's generating the data?

A They're assuming that the data are correct.

**Q** Now, you understood that it was your responsibility as the principal investigator to know the true data generated by your team and to report only the true data to NIH, right?

A Correct.

**THE COURT:** Mr. Hughes, I don't mean to crowd you and I'm not going to, but all of us lawyers started at 8:30 this morning as you know.

**MR. HUGHES:** Yes, your Honor.

**THE COURT:** And quite frankly, I need a rest halt here. So unless you're within abut five minutes we're going to --

**MR. HUGHES:** How about, how about one minute.

**THE COURT:** You go right ahead.

**MR. HUGHES:** I'm just going to read from Dr. Albert's deposition, your Honor, a couple of lines from page 298.

Question: And in certifying the accuracy and completeness of the grant application you considered it your responsibility to follow up any doubts that you had about the validity of the data you were reporting?

Answer: Yes.

And if you thought there was false manipulation of the data it would, as you said previously, invalidate data

and make your grant application a lie?

Answer: It would make the data a lie, yes.

And you would not have been able to state in your grant application what you did?

Answer: Yes.

Nothing further at this time, your Honor, thank you.

**THE COURT:** Thank you. Any redirect?

**REDIRECT EXAMINATION**

**BY MR. ROSE**

**Q** Did you think the MRI data that was submitted was a lie --

A No, I did not.

**Q** -- Dr. Albert?

And what was your basis for thinking that it was not a lie?

A Because we had had it evaluated by Dr. Moss and Dr. Moss said that the second set of measurements were more correct, by and large, than the first.

**Q** And you were asked by Mr. Hughes about four of the twelve normals being a part of the reliability study.

A Correct.

**Q** On whom did you rely to tell you if a new reliability study was needed?

**MR. HUGHES:** Objection; leading.

**THE COURT:** No, overruled.

A I relied on Dr. Jones. He was asking questions about the data. He could have asked questions about the reliability study. He was the statistical consultant who was responsible for that.

**Q** Did he ever tell you during that period, during any of that period of time that a new reliability study was needed?

**MR. HUGHES:** Asked and answered.

**THE COURT:** No, he may have that. Did he, during that period?

**Q** He did not.

**MR. ROSE:** Nothing further, your Honor.

**THE COURT:** Anything further?

**MR. HUGHES:** Nothing further, your Honor, thank you.

**THE COURT:** Thank you. You may step down.

(Whereupon the witness stepped down.)

**THE COURT:** That's the defense case?

**MR. ROSE:** The defense rests, your Honor, and I have a motion.

**THE COURT:** We'll entertain it in a moment.

All right, ladies and gentlemen, now I know exactly what's going to happen, at least in terms of time.

What we're going to do now is take a 15 minute

recess. When we're back the lawyers will get a chance to argue to you. That will take an hour. Then we'll take another 15 minute recess, come back and I will explain the law to you precisely with respect to this case. We'll crowd into that one o'clock lunch hour, but really they're doing very well, and we'll have the case to you sometime, my estimate, between 1:00 and 1:30.

Now, we're done with the evidence in this case. This is not the time to start talking about the case, because those final arguments, they're very important even though they're not evidence.

So keep your minds suspended. Do not discuss the case either among yourselves nor with anyone else.

You may stand in recess until a few minutes after 11:00. The jury may recess.

**THE CLERK:** All rise for the jury.

(Whereupon the jury left the courtroom.)

**THE COURT:** Please be seated. And we'll entertain the motion. And I take it that the plaintiffs have an oral motion with respect to all or nothing on the, on the amount of the damages.

**MR. HUGHES:** Yes, your Honor.

**THE COURT:** I will accept that as an oral motion. I'll take them both under advisement. We'll follow the schedule that I have announced.

Now, I'm going to recess, but I see we have students here so I'll be in the courtroom and you be at ease.

We'll recess.

(Recess.)

**THE CLERK:** All rise. Court is in session, you may be seated.

**THE COURT:** I came out because Ms. Gaudet said that the defense wanted to raise something about the damages issue. And then she also said, though it's not for her to editorialize, she was diffident, maybe they want to drop the damages issue. And that's why I came out. If you do, that's simple, I can handle that. But I've had my charge conference. So, is that it?

**MR. ROSE:** Yes.

**THE COURT:** Fine. I'll just change the verdict slip and just drop that out. So it's all or nothing. And now we're ready for final argument.

(Pause in proceedings.)

**THE CLERK:** All rise for the jury.

(Whereupon the jury entered the courtroom.)

**THE CLERK:** Court is in session, you may be seated.

**THE COURT:** We come now, ladies and gentlemen, to what is truly one of the most important parts of the case. It's the epitome of what we think of, in the legal

profession, when the lawyer, representing his client or clients, stands before an American jury and argues to them directly, tries to persuade them. And it's perfectly appropriate, it's the highest calling of the attorney.

I do caution you in these respects. Remember that none of the lawyers were there back in the day when any of this was going on. They are, and they've done a very fine job, they're teachers. They're teachers of the evidence that has been laid before you. And they're allowed now to argue from the evidence that is before you.

So, remember this. If a lawyer says something or asserts something and that isn't the way you remember it, your memory of the evidence governs. You're the jury here. But we give the lawyers a chance to make these final arguments.

Now, because it's Mr. Jones -- and I think I should say this now. I've called everyone Mr. or Ms. and that's how I do it normally, so I'm not calling one person Admiral and someone else something else. And courteously, they've called each other doctors because, given their educational attainments, I suppose that's right. Don't think that by my calling people Mr. or Ms., and I'm going to go on doing that, I disrespect them in any way, or I disrespect their testimony, or I think anything about their testimony. I don't. It's just my routine practice.

So having said that, it's Mr. Jones' burden on behalf of the government to prove what has to prove here in this case. So, under the rules of Court, his attorney gets to argue last and we hear first from the hospitals and the individuals' attorneys.

Mr. Rose.

**MR. ROSE:** Thank you, your Honor.

Before I say a thing in argument, and I'm sure I'm speaking on behalf of everyone here, I want to thank you all, each and every one of you, for your close attention. This is a very, very technical case and I know it was tedious listening to a lot of the evidence. I've looked over, I know you've been paying close attention to the evidence, and on behalf of everyone here, I want to thank you for your close attention to it.

Now, Dr. Jones claims that Dr. Killiany and Dr. Albert violated the False Claims Act. One allegation is that Dr. Killiany falsified scientific data by intentionally exaggerating the boundaries of the entorhinal cortex and that he did so in order to prove a hypothesis about the entorhinal cortex.

A second allegation is that the grant application made false statements about using blinded, reliable methodologies. The Court will set forth and define for you what it is that Dr. Jones has to prove.

Mr. Hughes said in his opening that he would prove that the defendants are bad apples, out for millions for their institutions and themselves. Now you know, based on the evidence, that those are empty words, wholly refuted by the facts.

Now that you have observed and heard Dr. Killiany and Dr. Albert in this courtroom you are in an excellent position to evaluate Dr. Jones' claims. The defendants I submit based on the evidence are diligent, committed scientists, doing difficult work very carefully. They made no false statements to the NIH.

Let's talk about Dr. Killiany for a moment. He works at the BU School of Medicine. He teaches, mentors students, runs an imaging lab, and he works in a clinic one day a week helping patients who are suffering from dementia. The NIH has funded his research and still does. So does the military he testified.

You observed Dr. Killiany in this courtroom patiently explain the way in which he measured and remeasured the boundaries of the EC. He is clearly a careful, cautious scientist. He really cares about his research and about helping other people.

He started working on the PPG in 1992. He had just received his Ph.D. He volunteered his time for a five year period from 1992 to 1997 measuring regions of interest on

MRI. Why? Because he thought it was interesting and important work. In the next five year period, '97 to '02, he received a supplement of $10,000 a year to his salary. He didn't get paid extra for making remeasurements. He did remeasurements because he wanted to be more accurate in his work. When he became a project leader he actually took a pay cut because then BU simply received salary support for Dr. Killiany's salary at Boston University. Millions for themselves and their institutions, Mr. Hughes said in opening statement. Not on this evidence.

You learned from Dr. Teresa Gomez-Isla that in 1996 she and her colleague, Brad Hyman, published an important article about the EC. They had studied the EC under a microscope. Their autopsy work proved that Alzheimer's disease attacks the EC and does so very early in the course of the disease. The question became whether scientists like Dr. Killiany could see that loss of neurons, nerve cells, on MRI scans. If so, physicians could use that information to predict who might get Alzheimer's disease some day. Such patients might be candidates for drug therapies when those drug therapies are developed.

So, Dr. Killiany and Dr. Gomez-Isla discussed how to outline the EC. It's a very tiny structure. They developed a way to measure it. Their reliability study looked good. Look at the figures, however, with regard to

the reliability study. I believe they're on Exhibit 177. Their drawings were certainly not identical and their volumes were certainly not identical either.

Take one example. Ron Killiany's left side of case 56 was fully 50 percent greater than Teresa's measurement of the left side of number 56. Other measures were different from each other by 28 percent, 25 percent. Clearly two people can arrive at volumetric measures that are quite different while still using and following the same protocol.

Dr. Killiany explained to you the way in which his early drawings were too conservative, too short, missed white matter, missed grey matter. Interesting, isn't it, that Dr. Jones' expert witness, Dr. Schuff, corroborated Dr. Killiany's description of the ways in which Dr. Killiany's initial drawings were too conservative. You heard Dr. Schuff say that Dr. Killiany's initial drawings were too short, too skinny, a bit too skinny, slightly too skinny. Schuff did not identify a single instance in which Dr. Killiany's initial measurement was too big. If a drawing was wrong it was because the drawing was too skinny or too short.

