UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
In Open Court
USDC, Mass.
Date 4/5/13
By J. baudet
Deputy Clerk

UNITED STATES OF AMERICA, *ex rel.* )
KENNETH JAMES JONES, Ed.D., )
)
Plaintiff, )
)
v. ) Civil No. 1:07-CV-11481-WGY
)
BRIGHAM AND WOMEN'S HOSPITAL, *et al.*, )
)
Defendants. )

### DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Under Fed. R. Civ. P. 50(a), the defendants move for judgment as a matter of law because Dr. Jones has presented insufficient evidence that: (1) Dr. Killiany falsified scientific data by intentionally exaggerating his re-measurements to cause proof of a particular scientific hypothesis to emerge from the data; or (2) the grant application made false statements about having used blinded, reliable methods. Dr. Jones' evidence is also insufficient on the elements of materiality and knowledge.

### BACKGROUND

In the light most favorable to Dr. Jones, the record contains the following evidence. See Guilloty Perez v. Pierluisi, 339 F.3d 43, 50 (1st Cir. 2003) (citing Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996)) (stating that on motion for judgment as a matter of law, court must construe evidence in light most favorable to non-moving party).

This case involves a grant application which the defendants submitted to the National Institutes of Health on October 1, 2001. (See Ex. 171.) Their study compared healthy controls to people with mild cognitive impairment. (Trial Tr. vol. 3, 50:15-51:1.) One of its goals was to

learn whether, by measuring brain regions on MRI scans, scientists could determine who would get Alzheimer's disease. (See Ex. 4.) Marilyn Albert was the principal investigator of the study. (Trial Tr. vol. 1, 57:7-10, Mar. 18, 2013.) Ron Killiany worked with the MRI scans. (Trial Tr. vol. 9, 41:16-23, Apr. 2, 2013.)

Because Dr. Jones was the chief statistician, the inter-rater reliability study was his job. (Trial Tr. vol. 3, 67:16-20, Mar. 21, 2013; Trial Tr. vol. 6, 49:18-22, Mar. 28, 2013.) In calculating reliability, Dr. Jones compared the measurements of two raters: Dr. Killiany and Teresa Gomez-Isla. (Trial Tr. vol. 2, 18:14-19; 38:5-10, Mar. 20, 2013.) In January 2000, Dr. Jones calculated that the correlation between their entorhinal cortex measurements was 0.96. (Trial Tr. vol. 5, 105:2-6; 105:20-21, Mar. 27, 2013.) Dr. Albert and Dr. Killiany testified—without contradiction—that Dr. Jones never suggested a second reliability study. (Trial Tr. vol. 2, 121:3-5, Mar. 20, 2013; Trial Tr. vol. 9, 108:19-23, Apr. 2, 2013.)

The defendants submitted the grant application on October 1, 2001. (See Ex. 171.) The application identified Dr. Jones as the leader of the study's statistical core. Id. at 144. He participated in drafting and reviewing the application. (Trial Tr. vol. 6, 50:16-19, Mar. 28, 2013.) Dr. Jones had a chance to say whatever he wanted to Dr. Albert about the statistical portion of the application. Id. at 58:3-7. Because he said nothing, the application reported that for various brain regions (including the entorhinal cortex), the reliability correlations ranged from 0.92 to 0.99. (See Ex. 171 at 339.)

The next month, in November 2001, Dr. Jones decided the reliability correlation for the entorhinal cortex should be recalculated. (Trial Tr. vol. 5, 105:23-106:15, Mar. 27, 2013.) When he compared Dr. Killiany's re-measurements with Dr. Gomez-Isla's measurements, he calculated a correlation of 0.54. Id. at 106:24-107:4. There is no evidence he gave that number

to anyone. There is also no evidence that Dr. Jones expressed concern about the reliability study to anyone. When he met with the grant reviewers in March 2002, he did not raise the issue of Dr. Killiany's re-measurements. (Trial Tr. vol. 7, 17:7-19, Mar. 29, 2013.)

## ARGUMENT

"Judgment as a matter of law under Rule 50(a) is appropriate 'if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party.'" Guilloty Perez, 339 F.3d at 50 (quoting Fed. R. Civ. P. 50(a)(1)) (alteration in original). Because Dr. Jones has the burden of proof in this case, he "must have presented 'more than a mere scintilla of evidence in [his] favor' to withstand judgment as a matter of law." Id. (quoting Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001)).