And Teresa Gomez-Isla and Dr. Moss corroborated the point that when you're starting out you begin with small drawings. Schuff's measurements himself he testified, you may recall this, I asked him about when he, occasions when

he had drawn, attempted to draw the EC on MRI, he said that his were too small when he first began drawing.

Dr. Killiany learned as he went along. He had never drawn an ROI as small as the EC. When he encountered a case with something new, something he had not seen before, a anatomical variation, this caused him to go back and look again at all of his earlier drawings to make sure that his drawings were consistent. There's no evidence that he was finding out the statistical consequences of his early drawings when he did remeasurements. So he had no reason to think that he needed to redraw for statistical reasons.

You have seen him testify. You've heard him. You probably noticed when he was at the, at the Elmo he was totally absorbed in what he was doing as he explained the process to you. And you may infer he was just as absorbed in those three, three or four years, 1997 through 1999, drawing ROI's and sending the data to Mary Hyde and then the drawings themselves to Keith Johnson.

Now, talk about a careful individual. I ask you to look in the jury room at Exhibit 205, Dr. Killiany's e-mail to Mary Hyde with 25 columns, 25 columns of figures hand typed for 17 extra cases for which complete data had apparently not yet been sent. This is a very careful person. Does he make mistakes? Of course. He happens to be human. He admits his mistakes when they occur and

93

corrects them. Contrast this attitude with Dr. Jones who, when confronted on the witness stand with his mistakes, tried in every way to avoid and evade answering questions.

When Marilyn Albert called Dr. Killiany in 2001 and said that Dr. Jones had concerns, Dr. Killiany said fine, he cooperated in having Mark Moss review his work, no questions, no argument, his professional life is an open book.

Dr. Killiany was blinded. The lawyers here I submit tried and failed to prove that Dr. Killiany knew group status. The documents prove he did not know the group status of any participants.

Now, consider this. If Dr. Killiany were the bad apple that these three lawyers would have you believe, how would he have done his work. First, if he were a cheat and he knew group status, why would he ever go through the difficult task of measuring twice, or three times. And why would he ever save all those measurements. Instead, if he were a cheat, he would measure once, make the drawings just enough larger on every entorhinal cortex, making them all slightly bigger than he believed was accurate. A cheat would not create and save second and third drawings. If he felt he had to redraw, he would alter, physically change his first drawing if he were a cheat. Ron testified that the software would have allowed him to alter his measurements.

He chose not to do that because he wanted to save all the data. He's a careful scientist.

Second, a cheat would hide things. Dr. Killiany hid nothing. He labeled every single drawing. ENT00. ENT01. ENT02. What cheat would do that? It's absurd.

Third, a cheat would not send all his drawings to others. He would only send his final drawings. Here, Dr. Killiany sent all of his drawings to Keith Johnson. It was that act that caused Jones to talk to Dr. Albert about the remeasurements. Why would Dr. Killiany do that if he were a cheat.

Fourth, he sent all his data to Mary Hyde for her to enter into the database. A cheat, I submit, would hide the evidence.

Fifth, a cheat would get rid of all the evidence at some point, right? But here we are in a federal courtroom analyzing potentially every EC drawing that Dr. Killiany created, more than a hundred of them, left/right, three slices. You have so many of them, hundreds and hundreds of them. So here we are, 16 years after the events began, looking at his work from 1997 and 1998, 1999. If Ron had cheated in 1997 to 1999 don't you think he would have destroyed the evidence sometime before this lawsuit.

Sixth, a cheat would not have increased the measures of questionables and converters. Dr. Killiany's

measures of ten questionables and five converters also increased.

I could go on and on describing all the things that a cheat would do or would not do. I submit to you based on the evidence Ron Killiany's conduct was inconsistent with cheating. On this evidence, he is an honest individual.

Other witnesses corroborate Dr. Killiany. Teresa Gomez-Isla made it clear that when you are first drawing the entorhinal cortex you draw conservatively. She was not surprised that Dr. Killiany remeasured. She said she would have too. In fact, she did on at least one participant, subject 1. When you have more experience you develop more confidence in your ability to determine where the boundaries are.

Dr. Moss. He's a very experienced, serious scientist working at BU School of Medicine. He reviewed Dr. Killiany's remeasurements. He saw the EC would be difficult to measure and he explained why.

On the evidence, there is simply no support for the claim that Dr. Killiany falsified scientific data. Indeed, Dr. Albert testified yesterday that the findings have been replicated two dozen times.

Let's talk about Marilyn Albert for a few minutes. She has devoted her professional life to the study of Alzheimer's disease and to the search for the first

indications of Alzheimer's. The NIH has funded her research since 1980. Still does. She teaches and mentors students at Johns Hopkins Medical School. She ran a clinic at Mass. General Hospital for more than 20 years. She founded the Massachusetts chapter of the Alzheimer's association. I suggest that you review her e-mails and the grant application. Consider the care with which she writes everything; the restrained way in which she dealt with Jones' incessant demands for more and more money on the project from '02 to '07.

Look at the grant application, the care with which she presents her case for renewal of the PPG. Yes, she sets forth the findings from their study, but she is careful to point out the sample was small and needs to be increased, that manual measures of ROI's are problematic. We need to move toward automated measurements. Our findings need to be tested in a larger group of subjects. She even acknowledged that other investigators had found slightly different findings regarding the EC and the hippocampus. She's careful, careful, careful.

I ask you pick up Exhibit 171, the grant application. Pick out a page. Any page. It doesn't matter. Read it. Marilyn Albert is a careful person, the kind of person you would want doing scientific research into this dreaded disease.

When Dr. Jones raised his concerns in March 2001 Dr. Albert acted immediately. March 15, 2001. She heard Dr. Jones out. Dr. Jones said that Dr. Killiany had remeasured. There's more than one drawing. Jones wanted to know which drawings were more accurate. That's what he said. He speculated that maybe the cases had been selected in order to enhance group differences. But the objective fact, the only objective fact he gave to her was that there were two, there was more than one measurement.

So what did she decide to do? Sweep it under the rug? No. She brought in someone who understood the anatomy but who was not working on the MRI project, Mark Moss. For Dr. Albert the key question was accuracy. Were the final measurements more accurate than the initial measurements. Dr. Moss reviewed the drawings and concluded that with one exception the final measurements were more accurate than the initial measurements. And Moss explained that large percentage changes did not surprise him at all since changes to a small structure could produce large percentage changes, unlike, unlike changes to a large structure where an increase might produce only a small percentage change. He also testified that the PPG made important advances in the field of Alzheimer's research.

I submit that on the evidence, Marilyn Albert is an honest individual. She did not and would not cheat the U.S.

government.

And what can we say of the plaintiff's evidence. Of course they called Mass. General's employees as witnesses. How about their witnesses. There are basically four of them, Jones and three experts, Goldstein, Davila-Garcia and Schuff. What do those four witnesses have in common? Financial motive.

Jones is a complex individual, clearly a very accomplished statistician, but with flaws that were exposed in this trial. He worked with Dr. Killiany for about eleven years. He had worked with Marilyn Albert for more than 30 years. And now he makes the worst possible claim anyone could make against scientists, that they rigged the data and defrauded the NIH. When I asked him why he said nothing, nothing to the NIH about Dr. Killiany's remeasurements, he said that he did not want to hurt hardworking colleagues. Keep in mind he was also under the Partners research integrity policy. Nothing's preventing him from going to talk to anybody he wants in the Partners organization.

When I asked him why he said nothing to the NIH about Dr. Killiany's remeasurements, he said he did not want to hurt hardworking colleagues. What a phony, contrived argument. He did not want to hurt these hardworking colleagues and that's why he said nothing to the NIH? He's sued them for millions here. He never picked up the phone

to talk about his concerns with his long-time colleague, Ron Killiany.

Now, Dr. Jones was clearly feeling wounded by what happened at the NIH reverse site visit in March 2002. What happened there was not the defendants' fault, it was Jones' fault. When Professor Kryscio at the University of Kentucky asked Dr. Jones why he was not using a method called survival analysis, Jones told Professor Kryscio that survival analysis was, in quotes, his words, completely inappropriate. Not a wise comment to make. It doesn't matter if Jones was right or wrong. You don't tell a coach, a teacher, the principal, or an NIH site reviewer that the method the reviewer thinks you should use is, in quotes, completely inappropriate. That comment caused NIH to inform Dr. Albert that she had to bring in a new statistician to work on the grant. That meant the budget had to be cut for Jones' work. And when Marilyn Albert moved to Maryland, Jones' contact with the PPG phased out and ended in 2003.

How did Dr. Jones try to spin these events in the courtroom? He claims he was dismissed from his appointment at MGH after he complained about the data. On the evidence this is nonsense. The truth hurts, I'm sure, but it's still the truth. Jones was a victim of his own foolishness in arguing with a site reviewer. As to losing his appointment at Mass. General, the correspondence, which is in evidence,

shows that Dr. Jones was told he could keep that appointment if he worked at least three or four hours a week at Mass. General. Dr. Jones did not follow up on that offer. His attempt to portray this as I blew the whistle and they fired me is pure fabrication. Jones worked on the project from '02 to '03, he filed suit in 2006, days after the last grant progress report was filed.

Now, consider this. When I asked Jones why he waited to file suit he said three words: Advice of counsel. Let's think about what that means.

This was a five year grant renewal. Year one was '02, then '03, '04, '05 and '06. So the middle of '06 was the beginning of the fifth year. By waiting all that time he made sure that the money was paid out by the NIH to the hospitals. If you want a piece of pie, first there has to be a pie. If the money had not been paid out there would be no money, no pie from which he could try to get his piece. But if the money were paid out then there would be a pie from which he could try to get a slice or a piece later on. That's what waiting on advice of counsel means in practical terms as applied to this case. That's his motive. Motive that colors every statement he made in court. How do you know that?