Dr. Jones has advanced two theories of liability. First, he contends that Dr. Killiany "falsified scientific data by intentionally exaggerating the re-measurements of the EC to cause proof of a particular scientific hypothesis to emerge from the data . . . ." United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 96 (1st Cir. 2012). Second, he asserts that there were false "statements made in the Application about having used blinded, reliable methods to produce those results . . . ." Id. To reach the jury, then, Dr. Jones must have presented sufficient evidence that: (1) the defendants made false statements in the grant application; (2) those statements were material; and (3) the defendants acted knowingly in violating the False Claims Act. Id.

**I.    Under the first theory (falsification of data), the defendants are entitled to judgment as a matter of law.**

To prevail under his first theory, Dr. Jones would need to show that: Dr. Killiany falsified scientific data; he did so by intentionally exaggerating the re-measurements of the entorhinal

cortex; and he was motivated to so because he wanted to prove a particular scientific hypothesis. Dr. Jones has failed to present sufficient evidence on any of these elements.

First, there is no evidence that Dr. Killiany falsified scientific data. Dr. Killiany's data, as shown on the Relator's Table, indicated that normal participants had larger entorhinal cortices than participants in the converter and questionable groups. Dr. Jones has not proved that this conclusion was false. His own expert, Norbert Schuff, wrote two articles replicating this conclusion, and testified that other scientists have made the same finding. Dr. Jones is unable to show there was anything false about the results of this study, because the results are consistent with what happens in the brain as Alzheimer's disease progresses.

Second, there is no evidence that Dr. Killiany intentionally exaggerated his re-measurements. Dr. Killiany testified that he re-measured in an effort to be more accurate. There is no evidence to the contrary. There is also no evidence that Dr. Killiany became unblinded during the study. On the issue of exaggeration, the only evidence in the record—based on the testimony of Dr. Killiany and Dr. Moss—is that the re-measurements followed the operational definition on which Dr. Killiany and Dr. Gomez-Isla had agreed. Dr. Schuff did not review any of Dr. Killiany's measurements with the jury. There would be no evidentiary basis for a finding that Dr. Killiany made intentional exaggerations.

Third and finally, it would be speculative for the jury to assume that Dr. Killiany was motivated to prove a particular scientific hypothesis. The First Circuit suggested that using statistical evidence, the jury might be able to draw an inference on this point. See id. at 84. At trial, however, Dr. Jones failed to present evidence about Dr. Killiany's motivation. His statistical expert, Richard Goldstein, conceded that he did not know what hypothesis Dr. Killiany was trying to prove. Although Dr. Jones' opening statement asserted that Dr. Killiany was trying

to save his job at Boston University, Dr. Jones adduced no evidence to that effect. Because Dr. Jones presented no evidence about Dr. Killiany's motivation, the jury would be left to speculate.

Dr. Jones has not met his burden to show that Dr. Killiany falsified scientific data, that he intentionally exaggerated his re-measurements, and that he intended to prove a particular scientific hypothesis. The defendants move for judgment as a matter of law as to Dr. Jones' first theory.

## II. Under the second theory (statements about blinded, reliable methods), the defendants are also entitled to judgment as a matter of law.

### A. This Court lacks subject matter jurisdiction over Dr. Jones' claim that the defendants made a false statement by reporting a reliability correlation of 0.96 rather than 0.54.

The False Claims Act requires relators to follow certain procedural requirements:

> including that the complaint be filed under seal, that the relator serve a copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses on the government, and that the government have an opportunity to decline or intervene after investigating relator's accusations.

United States ex rel. Wilson v. Bristol Myers Squibb, Inc., No. 06-12195 (D. Mass. June 16, 2011) (order on motion to amend) (citations omitted). By failing to meet these requirements, a relator deprives the court of subject matter jurisdiction. See id.; see also See Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003) ("[P]arties cannot confer subject matter jurisdiction on a federal court by waiver or consent.").

In this case, Dr. Jones asserted at trial that the defendants falsely stated the reliability correlation was 0.96, when the actual number should have been 0.54. Although Dr. Jones filed three complaints, none of them made this allegation. His Original Complaint, filed in 2006, did

5

not allege that the defendants should have reported a reliability correlation of 0.54. (See Docket No. 8-2.) He also did not raise this allegation in his First Amended Complaint. (See Docket No. 41.) These omissions are curious, since Dr. Jones testified at trial that he had calculated that number in November 2001. In any event, the Court lacks subject matter jurisdiction over Dr. Jones' claim that the defendants made a false statement by reporting a reliability correlation of 0.96 instead of 0.54.