When Mr. Hughes showed Jones his signature in this courtroom, on the authorship disclosure form, which is now

in evidence, Jones looked at it a long time before denying that the signature was his. Why did it take so long? Anyone would know in an instance whether a handwriting you are shown is yours. You wouldn't need to study it. What he was really deciding was whether he was so desperate to win the case that he was willing to disavow his own signature on the '02 authorship form. He knew how important that authorship form was.

His attempt to disown his signature did not work. Marilyn Albert knows his signature from many years of seeing it. Seven people who were coauthors on the '02 paper were at the planning meet on January 8, 2002, Killiany, Hyman, Albert, Jones, Moss, Kikinis, and Jolesz. They are seven of the coauthors on the 2002 paper. They all signed one form in sequence. If Jones did not want to sign that form don't sign it. The form says that the people signing the form have read and agree with the contents of the '02 Neurology article. Why is that important? It's crucially important. The paper makes many of the same statements about the role of the EC in Alzheimer's disease as are in the grant application. The paper also makes the same statement about the reliability of the EC methods that's in the grant application.

So, how can Jones say on one hand that statements in the grant application are false when he has signed a form

stating that he agrees with the content of the paper that makes the same statements about the role of the EC in Alzheimer's and reliability of the methods used to measure the EC. He can't have it both ways.

By the way, he was so proud of his association with the 2002 paper that he listed the paper and the 2000 paper on his resume. The resume is also in evidence.

Yes, the truth hurts. And the truth is that when Mark Moss completed his review, when after Jones asked that all of Dr. Killiany's measurements be redone, Jones did not raise the issue again with Marilyn Albert. Instead of talking about that issue he worked on the grant application instead. He sought more money for himself in the next five year period. He said nothing to suggest he did not agree with every word in the grant application. You heard testimony yesterday from Marilyn Albert about the way in which Dr. Jones was heavily involved in the grant application. And there are several e-mails in which Dr. Jones talks about the fact that he has a considerable intellectual investment in the grant and wanted it to succeed.

How is Marilyn Albert to know, how is Dr. Killiany to know if Dr. Jones still thought something was wrong with the data. The reality is apparently he thought nothing was wrong with the data because he stopped talking to her about

it.

Let's talk about the other witnesses. Goldstein. 600 an hour. He admitted he was acting out of ignorance. He never read Jones' deposition testimony. His testimony is undermined by the following, undermined by the following factors.

He claimed Dr. Killiany was trying to prove a hypothesis, but when he was asked what's the hypothesis, he had no idea what it was. He failed to take into account head size, age, gender, or any of the other variables that were supposed to be considered. He liked the answer he got from the EC data. That was enough for him.

He told the judge that his analysis was based entirely on the numbers. When he was challenged on the numbers, he acknowledged that some of them looked incorrect. So then he changed his tune and claimed, when Mr. Hughes was asking him questions, that those numbers didn't matter. His testimony, I submit, is useless. What is it he said, 94 chances in a million or 10 million, something like that. Is that it? What's the chance there's life on earth.

Dr. Davila-Garcia, 600 an hour. Three lawyers were apparently not enough. Davila-Garcia became the fourth advocate for Jones, eager to heap scorn on the defendants at every turn.

Now, she was told by Dr. Jones' lawyer right out of

gate this was a fraud case. And she was also told right out of the gate Dr. Killiany had only looked at a subset of the scans, therefore, she thought, he must have known what he was looking for and he must not have been blinded. Amazingly, she never even read Jones' deposition transcript so she did not know that when Jones first heard of the remeasurements he was so unconcerned that he said: So what? Or that he told Marilyn Albert that he simply wanted to know which measurements were more accurate. Or that he did not use words like fraud and scientific misconduct. Davila-Garcia's purchased testimony is biased and useless.

Then there's Dr. Schuff. A bargain at a mere 240 or $300 per hour. And his testimony as I've said helps the defendants. Why? Because he repeatedly identified many of Dr. Killiany's initial measurements as too skinny, too short, slightly too skinny, a bit too skinny, too short. He also admitted that when he had done a few drawings of the EC, using a very different protocol, his initial drawings were also too short.

But the best part of his testimony, I submit, concerns Dr. Killiany's character. Because Dr. Schuff said that when he, Dr. Schuff, had questions about automated methods, something about segmentation or parcellation -- we've all learned a lot of new words in this case -- so when Dr. Schuff had questions about automated methods who did he

turn to? He turned to Dr. Killiany, who answered his questions. A fellow scientist helping a fellow scientist. That's Ron Killiany.

Dr. Jones' case is built around statistics. That's all he knows. But the stats are flawed. Apparently he did not realize all the contradictions between Exhibit 176 -- I believe the document's referred to as entgeo -- and the relator's table. He presented these documents to you as accurate when they clearly are not. They are inconsistent. They cannot both be correct, yet Dr. Jones insisted they were both correct. He called 35 percent discrepancies rounding errors. The next day he changed his story. You cannot build a fraud case on shifting sands.

**THE COURT:** Five more minutes.

**MR. ROSE:** You've heard about the .96/.54 reliability numbers. We've demonstrated that when you look at the numbers only two of the cases, number 1 and 56, are significant changes. Two, two out of 25. That leaves remarkable consistency between Dr. Killiany and Dr. Gomez-Isla on 23, 23 of 25 cases. Twenty-three out of 25. That's 92 percent consistency by anyone's math. The .54, very fuzzy math.

Furthermore, the figure of .54 did not surface until this lawsuit. It's not even in the original complaint in the case filed in 2006. It's not referred to in any

document in 2001. Jones claims that he did the analysis that led to .54 reliability finding in November 2001. But that was not a reliability test. You know from the evidence that a reliability test occurs in this context when two people agree on a method and then do a small sample of drawings to see if they come up with similar results. Plugging in new numbers from later by which time one of the people has much more experience is not how you conduct a reliability test.

And beyond all that there's no evidence that Jones told anyone at any time about the .54. He kept that information to himself. His testimony about having done the analysis in November 2001 after the grant application was submitted, or at any time before the litigation, has the same credibility as the denial of his signature. In short, even if he did do the analysis in November 2001 there's no evidence he told anyone he did not say he did. Therefore, when the grant application was submitted, was pending, was approved, there's no evidence the defendants were told that the methods used to draw the EC were not reliable.

There's also no evidence that Dr. Killiany was not blinded to group status. In fact, Dr. Jones filed a declaration in this very case in which he said that Dr. Killiany and Dr. Gomez-Isla were blinded. He cannot escape from those words.

On all the evidence, then, we submit that Dr. Killiany did not falsify scientific data by intentionally exaggerating the boundaries of the EC with the intention of trying to prove a hypothesis, and we also submit that the grant application did not make false statements about the use of blinded, reliable methodologies.

Dr. Killiany and Dr. Albert and the hospitals have been under the dark cloud of false charges for too long. We ask that you return verdicts for the defendants.

**THE COURT:** Mr. Kohn.

**MR. KOHN:** Thank you, your Honor.

Ladies and gentlemen, it's been a long trial and I thank you for your patience.

When you consider the evidence you have here you'll be able to answer both questions put to you by the judge with resounding yes. You can accept almost anything you want from this case from the defendants, but in the end they're just guilty. Indeed, they have effectively admitted it. Mary Albert told the NIH that she had reliable data which could predict the onset of Alzheimer's disease. That is what she told them to get the grant funded. But Marilyn Albert told you on day two of this trial that she knew she was working with two sets of contradictory data. She admitted she knew that four of the cases in the reliability study had been altered. Ladies and gentlemen, no matter how

hard it is to measure the entorhinal cortex, it cannot be two different sizes at the same time. But to get $12.3 million, Marilyn Albert effectively said it was.

She had one set of data which she used to say she could measure the entorhinal cortex with superb reliability, and she had another set of measurements which enlarged the normal cases, some by as much as three times the size to claim that she could figure out who was going to get Alzheimer's disease. She knew that she was using both sets of data in her grant application. She never told the NIH she was using two contradictory sets of data. Never. She never told the NIH that her chief statistician had concluded that the alterations were intentional, or that there was anything wrong at all. Over and over again in the grant application she insisted that the measurements were reliable, that she had obtained a .96 Pearson correlation, when she knew that four of the values of the reliability study had been altered. And it was her legal duty to the NIH to say you know what, our Pearson correlation is .54. She put it in the grant. She had to vouch for it. Nobody else. She knew from her meetings with Ken Jones that the second set of data, not -- she knew from her meeting with Ken Jones that there was a second set of data responsible for showing predictability of Alzheimer's disease. And she knew from the publication she put out earlier that it was

the first set of data that was used to show the reliable methods.

So what does she do? She used both. She used the first set of data to make the other look legitimate. She had the first set of data that claimed her methods were reliable but the data could predict absolutely nothing. She used the reliable data to give a phony legitimacy to the altered set of second data. She used the altered data to say that she could predict the onset of Alzheimer's disease.

Let's close the loop and go back to the beginning. The second set of data altered four cases from the actual reliability study itself. If she used the second set of data alone the reliability of her method crashes from .96 to .54. That is an uncontested fact. The NIH would have laughed Albert out of the room if she had told the truth about the reliability of Killiany's measurements. They were horrible. They were unreliable. She couldn't tell the NIH otherwise, and she looked them straight in the face and said our data is some of the most reliable data in the world. The only way both the reliability of these data and the predictive power can be true, as it stands, ladies and gentlemen, is if the entorhinal cortex is not only small but it can change size by three times its volume at the same time. That can't be true. That's not how physics works. We see that two sets of, the two sets of data are

contradictory. They alter the same cases. They can't both be true at the same time. Yet, that's exactly what Dr. Albert told the NIH. She told them reliable and predictable -- she told them that her data was reliable and predictable when the reliable set was itself altered by the predictable set of data. Data which involved measurements of the same exact scans, of the same exact part of the brain, taken at the same exact time. You can't cheat the laws of physics. You use one set of data or the other. And if you think one is more accurate then you throw out the other one and you tell the NIH why. You don't present both, with a straight face, and say, oh, our study is utterly predictable and then go on to submit data that you know is contradicting that. Dr. Albert knew four of the cases had been altered.