Dr. Jones' Second Amended Complaint does refer to reliability. For example, he alleged it was false for the defendants to state that the reliability correlations ranged from 0.94 to 0.99. (See Docket No. 54 at 9-10.) Dr. Jones still did not contend, however, that the defendants should have reported a correlation of 0.54. See generally id. Even if his Second Amended Complaint could be interpreted to plead this theory, it would be barred by Dr. Jones' failure to disclose it to the government in the initial, sealed Complaint. See United States ex rel. Wilson, No. 06-12195 (precluding relator from pursuing theory which was not substantially similar to what he had presented for government's consideration in initial, sealed complaint).

**B.     Even if the Court were to have subject matter jurisdiction over Dr. Jones' reliability claim, he could not reach the jury on the issue of falsity because the defendants stated an opinion rather than a fact.**

Alternatively, as the Court explained to the jury, Dr. Jones needs to prove that the defendants made false statements of fact (not opinion):

> Fraud is saying something, either in writing or orally, that's not true and that the speaker knows is not true. It's a misrepresentation of actual fact, not an opinion, a misrepresentation of actual fact . . . .

(Trial Tr. vol. 1, 26:5-8, Mar. 18, 2013.) Dr. Jones argues the defendants falsely told the National Institutes of Health that they had used a reliable method. He points to this statement in the grant application:

> We acknowledge the difficulty pointed out by Xu et al., (2000) in measuring the entire entorhinal cortex and, instead, opted to focus on one segment of the entorhinal cortex, that could be measured in three slices, centered on the mammillary bodies. <u>We believe that this measure is reliable</u>, and that it captures the pathology in this area during prodromal AD; neuropathological studies have shown that neuronal counts throughout the entire volume are highly correlated with neuronal counts within a smaller segment (Gomez-Isla et al., 1996).

(Ex. 171 at 349 (emphasis added)). This statement—which began with "we believe"—was a statement of opinion rather than one of fact. As a matter of law, there is insufficient evidence for Dr. Jones to reach the jury on his argument that the defendants made false statements about using reliable methods.

### C. Dr. Jones also presented insufficient evidence that the defendants acted knowingly.

Under the False Claims Act, "[a] person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'" <u>United States ex rel. Jones</u>, 678 F.3d at 82 (quoting 31 U.S.C. § 3729(b)).

In this case, Dr. Jones' claim also fails as a matter of law on the knowledge element. There is no evidence from which the jury could find that the defendants acted knowingly, because Dr. Jones did not tell anyone: about his concerns regarding inter-rater reliability; that he had made a second reliability calculation; or that the second calculation resulted in a correlation of 0.54.

If we consider the evidence in the light most favorable to Dr. Jones, he was the leader of the statistical core, who was responsible for calculating reliability. He did so. He told the defendants that his calculation resulted in a correlation of 0.96. The defendants, relying on Dr. Jones as the study's chief statistician, reported that number to the National Institutes of

7

Health.  Dr. Jones has presented no evidence that the defendants knew—or recklessly disregarded—that the correlation of 0.96 was false.  Indeed, he joined the defendants in reporting that number, and did not calculate any other number until one month <u>after</u> the defendants had submitted the grant application.

If the jury credits Dr. Jones' testimony, then there would be evidence that he calculated a reliability correlation of 0.54 by comparing Dr. Killiany's re-measurements with Dr. Gomez-Isla's measurements.  However, Dr. Jones did not make this calculation—or tell anyone that he was doing a second calculation—at any relevant time.  In the light most favorable to Dr. Jones, in November 2001, he discovered that the reliability correlation should have been 0.54.  There is no evidence that he reported this number to Dr. Albert or Dr. Killiany.  He concedes that he also did not report it to the National Institutes of Health when he had a chance to do so in March 2002.

Even if we assume the reliability correlation of 0.96 was false, the only person who knew that information was Dr. Jones.  The evidence is undisputed that until this litigation, he had not told anyone that he made this calculation.  Because Dr. Jones has failed to present sufficient evidence as to the knowledge element, Rule 50(a) precludes him from reaching the jury under his second theory.

## CONCLUSION

The defendants respectfully request the Court to allow their motion for judgment as a matter of law.

        Brigham and Women's Hospital,
Massachusetts General Hospital,
Marilyn S. Albert, and
Ronald J. Killiany,

By their attorneys,

/s/ Alan D. Rose
Alan D. Rose (BBO #427280)
Brian D. Lipkin (BBO #673850)
Rose, Chinitz & Rose
One Beacon Street
Boston, MA  02108
(617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
bdl@rose-law.net

Date: April 5, 2013

## CERTIFICATE OF SERVICE

On April 5, 2013, I certify that I served this document by filing it through the ECF system and e-mailing it to:

Tracy L. Hilmer
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 261
Washington, DC  20044
tracy.hilmer@usdoj.gov

/s/ Brian D. Lipkin