And it wasn't Dr. Jones' responsibility to, to recalculate it. She knew that the reliability study had been altered. Mary Hyde -- everyone reported to her. Whatever she wanted was at her fingertips. She knew everything she needed to know that she was submitting falsified data.

Most importantly, she didn't tell the NIH there were any questions about any of this. The only thing the NIH knew from Dr. Albert was her claim that the reliability study and the predictive power were based on the same

111

methods and the same measurements. She submitted her NIH application and took the money.

We've heard a lot of -- we have heard a lot of side issues in this case and nobody has been able to explain why the fact that the two sets of data stand in stark contrast to each other. And what does their reliability defense boil down to? A big fat lie. Plain and simple. And I'll lay it out for you.

Moss was Killiany's mentor and chairman, and if there was something he could say to help Killiany out he would have volunteered it here for you.

So, what did Moss actually say? He admits that he had no idea that Killiany had made two sets of measurements. And that is in the hearing transcript at page 15.

Question: And it was your understanding that there was only one set of measurements, correct?

Answer: Uh-huh.

Question: That's yes?

Answer: Yes. That's yes. Sorry.

And on transcript page 9: Did you know that there was more than one set of tracings that Dr. Killiany had taken of the entorhinal cortex?

Answer: I don't think I was aware of that, no.

Moss claims he didn't know there were two sets of

measurements. That makes it impossible for him to have said that one set of measurements was valid and the other was invalid. If you only knew of one set of measurements he could not have prepared that report that lists one set of measurements next to the second set of measurements. It's just an impossibility. If you know -- if you don't know there's two sets, you can only list one.

And Moss admits that he did not author the report. And that was the first time -- and the first time he ever saw it was when he met with Killiany's lawyers the day before I deposed him. At best, Killiany prepared a self-serving report which was prepared around, which he circulated around as if Moss had authored it. But Ken refused to accept it and renewed his demand for an independent investigation.

You couldn't insert -- as far as accuracy goes, Moss straight ought refused to vouch for the accuracy of the measurements. He said at the trial that for him to, quote, identify the boundaries at this point would have been a disservice on my part. He was unable to look you in the face and say yes, the boundary changes that Dr. Killiany made accurately reflect the final boundaries. He never said that to you, ever.

Not only that, Dr. Moss testified that he had no conversations with Albert about what he saw during his

113

review. Transcript page 27, Question: You had no conversation with Dr. Albert about what you wrote down on your notes?
Answer: That's correct.
Question: So she had no idea whether you said they were good or bad?
Answer: That's probably correct, yes.
Question: You handed your notes to Dr. Killiany?
Answer: Yes.
Did you hear anything else about your work on this?
Answer: No.

I think it's pretty obvious that Killiany is not in the position to be the deciding official as to whether he falsified his own data. And that's what Dr. Albert allowed to happen in this case.

Only one witness was qualified to testify about the accuracy of the remeasurements, and that was Dr. Schuff. He testified that every one of the alterations Dr. Killiany made to the normal subject scans was a gross exaggeration.

I find it credible -- I find it incredible that one of the top research institutions in the world can't line up a single expert willing to say that Dr. Schuff was wrong. It's mind boggling. We get one of the world's most incredible experts on how to measure the entorhinal cortex

and he comes here and he tells you that every last one of these normals here, and he looked at them, and we showed them how they were changing, and he went down for every one of these and he said there was absolutely no scientific justification for any one of these moving down. That's his unimpeached testimony.

And if it was a matter of debate, I think with all their millions they could have got twelve experts to sit up there and say he was wrong. They didn't produce a single one, because no one can tell honestly that Dr. Schuff didn't know what he was talking about.

The only explanation Mary Albert came up with to explain why she refused to measure the scans was because she was afraid she would end up with two sets of data and wouldn't know which set was right. That's right in the transcript. That explanation turns logic on its head. She already had two sets of data and she knew both couldn't be true. The only thing is she wanted it both ways.

She refused to remeasure, refused to let anyone outside her inner circle even look at the measurements because the only way her grant was going to be approved is if she could claim that she was the first in the world to be able to use an MRI to predict who would get Alzheimer's disease. And Dr. Jones' evidence burst that bubble.

You have heard her effectively admit all this and

you must on the basis conclude that the answer to Question 2 is an emphatic yes. Yes, they altered data knowing to get the grant.

They did not just change a few cases by a pixel here or a pixel there to make measurements a little more accurate. The fingerprints of Killiany's crime is the alteration of the reliability study itself. You can't alter four measurements in the reliability study, one by as much as 283 percent, and drop the Pearson correlation from .96 to .54 and claim that it was done to improve accuracy. That's not scientifically feasible. It's a lie. It's the fingerprint. What Dr. Killiany didn't know was which cases were in the reliability study. And he got caught. Because he ended up changing the ones from the reliability study which proves that his alterations changed the scientific validity of his measurements.

This is the central issue in the case. Marilyn Albert knew it was a problem and she didn't fix it. And on transcript page 83, Question: Instead, you reported to the NIH that your inter-rater reliability was very good, excellent, based on an inter-rater reliability study in which you personally knew four of the measurements in that study had been altered, correct?

Answer: Correct.

She has admitted to asking the NIH for money based on bad data.

Now, we have to explore a lot of other issues in this case. Whether Ron Killiany was blinded or not. And I suppose anything's possible. After all, people hit the lottery once in a while. So, Dr. Goldstein's eight in ten million odds. It's pretty, pretty unbelievable that he was that lucky.

But what's the odds that a scientist with great skill and acumen as they say could just so happenly say, oh, this one. Not this one. Not this one. That one has to get changed. Not this one. Not this one. Not this one. Oh, this one needs another hundred percent change. Oh, these are all fine. Oh, this one needs one. Oh, these are all fine. This one needs a hundred percent change or a two hundred percent change or a 283 percent. These are all okay. This one again. And every last one of them, normal, normal, normal, normal, normal, normal, normal, normal, normal, normal, normal, normal. And they all get moved. Just like the patient's head got twice the size. It was 4.56, now it's 6.3. You can't have two size heads. And that's really what he's saying here.

Killiany claimed in the paper that he published in 1993 that he could look at MRI scans to figure out who was normal and who was mildly, who had mildly impaired AD, just

117

by looking at the scans. That's what he says. He says he studies this. He publishes papers on scans of the brain. He was the top expert. But could not figure out a code as complicated as 6 is normal and 7 is a converter.

Again, the judge said on day one you have to decide what's more likely than not. Is it more likely than not that all these normals just changed randomly while he was still blinded. One in a million shot. Those are the odds an expert statistician presented to you. Where's the counter expert to say he's wrong.

Dr. Killiany says quite, Dr. Killiany says quite credibly that the entorhinal cortex is small and hard to measure. That is true. But he and Dr. Albert are also the ones who told the NIH he could in fact measure it. He and Dr. Albert are the ones who told the NIH they could rely on his measurements and then Dr. Albert submitted the two sets of contradictory data to get the money.

Again, he can't have it both ways. He can't be the world's expert on measuring the EC and then suddenly run around telling us how hard it is to do. Did he tell Dr. Gomez-Isla his measurements were somehow wrong? No. Dr. Gomez-Isla blurted out twice on the stand, I don't know what he was thinking. He and Dr. Albert said his measurements and his methods were reliable when they both knew they were using two sets of data. But even if someone you want to

118

believe, but even if somehow you want to believe Dr. Killiany did not know what he was doing, Marilyn Albert, the principal investigator, the one who promised the NIH that her grant proposal would be truthful, complete and accurate, knew, she knew, she betrayed the NIH and she betrayed her oath, and she betrayed her chief statistician.

She told us on day two of this case that she knew there were two sets of data. She never, never since submitted, since submitting the grant has she ever been willing to admit that mistake. She may have had Mark Moss look at a few. She didn't have anyone remeasure, because she said she was afraid to do the remeasurements.

So she knew the data was invalid, but she submitted the grant to the NIH anyway. And the other side attempts to distract us from the issues because they know it's true. They want us to worry about whether Ken Jones is greedy for seeking the maximum amount allowed under the law. Did Ken Jones write the law? No. Is he supposed to seek the least amount he could under the law? I'm his lawyer. I can't blame him for taking my advice. Is he one who is following the law? That's the most damaging thing that they can say about him. They complain that he did not complain enough. Couldn't stay the course. He went to the principal investigator, he went to the authority the NIH required to sign in ink that she would comply with her institutions and

the NIH integrity policy. Did Dr. Albert know that Ken Jones was alleging scientific misconduct? Dr. Albert's testimony in this case answers that clearly.

On page 12, Question: Jones raised an allegation against Ron Killiany that impugned his honesty, correct?

Answer: Correct.

Question: And by impugning his honesty you are referring to Dr. Jones having questioned the honesty of Dr. Killiany's measurements, correct?

Answer: Correct.

Elsewhere: You thought his concern was that with redrawing the entorhinal cortex maps they were being made falsely large and that was altering the statistical significance of the results that had been reported, correct?

Answer: That's correct.

And when asked: And Dr. Jones' concern was that Dr. Killiany intentionally plumped out the volumes of the normal group so he could move them down to the bottom and prove his theory, that was what he was telling you, right?

Answer: Yes.

What does that mean under the law when she said yes. It's black and white. It's black and white.

And the only thing I have to pull out is the law itself which is in the record. It's the NIH rules of

handling misconduct. It's the NIH policy requirements that go over how you have to handle misconduct. And Dr. Davila testified here. Again, no rebuttal expert. She testified that based on, based alone on what Dr. Albert said in her deposition it mandated under law that they had to follow this Partners policy.

What does the Partners policy do and say? It says that you have to have a research integrity officer and you have to conduct an inquiry. The research integrity officer, in consultation with other institutional officials, and HMS as appropriate, will appoint an inquiry committee and the committee chair to consider the allegation as promptly and as reasonably possible. The inquiry committee shall consist of the individuals who do not have a real or apparent conflict of interest in this case, are unbiased and have the necessary expertise to evaluate the evidence.

A committee. Not Dr. Moss, Killiany's friend, and certainly not Dr. Killiany writing his own report. That's the law.

As soon as Dr. Jones came in and in Albert's own admission she understood he was making allegation of scientific misconduct, that triggered a whole set of legal requirements that she was in a straitjacket and couldn't get out of. It wasn't Jones who was in the straitjacket. It was her.

And did they ever tell Jones about the research integrity policy? No. He's got to stumble around tying to find a lawyer that knows the law what to do against an institution that he can't -- do you know hard it is to find a lawyer in Massachusetts to go against, against these guys? I'm in Washington, D.C. It took a long time for Dr. Jones to see me. A long, a long time.

And you know what? That never should have happened. It never should have happened. Because right here the research integrity officer will monitor the treatment of the individual. And the research integrity officer will have -- and the whistleblower has rights under this policy. Will have the opportunity to testify before the inquiry and investigation committee. What did Jones get? These meetings are over.

They violated this policy and by violating this policy they violated the law and the government of the United States wants its money back because they promised they would follow these policies and if they were taking our money they had to.

And also on the second day of testimony, I asked Dr. Albert: Question: And he -- referring to Jones -- he was concerned when he looked at it, all the ones that were really made larger were all the normal group, that was his concern?

122

And her response is: That was not the truth.

She betrayed you. She lied to you. Because all the ones that were really made larger are all in the normal group. That was his concern. That was not the truth? Dr. Killiany admitted that each one of these red lines is the truth.

**THE COURT:** Five more minutes, Mr. Kohn.

**MR. KOHN:** It all boils down to the fact that they knew they had two sets of data that were contradictory and they submitted a grant to the NIH using both sets of data to get the money. Because of this they are guilty of violating the False Claims Act.

What they are really asking is for you to adopt their values. They want you to say it's okay if we lie and steal, and it's okay because it's only the government's money. But the government's money is our money in the end of the day. It's money that's supposed to go to research. We have even heard expert testimony from Dr. Schuff, the only expert in this case on the issue who testified that their methods have in fact not been repeated. Research in this -- this case is as black and white as it gets. It's about fraud. Stealing money from the federal government on the false promise that Marilyn Albert made when she signed the grant.

For all of these reasons you can easily provide a yes to both questions put to you by the judge.

I want to thank you. It's been long and hard I'm sure on all of us. It's been my honor to be able to present this case to you. This is, in some ways, groundbreaking case. This is the first case of scientific misconduct going forward. This is it. This is America. This is where someone stands up in the workplace and says, hey, they fudged the data. You don't trample them down and fire them. We're scientists. We have policies that say, wow, let's embrace you, let's get to the bottom of it. That's what this case is about.

All said and done, the trail of that man and the hardship he had to do to end up in my office and end up in a horrible long, drawn out litigation so in the American sense of justice we can be here today. That's what America is about. Thank you.

**THE COURT:** All right, ladies and gentlemen, we'll take now another -- well, let's take ten minutes and I think we'll be ready for my explanation of the law.

Since that is part of the case, keep your minds suspended. Don't start talking about the case now. Wait until I've instructed you as to the law. And naturally, don't talk about the substance of the case with anyone else.

You may stand in recess for ten minutes. The jury

may recess.

**THE CLERK:** All rise for the jury.

(Whereupon the jury left the courtroom.)

**MR. ROSE:** Your Honor?

**THE COURT:** Yes.

**MR. ROSE:** Excuse me.

**THE COURT:** Please be seated.

**MR. ROSE:** I ask for a curative instruction.

**THE COURT:** As to what?

**MR. ROSE:** In the following respect. Mr. Kohn stated that the defendants, quote, unquote, violated the law by --

**THE COURT:** I'll take care of that. If there was, I'm going to charge that if there was a violation of the policy they may consider it with respect to the questions I posed to it, but it is not itself the end of the case.

**MR. ROSE:** Thank you.

**THE COURT:** We'll recess.

**THE CLERK:** All rise.

(Recess.)

**THE CLERK:** All rise for the jury.

(Whereupon the jury entered the courtroom.)

**THE CLERK:** Court is back in session, you may be seated.

**THE COURT:** At this time, ladies and gentlemen,

it's my duty to teach you the law that you must follow with respect to this case.

Let's start with your role. All eleven of you are equal. All eleven of you will deliberate. And the verdict must be unanimous. The lawyers have done a good job in narrowing this case down to two essential questions. I'm going to pass them out in a moment and we're going to go over them in detail, and the questions are answered either no or yes, and based upon your answers to those two questions will resolve the liability or nonliability in this case.

Your verdict must be unanimous in answering these questions, that is, all twelve of you agreeing either on a no or on a yes answer to the question.

You'll base your verdict on the evidence solely on the evidence as you've seen it and heard it over these eleven days. Nothing else. No bias. No prejudice. No sympathy. No desire that anyone be punished or have revenge. Just that cool, careful sifting of this evidence so that here, in this courtroom, justice may be done.

Now, my obligation is to teach you the law, actually teach it to you, and teach it accurately. If you don't understand anything, any aspect of what I explain to you now, as you have with respect to witnesses you may ask me a question. And you may ask it at any time. I think it

makes sense for you to write your question out as your deliberations are going along. But if you get to a point where you're unclear, who has to prove what or what has to be proved, or what I meant by the words I use, I have nothing to say about the evidence, but as to the law I keep saying, well, you've got to apply the law the way I teach it, well, you have to understand it. You can't apply it unless you understand it. And I have to teach it to you in a way that you will understand. So don't hesitate to ask me a question.

What happens then, we bring you back into the courtroom, I talk to the lawyers about the question, then I answer your question as to the law and we send you back and your deliberations can continue. This proves to you that we work in the afternoon each day as well. We'll be here as long as you're deliberating. So, you must follow it the way I explain it to you and I have to explain it clearly.

Now, I have to talk about all aspects of the case. So, don't grab hold of something I say as I'm going along and say to yourself, Aha, the case turns on this or that. I have to explain it all. Having done so, don't think that I think anything is proved or not proved. I simply must teach you the implications of all the evidence that you've heard depending upon whether your analysis goes in one way or goes in another, all of which is left for you. So listen to the

127

entire charge. Don't pick out part of it. I'm trying to build for you a mental framework within which you, and you alone, determine what the truth is about these matters.

I tell you you have to base your verdict on the evidence. And I tell you that, well, I will emphasize it again, Mr. Jones has brought this case, Mr. Jones has to prove this case. Mr. Jones is arguing for a yes answer to the two questions. And he's got to prove, and you take each of the questions separately, but he's got to prove that on all the evidence you believe that what he's got to prove now is proved by a fair preponderance of the evidence, more likely to be true than not true. If something else is more likely true, he didn't prove it. If on the evidence you believe that evidence tends one way, but it tends equally, it's got to be absolutely equal, but if it's absolutely equally the other way, then he hasn't proved it. But so long as on all the evidence you believe that evidence is more likely to be true than not true you may say he has proved the particular point.

Evidence comes in various forms. Many of them have been used in this case. Let me tell you just generally that we characterize evidence as direct and circumstantial evidence. Direct evidence is evidence from a witness who testifies that the witness actually saw, heard an event. Circumstantial evidence is direct evidence of something, a

circumstance, which, when combined with other circumstances, leads to a conclusion by a fair preponderance of the evidence.

Now, we may talk about evidence in those two different ways, the lawyers and I, but the law, for starters, when you go, it makes no difference between those two evidence -- those two characterizations. A case can be proved on direct evidence, it can be proved entirely on circumstantial evidence, or it can be proved on any combination of direct and circumstantial evidence.

So what have we got here. Well, we have the testimony of the witnesses. And I told you this, but I need to repeat it. If I let any witness testify to anything here before you, you are empowered as you are the jury to believe it. Equally, you can disbelieve and disregard it as though the witness never testified. And between those two extremes, you can believe part of what a witness said and disbelieve other parts.

Now, how do you do it? You're entitled to use everything you know about the witnesses. How did the witnesses impress you. How did they react to questions both on direct and on cross-examination. Did the witness have the ability accurately to recall, logically to remember and explain those things about which the witness was asked. Does the other testimony in the case, does the other

evidence of what the witness may have said on other occasions, does that, as we say, corroborate, does that back up what the witness is saying to you here on the witness stand before you, or does that undercut it, take away from it, make it less likely.

Does the witness stand to gain or lose anything depending on how this case comes out. Did that affect the witness's testimony. Did that color the witness's testimony.

Now, as to certain of this evidence, the evidence is disputed. Different people under oath made testimony before you, and the evidence is in dispute. You're not prevented from reaching a verdict because the evidence is in dispute. You decide, as you are reasonable men and women, where the truth lies. You can resolve those disputes. You can believe one and disbelieve the other, or believe the other and disbelieve the first. You can decide what has the ring of truth, what makes sense here in these particular evidentiary circumstances.

Now, two of the witnesses who, who are opinion witnesses, they weren't in on this actual study back in the day, but the law permits, as I explained to you, in light of background and experience and training, they can come in and they can offer their opinions to you.

Now, opinion witnesses are just like any other

witness. No better, no worse. But if I let you hear it, you may believe it. You may believe everything, including the opinions. Equally, you may disbelieve it and disregard it.

With an opinion witness you want to ask yourself initially what's the opinion based on. What's the evidence in the case from which the opinion witness drew the opinion; and then, if that, if you believe that evidence, then how credible, how believable is the opinion.

In short, as you are reasonable men and women, you may sum up a witness's testimony. You may determine what has the ring of truth.

Now, we have a bunch of exhibits. Those exhibits are in evidence. Certain of them I limited. And the limitation is pretty much uniform. The limitation is, well, wait a minute, you can see this, but it's not proof that what's in there is true, it's just proof that it was sent or proof that it was said.

Now, you've got to respect my limitations. But exhibits, as well as testimony, are evidence and you have the same powers. No problem that in this world of duplicate originals that you may not have the actual document, so long as you think it's an accurate duplicate.

So, first of all, look at it, and do you think that this is accurate, do you think this is what it is, a copy of

an e-mail, say.

Once you're satisfied that it is and it wasn't just, you know, some fake that's put before you, then you read the evidence and you see what you can draw from it. And your power is exactly the same. You can believe any exhibit I gave to you, or allowed to be given to you, you may disbelieve it as though it's not before you, you may believe parts of it and disbelieve other parts. And you combine that with the testimony of the witnesses.

Now, those are the usual evidence in a case. We've got many more in this case. In this case we have deposition statements that have been read to you. And those deposition statements, if I allowed them to be read, even if an attorney read them, that's evidence. And again you match it to the testimony of the witness. Does it back up the testimony of the witness. Does it take away from the testimony of the witness. It's evidence. So you can believe the deposition testimony and disbelieve the testimony of the witness. It's evidence and you may use it.

We have certain answers to interrogatories. I explained what those were. We have certain requests for admission, admitted or denied. You may take that as evidence. We also have a stipulation. They agreed to certain things. You take that as agreed to, no dispute about that. And I even took judicial notice of something.

I could notice the regulations, and you take that, that there's no dispute about that.

Now, that's the evidence in the case. Now, having in mind it's Mr. Jones who's got to do the proving here, he's got the burden of proof, what can you do with that evidence.

Well, you can draw from that evidence logical deductions, reasonable inferences, common sense. You don't check your common sense at the door to the jury room. Just the reverse. I charge you you may use your common sense and apply it to the evidence in this case to determine both where the truth lies and what it is that you believe. But you can't guess. I was stopping witnesses when colloquially they would say, well, I guess this. I was strict on that. You can't speculate. You're not concerned with maybe, perhaps, could have been, or even probably. On the things that Mr. Jones has to prove, you have to be unanimously convinced, more likely than not, that things are the way he has to prove it.

I want to give you an example which has nothing to do with the case -- I like the example -- and it will illustrate both what a reasonable inference is and what you can't do.

Let's say a lady's walking along a country road. Or this is her testimony. She testifies she's walking along

a country road and she looks out and she sees a field of barley. You know what barley is, they make whiskey out of it. Great green fields with the gray tufts. And she looks at the field and through the field in an irregular course the barley is lying down. Well, if you believe that testimony, from that testimony standing alone, even though she didn't see it, you can infer something went through there. I mean, after all, if it was a heavy rainstorm or a windstorm all the barley would have been knocked down. No, it's knocked down in an irregular course through the field. You can conclude, without her ever seeing it, something went through there.

But if that's all the evidence there is in the case, on this point, you don't know what it is. Animal. Human. Someone on a dirt bike. Big. Small. Two legged. Four footed. You don't know any of those things. You'd need other evidence. So, you may draw reasonable inferences, but you cannot guess and you cannot speculate.

Now, with those general matters spelled out for you, let's get to this case. And I'll have the clerk pass out to you the -- here they are -- the jury verdict.

We'll give each one of you a verdict slip, but I only need one back and that's the one signed by the foreman.

(Whereupon copies of the verdict slip were passed to the jurors.)

**THE COURT:** Now, while we're passing those verdict slips out, let me tell you a few things -- and I should say this -- a few things that are not evidence in the case.

I want to say this to the attorneys, and I don't say this in every case. You have proved yourself both able advocates for your clients who are here in the courtroom and you have also proved yourself outstanding officers of the Court. It's been a pleasure to preside over this case and you've done a good job.

Now, having said that disregard it. You see, because it has -- they've done their job to lay the evidence before you. That's what we expect of them. As a judge, I can assure you it's been well done. They haven't wasted your time. But it doesn't count. If they've made things clearer for you in any respect, if they have taught you, of course, that's what lawyers are supposed to do. But to the extent you like their presentation, to the extent you just liked them as people, don't let that cloud your judgment in any way. They weren't there. They don't know what went on.

But equally, suppose a lawyer has grated on you and it just has gotten to you the way he's asked questions. Equally, equally, that doesn't count. I'm telling you these lawyers are doing their jobs and they're doing their jobs well. The case isn't done -- the case isn't determined on the performance of the lawyers, it's determined on the

credible evidence.

Now, that applies to me, too. If any of you think anything about this case in the manner in which I have presided over it, I most earnestly instruct you to disregard it. And I tell you as honestly as I know my own heart, I have no view about how this case will come out. None. I do not talk about it with Ms. Gaudet or Mr. Womack or any of the Court's staff. We may talk law, but I don't have reactions to these witnesses. I mean, you've watched me. I have plenty to do. The fact finding is for you.

Now, in this way, I will state a bias to you, flat out. I am biased in favor of the American jury system. I believe in it passionately. I believe you eleven men and women will do justice in this case and fairly and impartially find the facts. My job is to teach you the law. I do it the best I know how. I have nothing to say about the facts.

Now, let's get to it because I have to -- we've both been here, we've all been here, while the case is tried, so let's now talk about precisely what it is that Mr. Jones has to prove.

He has brought this case as he is entitled to do on behalf of the United States government. The government. And in his capacity, acting on behalf of the government, he brings it under the False Claims Act, that provides for him

to do what's done here, and he makes a couple, he makes two really related but somewhat different claims. He's trying to prove that the two hospitals and the two people he sued knowingly presented or caused to be presented a false or fraudulent claim to the United States government. He's also claiming that the people who he's sued, the two hospitals and the two people, knowingly made or used or caused to be made or used a false record or statement in order to get the government to pay or approve a false or fraudulent claim.

Now, the two hospitals and the two people sued, they deny that. That's been the dispute over the last eleven days. So, let's talk first about what a claim is.

This is, after all, a False Claims Act case. Now, there's not much dispute that there's a claim here. And the claim is the grant application, and the request that it be paid, various progress reports and the like, they're claims. And certifications are made with those claims, and people act knowing that this is going to be government money that's funding this research.

Let's also talk about the relationships of the people whom Mr. Jones has sued.

There is no doubt here, no real dispute, and I haven't separated anything out in the questions we ask you, no real dispute that Mr. Killiany and Ms. Albert, they were employed by Mass. General and Brigham & Women's which are

themselves, there's some evidence they are related in this Partners. And the law is that when an employee, which includes people like the two people sued here, when they are acting, whether right or wrong, then their actions are taken on behalf of the employer, here on behalf of the hospital, the hospital, both hospitals, are equally liable. So if the people did something wrong here, Ms. Albert and Mr. Killiany, the hospitals are liable. No dispute about that.

Likewise, there's little dispute, because of the way I've defined claim is that here this is a human situation that involved claims within this act. I mean, it was a grant application, it was approved, moneys were paid, we know how much moneys were paid and the like. So there's a claim. So that much is not disputed. And the fact, with one difference, the two people are working for the hospitals and so they're all together. No real dispute about that. The rest of it is very much disputed, because this is the False Claims Act under which Mr. Jones sues.

So, let me speak generally first and then I'm going to speak about these particular, these particular questions.

In order for a false claim, in order for a claim to be false, let me say it like this, in order for a claim to be false the person or entity making the claim, or both of them together, must make a knowing misstatement of a

material fact in connection with that claim. A knowing misstatement of a material fact. All of those things are disputed. So, let me define them. And since this is the essence of the case, let me just say a couple of things that inspire me from great judges.

One was a judge that I knew, Richard Arnold. He was a judge in the Eighth Circuit. That's in the Midwest. And he said this. He said there has to be a safe place, and we have to be it. I think that's beautiful. That's what this really is at bottom. There has to be a place, someplace in our society where when we use the words -- and what we're really doing of course is reaching out for justice -- when we use the words justice and fair and impartial, those words have the meaning that they are supposed to have. And when I define the words, and I'll do it as accurately as I can, that you give weight to the definitions that I use.

The other one is a more famous quote from the famous Justice Oliver Wendell Holmes. But it gets the idea here. It says words are the skin of a living thought. So now I have to define these words. Knowingly, a knowing misstatement of a material fact in connection with getting this federal money. And I'm going to work backwards.

Let me define fact in the circumstances of this case. You are not asked after eleven days of hearing

testimony to act as research scientists in measuring MRIs of the human brain. You're not asked yourselves to determine accuracy or to determine the borders of the entorhinal cortex. Though you will have research papers and though you will have, and some of them have MRI scans, you're not asked to look at them yourself and dope out what is the actual border. That's not what this case is about.

The case is not about whether there is a difference in scientific opinion. No, no case like this can be based upon the fact that there are differences in scientific opinions. Likewise, this case is not about negligence. Negligence can be equated with carelessness. I mean, I'm sliding over more now to the knowing misstatement, but I do want to say to you, you're not asked to judge how careful the people were. That's not what this case is about. Even if you think someone was careless, that doesn't make either of these folks or the hospitals liable. This is a False Claims Act case, and I'm talking what false means.

So here we are. For the purposes of this case a fact is the best available data, the most accurate data as the scientists involved reasonably thought they had. Notwithstanding differences in pixels or voxels or lengths and the like, they're asked to use their best judgment as to what the actual existential world is. After all, this is research. So, they've got to use the best. You may take

the best available data as fact.

Well, now let's work back. The fact here has to be material. Now, what does material mean? Material means that it's got to be a fact of sufficient consequence to make a difference to the NIH, to the grant authority. You'll have the whole grant application and the like. And I'm going to give a silly example, just to give you an example of something that I think legally couldn't be a material fact.

Suppose, because they're working at different places, there's evidence as to that, and they've got computers, and they say, well, we're going to use a Dell computer. Well, I think it highly unlikely at least that the NIH grant approvers are going to make any determinations on what brand of computer you want. Even if, again, this is just hypothetical, they really like Apples. Unless -- it has nothing to do with this case so I won't go too far because I can conceive of a program that could be run on one. Let me not go too far.

Or I was thinking about, or they were going to actually take the brain scans by a green car as opposed to a red car. All right? None of those things are material. So it's got to be something that rises to the go/no go level. Something that would factor into these scores that you've heard testimony about. Something that the NIH reviewers

would have thought made a difference. A consequential difference.

So now, that's a material fact. Now, Mr. Jones has to prove that there were facts, as I've explained, he's got to prove that they are material facts, and now we come to a knowing misstatement of a material fact. And I'll take knowing misstatement together.

There is a knowing misstatement if any one of these three things are proved. It certainly covers an intentional misstatement. The person involved here knows that the best available data is one thing but reports something else. That would be an intentional misstatement of a material fact. And knowingly certainly captures intentional misstatements. But it also can be what's called a reckless misstatement. A reckless misstatement is where the person makes a statement of material fact with really disregard whether it's true or not, just doesn't care whether it's true or not. Just isn't reflective about it, just passes on that statement of material fact recklessly.

And then, with respect to Question 2, which talks about the grant application, if a person, and in this case now we're talking about Ms. Albert, if she, if Mr. Jones proves that Ms. Albert was deliberately blind to a situation, was, you know, she just shied away, knowing that she was shying away from uncovering a situation, if she was

aware that she should have gone further, then that can be deliberate or willful blindness, and that falls within knowingly.

So, knowing misstatement of a material fact. Those are the definitions.

Now, let's see how, again with the aid of counsel here, we can ask some specific questions, questions that make sense in this case in light of those definitions.

So the first question is this. And its focus is on Dr. Killiany. Did Dr. Killiany knowingly falsify scientific data by exaggerating certain remeasurements of the entorhinal cortex to cause proof of a particular scientific hypothesis to emerge from the data.

Now, in light of the definitions I've given you, the question at least, oh, it's disputed, but the question is rather straightforward. Did he, using the definition of the term that I've given you, did he knowingly falsify the scientific data by exaggerating certain remeasurements of the entorhinal cortex to support, to cause proof of a particular scientific hypothesis. And that hypothesis as I get it from the evidence is that the size of the entorhinal cortex has some predictive value with respect to who's going to get Alzheimer's. So, did he knowingly falsify data to exaggerate the measurements to cause the proof, the support of that particular scientific hypothesis to emerge from the

143

data.

If Mr. Jones has proved that your answer should be yes. If he hasn't proved that there was a knowing, any one of these, a knowing misstatement of a material fact then your answer should be no.

Now the second. Were the statements made in the grant application about having used blinded, reliable methods to produce the measurements both material, I use the word as I've defined it, were the statements about having used blinded methods, reliable, blinded methods, that's the part of the grant application that we're talking about, were those statements, were those statements, were they material, did they make a difference to the NIH, and were those statements, or either one of them, were they knowingly false.

Now, argument has been made to you about the NIH and the Mass. General, the NIH actual regulations about how you follow up particular statements, and there's been dispute about whether those statements were made and whether they needed to be followed up. And I have nothing to say about any of that. But in one respect I do need to correct something.

Let's say you think those regulations weren't followed. I'm not suggesting they weren't. But let's say you think those regulations were not followed. That's not

an end of the case here. I allowed you to hear that evidence one way and the other, I allowed that evidence to come in, because it bears on whether there was a knowing misstatement in the grant application or the further reports that went on. That's why. But that doesn't end the case.

So, on Question 2, were the statements made in the grant application about having used blinded, reliable methods to produce the measurements, and the measurements are the measurements of the entorhinal cortex, both material, did that make a difference to the NIH, and were those statements knowingly false in the grant application submitted to the government.

If Mr. Jones has proved that by a fair preponderance of the evidence your answer should be yes. If in any respect he hasn't proved those things your answer should be no.

When you go out to deliberate, let me say just a few words about that.

Mr. Foreman, as foreman of the jury, it doesn't mean you do all the talking, nor does it mean you keep your mouth shut. You set things up so all eleven of you, and you're familiar with that room, you can sit around -- that's the only place in the courthouse we have those nice conference tables where you can all see each other. And now we do ask you to talk about this case. End of keeping your

minds suspended. Take your suspended minds and apply them, fairly and impartially, to the evidence in this case and talk about it, all eleven of you acting together.

The verdict must be unanimous. So it should be the discussions of all eleven of you together. Not eight of you talking about the case and three of you seeing if you can see any workmen in the windows in the building across the way. All act together.

It's probably not a good idea -- and we'll have lunch for you just as soon as you go in there, I think. And eat your lunch whenever you want. But it's probably not a good idea to get in there and say, well, let's take a straw vote, how many people think yes on Question 1, how many people think no. I urge you, though I can't instruct you on this, how you deliberate is up to you, but I urge you not to do that. And here's why.

If you do that you may think that because you are under oath to do justice here, you may think that having gone that way initially you're required to stick to it. Now, if you have any strong view about how either of these questions should be answered, in light of the definitions that I've given you, by all means stick to it. The verdict must be truly unanimous, not eight or nine of you thinking one thing and the other two going along so you can go home. That's not a unanimous verdict. You will have failed in

146

your oath if you do that.

At the same time, jury deliberations are just that, the deliberations of you eleven men and women. And so listen now to the views of each other. The other people are under the same oath as you. They have heard and seen the same evidence as have you and have the same obligation to do justice. So if in fact you're convinced, if the views of other people as you respectfully listen to them, if they convince you and you change your initial reaction, that's fine. But the unanimous verdict must be the actual agreement of all the jurors, not some sort of majority and other people thrown in. That's not a jury verdict. So you deliberate together.

What will happen is, we're going to send you out, then Ms. Gaudet will come back in here and she has to sit down with the lawyers and we'll go over all those exhibits. And really not every one of them has been mentioned, but they agree that they are in evidence, so you must have them all. You can start your deliberations as soon as you go out, but she'll bring in to you all the exhibits and then we'll leave you alone.

You'll have your notebooks. You'll have whatever copies they made, and I see some of you are carrying them. With respect to the copies, don't over emphasize the copies. We did that because you were interested, and that's fine.

But all the exhibits start out equal and you see what you make of them.

Your notes. Your notes are for you. Don't pass your notes around because they're not evidence of anything. But if your notes refresh your recollection and aid you in discussing the matter with the other jurors then that's fine.

I've already mentioned questions. I we'll be here as long as you are. If you have a question about anything you just write it out, we'll all gather, I'll answer your question.

When you're ready to return a verdict tell the court security officer -- he's sitting there -- that you have a verdict. Don't give it to him, just tell him you have the verdict. We'll set things up here. And you all come in. And the Court's in session. And the clerk will say: Ladies and gentlemen, have you agreed upon a unanimous verdict? And if you're back with a verdict, I imagine your answer is going to be yes. And she will say: Pass the verdict slip.

It gets passed, everyone watches, it's given to me first, and I look at it just to see that it's logical. The only business I have to look at it. And I'm going to tell you right now what's logical and I'm going to tell you what will happen.

You can answer both of these questions yes. You can answer both of the questions no. Either of those outcomes are equally logical. A third logical outcome is you can answer one of them yes and the other one no. And it makes no difference, I could have used the word no before yes there. Don't think there's any hint there. There isn't. But here's the difference.

If you answer Question 1 no, but Question 2 yes, then Mr. Killiany is not liable, but Ms. Albert and the hospitals are. If you answer Question 1 yes, but Question 2 no, Ms. Albert's not liable but Mr. Killiany and the hospitals are.

Now, if your answer to either one of the questions is yes, here's what happens. The government gets their money back and a judgment is entered against the person and hospitals or persons and hospitals that you found liable. The judgment is joint and severally. Joint and several. Which means all of them together have to satisfy the judgment. The particular amount, because the attorneys have narrowed this all down, the particular amount I must determine finally. And also they get their attorneys' fees. You understand that if that were to happen, Mr. Jones gets a piece of it because that's the way the statute is drafted. That's the idea of the statute to cause people to come forward.

If your answer is no to both of the questions the case is over, nobody is liable, and that's an end of the case.

So, I look at it just to see if it is logical. And don't check no and yes to the same question, I won't know what to do. Don't leave one of them blank, I won't know what to do. And the foreman has to sign it and date it. But so long as it's logical, I say the verdict is in order, it may be recorded.

And then Ms. Gaudet asks you all to stand up. And that's the one time in the whole proceeding where you stand and we all look at you, and she will read it out in open court your answers to these two questions. If, as you stand there, in this courtroom, you individually are satisfied with the consciousness of your duty faithfully performed, you will have done what's required of you at this time.

The word verdict comes from two Latin words. They mean to speak the truth. And that is what is asked of you with respect to this claim, to speak the truth.

Now, I may have left something out, I may have misstated something, and the lawyers get a chance to call that to my attention now.

Counsel?

SIDEBAR CONFERENCE, AS FOLLOWS:

**THE COURT:** Plaintiff?

**MR. FRIEDMAN:** Yes, on the issue of materiality, Judge. It's a natural tendency for influence not to make a difference because that's a but for causation issue.

**THE COURT:** I'll, I'll add that, yes. Natural tendency.

**MR. FRIEDMAN:** There was a thing about accuracy and I thought we were going to get a ruling that said that accuracy of the measurements was an issue because it has to do with the reliability.

**THE COURT:** No, I think, I think I accurately covered it.

**MR. FRIEDMAN:** Okay. There was no materiality requirement for Number 1, but when you went over it you said there was and I thought that --

**THE COURT:** No, I believe there must be, and I'm satisfied with that.

**MR. FRIEDMAN:** All right. And then one final thing. You said two opinion testimony, but there were three witnesses. I don't want there to be any confusion.

**THE COURT:** There's Schuff, Davila.

**MR. FRIEDMAN:** And Goldstein.

**THE COURT:** And Goldstein. Yes, I'll correct it.

**MR. FRIEDMAN:** All right, thank you.

Mr. Lipkin?

**MR. LIPKIN:** On the verdict slip, your Honor,

Question Number 1 does not incorporate the materiality element.

**THE COURT:** Well, that's his point. And so since you make it as well, I will make sure that it is applied there even though it doesn't say it.

All right, anything else?

**MR. LIPKIN:** Question Number 2 on the verdict slip does not state whose knowledge --

**THE COURT:** Does not state what?

**MR. LIPKIN:** -- it should be based on. The word knowingly is used, but there's no separation as to whether we're talking about the knowledge of Dr. Albert or Dr. Killiany.

**THE COURT:** In context, you've had that question since yesterday, and in context it's clear. I'm satisfied.

**MR. LIPKIN:** There was a statement in the Court's charge that the progress reports were included in the definition of a claim.

**THE COURT:** Yes.

**MR. LIPKIN:** And we object on the grounds that liability under the False Claims Act would not be based on the statement that was made in the annual renewal progress reports.

**THE COURT:** So, this just emphasizes that you're in for the whole 12 million if they go for --

**MR. LIPKIN:** Yes.

**THE COURT:** All right.

**MR. LIPKIN:** Yes.

**THE COURT:** Fine. I'll do it.

**MR. LIPKIN:** There was a statement in the charge that a fact is the most accurate data that the scientists involved reasonably could have had.

**THE COURT:** So you're going to go with Mr. Friedman, it should be the most reliable.

**MR. FRIEDMAN:** Yes.

**MR. LIPKIN:** Well, we're not saying it's the most reliable or most accurate, we're trying to emphasize the point that scientists must be doing their best for the most -- we're not emphasizing it has to be perfect.

**THE COURT:** No, no, no, I've done that. But I am going to go with reliable. All right.

**MR. FRIEDMAN:** Your Honor, can I --

**MR. LIPKIN:** There was also a statement that they've got to do their best, use their best judgment to use the best available data and we believe that that's a higher standard than is required.

**THE COURT:** No, that's what they have to do.

**MR. FRIEDMAN:** Your Honor, I just wanted to --

**THE COURT:** Yes. All right. Yes, Mr. Friedman.

**MR. FRIEDMAN:** I just want to preserve our

objection to the mention of attorneys' fees.

**THE COURT:** Noted. Yes. Your rights are saved.

(Whereupon the sidebar conference concluded.)

**THE COURT:** Actually there are four things and I should add them to my charge and they're just as important as the main charge, the lawyers have brought it to my attention.

I said there were two opinion witnesses. Actually there are three. But my instructions as to an opinion witness are accurate.

I talked about the most accurate data. You know, in terms of this case, the better way to say that is the most reliable data. If I, if I slide off into accuracy you may get measuring pixels and voxels. That's not what we're talking about. It's got to be the most reliable data and they have the duty to come forward with the most reliable data.

When I defined materiality, I should, I defined it accurately, I should add this phrase. A statement is material if it has a natural tendency to affect the thinking of the NIH. Keep that in mind.

Then, lastly, I said the claim here would be the grant application and the progress reports. Wrong. The claim is the grant application. What's at issue is the whole amount of the grant, not, not the progress reports.

You have the progress reports because they may be germane to you in other respects. But it's the whole thing.

Is the supplementary charge satisfactory, Mr. Friedman?

**MR. FRIEDMAN:** Yes, your Honor.

**THE COURT:** And Mr. Lipkin?

**MR. LIPKIN:** Yes, your Honor.

**THE COURT:** Saving your rights, of course, as to the other matters.

All right, the jury may retire and commence their deliberations.

**THE CLERK:** All rise for the jury.

(Whereupon the jury left the courtroom at 1:11 p.m.

**THE COURT:** Please be seated.

Let me say first that the compliment is genuine and it applies to everyone who has participated in this case. It's been a privilege to work on this case with you.

Now, just the logistics here. Ms. Gaudet will stay here with you. I want her to be sure that you're all satisfied with what's going into the jury room and all the exhibits that have numbers will go into the jury room.

You're, of course, free to go. I have telephone conferences in the afternoon, but you're welcome to stay here. No one else is going to be in the courtroom.

I need to be able to reach out to you within five

minutes of getting a question if you want to be heard on the answer to the question.

It's also my practice that at about ten minutes of 5:00, I'll bring the jury in to give them instructions should we have to separate. If we're going to separate for the weekend, I do think I'm going to give them the option of whether they want to come back Monday or Tuesday because I told them they wouldn't sit on Monday, and if they've made, or any of them, have made arrangements I'm going to honor that. So I'll take a three day hiatus for them. And you may want to be here for that.

All right. Go over the things with Ms. Gaudet, and we'll recess.

**THE CLERK:** All rise.

(Recess.)

**PROCEEDINGS 4:18 P.M.**

**THE CLERK:** All rise for the jury.

(Whereupon the jury entered the courtroom.)

**THE CLERK:** Court is in session, you may be seated.

**THE COURT:** I've received -- let the record show that the eleven deliberating jurors are present in the courtroom.

Mr. Foreman, ladies and gentlemen of the jury, I've

156

received the following questions and I'll read them.

In Question 2, we need a definition of, quote, reliable methods, close quote. Does this mean only the intra/inter-reliability studies? If no, what does it mean?

Are those the questions, Mr. Foreman?

**THE FOREMAN:** Yes.

**THE COURT:** Are those the questions, ladies and gentlemen of the jury?

**THE JURY:** Yes.

**THE COURT:** To those questions, I make these answers. That's the formal way to do it.

All right. First question. Short answer, no.

So we get to the second question: What does it mean? And in context, if you look at the question, it means the statements in the grant application about blinded, reliable methods, were those statements in the grant application about blinded, reliable methods, methods to produce the measurements, were those statements both material and knowingly false.

That's my answer to the question. You may retire and continue your deliberations.

**THE CLERK:** All rise for the jury.

(Whereupon the jury left the courtroom at 4:20 p.m.)

(Recess.)

**THE CLERK:** All rise for the jury.

(Whereupon the jury entered the courtroom at 5:01 p.m.)

**THE CLERK:** Court is in session, you may be seated.

**THE COURT:** Let the record show that the eleven deliberating jurors are present in the courtroom.

All right, ladies and gentlemen, as I promised you, we're now going to suspend, and at your request, until Tuesday morning at 9:00 a.m.

Now, this frequently happens, especially in a case that's taken this time to try, so the weekend intervenes and we let the jury go. But I have some special instructions for you now.

No longer can I say keep your minds suspended, because you've been hard at work at this case since lunch time. That means that you know things about this case that the rest of us don't know. And that's fully appropriate. However, more than ever you must guard against saying anything about the substance of this case to anyone or letting anyone say anything about the substance of the case to you.

So important is that that when you come in on Tuesday morning, and you'll come in as your schedules permit, but I really trust you will all be here by nine o'clock, so at nine o'clock I will bring you back in here

and I will ask you whether you've obeyed my instruction. That's how important it is. Because the whole effort can go by the boards if anything other than the evidence, other than the presentation that's been made to you, influences you about your verdict in this case.

So the best thing to do now is, I won't say keep your minds suspended, but have a good weekend, put this out of your mind. You'll find that Tuesday morning it will all be fresh. You can get back into your discussion wherever that discussion was. Monday you have to yourself since that's what we promised you, and Tuesday morning 9:00 a.m. you may resume once I've had you in here and checked that you've obeyed my instructions.

Now, no one can go in there except for you folks. There's cleaning people who will get the food items out of there, but they'll be under the supervision of Ms. Gaudet. Once the food's out of there that will be locked, and it will stay locked until you go back in there Tuesday morning.

So with those instructions don't talk to anyone, don't permit anyone to talk to you, don't communicate in any way about the case. We will see you promptly 9:00 a.m. on Tuesday morning, the 9th of April.

We'll stand in recess until that time.

**THE CLERK:** All rise for the jury.

(Whereupon the jury left the courtroom at 5:04 p.m.

(Adjournment.)

**C E R T I F I C A T E**

I, Donald E. Womack, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ DONALD E. WOMACK 4-6-2013
____________________________

DONALD E. WOMACK
Official Court Reporter
P.O. Box 51062
Boston, Massachusetts 02205-1062
womack@megatran.com